```
                    UNITED STATES DISTRICT COURT

                    SOUTHERN DISTRICT OF FLORIDA

                     FORT LAUDERDALE DIVISION

                    CASE NO. 19-80030-CR-WPD




UNITED STATES OF AMERICA,          .
                                   .
               Plaintiff,          . Fort Lauderdale, Florida
                                   . May 3, 2019
               v.                  . 9:01 a.m.
                                   .
PHILLIP BRAUN, a/k/a "PJ,"         .
ET AL.,                            .
                                   .
               Defendant.          .
. . . . . . . . . . . . . . . . .  .



                         -   -   -   -

               Transcript of Calendar Call had before

               the Honorable William P. Dimitrouleas,

                   United States District Judge.

                         -   -   -   -
```

Proceedings recorded by mechanical stenography, transcript
produced by computer.

```
APPEARANCES:

For the Government:   David A. Frank
                      Trial Attorney
                      U.S. Department of Justice
                      Consumer Protection Branch
                      P.O. Box 386
                      Washington, DC  20044-0386
                             and
                      Alistair Reader
                      Trial Attorney
                      U.S. Department of Justice
                      450 Fifth Street, NW
                      Washington, DC  20530

For the Defendant     Benedict P. Kuehne, Esq.
Braun:                Kuehne Davis Law, P.A.
                      Miami Tower, Suite 3550
                      100 SE 2nd Street
                      Miami, FL  33132

For the Defendant     Susan Dmitrovsky, Esq.
Blackstone:           Zachary L. Catanzaro, Esq.
                      Kuehne Davis Law, P.A.
                      Miami Tower, Suite 3550
                      100 SE 2nd Street
                      Miami, FL  33132

For the Defendant     Richard G. Lubin, Esq.
Singerman:            Richard G. Lubin, P.A.
                      1217 S. Flagler Drive
                      2nd Floor
                      West Palm Beach, FL  33401-6706
                             and
                      Amy M. Morse, Esq.
                      Morse & Morse
                      707 North Flagler Drive
                      West Palm Beach, FL  33401

For the Defendant     Nancy V. Quinlan, Esq.
Ventrella:            Nancy V. Quinlan, P.A.
                      Perlet & Shiner, P.A.
                      515 N. Flagler Drive, Suite 701
                      West Palm Beach, FL  33401

For the Defendant     Robert J. Buonauro, Esq.
Winsauer:             Law Offices of Robert J. Buonauro
                      722 Vassar Street
                      Orlando, FL 32804
```

```
APPEARANCES (Continued):

For the Defendant       J. Stephen Salter, Esq.
Boccuzzi:               Law Offices of J. Stephen Salter
                        8975 Pompano Way
                        Gulf Shores, AL  36542-8123


For the Defendant       Robert L. Shearin, Esq.
Ventach Labs, LLC:      Law Offices of Robert L. Shearin, Esq.
                        1499 W. Palmetto Park Road
                        Suite 212
                        Boca Raton, FL  33486


Court Reporter:         Francine C. Salopek, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        299 E. Broward Blvd., Room 205F
                        Fort Lauderdale, Florida 33301
                        (954)769-5657

                           -   -   -   -   -
```

```
1              FRIDAY, MAY 3, 2019, 9:01 A.M.

2              (The Judge entered the courtroom)

3              THE COURT:  Please be seated.

4         Does anybody have a phone number for the prosecutor?

5              MR. KUEHNE:  The agent went out to check with them.

6              THE COURT:  Oh, okay.

7              (Discussion had off the record between counsel)

8              THE AGENT:  Apparently their flight got cancelled, and

9    they got a later flight.  They're on their way from the

10   airport.

11             THE COURT:  We'll be in recess until they get here.

12             COURTROOM SECURITY OFFICER:  All rise.

13             (The Judge exited the courtroom)

14             ROOM CLERK:  All rise.

15             (The Judge entered the courtroom)

16             THE COURT:  Please be seated.

17             (Discussion had off the record between the court

18   reporter, counsel, and Court about the sound system)

19             (Mr. Frank entered the courtroom at 9:17 a.m.)

20             THE COURT:  United States vs. Phillip Braun.

21        If counsel would announce their appearances for the

22   record.

23             MR. FRANK:  Good morning, your Honor.  David Frank on

24   behalf of the United States.

25             MR. KUEHNE:  Kuehne on behalf of Phillip Braun.
```

1  Mr. Braun is in attendance.

2          THE COURT:  And what's the status of Mr. Braun's case?

3          MR. KUEHNE:  Your Honor, we were arraigned on April 22

4  immediately following the magistrate judge's denial of the

5  government motion to disqualify.  Mr. Braun entered a not

6  guilty plea, and we are currently on the trial calendar --

7  initial trial calendar of May 28.  But we are here for this

8  status conference since the Court did set it and requested that

9  all defendants be in attendance.

10          THE COURT:  And what's your position on a May 28th

11  trial?

12          MR. KUEHNE:  I have filed a motion for a continuance

13  late last night, your Honor.  And the motion sets out

14  significant reasons why we believe a May 28 date is just not

15  possible, and --

16          THE COURT:  I mean I read your motion.  You're asking

17  for a February of next year trial date?

18          MR. KUEHNE:  At the earliest, your Honor.  We think a

19  little bit later would be better for a joint trial with all

20  defendants.  But we believe that the earliest practicable date,

21  for all the reasons set out in the motion for a continuance,

22  would be a February 2020 date.

23          THE COURT:  And how much time do you need to file

24  defensive motions?

25          MR. KUEHNE:  Your Honor, we think that defensive

```
1   motions could be filed within 45 to 60 days after receipt of
2   the discovery.  We do understand from the government that we
3   should -- Mr. Braun should be getting our discovery electronic
4   today.  I think the government may be bringing the hard drives
5   today.  We have not received discovery yet, but it's still
6   early in our particular case, your Honor.
7           THE COURT:  Well, let me ask Mr. Frank.  When will all
8   the defendants have all the discovery?
9           MR. FRANK:  Your Honor, my belief is that Mr. Reader,
10  who was delayed this morning in transit from Washington, D.C.,
11  is carrying a number of hard drives, including, I believe, all
12  of the discovery for Mr. Kuehne and his client, and Blackstone.
13          THE COURT:  How about the rest of the defendants?
14          MR. FRANK:  As well as hard drives that would
15  complete, I believe, the balance of the discovery for the
16  remaining defendants.
17          THE COURT:  So, by today, all the defendants will have
18  all the discovery.
19          MR. FRANK:  That's my understanding.  I mean literally
20  Mr. Reader was bringing stuff, and I believe our case agent may
21  have other discovery with him in the courtroom.  And I'd like
22  Mr. Reader just to confer with the case agent or the co-case
23  agent to make sure that happens.  But my belief is, as of
24  today -- and, again, this is my best belief -- they will have
25  nearly all the discovery.  There may be some outstanding
```

```
 1   matters that I'm unaware of.  Mr. Reader has been the one that
 2   principally has been handling the discovery since the
 3   indictment.  But I do know that -- that's my best belief,
 4   Judge.
 5            THE COURT:  So, if I could have Mr. Braun approach the
 6   podium.
 7            Mr. Braun, your lawyer's asking me to postpone your
 8   trial, which would toll your right to speedy trial.  Is that
 9   okay with you?
10            DEFENDANT BRAUN:  Yes, your Honor.
11            THE COURT:  All right.  We'll keep the case on recall.
12            Let me call United States vs. Blackstone Labs.
13            If counsel would announce their appearances for the
14   record.
15            MS. DMITROVSKY:  Good morning, your Honor.  Susan
16   Dmitrovsky -- oh, I think this is the only one working -- Susan
17   Dmitrovsky from Kuehne Davis Law on behalf of Blackstone Labs.
18            THE COURT:  And who's the corporate representative for
19   Blackstone Labs?
20            MS. DMITROVSKY:  Mr. Braun, your Honor.
21            THE COURT:  Mr. Braun, do you have authorization from
22   the corporate board to represent the company here today?
23            DEFENDANT BRAUN:  I do, your Honor.
24            THE COURT:  And what's the status on Blackstone Labs'
25   case?
```

```
 1          MS. DMITROVSKY:  I'm sorry, your Honor?

 2          THE COURT:  What's the status on Blackstone Labs' case

 3   for trial?

 4          MS. DMITROVSKY:  Your Honor, I would defer to

 5   Mr. Kuehne on that argument.

 6          THE COURT:  All right.  So, you're asking for a

 7   postponement, is that correct?

 8          MS. DMITROVSKY:  Yes.

 9          THE COURT:  And, again, Mr. Braun, your lawyer's

10   asking me to postpone the trial for the corporation, which --

11   if the corporation has a right to speedy trial, which would

12   toll that right to speedy trial.  Is that okay with the

13   corporation?

14          DEFENDANT BRAUN:  Yes, your Honor.

15          THE COURT:  All right.  We'll keep the case on recall.

16          DEFENDANT BRAUN:  Thank you.

17          MS. DMITROVSKY:  Thank you, Judge.

18          THE COURT:  United States vs. Aaron Singerman.

19          MR. KUEHNE:  Your Honor, could I just mention that

20   Mr. Braun and the corporation did file in the court record a

21   corporate resolution that was accepted by Magistrate

22   Judge Matthewman, authorizing Mr. Braun to be the corporate

23   representative.  I don't remember the docket entry number, but

24   it is on file.

25          THE COURT:  Thank you.
```

```
1           United States vs. Aaron Singerman.

2           MR. LUBIN:  Good morning, your Honor.  Richard Lubin

3  and Amy Morse on behalf of Aaron Singerman, who is present in

4  the courtroom.

5           Could you stand, please?

6           I filed, I think, two motions for continuance, and

7  yesterday I filed a status report and renewed motion for

8  continuance.

9           THE COURT:  You're asking for a June 2020 trial date?

10          MR. LUBIN:  Yes, and let me just explain, if I could

11 highlight it.  I have a capital murder case set and --

12 specially set for trial in front of Judge Marks in West Palm

13 Beach.  It is a legitimate death case.  They're asking for the

14 death penalty if a conviction occurs in February.

15          And I have a specially set healthcare fraud case with

16 Judge Rosenberg in federal district court in October.  Three

17 weeks is reserved.  I think that's conservative for that trial.

18          The other ones are all just scattered.  But those are

19 the two specially set ones.  And I can just highlight what

20 everyone has said in terms of the discovery.

21          We have protective order in place.  We have -- to

22 date, we've received 1.8 million documents in discovery.  And

23 we're not done getting it.  I think we're gonna get a

24 six-terabyte hard drive this morning, at least according to

25 Mr. Frank.
```

1            So, it's not just a defense lawyer, you know, looking

2    to put it off.  I think we all legitimately need this time to

3    get ready for it.

4            THE COURT:  And how much time do you need to file

5    defensive motions?

6            MR. LUBIN:  I knew you were gonna ask that, because

7    you asked Mr. Kuehne.  I think 90 days is reasonable.  I don't

8    see how we could get it done in less than 90 days, because

9    we've got to get through that discovery at least one time

10   through.  And there are some other issues that you're not

11   asking about now, but which may be the subject of motions in

12   terms of the discovery and the protective order.

13           THE COURT:  But 90 days is going to be enough for you

14   to file all your defensive motions?

15           MR. LUBIN:  Well, you know, it's a guess, because I

16   haven't really seen most of the discovery.  But I would say

17   90 days is probably a reasonable time to file those motions.

18   If we come across something, I'd have no choice but to file a

19   motion to extend the time.  But if the Court would give me 120,

20   I'd rather have it, but I don't want to push my luck either,

21   so....

22           *(Mr. Reader entered the courtroom at 9:25 a.m.)*

23           THE COURT:  Well, let me ask, again, the government.

24   If you know, when will all the discovery be given to all the

25   defendants?

1          MR. READER:  Good morning, your Honor.

2          Trial attorney Alistair Reader for the United States.

3    And my apologies, your Honor, that I was late this morning.

4          Your Honor, the vast majority of discovery has already

5    been produced.  There is a particular issue involving copies of

6    seized forensic images that we'd like to produce.  Those are

7    ready to be produced, and we have not turned them over because

8    of some dispute about privilege that was expressed by several

9    defendants.  But we actually have those with us here today, if

10   we can resolve that issue.  And beyond that, your Honor,

11   there's, I think, relatively little discovery to continue to

12   produce, some records from the FDA, a few expert disclosures,

13   and I believe that's essentially it, your Honor.

14         THE COURT:  So, when are the defendants gonna have all

15   the discovery?

16         MR. READER:  I think, your Honor, we could certainly

17   do that by the end of the month and hopefully sooner.

18         THE COURT:  I mean this indictment was March the 8th?

19         MR. READER:  Yes, your Honor.

20         THE COURT:  And this isn't a responsive indictment;

21   this is an historical indictment?

22         MR. READER:  That's correct, your Honor.

23         THE COURT:  So, why wasn't the discovery available

24   March the 8th?

25         MR. READER:  Well, your Honor, most of the discovery

1   for the arraigned defendants was produced weeks and weeks and

2   weeks ago.  Again, as I said, the forensic drives, we have made

3   the defendants' own devices already available to them for

4   inspection.  We were trying to go beyond that, your Honor, to

5   avoid issues about *Brady* and make sure that they had access to

6   review the drives for all of their codefendants, which they

7   said would violate privilege, and we felt that was an issue

8   needing to be sorted out at court.  But that's not -- the

9   documents in those images have actually already been turned

10   over.

11          So, really, the only documents I think that are

12   arguably discoverable that have not been turned over yet are

13   FDA documents, and those are under privilege review.  And we're

14   seeking an order that was filed last night, your Honor, that

15   there be no waiver of privilege in those documents.  And if

16   that order is granted, they will be produced forthwith.

17          THE COURT:  Run that by me one more time.  If what

18   order is granted?

19          MR. READER:  Very late last night, your Honor -- and I

20   apologize, I spent most of yesterday in an airport -- there was

21   an amended protective order filed by the government.

22          THE COURT:  I've got that here, the first revised

23   protective order.

24          MR. READER:  Yes.

25          THE COURT:  So, you're saying if I grant that, then

1    all the discovery will be given to everybody by when?

2            MR. READER:  I think within two weeks would be no

3    problem.

4            MR. LUBIN:  I'd like to say, we haven't -- I haven't

5    even seen this requested protective order.  I know it came last

6    night, but I haven't gotten to see it yet.

7            THE COURT:  All right.  So --

8            MR. READER:  If I might.

9            THE COURT:  -- is Mr. Singerman here?

10           MR. LUBIN:  Yes.

11           THE COURT:  Come on up, Mr. Singerman.

12           MR. READER:  If I might, your Honor.  A draft of that

13   order was shared earlier this week.  I've had numerous

14   conversations with Mr. Lubin about it.  We weren't able to

15   agree about an issue of redactions, but the order that came

16   out, which is about 502(d), the language -- or essentially

17   identical language was provided to all the defense attorneys

18   here I believe on April 30th.  So, they haven't seen the order

19   maybe that came in last night, but certainly they've had an

20   opportunity to discuss substantively the issues.

21           THE COURT:  Mr. Singerman, your lawyer's asking me to

22   postpone your trial, which would toll your right to speedy

23   trial.  Is that okay with you?

24           DEFENDANT SINGERMAN:  Yes, your Honor.

25           THE COURT:  All right.  We'll keep the case on recall,

1  and maybe while it's on recall, Mr. Lubin can look at the

2  proposed first revised protective order.

3         MR. LUBIN:  And if I could, maybe towards the end of

4  the hearing, I would like to address some issues relating to

5  whichever protective order is in place, because I think it's

6  going to preclude the defense from having -- from quickly

7  getting through all of the documents with the client.  It

8  places some real severe restrictions on where and when and how

9  the clients can see the discovery.  And, of course, they're the

10 ones that know the most about this case.

11        THE COURT:  So, look over the first revised protective

12 order and see if you agree to it, and if not, what your

13 objections are, and we'll see if we can deal with them this

14 morning.

15        MR. LUBIN:  Thank you, Judge.

16        THE COURT:  United States vs. Robert Dimaggio.

17        If counsel would announce their appearances for the

18 record.

19        MR. WILLIAMS:  Good morning, Judge.  Russell Williams

20 on behalf of Robert Dimaggio.

21        THE COURT:  And is Mr. Dimaggio present?

22        MR. WILLIAMS:  He is present.

23        THE COURT:  And what's the status of Mr. Dimaggio's

24 case?

25        MR. WILLIAMS:  Judge, I had filed a motion to

1  continue, joining in with everybody else's in the case.  There

2  is a voluminous amount of discovery.

3          THE COURT:  And how much time do you need to be ready

4  on Mr. Dimaggio's case?

5          MR. WILLIAMS:  February, March, April, May, I mean of

6  next year, that's fine.

7          THE COURT:  And how much time do you need for

8  defensive motions?

9          MR. WILLIAMS:  I think Mr. Lubin said 90 days.  I

10  think that would be okay as well.

11          THE COURT:  Mr. Dimaggio, your lawyer's asking me to

12  postpone your trial, which would toll your right to speedy

13  trial.  Is that okay with you?

14          DEFENDANT DIMAGGIO:  Yes, your Honor.

15          THE COURT:  All right.  We'll keep the case on recall.

16          MR. WILLIAMS:  Thank you, sir.

17          THE COURT:  United States vs. Anthony Ventrella.

18          If counsel would announce their appearances for the

19  record.

20          MS. VORPE QUINLAN:  Yes, good morning, your Honor.

21  Nancy Vorpe Quinlan on behalf of Anthony Ventrella.

22  Mr. Ventrella is present in the courtroom and is right there,

23  your Honor.

24          THE COURT:  And what's the status of Mr. Ventrella's

25  case?

1          MS. VORPE QUINLAN:  Mr. Ventrella would join in the

2    motions by other defense counsel.  And I would point out just

3    briefly, on page 10 of the indictment, they charge a white

4    collar fraud indictment that involves seven different drugs,

5    and then paragraph E says and "other products that violated the

6    Food and Drug Act."  And then, he's also charged in a drug

7    conspiracy, and that involves six different drugs that have

8    names I can't say.  So, the discovery is millions and millions

9    of documents, and since under the jointly undertaken criminal

10   activity, he would be responsible for anything reasonably

11   foreseeable.  So, there's simply no way to sever him out or to

12   go through these documents without looking at each one -- each

13   and every one of them.  So, it would take a long time.

14          THE COURT:  So, how much time do you need to be ready?

15          MS. VORPE QUINLAN:  I would agree with Mr. Lubin that

16   June is a good time for that.  I would disagree with defense

17   counsel that we can be ready for motions within three months.

18   And I say that because this is the first case, according to the

19   government in their pleadings, brought under a new statute

20   passed in 2014 called DASCA.

21          And, also, they've issued press releases.  There have

22   been articles from as far away as Las Vegas.  They want to shut

23   down this industry full stop.  So, they're bringing everything

24   to bear, and there may be some motions that need to be filed

25   that are different than there would be in the ordinary case.

```
 1              THE COURT:  So, how much time do you need to file
 2   defensive motions?
 3              MS. VORPE QUINLAN:  I'd ask for six months to file
 4   motions, your Honor, and not go to trial before June.
 5              THE COURT:  Mr. Ventrella, your lawyer's asking me to
 6   postpone your trial, which would toll your right to speedy
 7   trial.  Is that okay with you?
 8              DEFENDANT VENTRELLA:  Yes, your Honor.
 9              THE COURT:  All right.  We'll keep the case on recall.
10              MS. VORPE QUINLAN:  Thank you, Judge.
11              THE COURT:  United States vs. James Boccuzzi.
12              MR. SALTER:  He's here, your Honor.
13              Stand up, Jim.
14              THE COURT:  If counsel would announce their
15   appearances for the record.
16              MR. SALTER:  Yes, your Honor.
17              Good morning, your Honor.  Steve Salter from Gulf
18   Shores, Alabama.  I represent the defendant, James Boccuzzi,
19   who's present in court.  He's standing at the moment.
20              I'd like to first thank the Court for allowing me to
21   appear pro hac vice in this matter.
22              THE COURT:  Is your local counsel Mr. Lubin?
23              MR. LUBIN:  Yes.
24              MR. SALTER:  Yes, your Honor.
25              THE COURT:  Is that a conflict with Mr. Lubin being
```

```
 1    local counsel on Mr. Boccuzzi and representing Mr. Singerman?

 2              MR. SALTER:  No, your Honor.

 3              THE COURT:  What does the government think of that?

 4              MR. READER:  Your Honor, there have been some issues

 5    already involving conflict of counsel in this case.  I will say

 6    for the record that there was a discussion of a number of

 7    different attorneys being local counsel, some of which I

 8    objected to.  And then I did say that I was okay with that when

 9    they asked about Mr. Lubin.

10              I think at the time I was thinking that it was merely

11    for the purposes of applying for pro hac vice versus serving as

12    true local counsel.  I think it depends on what the purpose of

13    Mr. Lubin's representation here is.

14              THE COURT:  Mr. Salter?

15              MR. SALTER:  May it please the Court.

16              It would simply be to file any pleadings as required

17    by the court's local rules.  In some courts that I appear,

18    local -- counsel appearing pro hac vice may file their own

19    motions.  I respect and understand this court's rule requiring

20    that it be filed by the local counsel.  I do not see a conflict

21    in these regards.

22              THE COURT:  I don't know.  Do we have a local rule

23    saying pro hac vice can't file motions, that it has to be local

24    counsel?

25              MR. LUBIN:  *(Nodding head affirmatively)*
```

1          THE COURT:  That's our rule?

2          MR. LUBIN:  May I?  Richard Lubin speaking.  Because I

3   am local counsel for him.

4          That's our reading of the rule.  We've read it.  I

5   read it again when we discussed this with government counsel.

6   They did not object, so I filed a pro hac vice motion on his

7   behalf.

8          THE COURT:  I think I got -- at least in civil cases,

9   I got pro hac vice counsel filing motions all over the place

10  from all over the country.

11         MR. LUBIN:  I do not read the local rule to permit him

12  to do that in criminal cases.

13         THE COURT:  Maybe criminal's different.  We don't get

14  too many pro hac vices in criminal cases.

15         MR. LUBIN:  Now, if the Court would waive that and let

16  him file on his own, that would be great.  I mean, but right

17  now we've been doing it for him, even to the extent of

18  joining -- adopting other people's motions for continuance.

19         THE COURT:  Well, I guess he would have to be able to

20  do things through CM/ECF --

21         MR. LUBIN:  Right.

22         THE COURT:  -- that work locally.  And I don't have

23  any problem with Mr. Salter being able to do that if you can

24  coordinate it with the clerk's office.

25         MR. SALTER:  Thank you, your Honor.  I will take that

1   up with the clerk's office at an appropriate time after this

2   hearing.

3           MR. LUBIN:  And we also will speak with the clerk's

4   office and see if we can make anything happen in that regard.

5           THE COURT:  So, how much time do you need, Mr. Salter,

6   to be ready for Mr. Boccuzzi?

7           MR. SALTER:  I would concur with the remarks and the

8   argument that Mr. Lubin and other counsel have made as regards

9   the matters of discovery being extensive and how that might

10  bear.  And to answer the Court's question more directly, I

11  would hope to be in a position to file the first motions in the

12  matter perhaps within 60 days, 90 would be better, but it's so

13  voluminous it's hard to really accurately say.  But certainly

14  that would give us an opportunity to file our first motions

15  that might be appropriate in the case.  And if additional

16  motions are desired, we would certainly take that up with the

17  Court at the appropriate time by a motion for -- to be allowed

18  to file it, in effect, then out of time.

19          THE COURT:  If you're allowed to file your own

20  motions, and Mr. Lubin doesn't have to file the motions for

21  you, what do you anticipate Mr. Lubin's involvement would be in

22  defending Mr. Boccuzzi?

23          MR. SALTER:  None, your Honor.  Except as counsel that

24  might participate ultimately in a joint defense agreement or

25  things of that nature.  But as regards the actual

1   representation of the defendant, James Boccuzzi, he would not

2   be involved in any particular.  I've been practicing --

3           THE COURT:  Well, I mean I think technically under the

4   pro hac vice rules, if you do something that I don't like, and

5   I throw you off the case, then Mr. Lubin would have to jump in

6   and take over the case.  But assuming that that's not going to

7   happen, what you're saying is, is that you're going to

8   represent Mr. Boccuzzi, and if there's something that is gonna

9   be good for Mr. Boccuzzi and bad for Mr. Singerman, you're

10  going to do what's in Mr. Boccuzzi's best interest?

11          MR. SALTER:  Absolutely, your Honor.

12          THE COURT:  What does the government think of that?

13          MR. READER:  Your Honor, based on these

14  representations and our understanding of the nature of the

15  relationship, we wouldn't object.

16          THE COURT:  Mr. Boccuzzi, you want to come on up.

17          MR. SALTER:  Step around, please.

18          THE COURT:  Your lawyer's asking me to postpone your

19  trial, which would toll your right to speedy trial.  Is that

20  okay with you?

21          DEFENDANT BOCCUZZI:  Yes, your Honor.

22          THE COURT:  And there's a slim possibility that there

23  could be a conflict for Mr. Lubin representing Mr. Singerman

24  and also, you know, having some reduced responsibility for

25  helping you out.  Do you understand that?

```
 1              DEFENDANT BOCCUZZI:  Yes, your Honor.
 2              THE COURT:  And if you weren't comfortable with that,
 3    then you could find another local counsel to take over for
 4    Mr. Lubin in case something happened with Mr. Salter and he
 5    wasn't allowed to continue with the case.  Do you understand
 6    that?
 7              DEFENDANT BOCCUZZI:  Yes, your Honor.
 8              THE COURT:  But if you stick with Mr. Lubin, and if
 9    later on you get convicted in the case, you're not going to be
10    able to come back and say, "Gee, Judge, Mr. Lubin was hurting
11    my case and helping Mr. Singerman's case, and I didn't get a
12    fair trial."  Do you understand that?
13              DEFENDANT BOCCUZZI:  I understand, your Honor, yes.
14              THE COURT:  And do you want to waive any possible
15    argument of a conflict of interest and stick with Mr. Salter,
16    and either stick with Mr. Lubin as the local counsel, realizing
17    that it's a slight possibility that he might have to jump in on
18    the case?  Or you can always hire some other local counsel.  Do
19    you understand that?
20              DEFENDANT BOCCUZZI:  Yes, your Honor.
21              THE COURT:  And do you want to keep the status quo?
22              MR. SALTER:  Yes.
23              DEFENDANT BOCCUZZI:  Yes, your Honor.
24              THE COURT:  All right.  We'll keep the case on recall.
25              MR. SALTER:  Thank you, your Honor.
```

```
 1              THE COURT:  United States vs. David Winsauer.

 2              If counsel would announce their appearances for the

 3    record.

 4              MR. BUONAURO:  Good morning, your Honor.  Robert

 5    Buonauro from Orlando, Florida, representing Mr. Winsauer,

 6    who's present, your Honor.

 7              THE COURT:  And what's the status of Mr. Winsauer's

 8    case.

 9              MR. BUONAURO:  Your Honor, we previously filed a

10    motion to continue, I think it was document 81, and we're in

11    the same position as counsel has stated to the Court.  We're

12    requesting a continuance until next year.

13              We have -- also requesting at least a minimum of

14    90 days to file motions.

15              Judge, I will tell you, we spent one day last week

16    just going through the government's index.  We haven't even

17    gotten into discovery yet.

18              THE COURT:  Mr. Winsauer, your lawyer's asking me to

19    postpone your trial, which would toll your right to speedy

20    trial.  Is that okay with you?

21              DEFENDANT WINSAUER:  Yes, your Honor.

22              THE COURT:  All right.  We'll keep the case on recall.

23              MR. BUONAURO:  Thank you, your Honor.

24              THE COURT:  United States vs. Ventech Labs.

25              If counsel would announce their appearances for the
```

1    record.

2          MR. SHEARIN:  Good morning, your Honor.  Robert

3    Shearin on behalf of Ventech Labs.  Our authorized

4    representative, Mr. Wakely, is here.

5          We made a motion to continue the trial.  We were

6    arraigned on April the 12th.  We've got a calendar call -- I

7    think it's set for May 15th.  And we filed a motion for

8    continuance, which the Court denied on April the 18th.

9          And I'm a solo practitioner.  I just received the

10   discovery.  I -- there is no way that I could do anything until

11   the end of this year.  So, I go along with other counsel,

12   sometime next year would be fine.  I cannot imagine me

13   getting -- being able to file the motions I'll need to within

14   90 days, as some have suggested.  I think it is more like 180,

15   at least 120 days.  I just don't know what's coming forth.  You

16   know, I was obtained *(sic)* right before their arraignment.  So,

17   I would be okay with 120, something like that, but I might have

18   to come back in before your Honor and ask for further time to

19   file any motions.

20         THE COURT:  And is it Mr. Weekly, did you say?

21         MR. SHEARIN:  Wakely.

22         THE COURT:  Wakely.

23         MR. SHEARIN:  Yes.

24         Come forward.

25         THE COURT:  Come on up, Mr. Wakely.

1          MR. SHEARIN:  We have a corporate representative

2    authorizing him.

3          THE COURT:  Are you authorized by the board to

4    represent Ventech Labs?

5          DEFENDANT WAKLEY:  That is correct.

6          THE COURT:  And your lawyer's asking me to postpone

7    the trial, which would toll any right to speedy trial.  Is that

8    okay with you?

9          DEFENDANT WAKLEY:  It is.

10         THE COURT:  All right.  We'll keep the case on recall.

11         MR. SHEARIN:  Thank you, your Honor.

12         THE COURT:  Mr. Kuehne filed a motion to transfer the

13   case to Judge Marra, because there's a pending related civil

14   case in front of Judge Marra, under the internal operating

15   rules.  I conferred with Judge Marra this morning, and based on

16   that conference, I'm denying the motion to continue.  So, I'll

17   enter an order to that effect.

18         And how about the revised protective order?  Was there

19   an original protective order that was entered or not?

20         MR. READER:  That's correct, your Honor.  I think it's

21   ECF Number 58 was a protective order which created a category

22   of confidential documents that had financial, medical, or

23   personal identifying information in them.  Six of the

24   defendants agreed to that protective order, all six of the

25   arraigned defendants at that point.  And there have been a

1   number of discussions since then about it, and some of the

2   defendants I think fairly have said that they thought it was

3   too restrictive.

4        The revised protective order that was filed late last

5   night was focused on the issue of avoiding inadvertent waiver

6   of privilege both on behalf of the defendants as well as for

7   the FDA for these remaining documents that need to be produced.

8        There were two premise warrants, your Honor, in this

9   case, at Blackstone Labs and Ventech Labs.  Electronic devices,

10  such as cell phones and computers, were seized at each of those

11  two locations.  And I think it's fair to say that the

12  individuals who worked at Ventech may not share privilege with

13  the individuals who worked at Blackstone Labs.

14       So, we have produced already responsive documents out

15  of those particular images, but I can see where counsel would

16  want the ability to search for *Brady*, perhaps, in those images,

17  and we believe that we ought to turn them over.  When I

18  informed counsel of this in March, they expressed an objection

19  based either on attorney-client privilege, proprietary, which I

20  sort of interpret as trade secrets information, or, from one

21  counsel, concerns about information of a very intimate nature

22  being on the cell phones.  And no defendant has filed a

23  protective order seeking that we don't turn those things over.

24  Like I said, I've -- there's been some time that we've proposed

25  that there would be a 502(d) protective order, and earlier this

1  week, we sent around a draft motion that addressed that

2  particular issue, as well as a separate issue of redactions,

3  which didn't make it into the final motion.

4         So, what we're asking for, your Honor, is that we be

5  allowed to give these drives, all of the drives to all the

6  defendants.  We've made copies and are prepared to do that as

7  soon as today.  That would give them an opportunity to, you

8  know, inspect evidence as they see fit, to confirm the

9  authenticity of electronic evidence that would come out of

10 these drives.  Although, again, the responsive documents that

11 we expect to be trial exhibits are almost undoubtedly already

12 produced in discovery separately as electronic discovery.

13        So, we're asking the Court enter this order saying

14 that they're not waiving privilege by these documents being

15 produced to their codefendants.  They obviously can reserve

16 their rights to claim privilege on any particular documents.

17 And that defendants would not be able to use potentially

18 privileged documents or work product or trade secrets anywhere

19 outside this proceeding.  And I think if there's an item that

20 appears to be privileged, obviously they would need to come to

21 the Court and see if that was the case or if it was permissible

22 to use in their defense.

23        And then separately, I think for a parallel track, is

24 the FDA documents.  Your Honor, we may have already produced

25 all of the necessary discovery, but in an abundance of caution,

1    we collected documents from the Food and Drug Administration,

2    which regulates the ingredients and substances which make up

3    part of this case.  We don't want to be in a position down the

4    road where defense says, "Oh, you hid something that was going

5    on at FDA and didn't give it to us."  So, we've collected those

6    documents.  It's tens of thousands of documents, not more than

7    that.  We are reviewing those for privilege, and our goal is to

8    be able to turn over quickly the rest of those documents, again

9    in a searchable electronic format.  At the same time, however,

10   because we'd like to do this promptly for the benefit of the

11   defendants, it seems fair that we wouldn't waive privilege if

12   something was inadvertently turned over -- attorney-client

13   privilege, work product, and there's also a deliberate process

14   privilege that could apply to FDA.

15           And lastly, your Honor, there is actually a statute

16   that prohibits FDA from disclosing trade secrets -- 331(j), I

17   believe, 21 U.S.C. 331(j).  And FDA counsel has expressed

18   concern that as we turn over a large set of documents without

19   necessarily having been able to review each particular

20   document, there may actually be trade secrets for nonparties

21   that are there, where we're talking about particular chemicals

22   that were being investigated as prescription drugs, for

23   example.  And so, those would be confidential records, and we

24   would deem the FDA records confidential as a result, and just

25   ask that the Court enter the proposed order saying that defense

1  can, you know, review that, they can -- defendants can review

2  that under their supervision, but if they find something in

3  there, and they want to use it publicly, that would be subject

4  to agreement by the Court.

5            THE COURT:  So, what you want to do is you want to

6  give everybody everything that you have, but reserve the right,

7  if you made a mistake and gave them something that was

8  privileged, to say, "Wait a minute, you can't use this during

9  the trial," and if there's personal identification information

10 or trade secrets, that everybody on the defense side is

11 agreeing that they could talk about it, but they can't disclose

12 it to anybody else?

13           MR. READER:  That's correct, your Honor.

14           THE COURT:  So, why isn't that reasonable?

15           MR. LUBIN:  On behalf of Mr. Singerman, that isn't our

16 problem with the protective order.  We have a totally unrelated

17 problem.

18           THE COURT:  So what's the problem?

19           MR. LUBIN:  I think that is reasonable.

20           THE COURT:  So what's the problem?

21           MR. LUBIN:  Our problem?

22           THE COURT:  Right.

23           MR. LUBIN:  So, the protective order is very

24 restrictive as it relates to the defendants.  It's not a

25 problem as it relates to the lawyer.  But we're --

```
 1            THE COURT:  I thought he just said that the defendants
 2    can see everything in the documents?  And talk about it with
 3    the lawyers?
 4            MR. LUBIN:  In -- if it's in the lawyer's office and
 5    they sit there.  We're talking about millions of documents and
 6    thousands and thousands of hours.  What we were pushing for was
 7    to let the -- have the defendants swear under oath here today
 8    that they would not disclose the information to anyone, but
 9    allow them to have a set of the discovery to take home.  It's
10    just not reasonable on a case this massive to require them to
11    look at it in our office.
12            THE COURT:  So, let me ask Mr. Reader what his
13    position is on that.
14            MR. READER:  Thank you, your Honor.
15            The language that's in the existing protective order,
16    which does restrict confidential documents to being reviewed in
17    counsel's office, is not innovative or new.  It's been adopted
18    by the Southern District of Florida in other cases --
19    U.S. v. Groh (phonetic) I know is a certain example.
20            Your Honor, the discovery here is, I would say, not
21    millions of documents.  It's essentially one million documents.
22    And the vast majority of those documents, in fact, were
23    documents belonging to Blackstone Labs, the corporation here
24    that employed most of the individuals.  And those documents
25    have been in their custody and control, you know, before
```

```
 1   discovery, as well as being produced back to them in discovery.
 2          The issue with the redactions is this.  Because of the
 3   nature of the sort of consumer sales that occurred with these
 4   companies, the documents that we have deemed as confidential
 5   are, you know, several hundred thousand documents I'm sure that
 6   are rife with financial account information -- credit card
 7   numbers, bank account numbers, there are also personal
 8   identifiers in them.  And I believe in certain cases, there's
 9   also medical information as well.  We've produced a small
10   number of medical records that we would strongly object to
11   being turned over outside of counsel's presence.
12          The government was seeking a compromise on this issue.
13   Again, the discovery is all currently available to the
14   defendants.  They have access to it.  Their counsel has access
15   to it.
16          THE COURT:  So, what's the compromise between having
17   to look at it in the lawyer's office and being able to take it
18   home?
19          MR. READER:  So, the compromise that the government
20   had proposed but didn't reach agreement on was that defense
21   counsel can look at all the documents, and if they see
22   documents that they want to send home with their defendants,
23   they can redact them according to Federal Rules of Criminal
24   Procedure 49.1.  That's all we're asking for.  And I think that
25   there's -- the disagreement on their side is that's too much
```

1    work.

2            Well, your Honor, if the argument is, is that they

3    don't want to review the discovery before giving it to

4    defendants, then the government would not agree.  And the

5    government -- given that the large volume of documents here --

6    you know, again, it's at least several hundred thousand

7    documents that are deemed as confidential.  The type of

8    information we're talking about it's in a random email here and

9    there, you know, scattered throughout because of the way the

10   company was doing business.  And so, it's essentially

11   impossible to writ large redact everything.  And if somebody

12   wanted to do that, I think it would probably take months.

13           So, it seems that the only logical way to do it is,

14   allow defendants to come to the office and review it,

15   unredacted, and if there's things they want to take home, the

16   defense counsel think are important information that the

17   defendant should be able to take home *(sic)*, then defense

18   counsel's in a position to say, Okay, let's take a look at this

19   and make sure that the critical confidential information is

20   redacted.

21           And I just say one more thing, which is that the need

22   to put a "confidential" designation on chunks of discovery is

23   because the confidential information is interspersed, not that

24   every document itself has it.  So, most of the documents they

25   want to turn over aren't going to have redactable information.

```
 1   If they want to turn over emails, I'm sure that many of the

 2   emails don't, in fact, have credit card numbers in them.  But

 3   it's the ones that do, your Honor, that are a problem.  And I

 4   think the government thinks it's eminently reasonable that we

 5   have already given this discovery over, we're allowing the

 6   defendants to view it in its unredacted form, and we're simply

 7   saying that giving a defendant a million documents, including

 8   bank records, medical records, confidential information of

 9   other defendants or victims in this case, or other consumers,

10   is not necessary for the government to meet its obligations and

11   for them to prepare for trial.

12           THE COURT:  I mean I got a lot of identity theft

13   cases, I got a lot of cases with PII in it, and I don't

14   remember entering a protective order on request of the

15   government in all those cases.  What happens in just the

16   run-of-the-mill PII case?  Is it something that it's just

17   assumed between the prosecutor and the defense attorney that

18   the defendants aren't gonna have a personal copy of the

19   discovery?

20           MR. READER:  So, I think, your Honor, that what may be

21   different about this case is that because it's a

22   multi-defendant conspiracy where they didn't work at the same

23   place, there's confidential information that could have come

24   from one party that really wasn't privy to the other party, as

25   opposed to a single group of people who all worked together and
```

1  all already had access to the information.  So, you know,

2  Ventech Labs was one corporation, although under the

3  allegations controlled by Blackstone Labs, and Blackstone Labs

4  was another organization.  In fact, Blackstone Labs expressed

5  that they did not want their information produced to the other

6  defendants.

7          So, I think that is a little different, your Honor,

8  than a typical PII case where, you know, a person or two stole

9  a bunch of information, and they already had that information,

10  and it's just being produced back to them.  Here, we're talking

11  about giving credit card numbers, et cetera, you know, personal

12  information from codefendants to the other defendants.  And,

13  again, we're willing to do that, but I think it ought to happen

14  under the supervision of counsel.

15          THE COURT:  Well, let me ask Ms. Dmitrovsky.

16  Blackstone Labs doesn't want to have all the information given

17  to everybody?

18          (Discussion had off the record between counsel)

19          MS. DMITROVSKY:  We agree, your Honor, as long as it's

20  kept confidential.

21          MR. LUBIN:  And can I add something, with the Court's

22  permission, on this issue?

23          THE COURT:  Before you do that, by "confidential,"

24  you're comfortable with the other defense attorneys redacting

25  confidential information and letting their clients see

1  everything else?

2          *(Discussion had off the record between counsel)*

3          MS. DMITROVSKY:  Your Honor, Blackstone's position is

4  that we don't mind if it's redacted, but we prefer that it's

5  not for purposes of this litigation only *(sic)*.

6          THE COURT:  I don't understand that.  What do you

7  mean?

8          *(Discussion had off the record between counsel)*

9          MS. DMITROVSKY:  Oh, I'm sorry, Judge.  Mr. Kuehne

10 just pointed out, we'd prefer that it be redacted.  But for

11 purposes of this litigation, we're not opposed to it not being

12 redacted, as long as it's used only for this case, this

13 litigation.

14         THE COURT:  Okay.  Now, let me hear from Mr. Lubin.

15         MR. LUBIN:  With respect to -- all due respect to the

16 government, they're making it sound like, oh, we can look -- we

17 can spend a couple hours looking at documents and redact.

18 We've done two things.  We've looked into how much it would

19 cost to redact, and we came up with, for 60,000 pages -- so

20 that's not close to how many is here -- it would end up costing

21 about $165,000 if we could hire somebody.

22         THE COURT:  But you don't have to redact anything if

23 your client comes into the office, right?

24         MR. LUBIN:  Right.

25         THE COURT:  It's only if you want to send stuff out of

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1  the office that you have to redact.

2      MR. LUBIN:  That would be fine if we had a thousand or

3  a hundred documents, but we have hundreds of thousands.  They

4  work.  They're gonna come to my office all day during the day.

5  I'm gonna have to spend time or a staff member --

6      THE COURT:  They could be in jail awaiting trial

7  instead of out on bond.  I mean, I'm going to give you time to

8  file defensive motions.  I'm going to give you probably more

9  time for this trial than I've given anybody else in 20 years.

10     MR. LUBIN:  Well, I thank you for that.  And I don't

11 want to lose that opportunity.  But I do want to say that it

12 is -- I think that if the clients were put under oath and were

13 sworn to not share this information with anyone, except

14 counsel, and only for the purposes of litigation, it would

15 solve the problem here.

16     And counsel has already said -- government counsel has

17 already said, well, maybe many of these documents had already

18 been seen by -- prior to the indictment by various of the

19 defendants.  I'm not sure.  But I have no problem with them

20 swearing at the peril of the wrath of the Court if they did

21 anything other than review these documents and made notes for

22 the attorney.

23     I don't think it's workable to have them coming up,

24 spending either nights in my office and then me having to be

25 there, or spending days when they have to work themselves in

```
 1   the office going through hundreds of thousands of documents.
 2            THE COURT:  Let me ask Mr. Reader.  How does a defense
 3   attorney decide what he or she can automatically send
 4   completely to his or her client as opposed to what he has to
 5   have his client come into the office to look at, and if parts
 6   of that want to be sent home, he has to redact it?  Are you
 7   saying that everything has to be reviewed in the office or only
 8   certain things?
 9            MR. READER:  Well, your Honor, there are documents
10   that are not designated as confidential.  That's listed on the
11   index.  And they're produced on completely separate DVDs or
12   drives.
13            THE COURT:  So, how many documents are listed
14   "confidential"?
15            MR. READER:  I think it's the majority, your Honor.  I
16   don't know that I have an exact number today.  It is the vast
17   majority of documents.  I think that the piece --
18            THE COURT:  So, why not -- I mean why would having the
19   defendants swear that they weren't going to utilize the
20   information at all, other than in their defense, under
21   penalties of perjury be something that would not be a fair
22   compromise, assuming that if the defendants go to trial,
23   they're going to see everything in open court that they could
24   have taken home with them?  I mean, if they swear that they're
25   not going to reveal it to anybody else, if they agree that
```

```
1    they're going to give back -- any documents back to their
2    lawyer when they're done reviewing it, why wouldn't that be a
3    viable compromise?
4          MR. READER:  Well, I think that one concern, your
5    Honor, the government has is, again, with compliance with the
6    Court's orders.  One reason for that is -- and this is based,
7    your Honor, on an allegation in the indictment -- was that
8    Mr. Braun, the president of Blackstone Labs, after he was aware
9    of the investigation, was contacted by a potential witness who
10   the FDA was seeking to interview.  Mr. Braun's response in
11   writing to that individual who asked, "What should I do about
12   the FDA agent coming to talk to me," was that he should ignore
13   that.  That's an allegation in the indictment.
14         THE COURT:  But I mean the difference would be here
15   Mr. Braun will be swearing under oath that he's going to look
16   at the information and not reveal it to anybody else, only
17   discuss it with his attorney, and when he's done looking at the
18   confidential information, he's going to give it back.  Why
19   wouldn't that be a good compromise?
20         MR. READER:  Your Honor, again, I think the
21   government's position would be, is that we're concerned about
22   the dissemination of this confidential information.
23   Blackstone's counsel suggested that if confidential information
24   was being shared, it should only be within this proceeding.
25   And I think the Court would be wise to put an order saying that
```

1   the discovery that's confidential could only then be used for

2   purposes of this litigation as opposed to some other purposes.

3           THE COURT:  Well, that's kind of inherent in what I

4   was saying, that you can only use the information to talk about

5   your defenses with your lawyer, and you can't share the

6   information with anybody else.

7           MR. READER:  Again, your Honor, I think that hasn't

8   been our position.  We proposed a compromise, which was that

9   the defense counsel was perfectly permitted to provide redacted

10  documents to their clients, and we thought that that was

11  eminently reasonable.

12          This is not a case, your Honor, I think, where -- you

13  know, a significant number of the confidential documents, for

14  example, are bank records.  Okay?  And the bank records -- you

15  know, I think maybe someone wants to study the bank records,

16  but that's not talking about a hundred thousand pages.  The

17  documents that are the large chunks of confidential documents

18  are emails produced by Blackstone Labs, emails brought in via

19  search warrant, other documents brought in via the search

20  warrant, and emails perhaps produced by other defendants.

21  Those are the large chunks of documents that were deemed

22  confidential, because, again, they had this confidential

23  information in it.

24          THE COURT:  It would seem to me that if we could

25  fashion an agreement where defendants are able to swear that

```
 1   they're only going to utilize the information for defense
 2   purposes at trial and give it back to the lawyer when they're
 3   done, and we're not going to have to have a situation where the
 4   defendants are gonna have to come into court -- I mean come
 5   into the lawyer's office -- I mean don't we have somebody here
 6   that lives in Colorado or out of state?
 7           MR. WILLIAMS:  Nevada.
 8           MR. READER:  Nevada, your Honor.
 9           THE COURT:  Nevada, okay.  I mean, isn't that going to
10   slow the process down?  Aren't I going to have to consider
11   maybe delaying the trial date and the time for filing motions
12   to be able to accommodate the lag in time that would be
13   involved by requiring the defendants to come into the lawyer's
14   office to review information?
15           MR. READER:  Your Honor, I think there's two things
16   that the government is doing or will do that are helping make
17   this not a real problem.  One is, is that all this discovery is
18   produced as eDiscovery with metadata searchable and can be
19   quickly loaded into an eDiscovery platform, with the idea being
20   that defense counsel will be able to actually search the
21   records as opposed to brute force review a million records.
22   That's better, your Honor, I think, than your average case
23   where you have a hundred boxes of paper and someone's told to
24   go into a back room and look into them.
25           The second piece of it is, is that the government is
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1   intending -- and we have not done this yet, but the government

2   is intending to provide, again, as soon as possible, a set of

3   potential trial exhibits and hot docs that are the documents

4   most relevant to this case.  Many of those documents have

5   already been identified in the sense that they were included as

6   exhibits to grand jury testimony that was produced to analyze

7   and the search warrants.  They have a lot of information here,

8   your Honor, about what's going on in this case.

9          And we're gonna go even farther than that and produce

10  the hot documents.  And we can do that in a way that doesn't

11  require any additional redactions, and they can give

12  immediately, you know, the hundreds of most important documents

13  to their clients.

14         THE COURT:  I appreciate that, and I think that is the

15  right thing to do.  But if I were a defendant, and I'm presumed

16  to be innocent, and I'm facing a lot of time in jail, I might

17  not want to just rely on what the government thinks the

18  evidence is that's gonna be introduced at trial.  I might want

19  to take the time to sift through everything I could to see if

20  there's something in there that's beneficial to me.

21         MR. READER:  I understand your point, your Honor.

22         THE COURT:  And I think it's -- we've got good lawyers

23  involved in the case, but four eyes are better than two, and

24  the clients might understand some significance in a document

25  that the lawyer, not having been allegedly involved in the

1  case, doesn't understand.  And to have to go into the office to

2  review that, I think might slow the case down.

3        MR. READER:  If I might add one more thing, your

4  Honor.  If your Honor is inclined to create an order that

5  allows the defendants to take home the discovery, I would just

6  ask that it include a requirement that this information be

7  encrypted.  You know, a lot of the information is already on

8  encrypted hard drives or in encrypted files, under zip files.

9  And that means that if somebody loses these somewhere, the PII,

10 you know, personal information and confidential financial

11 information, is not gonna get out there.  That's how we've

12 produced the information, and it seems appropriate, if

13 defendants are gonna have it, that the voluminous confidential

14 information continue to be encrypted.

15        THE COURT:  Well, I don't understand.  Are they going

16 to have to do something in addition to make it encrypted, or

17 are they just going to let their clients have this information

18 that is encrypted?

19        MR. READER:  If your Honor is inclined to let the

20 defendants take home the unredacted confidential information,

21 we would just ask that it go in an encrypted format such as

22 they already have it.  They've already got encrypted -- you

23 know, we've been producing encrypted drives that have like a

24 punch pad, and you have to know the password to be able to get

25 into it.

```
1          THE COURT:  So, what's the problem with that from the
2    defense point of view?
3          MR. LUBIN:  No problem with that.  We can do that.  We
4    would give it to our clients in a password-protected hard drive
5    form so that they would need to enter the code to look at it.
6          THE COURT:  So, if I have the defendants today swear
7    that they're going to follow the rules, and they can take it
8    home in an encrypted form, why wouldn't that be a compromise
9    that would facilitate getting the case to trial a little
10   quicker and maximize the chances of the defendants being able
11   to see as much as of the information as they can and discuss it
12   with their lawyers?
13         MR. LUBIN:  Is that question for the government?
14         THE COURT:  That's a question to everybody.  Anybody
15   have a problem with that?
16         MS. VORPE QUINLAN:  May I just be heard as to one
17   matter?
18         THE COURT:  Okay.
19         MS. VORPE QUINLAN:  The government did a search
20   warrant of the corporation Ventech, which is an indicted
21   corporation.  My client, Mr. Joey Ventrella, was present at the
22   time of the search warrant and so was his wife.  They took
23   their cell phones, and they mirror imaged both of their cell
24   phones.  Mr. Ventrella used his cell phone obviously for
25   business with email and texts, but he has two children, one of
```

1   whom is a special needs child, so he also used his telephone to

2   communicate with his wife about matters involving their

3   children.

4           I think he may be the only defendant in this position

5   of having children that he may have -- that may have used their

6   phone for matters other than that type of business.

7           So, on behalf of Mr. Ventrella, it's difficult for

8   them to turn over the mirror images of his phone and his wife's

9   phone to all these other defendants with their personal

10   information on it.

11          So, if I could confer with my client -- I know you

12   want to enter an order saying they can only use it for purposes

13   of this litigation, but there are some privacy concerns there,

14   especially with respect to the child.  And there's something in

15   the protective order, on page 2, I believe, that the

16   information regarding minors should be redacted.

17          Now, as you know, I was an AUSA for 20 years here.  I

18   did a lot of wiretaps, and it was our obligation as the

19   government and the agents to minimize.  We weren't allowed to

20   listen to personal information.  Now we have cell phones where

21   people use texts and emails instead of talking.  So, if

22   they've -- if they have all of that, my position would be it's

23   on the government to minimize any of that personal information

24   before they distribute it wholesale to other defendants.

25          THE COURT:  I don't see the analogy between wiretap

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1  law and discovery.

2         MS. VORPE QUINLAN:  Text -- it's text information,

3  same as content.  Kids now don't talk on the phone; they text.

4  It's the same thing.  The law hadn't caught up yet, but --

5         THE COURT:  Well, maybe it will catch up after this

6  case.

7         Talk to your client and see what your client wants

8  to -- what position your client wants to have regarding the

9  proposed --

10        MS. VORPE QUINLAN:  With respect to the telephones?

11        THE COURT:  Right.

12        MS. VORPE QUINLAN:  The mirror imaging of the personal

13 cell phones?

14        THE COURT:  Right.

15        MS. VORPE QUINLAN:  Thank you.

16        MR. LUBIN:  Your Honor, again, Richard Lubin on behalf

17 of Mr. Singerman.  And I think I speak for everyone when I say

18 this.  We agree with the Court's proposal.  And we think that

19 it would certainly take less time to prepare this case than it

20 would.  I still think this is an enormous case with the

21 requirement of a lot of time, but it would be less rather than

22 more of that time if we were able to do it this way.

23        And I can speak for my client, and I believe everyone

24 is going to agree with me, they will go under oath this

25 morning, and they will promise that they will not disclose that

```
 1   information, and it will not be used except for this case.  And
 2   I think the Court has obvious contempt powers, revocation of
 3   bond powers, all kinds of powers over these defendants, but
 4   none of them want to do anything other than start looking at
 5   the documents to prepare their case.  That's what they want.
 6          We're really talking about matters such as bank ID
 7   numbers, and Social Security numbers, and dates of birth.
 8   That's the kind of stuff we're talking about here.  Occasional
 9   health information.  Occasional, very rare, I think.
10          So, we are -- as the Court just laid it out, we are a
11   hundred percent in agreement with the Court's suggestion for
12   what we should do.
13          THE COURT:  Mr. Reader?
14          MR. READER:  The government would accept this
15   compromise the Court has proposed if, of course, the defendants
16   are understanding under oath that a violation of the order
17   would be contempt with potential very serious consequences.
18          And particularly under the idea, your Honor, that this
19   would help speed things to trial.  You know, the government
20   doesn't believe that this needs to be a case put off for a
21   year.  And Mr. Frank can speak to that.  But I think that the
22   argument made that if this will speed -- get us to a speedy
23   trial date, that may be worth considering, your Honor.  And we
24   would accept the proposal that your Honor made versus --
25   including encryption, a sworn statement by the defendants, and
```

1  their ability to review it off site as a way to move things

2  along.

3          THE COURT:  Ms. Vorpe Quinlan?

4          MS. VORPE QUINLAN:  Yes, sir.

5          With respect to the cell phone of Mr. Ventrella and

6  his wife, Ashley Ventrella, there are conversations of an

7  extremely personal nature between husband and wife.

8          In addition, Mrs. Ventrella has been cooperating with

9  the government for over a year.  Her lawyer is here, and he

10  communicated with her over that cell phone.  So, there are

11  privileged communications between her lawyer and

12  Mrs. Ventrella.

13          THE COURT:  So, how would you propose we carve out an

14  exception for the two phones?

15          MS. VORPE QUINLAN:  I would propose the same procedure

16  be applied as we went through in a wiretap.  They have to go

17  through those phones -- they seized them, they mirrored them,

18  and they can go through -- they have a team of agents.  There

19  are two lawyers from D.C., multiple lawyers from Southern

20  District of Florida, and a whole team of agents.  They seized

21  it.

22          THE COURT:  I mean you can file a motion to suppress

23  it if you want to file a motion to suppress.

24          MR. READER:  Your Honor, I have an easy answer to

25  this.

```
1              MS. VORPE QUINLAN:  I would like for them to go

2    through and redact the information that's of a personal nature

3    and is attorney-client and doesn't apply to this case.

4              THE COURT:  Well, I mean --

5              MS. VORPE QUINLAN:  That's their obligation.  They

6    seized the phones.

7              THE COURT:  Well, I don't know that it's their

8    obligation.

9              Mr. Reader.

10             MR. READER:  Your Honor, the government has already

11   turned over in discovery the extracts of text messages from

12   this case.  The government did a privilege review on those text

13   messages and did not turn over attorney-client privilege

14   information.  The taint team went through it.  Mr. Frank and I

15   haven't seen any privileged records from the cell phones.  And,

16   in fact, the taint team redacted personal conversations between

17   Mr. Ventrella and Mrs. Ventrella in the versions that have been

18   disseminated to counsel.

19             MS. VORPE QUINLAN:  Okay.

20             MR. READER:  That would differ for the forensic

21   images, your Honor.  And the problem with the forensic image

22   is, it's only good if it's whole.  You know, it's no good to

23   them if somebody alters the forensic image.  And that, I think,

24   would be a reason for the forensic images, perhaps, to have a

25   different level of sort of confidentiality and scrutiny than
```

1    perhaps the other documents.  But I think that her concerns

2    have already been addressed in the way the government --

3              MS. VORPE QUINLAN:  By the taint team?

4              He has a taint team.  That's true.  He does have a

5    taint team, and if they could go through it before it's

6    disseminated to the other defendants and take out the privilege

7    material, the husband/wife communications and the

8    communications about the minor children, then if the taint team

9    did that, I would be satisfied with that.

10             MR. READER:  Your Honor, I don't believe -- well, I

11   don't know if any communications that were with a minor child

12   were redacted from what's gone out.  Certainly --

13             THE COURT:  Well, she's asking you to do it now before

14   you turn it over.

15             MR. READER:  I'm saying that's already been turned

16   over, your Honor, those text messages.  We turned --

17             MS. VORPE QUINLAN:  To all the other defendants?

18             MR. READER:  To all the other defendants.  We turned

19   over, your Honor, what's an Excel spreadsheet -- this is, you

20   know, part of one of the many productions we've done -- an

21   Excel spreadsheet that has, you know, the chats, texts, phone

22   calls, et cetera, extracted from the defendants' cell phones.

23   And those were reviewed for privilege, including marital

24   communications privilege.

25             THE COURT:  So as far as the two phones go, everything

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1  has already been turned over.  Now, the question is, who can

2  look at them?

3       MR. READER:  So, I wouldn't say it's everything, your

4  Honor.  I'd say it's the most useful things have been turned

5  over.  And what we're trying to do now is, is give the full

6  forensic electronic copy so that defendants could hire a

7  forensics examiner themselves and go look at the forensic copy

8  of the phone, which is not, I would say, readily reviewable

9  unless you have a forensic expert, and say, Wait a second, the

10  government is not telling the truth, you know, about those text

11  messages coming from this phone.  We don't think that's gonna

12  happen, but we think that we have an obligation to allow them

13  to inspect the devices if they want to challenge the

14  authenticity, or even more importantly so that they have to

15  stipulate to the authenticity, because they've had an

16  opportunity to review the actual forensic images.

17       THE COURT:  So, how about an exception for the two

18  cell phones, and that is that only the lawyers can see the two

19  cell phones?

20       MS. VORPE QUINLAN:  Yes.  And it sounds like as to the

21  marital communications, you -- do you --

22       MR. READER:  Well, your Honor, Mrs. Ventrella is one

23  of the unindicted coconspirators in this matter, so I think

24  there are some reasons to think that the personal

25  communications between the two, where her husband has been

```
 1   indicted in this case, are not necessarily subject to
 2   marital --
 3            MS. VORPE QUINLAN:  I'm not talking about those.  I'm
 4   talking about --
 5            MR. READER:  I understand that.
 6            MS. VORPE QUINLAN:  -- husband/wife personal
 7   communications.
 8            MR. READER:  What has been produced already should
 9   have redacted all, all individual communications between --
10   that are private, and I mean only the two of them,
11   Mr. Ventrella and Ms. Ventrella.  I believe those have already
12   been redacted in the discovery.  If I'm wrong about that, I'll
13   be --
14            MS. VORPE QUINLAN:  Okay.
15            THE COURT:  So, do we need an exception for the two
16   cell phones, and if so, what would the exception be?
17            MR. READER:  I think the exception could be, your
18   Honor -- if your Honor's gonna allow defendants to take home
19   discovery that's confidential, the exception should be for the
20   forensic images writ large.  Mr. Boccuzzi's -- there are a
21   number of cell phones that have very personal things in them.
22   They may not be officially privileged, but they're certainly
23   very personal, and they are not likely to be relevant to this
24   case.
25            There will be a single hard drive produced by the
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1   government to each defendant that has all of these forensics on

2   it, one encrypted hard drive.  And we do think it should be

3   turned over so they can get a forensic examination, if they

4   want one.  But that might be something that could be restricted

5   just to counsel and, you know, their team that needs to review

6   it.  And separate and apart from that, the other confidential

7   discovery could be turned over to the defendants under the

8   proposal that your Honor made earlier.

9           THE COURT:  I don't know.  What do you think,

10  Ms. Quinlan?

11          MS. VORPE QUINLAN:  I think that's okay.  I pretty

12  much know all of the lawyers.  And if there's something in

13  there that really doesn't need to be reviewed by a client,

14  because it's extremely personal -- plus he's made the

15  representation that they've gone through it and taken out a lot

16  of it.  So, I'm fine now.  I just needed to express that on the

17  record so it wasn't wholesale distributed to all of the people

18  in the courtroom --

19          THE COURT:  So --

20          MS. VORPE QUINLAN:  -- concerning the minor child

21  and --

22          THE COURT:  -- do we bring up all the defendants and

23  swear them in and ask them whether they're going to follow the

24  rules?  Is that the procedure?

25          MS. VORPE QUINLAN:  Sure.

1          MR. LUBIN:  Yes, your Honor.  But I just have one

2    question about the hard drive -- again, Richard Lubin on behalf

3    of Mr. Singerman -- the hard drive that we have not yet

4    received.  I don't know what's on it, but counsel is saying

5    there are forensic images on it.  I don't know that we can

6    agree that the client shouldn't be allowed to take that home.

7    Certainly, something of a personal nature would be different.

8    But I'm assuming this is discovery, so there's relevant

9    information on this hard drive to the case.  I don't -- and

10   they've asked for a six-terabyte hard drive for this.  The one

11   we have already is a two-terabyte hard drive.

12          So, I'd like -- I don't know that we can agree in

13   advance that it's nothing that the clients have to be able to

14   have access to.  So, I don't know what counsel --

15          MR. READER:  It might be helpful, your Honor, if I

16   explain precisely what we're talking about for the forensic

17   hard drives.

18          Premise warrants were executed.  The government seized

19   cell phones and computers and some hard drive storage devices,

20   and it imaged all --

21          MR. SALTER:  May it please the Court?  Might I ask the

22   government attorney to approach the lectern so I can hear?  I

23   think the court reporter is nodding her head.  It might be

24   helpful to her to get -- it's just a little difficult for me,

25   and maybe I'm just too old.

```
 1            THE COURT:  Okay.

 2            MR. READER:  It's also raining on me over here, your

 3  Honor.  I'm happy to approach.

 4            THE COURT:  That's been going on for about ten years.

 5            (Laughter)

 6            MR. READER:  Is that better?

 7            MR. SALTER:  Yes.  Thank you.

 8            MR. READER:  So, search warrants were executed.

 9  Computers, cell phones, and hard drives were seized by the

10  government.  The government imaged those, made an exact copy of

11  those, with a hash value where you can prove that it's the

12  exact copy of what was seized on that day in February 2017.

13  And then the government returned the originals to their owners,

14  pretty shortly, within a couple of weeks, I believe.

15            So, one, this is information that if it's Blackstone

16  Labs information, they have it.  They got their computers back.

17  If it's Mr. Ventrella's phones, he has it.  He got them back as

18  well.

19            What the government is proposing to do is, is take the

20  copy of all those devices -- which is voluminous in the sense

21  that these are complete copies of computers.  So, one computer

22  may be 200 gigabytes; one computer may be one terabyte.  And

23  they're all put on one single drive.  I believe it totals about

24  four-and-a-half terabytes.  I guess, arguably, you could say

25  that there's million of documents there, because there's
```

1  millions of tiny little fragments of documents on a computer.

2  But the purpose of these is not to say, "Oh, go hunt for

3  something."  The purpose of these is to say to the defense, We

4  are going to use documents that came out of these computers and

5  out of these cell phones.  We'll even tell you which ones we're

6  gonna use.  And if you're gonna try to dispute that those were

7  not accurately brought out of these computers or out of these

8  cell phones, we'll give you the opportunity to test it out

9  yourself with your own forensic expert and to see what you

10 actually think is in the computers.  As well as, if you think

11 there's something exculpatory in there that we haven't seen or

12 we haven't already extracted, go have at it.

13         So, it's one single drive.  It would have all these

14 devices on it.  I think it would be quite simple for the

15 defense here to agree that counsel will review that.  Again,

16 they won't actually be able to review it unless they have a

17 forensic examiner.  These are forensic copies.  It's not just a

18 folder that you click through.  But any competent forensic

19 examiner would be able to open them and have a look at it.

20         And then, if after they've done a forensic

21 examination, they realize that there's documents that they

22 haven't received otherwise that they want to bring to the

23 Court's attention or bring to their defendants' attention,

24 perhaps that would be a time for them to come forward and amend

25 the protective order and say, "Your Honor, we think there's

1  documents we haven't received anywhere else in discovery,

2  they're in these drives, and I need to send it home with my

3  client."  And I say that because, your Honor, we have extracted

4  documents from the drives that were seized pursuant to the

5  search warrant, and those have also already been turned over.

6        THE COURT:  Well, I mean, I thought we were leaning

7  towards letting the defendants have access to everything at

8  home as long as they promise to follow the rules.  And then the

9  glitch in that was the two cell phones from Ms. Quinlan's

10  clients.  It seems to me like you're backtracking from that

11  proposal.

12        MR. READER:  Well, your Honor, that may be a practical

13  matter, because they're all on a single drive.  If the Court's

14  decision is ultimately that further restriction only applies to

15  the two cell phones, I suppose we could take a little more time

16  and split them up, or counsel could get the whole drive and

17  split them up themselves.  We could do that.

18        And I think that the reason my -- I responded that

19  way, your Honor, is I think that Ms. Quinlan's explanation

20  about why these documents are particularly confidential might

21  actually apply to some other defendants.  There are other cell

22  phones here, your Honor, from other defendants and from one

23  nondefendant.

24        So, at least one other defense counsel had previously

25  expressed that his client felt that there were personal items

1   that were not relevant to the case that he did not want shared

2   with codefendants.  And I understand that, your Honor.  We

3   weren't -- this wasn't, you know, a search for personal items.

4   This was a search for evidence of certain crimes.

5           So, whether you did just the cell phones, or just the

6   two cell phones, or all the forensic devices, the government

7   doesn't think it's a burden on the defendants to not have

8   access to the forensic devices, because, again, they're gonna

9   need a forensic examiner to even see --

10          THE COURT REPORTER:  I'm sorry.  You have to slow

11   down.

12          MR. READER:  The government does not believe it would

13   be a burden to have the whole drive of forensic devices

14   restricted to counsel's office, because you will need a

15   forensic examiner to open those files and take a look at them.

16   That's not something the defendant can do on their own at home,

17   as opposed to the other discovery where they can poke through

18   and read various documents, if they want to.

19          THE COURT:  So, you're able to separate the forensic

20   device evidence from all the other evidence?

21          MR. READER:  We've turned over all the other evidence

22   already.  The forensic devices are in a set of boxes here in

23   the courtroom, one for each of the parties.  We have six copies

24   with us, I believe, today.  And, again, the only other

25   discovery would be the FDA discovery that we mentioned earlier.

```
 1              THE COURT:  So, what you're saying now is that the
 2   defendants could look at everything except for the forensic
 3   devices, and they would have to go to the lawyer's office to
 4   look at that after some expert had gone through it?
 5              MR. READER:  Your Honor, the government's trying to
 6   respond to a compromise here that your Honor was suggesting --
 7              THE COURT:  Right.
 8              MR. READER:  -- with regards to documents that have
 9   already been produced that were marked as confidential, we'll
10   accept the Court's proposal.  We have not yet produced the
11   forensics because of this particular issue and because it's a
12   bit thorny.
13              The government would propose that because they already
14   exist in a completely different drive -- they're not mixed up
15   in any way.  There is a single physical drive with these on it.
16   It's easy to set them apart and say those be treated
17   differently.  And that the easiest way to do that is to treat
18   all of them the same, because they're all in one place, one
19   physical place on one drive.  And I think that's the simplest
20   and most logical proposal.  And that it would be restricted to
21   defense and their team to review.
22              And then if defense decides, after getting a forensic
23   expert, after going into the documents, that they need to share
24   them with their client, I'm sure we can deal with that down the
25   road.  It seems like that's a little far off and perhaps
```

1  hypothetical.

2          THE COURT:  So, what's the defense position on that

3  proposal?

4          MR. LUBIN:  Your Honor, again, Richard Lubin on behalf

5  of Mr. Singerman.

6          I thought the only issue was the two cell phones and

7  the confidential information -- personal information on them.

8  I don't see why this hard drive should be treated any

9  differently from the other hard drive that it seems like we've

10 got an agreement on.

11         THE COURT:  Well, it seems to me like Mr. Reader's

12 saying it's not just Ms. Quinlan that's concerned about

13 personal information on the cell phones, that somebody else has

14 that concern.

15         MR. LUBIN:  I'm not hearing it, but I know originally

16 there was some question about --

17         MR. BUONAURO:  That was my client, Mr. Winsauer.

18         MR. LUBIN:  So, I guess we should hear from him.  And

19 then maybe the government can provide us a hard drive with just

20 those two things omitted from it.  That would be --

21         MS. VORPE QUINLAN:  On behalf of Mr. Ventrella, if

22 they wanted to just put Mr. Ventrella's cell phone and

23 Mrs. Ventrella's cell phone on a different drive and let us

24 look at it.  If they want us to do the redactions or their

25 taint team is gonna do the redactions, we'll try to accommodate

1   everybody.

2           MR. LUBIN:  I think putting the burden of the

3   redactions on the defense is -- it's -- it creates an

4   impossible obligation.

5           MS. VORPE QUINLAN:  It does.

6           MR. LUBIN:  I think the government can do it easily,

7   but it's pretty much impossible for us to be able to.  And

8   someone would have to see the information to know what it is

9   that needs to be redacted.  I would just propose that the

10  second hard drive be given to us without the two defendants'

11  cell phones --

12          MS. VORPE QUINLAN:  Okay.

13          MR. LUBIN:  -- and end of story, and subject to the

14  same rules as the first hard drive.

15          THE COURT:  Mr. Reader?

16          MR. READER:  Your Honor, the government has put a lot

17  of effort into not just making documents available for

18  inspection but actually copying and producing them to counsel,

19  including, at their requests, providing expensive encrypted

20  drives for those who didn't want to buy them themselves.  We

21  have those here today.

22          It was our goal to produce discovery as soon as

23  possible.  If we go back and start over and, you know, have to

24  recopy large volumes of data to eight or more drives, I think

25  that will be a waste of the Court's time and a waste of the

1   defendants' time.  Certainly, we can turn over these drives,

2   and defendants are just as capable as the government is to

3   split off some part of it.  They're just files on a drive.  If

4   your Honor wants to order that these two phones are gonna be

5   dealt with differently, and they want to produce the drives to

6   their clients, then they can move those to another drive.  It

7   seems to me that that's by far the easiest solution here, as

8   opposed to sending us back home and making us make not eight

9   more drives but 16 more drives, where we split it in two.

10          MS. VORPE QUINLAN:  Well, that's quite a burden on

11   Mr. and Mrs. Ventrella.  And you know the financial position

12   that they're in.  I'm supposed to take all of the drives that

13   you are gonna disseminate to all of these defendants and take

14   off --

15          MR. READER:  That's not what I'm proposing.

16          MS. VORPE QUINLAN:  What did you say?

17          MR. READER:  I'm proposing -- your Honor, we could

18   just make these materials available for inspection and not

19   produce anything.  I mean that would have been the normal

20   course of business under Rule 16.  We've gone beyond that.

21   Including, at the government's expense, buying expensive

22   encrypted drives so that we could make these documents

23   available for inspection.  I think that goes well beyond our

24   obligations.

25          We'd like to give them the drives now.  And if your

1  Honor sees fit to create different categories for what's within

2  the existing drive, you know, counsel are officers of the

3  Court, and they can follow that, and they can take the drive,

4  and the ones that want to send it to their client can move off

5  the two files that respond to Ms. Quinlan's concerns.  And it's

6  not that Ms. Quinlan has to do it, it's that each counsel will

7  get a drive, and, you know, I think is in an easy position to

8  say, Okay, there's ten things here, two of these things can't

9  go home with the client, let's put them on another hard drive.

10         THE COURT:  Won't it be three?  Isn't Mr. Winsauer now

11  complaining?

12         MR. READER:  Well, three, I guess, your Honor, yes.

13         MR. BUONAURO:  Your Honor, Robert Buonauro on behalf

14  of Mr. Winsauer.

15         We did early on observe -- tell Mr. Reader that we had

16  a problem with the seizure of the phone because of personal

17  information on it.

18         THE COURT:  So, I guess if Ms. Quinlan and

19  Mr. Buonauro are gonna keep their objections, then it's gonna

20  be a situation where if any defendant wants to take home the

21  information, the lawyer representing him is going to have to

22  redact out the information from the three drives.

23         MR. READER:  Your Honor, it wouldn't be a redaction.

24  The forensic images are like a single file.  It's like a

25  capsule containing all of the information.  It'd literally be

```
1    dragging, I believe, two of the files, two of ten files on this
2    drive onto another drive.  You know, that -- it takes a few
3    minutes, because it's a large amount of information to copy
4    over, but this is not -- this should not be a burden.  I'm
5    imagining that this would take five minutes of time for
6    someone, you know, who was familiar with this technology.  And
7    then --
8              THE COURT:  So, if we get all the defendants to agree
9    to follow the confidentiality rules, one of the rules is gonna
10   be that before a lawyer can let his client take the information
11   home, those three drives have to be taken out.
12             MR. READER:  Yes, your Honor.  I think that's
13   eminently reasonable and is a much better solution than saying,
14   no, they can't have the discovery now, and we need to take
15   weeks to copy discovery over and give it back to them.
16             MR. LUBIN:  We're okay with that.
17             MR. KUEHNE:  Your Honor, and in abundance of caution,
18   Mr. Braun would also ask, since we haven't seen the discovery
19   yet, his cell phone be included within the extra protection,
20   the carve-out provision.
21             Oh, we're told it's not part of the process, so I
22   revoke that position.
23             THE COURT:  Okay.
24             So --
25             MS. VORPE QUINLAN:  Thank you, your Honor.  Thank you
```

1   very much.

2           THE COURT:  So, why don't we come up with a list of

3   rules that we can have the defendants swear under oath that

4   they're going to follow.

5           Mr. Reader, you want to come up with the rules that

6   they've got to follow so we can swear them in that they're

7   going to follow the rules under penalty of perjury?  And then

8   you guys can submit to me a second revised protective order.

9           MR. READER:  We'll do that, your Honor.

10          THE COURT:  But we've got everybody here now, so why

11  don't we come up with the rules right now, and we can bring

12  them up, they can swear under oath that they're going to follow

13  those rules, and then I'll rule on the motion for continuance.

14          MR. READER:  That's fine, your Honor.

15          I think the first rule would be that the discovery

16  they receive remains at all times on an encrypted or

17  password-protected drive; that they may not share any documents

18  from the confidential discovery with anyone outside of their

19  defense team.

20          THE COURT:  Okay.

21          MR. READER:  And, lastly, I would ask that the actual

22  physical drives be restricted for use at their homes.

23          DEFENDANT WAKLEY:  Begging -- I didn't understand

24  that.

25          MR. READER:  That geographically, if they're gonna

1  have access to these devices, that they're not carrying them

2  all over the country.  Several of the defendants travel

3  extensively for business still, your Honor.  And so, their

4  access to these devices should be limited to one place, whether

5  it's home or business, and that they're not carrying these

6  around with them and potentially losing them.

7          MR. LUBIN:  Home or office we can agree to, home or

8  office.  It could be -- it would need to be both, though.

9          THE COURT:  And then they have to return the drive

10  back to the lawyer when they're done with it?

11          MR. READER:  That would be within the existing order

12  already, your Honor.  All discovery is currently marked as --

13  that is currently marked as confidential under the existing

14  protective order will be returned at the conclusion of these

15  proceedings.

16          THE COURT:  Anything else we need to ask them to swear

17  to?

18          MR. READER:  I think the last thing, your Honor -- and

19  I believe your Honor said this earlier -- but that, yes,

20  they're not supposed to share this information with anybody

21  else, but I think it would also be appropriate to clarify that

22  the information can only be used for this proceeding.

23          MS. VORPE QUINLAN:  And that before the drives are

24  disseminated to clients, that the lawyers will remove the

25  Ventrella cell phones from the drives.

```
 1           THE COURT:  Well, that's not something that the
 2  defendants are gonna swear to.  That's something that will be
 3  in the second revised protective order.
 4           Anything else --
 5           MS. VORPE QUINLAN:  And you're his client.
 6           MR. BUONAURO:  And Mr. Winsauer, also.
 7           THE COURT:  Right.  The three phones.
 8           MR. READER:  Again, I'm not sure if this is responsive
 9  to what your Honor is asking, but I think we would ask that the
10  colloquy clarify that producing these documents outside of this
11  order would be in contempt of court and, you know, subject to
12  very severe sanctions, possibly criminal penalties.
13           THE COURT:  If they share the documents with anybody
14  other than the defense team, then they can be held in contempt
15  of court, and I could put them in jail.
16           MR. READER:  That's right.  And I think perhaps your
17  Honor could even make the point that given the current state of
18  forensics, it's possible to track that down after the fact.
19           THE COURT:  They're all here hearing what you're
20  saying.
21           Anything else that we need to have in the colloquy?
22           MR. KUEHNE:  Your Honor, Ben Kuehne.
23           I don't think so, but I just wanted to raise this as a
24  potential issue.  It should not affect the colloquy.  But my
25  concern, your Honor, is that once we get the discovery for
```

```
 1    Mr. Braun, if there are privileged materials, attorney-client
 2    or work product privileged materials that didn't make it
 3    through the taint team, there may be a protective action after
 4    the fact.
 5              THE COURT:  Okay.
 6              MR. KUEHNE:  And if so, the Court can fashion
 7    appropriate remedies.  But I did want the Court to understand
 8    that there may be particular issues that we don't have the
 9    ability to address until we see the documents.
10              THE COURT:  And maybe Judge Matthewman will address
11    those.
12              MR. KUEHNE:  Of course.
13              THE COURT:  Anything else before I call up all the
14    defendants to be sworn in?
15              MR. READER:  I guess, your Honor, it might be
16    appropriate to address who the client is with regards to the
17    corporations.  So, the individuals, obviously, we understand.
18              THE COURT:  I think it's going to be the corporate
19    representatives that are here today.
20              MR. READER:  So, we would ask, then, that the
21    provision of that discovery be restricted to the corporate
22    representative.
23              THE COURT:  Right.  Only the two corporate
24    representatives are gonna be able to look at it, and they can't
25    share it with other people.
```

1          MR. READER:  And then lastly, your Honor, I did want

2     to respond to Mr. Kuehne's comment about privilege.  You know,

3     Blackstone Labs' computers from their offices were imaged and

4     are part of this.  None of the forensic images are redacted in

5     any way.  You can't redact a forensic image.  It's an image of

6     the computer.  So, they necessarily include whatever existed on

7     that computer on the day that it was seized.  And that's why,

8     your Honor, the current protective order includes this 502(d).

9          So, there is no way for the government to redact a

10    forensic image.  I don't believe that's technically possible.

11    So, if they want to have the ability to look in the computers,

12    it's gonna have to be all or nothing.  I think that's perfectly

13    reasonable.  And the Court's 502(d) order will cover any issue

14    there.  And in the unlikely event that there's something that

15    somebody thinks is privileged and wants to use for their

16    defense, then that's gonna be an issue for the Court.

17          THE COURT:  Anything further before we bring up the

18    defendants?

19          MR. SHEARIN:  Yes, your Honor.  Robert Shearin on

20    behalf of Ventech Labs.

21          Just to make it clear, my authorized representative,

22    Eric Wakely, I also -- another authorized representative is

23    Ms. Ashley Ventrella, who's an unindicted coconspirator.  So, I

24    would need to share it with her also, even though she won't be

25    here to swear, to swear in it, if that would be okay with the

1   Court.

2          THE COURT:  I don't think so.  She should have been

3   here if she wanted to --

4          MR. SHEARIN:  Okay.  She's an unindicted

5   coconspirator.  So is the order I --

6          THE COURT:  We're just agreeing on Mr. Wakely.

7          MR. SHEARIN:  Beg your pardon?

8          THE COURT:  Just Mr. Wakely is gonna be able to look

9   at it.

10          MR. SHEARIN:  Okay.

11          THE COURT:  And then you'll have to maybe file a

12   motion to add her --

13          MR. SHEARIN:  I'll bring her in.  If she needed to

14   look at it, I would.  Because I think Mr. Ventrella will be

15   competent also.  I don't represent him.

16          THE COURT:  Okay.

17          MR. SHEARIN:  One final thing is, I know that some of

18   these discovery issues, and by being there was gonna shorten

19   time, from my perspective, what we've -- doing this protective

20   order does not shorten the time I need to prepare for this

21   trial and for the motions.

22          THE COURT:  Okay.

23          MR. SHEARIN:  Thank you, your Honor.

24          THE COURT:  All right.  If we could have the

25   defendants come on up and the corporate representatives?

1          So, why don't we start with swearing in Mr. Braun.

2          ROOM CLERK:  Please raise your right hand.

3          *(PHILLIP BRAUN, DEFENDANT HEREIN, WAS SWORN)*

4          THE COURT:  And can we swear in Mr. Singerman?

5          ROOM CLERK:  Please raise your right hand.

6          *(AARON SINGERMAN, DEFENDANT HEREIN, WAS SWORN)*

7          THE COURT:  And can we swear in Mr. Dimaggio?

8          ROOM CLERK:  Please raise your right hand.

9          *(ROBERT DIMAGGIO, DEFENDANT HEREIN, WAS SWORN)*

10         THE COURT:  And can we swear in Mr. Boccuzzi?

11         ROOM CLERK:  Please raise your right hand.

12         *(JAMES BOCCUZZI, DEFENDANT HEREIN, WAS SWORN)*

13         THE COURT:  And can we swear in Mr. Wakely?

14         ROOM CLERK:  Please raise your right hand.

15     *(ERIC WAKELY, CORPORATE REPRESENTATIVE FOR VENTECH LABS,*

16                 *DEFENDANT HEREIN, WAS SWORN)*

17         THE COURT:  And do you understand that you're now

18  under oath, and if you answer any of my questions falsely, your

19  answers may later be used against you in another prosecution

20  for perjury or contempt of court?

21         Mr. Braun?

22         DEFENDANT BRAUN:  Yes, your Honor.

23         THE COURT:  Mr. Singerman?

24         DEFENDANT SINGERMAN:  Yes, your Honor.

25         THE COURT:  Mr. Dimaggio?

```
1           DEFENDANT DIMAGGIO:  Yes, your Honor.

2           THE COURT:  Mr. Ventrella?

3           DEFENDANT VENTRELLA:  Yes, your Honor.

4           THE COURT:  Mr. Boccuzzi?

5           DEFENDANT BOCCUZZI:  Yes, your Honor.

6           THE COURT:  And Mr. Winsauer?

7           DEFENDANT WINSAUER:  Yes, your Honor.

8           THE COURT:  And Mr. Wakely?

9           DEFENDANT WAKLEY:  Yes, sir.

10          (Discussion had off the record between the court clerk

11  and the Court)

12          THE COURT:  And I think I may have forgot to swear

13  Mr. Winsauer.

14          ROOM CLERK:  Please raise your right hand.

15          (DAVID WINSAUER, DEFENDANT HEREIN, WAS SWORN)

16          THE COURT:  And do you understand that you're now

17  under oath, and if you answer any of my questions falsely, your

18  answers may later be used against you in another prosecution

19  for perjury or contempt of court, Mr. Winsauer?

20          DEFENDANT WINSAUER:  Yes.

21          THE COURT:  Is that everybody?  Or have I missed

22  anybody?

23          MS. VORPE QUINLAN:  Mr. Ventrella was not sworn.

24          THE COURT:  Okay.

25          ROOM CLERK:  Please raise your right hand.
```

```
 1              (ANTHONY VENTRELLA, DEFENDANT HEREIN, WAS SWORN)
 2              THE COURT:  And, Mr. Ventrella, do you understand that
 3     you're now under oath, and if you answer any of my questions
 4     falsely, your answers may later be used against you in another
 5     prosecution for perjury or contempt of court?
 6              DEFENDANT VENTRELLA:  Yes, your Honor.
 7              THE COURT:  And Mr. Braun was sworn in, I guess, both
 8     for himself and for Blackstone Labs?
 9              MR. KUEHNE:  Your Honor, we'd like that clarification
10     on the record.
11              THE COURT:  Okay.  So, on behalf of Blackstone Labs,
12     can we swear in Mr. Braun?
13              ROOM CLERK:  Please raise your right hand.
14      (PHILLIP BRAUN, CORPORATE REPRESENTATIVE FOR BLACKSTONE LABS,
15                      DEFENDANT HEREIN, WAS SWORN)
16              THE COURT:  And do you understand that you're now
17     under oath, and if you answer any of my questions falsely, your
18     answers may later be used against you in another prosecution
19     for perjury or contempt of court, Mr. Braun?
20              DEFENDANT BRAUN:  Yes, your Honor.
21              THE COURT:  All right.  Do you agree that the
22     discovery is going to be kept on an encrypted or protected
23     drive; that you're not going to make any copies of it; that
24     you're not going to show any of these documents to anybody else
25     except your lawyer or the defense team; that you're not gonna
```

1   use the documents for any purpose other than this preparing for

2   trial; that you're gonna keep the documents or the hard drives

3   only at your house or office; and that you're gonna return

4   those devices to your lawyer when you're done with them; and

5   understand if you don't follow those rules, that you can be

6   criminally prosecuted for contempt of court?

7             Do you agree to all of that, Mr. Braun?

8             DEFENDANT BRAUN:  I do, your Honor.

9             THE COURT:  On behalf of yourself and the corporation?

10            DEFENDANT BRAUN:  Yes, your Honor.

11            THE COURT:  Do you agree with that, Mr. Singerman?

12            DEFENDANT SINGERMAN:  Yes, your Honor.

13            THE COURT:  Do you agree with that, Mr. Dimaggio?

14            DEFENDANT DIMAGGIO:  Yes, your Honor.

15            THE COURT:  Do you agree with that, Mr. Ventrella?

16            DEFENDANT VENTRELLA:  Yes, your Honor.

17            THE COURT:  Do you agree with that, Mr. Boccuzzi?

18            DEFENDANT BOCCUZZI:  Yes, your Honor.

19            THE COURT:  And do you agree with that, Mr. Wakely?

20            DEFENDANT WAKLEY:  Yes, your Honor.

21            THE COURT:  Okay.  You can have a seat.

22            I forgot somebody again -- Mr. Winsauer.  I keep

23   skipping Mr. Winsauer.

24            Do you agree with that, Mr. Winsauer?

25            DEFENDANT WINSAUER:  Yes, your Honor.

1          *(Laughter)*

2          THE COURT:  Have a seat.

3          All right.  So, I'm going to ask the government to

4    provide the Court with a proposed second revised protective

5    order that incorporates what we talked about today.

6          Anything further before I rule on the motion for

7    continuance?

8          *(No response)*

9          THE COURT:  Anything further from the government?

10         MR. FRANK:  No, your Honor.  No, your Honor.

11         THE COURT:  All right.  I'm gonna order that all the

12   discovery be provided to the defendants by May the 17th.  I'm

13   gonna give the defendants until September the 17th to file

14   defensive motions.  I'm gonna set the trial for January the 6th

15   of next year, with a calendar call on December the 27th.  And

16   we'll see everybody back on those two dates.

17         Thanks for coming in.

18         MS. DMITROVSKY:  Thank you, your Honor.

19         MR. FRANK:  Thank you, your Honor.

20         *(Discussion had off the record)*

21         THE COURT:  All the other calendar calls are

22   cancelled.  So, you don't have to come in for the other

23   calendar calls.

24         MR. KUEHNE:  Your Honor, will the Court be making the

25   appropriate finding for the speedy trial, ends of justice?

```
1              THE COURT:  Yes.

2              MS. VORPE QUINLAN:  And, also, would the Court --

3    would the government's order include that defense counsel move

4    the cell phones of the Ventrellas off of the hard drives?

5              THE COURT:  Yes.

6              MS. VORPE QUINLAN:  Thank you.

7              And also Mr. Winsauer's cell phone.

8              THE COURT:  Yes.

9              MS. VORPE QUINLAN:  Thank you.

10             MR. READER:  Your Honor, just to make sure to not

11   waste any time for the Court, while we're drafting the

12   protective order.  Is your Honor inclined to adopt a 502(d)

13   protection for these materials?

14             THE COURT:  Yes, yes.

15             MR. READER:  Thank you.

16             (Discussion had off the record between court reporter

17   and counsel concerning their business cards)

18             MR. SALTER:  Do you need mine as well?

19             MR. KUEHNE:  Thank you, Judge.

20             (Discussion had off the record)

21             MR. SALTER:  Your Honor, Steve Salter for the

22   defendant, James Boccuzzi.

23             We had discussed much earlier the matter of my being

24   able -- or seeking the permission of the Court, which I

25   understand the Court is agreeable, to allow me to file
```

```
1    pleadings --

2            THE COURT:  Yeah, just check with the clerk and see

3    how you can facilitate that.  And if there's a problem, file a

4    motion, and I'll rule on it.

5            MR. SALTER:  Thank you, your Honor.

6            And thank you again for allowing me to appear.

7            MR. LUBIN:  Just one last thing, and I'm not

8    quarreling with the Court, you did take into account my capital

9    murder trial which is set for February.

10           THE COURT:  Right.  We'll be done before then.

11           MR. LUBIN:  Okay.  I thought that's why you --

12           THE COURT:  Or the judge will have to wait.  It's that

13   simple.

14           MR. LUBIN:  Right.  Okay.  I thought that's what you

15   were thinking, but I just wanted to make sure you had

16   considered it.

17           Thank you.

18           (Proceedings concluded at 10:49 a.m.)

19                           -  -  -  -  -

20                     C E R T I F I C A T E

21       I hereby certify that pursuant to Section 753,
     Title 28, United States Code, the foregoing is a true and
22   correct transcript from the record of proceedings in the
     above-entitled matter.

23

24   _____     ___ 6-4-2019_____
     Francine C. Salopek, RMR-CRR                Date
25   Official Court Reporter
```

**COURTROOM SECURITY**
**OFFICER: [1]** 4/11
**DEFENDANT BOCCUZZI: [8]** 21/20
21/25 22/6 22/12 22/19 22/22 71/4
73/17
**DEFENDANT BRAUN: [8]** 7/9 7/22
8/13 8/15 70/21 72/19 73/7 73/9
**DEFENDANT DIMAGGIO: [3]** 15/13
70/25 73/13
**DEFENDANT SINGERMAN: [3]**
13/23 70/23 73/11
**DEFENDANT VENTRELLA: [4]** 17/7
71/2 72/5 73/15
**DEFENDANT WAKLEY: [5]** 25/4
25/8 64/22 71/8 73/19
**DEFENDANT WINSAUER: [4]** 23/20
71/6 71/19 73/24
**MR. BUONAURO: [6]** 23/3 23/8
23/22 59/16 62/12 66/5
**MR. FRANK: [6]** 4/22 6/8 6/13 6/18
74/9 74/18
**MR. KUEHNE: [14]** 4/4 4/24 5/2 5/11
5/17 5/24 8/18 63/16 66/21 67/5
67/11 72/8 74/23 75/18
**MR. LUBIN: [40]**
**MR. READER: [67]**
**MR. SALTER: [17]**
**MR. SHEARIN: [12]** 24/1 24/20
24/22 24/25 25/10 68/18 69/3 69/6
69/9 69/12 69/16 69/22
**MR. WILLIAMS: [7]** 14/18 14/21
14/24 15/4 15/8 15/15 40/6
**MS. DMITROVSKY: [10]** 7/14 7/19
7/25 8/3 8/7 8/16 34/18 35/2 35/8
74/17
**MS. VORPE QUINLAN: [37]**
**ROOM CLERK: [9]** 4/13 70/1 70/4
70/7 70/10 70/13 71/13 71/24 72/12
**THE AGENT: [1]** 4/7
**THE COURT REPORTER: [1]** 57/9
**THE COURT: [209]**

**$**

**$165,000 [1]** 35/21

**0**

**0386 [1]** 2/4

**1**

**1.8 million [1]** 9/22
**10 [1]** 16/3
**100 [2]** 2/10 2/13
**10:49 [1]** 76/18
**120 [2]** 10/19 24/17
**120 days [1]** 24/15
**1217 [1]** 2/16
**12th [1]** 24/6
**1499 [1]** 3/5
**15th [1]** 24/7
**16 [2]** 61/9 61/20
**17th [2]** 74/12 74/13
**180 [1]** 24/14
**18th [1]** 24/8

**19-80030-CR-WPD [1]** 1/4

**2**

**20 years [2]** 36/9 44/17
**200 gigabytes [1]** 54/22
**20044-0386 [1]** 2/4
**2014 [1]** 16/20
**2017 [1]** 54/12
**2019 [3]** 1/8 4/1 76/24
**2020 [2]** 5/22 9/9
**20530 [1]** 2/7
**205F [1]** 3/9
**21 U.S.C. 331 [1]** 28/17
**212 [1]** 3/6
**22 [1]** 5/3
**27th [1]** 74/15
**28 [3]** 5/7 5/14 76/21
**28th [1]** 5/10
**299 [1]** 3/9
**2nd [3]** 2/10 2/13 2/16

**3**

**30th [1]** 13/18
**32804 [1]** 2/25
**331 [2]** 28/16 28/17
**33132 [2]** 2/10 2/14
**33301 [1]** 3/9
**33401 [2]** 2/19 2/22
**33401-6706 [1]** 2/17
**33486 [1]** 3/6
**3550 [2]** 2/9 2/13
**36542-8123 [1]** 3/3
**386 [1]** 2/4

**4**

**45 [1]** 6/1
**450 [1]** 2/7
**49.1 [1]** 31/24

**5**

**502 [5]** 13/16 26/25 68/8 68/13 75/12
**515 [1]** 2/22
**5657 [1]** 3/10
**58 [1]** 25/21

**6**

**6-4-2019 [1]** 76/24
**60 days [2]** 6/1 20/12
**60,000 [1]** 35/19
**6706 [1]** 2/17
**6th [1]** 74/14

**7**

**701 [1]** 2/22
**707 [1]** 2/19
**722 [1]** 2/24
**753 [1]** 76/21
**769-5657 [1]** 3/10

**8**

**81 [1]** 23/10
**8123 [1]** 3/3
**8975 [1]** 3/3
**8th [2]** 11/18 11/24

**9**

**90 [1]** 20/12
**90 days [7]** 10/7 10/8 10/13 10/17
15/9 23/14 24/14
**954 [1]** 3/10
**9:01 [2]** 1/9 4/1
**9:17 [1]** 4/19
**9:25 [1]** 10/22

**A**

**a.m [5]** 1/9 4/1 4/19 10/22 76/18
**a/k/a [1]** 1/10
**Aaron [4]** 8/18 9/1 9/3 70/6
**ability [4]** 26/16 47/1 67/9 68/11
**above [1]** 76/22
**above-entitled [1]** 76/22
**Absolutely [1]** 21/11
**abundance [2]** 27/25 63/17
**accept [3]** 46/14 46/24 58/10
**accepted [1]** 8/21
**access [9]** 12/5 31/14 31/14 34/1
53/14 56/7 57/8 65/1 65/4
**accommodate [2]** 40/12 59/25
**according [3]** 9/24 16/18 31/23
**account [3]** 31/6 31/7 76/8
**accurately [2]** 20/13 55/7
**across [1]** 10/18
**Act [1]** 16/6
**action [1]** 67/3
**activity [1]** 16/10
**add [3]** 34/21 42/3 69/12
**addition [2]** 42/16 47/8
**address [4]** 14/4 67/9 67/10 67/16
**addressed [2]** 27/1 49/2
**Administration [1]** 28/1
**adopt [1]** 75/12
**adopted [1]** 30/17
**adopting [1]** 19/18
**advance [1]** 53/13
**affect [1]** 66/24
**affirmatively [1]** 18/25
**agent [5]** 4/5 6/20 6/22 6/23 38/12
**agents [3]** 44/19 47/18 47/20
**agree [21]**
**agreeable [1]** 75/25
**agreement [6]** 20/24 29/4 31/20
39/25 46/11 59/10
**airport [2]** 4/10 12/20
**AL [2]** 1/10 3/3
**Alabama [1]** 17/18
**Alistair [2]** 2/5 11/2
**allegation [2]** 38/7 38/13
**allegations [1]** 34/3
**allegedly [1]** 41/25
**allow [5]** 30/9 32/14 50/12 51/18
75/25
**allowed [6]** 20/17 20/19 22/5 27/5
44/19 53/6
**allowing [3]** 17/20 33/5 76/6
**allows [1]** 42/5
**almost [1]** 27/11
**alters [1]** 48/23
**although [2]** 27/10 34/2
**amend [1]** 55/24

## A

amended [1]  12/21
AMERICA [1]  1/7
amount [2]  15/2 63/3
Amy [2]  2/18 9/3
analogy [1]  44/25
analyze [1]  41/6
announce [7]  4/21 7/13 14/17 15/18
 17/14 23/2 23/25
answer [6]  20/10 47/24 70/18 71/17
 72/3 72/17
answers [4]  70/19 71/18 72/4 72/18
Anthony [3]  15/17 15/21 72/1
anticipate [1]  20/21
apologies [1]  11/3
apologize [1]  12/20
appearances [9]  2/1 3/1 4/21 7/13
 14/7 15/18 17/15 23/2 23/25
applied [1]  47/16
applies [1]  56/14
apply [3]  28/14 48/3 56/21
applying [1]  18/11
appreciate [1]  41/14
approach [3]  7/5 53/22 54/3
April [5]  5/3 13/18 15/5 24/6 24/8
April 22 [1]  5/3
April 30th [1]  13/18
aren't [3]  32/25 33/18 40/10
arguably [2]  12/12 54/24
argument [5]  8/5 20/8 22/15 32/2
 46/22
arraigned [4]  5/3 12/1 24/6 25/25
arraignment [1]  24/16
articles [1]  16/22
Ashley [2]  47/6 68/23
assumed [1]  33/17
assuming [3]  21/6 37/22 53/8
attendance [2]  5/1 5/9
attorney [13]  2/2 2/6 11/2 26/19
 28/12 33/17 36/22 37/3 38/17 48/3
 48/13 53/22 67/1
attorney-client [5]  26/19 28/12 48/3
 48/13 67/1
attorneys [3]  13/17 18/7 34/24
AUSA [1]  44/17
authenticity [3]  27/9 50/14 50/15
authorization [1]  7/21
authorized [4]  24/3 25/3 68/21 68/22
authorizing [2]  8/22 25/2
automatically [1]  37/3
average [1]  40/22
avoid [1]  12/5
avoiding [1]  26/5
awaiting [1]  36/6
aware [1]  38/8

## B

backtracking [1]  56/10
balance [1]  6/15
bank [6]  31/7 33/8 39/14 39/14 39/15
 46/6
Beach [4]  2/17 2/19 2/22 9/13
bear [2]  16/24 20/10
Beg [1]  69/7

Begging [1]  64/23
belief [4]  6/9 6/23 6/24 7/3
believe [22]
belonging [1]  30/23
Ben [1]  66/22
Benedict [1]  2/8
beneficial [1]  41/20
benefit [1]  28/10
beyond [4]  11/10 12/4 61/20 61/23
birth [1]  46/7
Blackstone [21]
Blackstone's [2]  35/3 38/23
Blvd [1]  3/9
board [2]  7/22 25/3
Boca [1]  3/6
Boccuzzi [15]  3/2 17/11 17/18 18/1
 20/6 20/22 21/1 21/8 21/9 21/16
 70/10 70/12 71/4 73/17 75/22
Boccuzzi's [2]  21/10 51/20
bond [2]  36/7 46/3
Box [1]  47/7
boxes [2]  40/23 57/22
Brady [2]  12/5 26/16
Branch [1]  2/3
BRAUN [26]
Braun's [2]  5/2 38/10
Broward [1]  3/9
brute [1]  40/21
bunch [1]  34/9
Buonauro [5]  2/23 2/24 23/5 62/13
 62/19
burden [5]  57/7 57/13 60/2 61/10
 63/4
business [7]  32/10 43/25 44/6 61/20
 65/3 65/5 75/17
buy [1]  60/20
buying [1]  61/21

## C

calendar [7]  1/15 5/6 5/7 24/6 74/15
 74/21 74/23
call [5]  1/15 7/12 24/6 67/13 74/15
called [1]  16/20
calls [3]  49/22 74/21 74/23
cancelled [2]  4/8 74/22
capable [1]  61/2
capital [2]  9/11 76/8
capsule [1]  62/25
card [3]  31/6 33/2 34/11
cards [1]  75/17
carrying [3]  6/11 65/1 65/5
carve [2]  47/13 63/20
carve-out [1]  63/20
Catanzaro [1]  2/12
catch [1]  45/5
categories [1]  62/1
category [1]  25/21
caught [1]  45/4
caution [2]  27/25 63/17
cell [33]
certify [1]  76/21
cetera [1]  34/11 49/22
challenge [1]  50/13
chances [1]  43/10

charge [1]  16/3
charged [1]  16/6
chats [1]  49/21
check [2]  4/5 76/2
chemicals [1]  28/21
child [4]  44/1 44/14 49/11 52/20
children [4]  43/25 44/3 44/5 49/8
choice [1]  10/18
chunks [3]  32/22 39/17 39/21
civil [2]  19/8 25/13
claim [1]  27/16
clarification [1]  72/9
clarify [2]  65/21 66/10
clear [1]  68/21
clerk [2]  71/10 76/2
clerk's [3]  19/24 20/1 20/3
click [1]  55/18
client [27]
clients [12]  14/9 34/25 36/12 39/10
 41/13 41/24 42/17 43/4 53/13 56/10
 61/6 65/24
close [1]  35/20
CM [1]  19/20
CM/ECF [1]  19/20
co [1]  6/22
co-case [1]  6/22
coconspirator [2]  68/23 69/5
coconspirators [1]  50/23
code [2]  43/5 76/21
codefendants [4]  12/6 27/15 34/12
 57/2
collar [1]  16/4
collected [2]  28/1 28/5
colloquy [3]  66/10 66/21 66/24
Colorado [1]  40/6
comfortable [2]  22/2 34/24
comment [1]  68/2
communicate [1]  44/2
communicated [1]  47/10
communications [9]  47/11 49/7 49/8
 49/11 49/24 50/21 50/25 51/7 51/9
companies [1]  31/4
company [2]  7/22 32/10
competent [2]  55/18 69/15
complaining [1]  62/11
complete [2]  6/15 54/21
compliance [1]  38/5
compromise [10]  31/12 31/16 31/19
 37/22 38/3 38/19 39/8 43/8 46/15
 58/6
computer [6]  1/25 54/21 54/22 55/1
 68/6 68/7
computers [10]  26/10 53/19 54/9
 54/16 54/21 55/4 55/7 55/10 68/3
 68/11
concern [4]  28/18 38/4 59/14 66/25
concerned [2]  38/21 59/12
concerning [2]  52/20 75/17
concerns [4]  26/21 44/13 49/1 62/5
concluded [1]  76/18
conclusion [1]  65/14
concur [1]  20/7
confer [2]  6/22 44/11
conference [2]  5/8 25/16

79

**C**

**conferred [1]** 25/15
**confidential [34]**
**confidentiality [2]** 48/25 63/9
**confirm [1]** 27/8
**conflict [5]** 17/25 18/5 18/20 21/23 22/15
**consequences [1]** 46/17
**conservative [1]** 9/17
**conspiracy [2]** 16/7 33/22
**consumer [2]** 2/3 31/3
**consumers [1]** 33/9
**contacted [1]** 38/9
**containing [1]** 62/25
**contempt [9]** 46/2 46/17 66/11 66/14 70/20 71/19 72/5 72/19 73/6
**content [1]** 45/3
**continuance [9]** 5/12 5/21 9/6 9/8 19/18 23/12 24/8 64/13 74/7
**Continued [1]** 3/1
**control [1]** 30/25
**controlled [1]** 34/3
**conversations [3]** 13/14 47/6 48/16
**convicted [1]** 22/9
**conviction [1]** 9/14
**cooperating [1]** 47/8
**coordinate [1]** 19/24
**copies [6]** 11/5 27/6 54/21 55/17 57/23 72/23
**copy [8]** 33/18 50/6 50/7 54/10 54/12 54/20 63/3 63/15
**copying [1]** 60/18
**corporate [11]** 7/18 7/22 8/21 8/22 25/1 67/18 67/21 67/23 69/25 70/15 72/14
**corporation [9]** 8/10 8/11 8/13 8/20 30/23 34/2 43/20 43/21 73/9
**corporations [1]** 67/17
**counsel [58]**
**counsel's [4]** 30/17 31/11 32/18 57/14
**country [2]** 19/10 65/2
**court [54]**
**court's [12]** 18/17 18/19 20/10 34/21 38/6 45/18 46/11 55/23 56/13 58/10 60/25 68/13
**courtroom [10]** 4/2 4/13 4/15 4/19 6/21 9/4 10/22 15/22 52/18 57/23
**courts [1]** 18/17
**cover [1]** 68/13
**CR [1]** 1/4
**create [2]** 42/4 62/1
**created [1]** 25/21
**creates [1]** 60/3
**credit [3]** 31/6 33/2 34/11
**crimes [1]** 57/4
**criminal [5]** 16/9 19/12 19/14 31/23 66/12
**criminal's [1]** 19/13
**criminally [1]** 73/6
**critical [1]** 32/19
**CRR [2]** 3/7 76/24
**custody [1]** 30/25

**D**

**D.C [2]** 6/10 47/19
**DASCA [1]** 16/20
**data [1]** 60/24
**date [9]** 5/14 5/17 5/20 5/22 9/9 9/22 40/11 46/23 76/24
**dates [2]** 46/7 74/16
**David [4]** 2/2 4/23 23/1 71/15
**Davis [3]** 2/9 2/12 7/17
**DC [2]** 2/4 2/7
**dealt [1]** 61/5
**death [2]** 9/13 9/14
**December [1]** 74/15
**decide [1]** 37/3
**decides [1]** 58/22
**decision [1]** 56/14
**deem [1]** 28/24
**deemed [3]** 31/4 32/7 39/21
**defendant [28]**
**defendants [70]**
**defendants' [5]** 12/3 49/22 55/23 60/10 61/1
**defending [1]** 20/22
**defense [33]**
**defenses [1]** 39/5
**defensive [8]** 5/24 5/25 10/5 10/14 15/8 17/2 36/8 74/14
**defer [1]** 8/4
**delayed [1]** 6/10
**delaying [1]** 40/11
**deliberate [1]** 28/13
**denial [1]** 5/4
**denied [1]** 24/8
**denying [1]** 25/16
**Department [2]** 2/3 2/6
**depends [1]** 18/12
**designated [1]** 37/10
**designation [1]** 32/22
**desired [1]** 20/16
**device [1]** 57/20
**devices [14]** 12/3 26/9 50/13 53/19 54/20 55/14 57/6 57/8 57/13 57/22 58/3 65/1 65/4 73/4
**difference [1]** 38/14
**difficult [2]** 44/7 53/24
**Dimaggio [8]** 14/16 14/20 14/21 15/11 70/7 70/9 70/25 73/13
**Dimaggio's [2]** 14/23 15/4
**Dimitrouleas [1]** 1/16
**directly [1]** 20/10
**disagree [1]** 16/16
**disagreement [1]** 31/25
**disclose [3]** 29/11 30/8 45/25
**disclosing [1]** 28/16
**disclosures [1]** 11/12
**discoverable [1]** 12/12
**discovery [65]**
**discuss [3]** 13/20 38/17 43/11
**discussed [2]** 19/5 75/23
**discussion [10]** 4/7 4/17 18/6 34/18 35/2 35/8 71/10 74/20 75/16 75/20
**discussions [1]** 26/1
**dispute [2]** 11/8 55/6
**disqualify [1]** 5/5

**D (cont.)**

**disseminate [1]** 61/13
**disseminated [3]** 48/18 49/6 65/24
**dissemination [1]** 38/22
**distribute [1]** 44/24
**distributed [1]** 52/17
**district [7]** 1/1 1/2 1/17 3/8 9/16 30/18 47/20
**DIVISION [1]** 1/3
**Dmitrovsky [4]** 2/11 7/16 7/17 34/15
**docket [1]** 8/23
**docs [1]** 41/3
**document [4]** 23/10 28/20 32/24 41/24
**document 81 [1]** 23/10
**documents [77]**
**draft [2]** 13/12 27/1
**drafting [1]** 75/11
**dragging [1]** 63/1
**drive [38]**
**drives [31]**
**drug [3]** 16/6 16/6 28/1
**drugs [3]** 16/4 16/7 28/22
**DVDs [1]** 37/11

**E**

**earliest [2]** 5/18 5/20
**early [2]** 6/6 62/15
**easiest [2]** 58/17 61/7
**easily [1]** 60/6
**easy [3]** 47/24 58/16 62/7
**ECF [2]** 19/20 25/21
**eDiscovery [2]** 40/18 40/19
**effect [2]** 20/18 25/17
**effort [1]** 60/17
**eight [2]** 60/24 61/8
**electronic [6]** 6/3 26/9 27/9 27/12 28/9 50/6
**else's [1]** 15/1
**email [2]** 32/8 43/25
**emails [6]** 33/1 33/2 39/18 39/18 39/20 44/21
**eminently [3]** 33/4 39/11 63/13
**employed [1]** 30/24
**encrypted [15]** 42/7 42/8 42/8 42/14 42/16 42/18 42/21 42/22 42/23 43/8 52/2 60/19 61/22 64/16 72/22
**encryption [1]** 46/25
**enormous [1]** 30/24
**enter [5]** 25/17 27/13 28/25 43/5 44/12
**entitled [1]** 76/22
**entry [1]** 8/23
**Eric [2]** 68/22 70/15
**especially [1]** 44/14
**Esq [10]** 2/8 2/11 2/12 2/15 2/18 2/20 2/23 3/2 3/4 3/5
**essentially [4]** 11/13 13/16 30/21 32/10
**et [3]** 1/10 34/11 49/22
**et cetera [2]** 34/11 49/22
**event [1]** 68/14
**everybody [10]** 13/1 15/1 29/6 29/10 34/17 43/14 60/1 64/10 71/21 74/16
**everyone [3]** 9/20 45/17 45/23

**E**

**evidence [7]** 27/8 27/9 41/18 57/4
57/20 57/20 57/21
**examination [2]** 52/3 55/21
**examiner [5]** 50/7 55/17 55/19 57/9
57/15
**Excel [2]** 49/19 49/21
**exception [6]** 47/14 50/17 51/15
51/16 51/17 51/19
**exculpatory [1]** 55/11
**executed [2]** 53/18 54/8
**exhibits [3]** 27/11 41/3 41/6
**exist [1]** 58/14
**existed [1]** 68/6
**existing [4]** 30/15 62/2 65/11 65/13
**exited [1]** 4/13
**expect [1]** 27/11
**expense [1]** 61/21
**expensive [2]** 60/19 61/21
**expert [5]** 11/12 50/9 55/9 58/4 58/23
**explain [2]** 9/10 53/16
**explanation [1]** 56/19
**express [1]** 52/16
**expressed [5]** 11/8 26/18 28/17 34/4
56/25
**extend [1]** 10/19
**extensive [1]** 20/9
**extensively [1]** 65/3
**extent [1]** 19/17
**extra [1]** 63/19
**extracted [3]** 49/22 55/12 56/3
**extracts [1]** 48/11
**extremely [2]** 47/7 52/14
**eyes [1]** 41/23

**F**

**facilitate [2]** 43/9 76/3
**facing [1]** 41/16
**fact [6]** 30/22 33/2 34/4 48/16 66/18
67/4
**falsely [4]** 70/18 71/17 72/4 72/17
**farther [1]** 41/9
**fashion [2]** 39/25 67/6
**FDA [12]** 11/12 12/13 26/7 27/24
28/5 28/14 28/16 28/17 28/24 38/10
38/12 57/25
**February [6]** 5/17 5/22 9/14 15/5
54/12 76/9
**February 2017 [1]** 54/12
**February 2020 [1]** 5/22
**federal [2]** 9/16 31/23
**Fifth [1]** 2/7
**file [29]**
**filed [15]** 5/12 6/1 9/6 9/7 12/14
12/21 14/25 16/24 18/20 19/6 23/9
24/7 25/12 26/4 26/22
**files [7]** 42/8 42/8 57/15 61/3 62/5
63/1 63/1
**filing [2]** 19/9 40/11
**final [2]** 27/3 69/17
**financial [4]** 25/22 31/6 42/10 61/11
**fine [5]** 15/6 24/12 36/2 52/16 64/14
**fit [2]** 27/8 62/1
**five minutes [1]** 63/5

**FL [7]** 2/10 2/14 2/17 2/19 2/22 2/25
3/6
**Flagler [3]** 2/16 2/19 2/22
**flight [2]** 4/8 4/9
**Floor [1]** 2/16
**FLORIDA [6]** 1/2 1/8 3/9 23/5 30/18
47/20
**focused [1]** 26/5
**folder [1]** 55/18
**Food [2]** 16/6 28/1
**force [1]** 40/21
**foregoing [1]** 76/21
**forensic [32]**
**forensics [4]** 50/7 52/1 58/11 66/18
**foreseeable [1]** 16/11
**forgot [2]** 71/12 73/22
**form [3]** 33/6 43/5 43/8
**format [2]** 28/9 42/21
**FORT [3]** 1/3 1/8 3/9
**forthwith [1]** 12/16
**four-and-a-half [1]** 54/24
**fragments [1]** 55/1
**Francine [3]** 3/7 76/24
**Frank [7]** 2/2 4/19 4/23 6/7 9/25
46/21 48/14
**fraud [2]** 9/15 16/4
**FRIDAY [1]** 4/1
**front [2]** 9/12 25/14

**G**

**geographically [1]** 64/25
**gigabytes [1]** 54/22
**glitch [1]** 56/9
**goal [2]** 28/7 60/22
**gonna [36]**
**gotten [2]** 13/6 23/17
**government [52]**
**government's [5]** 23/16 38/21 58/5
61/21 75/3
**grand [1]** 41/6
**grant [1]** 12/25
**granted [2]** 12/16 12/18
**great [1]** 19/16
**Groh [1]** 30/19
**group [1]** 33/25
**guilty [1]** 5/6
**Gulf [2]** 3/3 17/17

**H**

**hac [8]** 17/21 18/11 18/18 18/23 19/6
19/9 19/14 21/4
**half [1]** 54/24
**hand [8]** 70/2 70/5 70/8 70/11 70/14
71/14 71/25 72/13
**handling [1]** 7/2
**happy [1]** 54/3
**hash [1]** 54/11
**head [2]** 18/25 53/23
**health [1]** 46/9
**healthcare [1]** 9/15
**hear [3]** 35/14 53/22 59/18
**heard [1]** 43/16
**hearing [4]** 14/4 20/2 59/15 66/19
**help [1]** 46/19

**helpful [2]** 53/15 53/24
**helping [3]** 21/25 22/11 40/16
**hereby [1]** 76/21
**hid [1]** 28/4
**highlight [2]** 9/11 9/19
**hire [3]** 22/18 35/21 50/6
**historical [1]** 11/21
**home [22]**
**homes [1]** 64/22
**Honor [166]**
**Honor's [1]** 51/18
**Honorable [1]** 1/16
**hope [1]** 20/11
**hopefully [1]** 11/17
**hot [2]** 41/3 41/10
**hours [2]** 30/6 35/17
**house [1]** 73/3
**hundred [6]** 31/5 32/6 36/3 39/16
40/23 46/11
**hundreds [3]** 36/3 37/1 41/12
**hunt [1]** 55/2
**hurting [1]** 22/10
**husband [4]** 47/7 49/7 50/25 51/6
**husband/wife [2]** 49/7 51/6
**hypothetical [1]** 59/1

**I**

**I'd [8]** 6/21 10/18 10/20 13/4 17/3
17/20 50/4 53/12
**I'll [6]** 24/13 25/16 51/12 64/13 69/13
76/4
**I'm [34]**
**I've [5]** 12/22 13/13 21/2 26/24 36/9
**ID [1]** 46/6
**idea [2]** 40/19 46/18
**identical [1]** 13/17
**identification [1]** 29/9
**identified [1]** 41/5
**identifiers [1]** 31/8
**identifying [1]** 25/23
**identity [1]** 33/12
**ignore [1]** 38/12
**image [5]** 48/21 48/23 68/5 68/5
68/10
**imaged [4]** 43/23 53/20 54/10 68/3
**images [12]** 11/6 12/9 26/15 26/16
44/8 48/21 48/24 50/16 51/20 53/5
62/24 68/4
**imagine [1]** 24/12
**imaging [1]** 45/12
**imagining [1]** 63/5
**immediately [2]** 5/4 41/12
**impossible [3]** 32/11 60/4 60/7
**inadvertent [1]** 26/5
**inadvertently [1]** 28/12
**inclined [3]** 42/4 42/19 75/12
**include [3]** 42/6 68/6 75/3
**included [2]** 41/5 63/19
**includes [1]** 68/8
**including [6]** 6/11 33/7 46/25 49/23
60/19 61/21
**incorporates [1]** 74/5
**index [2]** 23/16 37/11
**indicted [2]** 43/20 51/1

**I**

**indictment [9]**  7/3 11/18 11/20 11/21 16/3 16/4 36/18 38/7 38/13
**individual [2]**  38/11 51/9
**individuals [4]**  26/12 26/13 30/24 67/17
**industry [1]**  16/23
**information [66]**
**informed [1]**  26/18
**ingredients [1]**  28/2
**inherent [1]**  39/3
**initial [1]**  5/7
**innocent [1]**  41/16
**innovative [1]**  30/17
**inspect [2]**  27/8 50/13
**inspection [4]**  12/4 60/18 61/18 61/23
**instead [2]**  36/7 44/21
**intending [2]**  41/1 41/2
**interest [2]**  21/10 22/15
**internal [1]**  25/14
**interspersed [1]**  32/23
**interview [1]**  38/10
**intimate [1]**  26/21
**introduced [1]**  41/18
**investigated [1]**  28/22
**investigation [1]**  38/9
**involvement [1]**  20/21
**issue [15]**  11/5 11/10 12/7 13/15 26/5 27/2 27/2 31/2 31/12 34/22 58/11 59/6 66/24 68/13 68/16
**issued [1]**  16/21
**issues [7]**  10/10 12/5 13/20 14/4 18/4 67/8 69/18
**It'd [1]**  62/25
**item [1]**  27/19
**items [2]**  56/25 57/3

**J**

**jail [3]**  36/6 41/16 66/15
**James [5]**  17/11 17/18 21/1 70/12 75/22
**January [1]**  74/14
**Jim [1]**  17/13
**Joey [1]**  43/21
**join [1]**  16/1
**joining [2]**  15/1 19/18
**joint [2]**  5/19 20/24
**jointly [1]**  16/9
**judge [22]**
**Judge Marks [1]**  9/12
**Judge Marra [3]**  25/13 25/14 25/15
**Judge Matthewman [2]**  8/22 67/10
**Judge Rosenberg [1]**  9/16
**judge's [1]**  5/4
**jump [2]**  21/5 22/17
**June [3]**  9/9 16/16 17/4
**June 2020 [1]**  9/9
**jury [1]**  41/6
**justice [3]**  2/3 2/6 74/25

**K**

**keep [12]**  7/11 8/15 13/25 15/15 17/9 22/21 22/24 23/22 25/10 62/19 73/2

73/22
**Kids [1]**  45/3
**kinds [1]**  46/3
**Kuehne [11]**  2/8 2/9 2/12 4/25 6/12 7/17 8/5 10/7 25/12 35/9 66/22
**Kuehne's [1]**  68/2

**L**

**Labs [24]**
**Labs' [3]**  7/24 8/2 68/3
**lag [1]**  40/12
**laid [1]**  46/10
**language [3]**  13/16 13/17 30/15
**large [8]**  28/18 32/5 32/11 39/17 39/21 51/20 60/24 63/3
**Las [1]**  16/22
**Las Vegas [1]**  16/22
**lastly [3]**  28/15 64/21 68/1
**late [4]**  5/13 11/3 12/19 26/4
**LAUDERDALE [3]**  1/3 1/8 3/9
**Laughter [2]**  54/5 74/1
**law [8]**  2/9 2/12 2/24 3/2 3/5 7/17 45/1 45/4
**lawyer [13]**  10/1 29/25 38/2 39/5 40/2 41/25 47/9 47/11 62/21 63/10 65/10 72/25 73/4
**lawyer's [13]**  7/7 8/9 13/21 15/11 17/5 21/18 23/18 25/6 30/4 31/17 40/5 40/13 58/3
**lawyers [8]**  30/3 41/22 43/12 47/19 47/19 50/18 52/12 65/24
**leaning [1]**  56/6
**lectern [1]**  53/22
**legitimate [1]**  9/13
**legitimately [1]**  10/2
**letting [2]**  34/25 56/7
**limited [1]**  65/4
**list [1]**  64/2
**listen [1]**  44/20
**literally [2]**  6/19 62/25
**litigation [6]**  35/5 35/11 35/13 36/14 39/2 44/13
**LLC [1]**  3/5
**loaded [1]**  40/19
**local [14]**  17/22 18/1 18/7 18/12 18/17 18/18 18/20 18/22 18/23 19/3 19/11 22/3 22/16 22/18
**locally [1]**  19/22
**locations [1]**  26/11
**logical [2]**  32/13 58/20
**lose [1]**  36/11
**loses [1]**  42/9
**losing [1]**  65/6
**Lubin [23]**
**Lubin's [2]**  18/13 20/21
**luck [1]**  10/20

**M**

**magistrate [2]**  5/4 8/21
**majority [4]**  11/4 30/22 37/15 37/17
**March [4]**  11/18 11/24 15/5 26/18
**marital [3]**  49/23 50/21 51/2
**marked [3]**  58/9 65/12 65/13
**Marks [1]**  9/12

**Marra [3]**  25/13 25/14 25/15
**massive [1]**  30/10
**material [1]**  49/7
**materials [4]**  61/18 67/1 67/2 75/13
**matter [7]**  17/21 20/12 43/17 50/23 56/13 75/23 76/22
**matters [5]**  7/1 20/9 44/2 44/6 46/6
**Matthewman [2]**  8/22 67/10
**maximize [1]**  43/10
**May 15th [1]**  24/7
**May 28 [2]**  5/7 5/14
**May 28th [1]**  5/10
**mean [20]**
**means [1]**  42/9
**mechanical [1]**  1/24
**medical [4]**  25/22 31/9 31/10 33/8
**meet [1]**  33/10
**member [1]**  36/5
**merely [1]**  18/10
**messages [4]**  48/11 48/13 49/16 50/11
**metadata [1]**  40/18
**Miami [4]**  2/9 2/10 2/13 2/14
**mill [1]**  33/16
**million [5]**  9/22 30/21 33/7 40/21 54/25
**millions [5]**  16/8 16/8 30/5 30/21 55/1
**mine [1]**  75/18
**minimize [2]**  44/19 44/23
**minimum [1]**  23/13
**minor [3]**  49/8 49/11 52/20
**minors [1]**  44/16
**minute [1]**  29/8
**minutes [2]**  63/3 63/5
**mirror [3]**  43/23 44/8 45/12
**mirrored [1]**  47/17
**missed [1]**  71/21
**mistake [1]**  29/7
**mixed [1]**  58/14
**moment [1]**  17/19
**month [1]**  11/17
**months [3]**  16/17 17/3 32/12
**morning [15]**  4/23 6/10 7/15 9/2 9/24 11/1 11/3 14/14 14/19 15/20 17/17 23/4 24/2 25/15 45/25
**Morse [4]**  2/18 2/18 2/18 9/3
**motion [23]**
**motions [29]**
**move [4]**  47/1 61/6 62/4 75/3
**Mr [1]**  4/19
**Mr. [142]**
**Mr. and [1]**  61/11
**Mr. Boccuzzi [9]**  18/1 20/6 20/22 21/8 21/9 21/16 70/10 71/4 73/17
**Mr. Boccuzzi's [2]**  21/10 51/20
**Mr. Braun [20]**
**Mr. Braun's [2]**  5/2 38/10
**Mr. Buonauro [1]**  62/19
**Mr. Dimaggio [5]**  14/21 15/11 70/7 70/25 73/13
**Mr. Dimaggio's [2]**  14/23 15/4
**Mr. Frank [4]**  6/7 9/25 46/21 48/14
**Mr. Joey [1]**  43/21

## M

**Mr. Kuehne [5]**  6/12 8/5 10/7 25/12 35/9
**Mr. Kuehne's [1]**  68/2
**Mr. Lubin [16]**
**Mr. Lubin's [1]**  18/13 20/21
**Mr. Reader [12]**  6/9 6/20 6/22 7/1 10/22 30/12 37/2 46/13 48/9 60/15 62/15 64/5
**Mr. Reader's [1]**  59/11
**Mr. Salter [5]**  18/14 19/23 20/5 22/4 22/15
**Mr. Singerman [13]**  13/9 13/11 13/21 18/1 21/9 21/23 29/15 45/17 53/3 59/5 70/4 70/23 73/11
**Mr. Singerman's [1]**  22/11
**Mr. Ventrella [14]**  15/22 16/1 17/5 43/24 44/7 47/5 48/17 51/11 59/21 69/14 71/2 71/23 72/2 73/15
**Mr. Ventrella's [3]**  15/24 54/17 59/22
**Mr. Wakely [7]**  24/4 24/25 69/6 69/8 70/13 71/8 73/19
**Mr. Weekly [1]**  24/20
**Mr. Winsauer [12]**  23/5 23/18 59/17 62/10 62/14 66/6 71/6 71/13 71/19 73/22 73/23 73/24
**Mr. Winsauer's [2]**  23/7 75/7
**Mrs. [6]**  47/8 47/12 48/17 50/22 59/23 61/11
**Mrs. Ventrella [5]**  47/8 47/12 48/17 50/22 61/11
**Mrs. Ventrella's [1]**  59/23
**Ms. [11]**  34/15 47/3 51/11 52/10 56/9 56/19 59/12 62/5 62/6 62/18 68/23
**Ms. Ashley [1]**  68/23
**Ms. Dmitrovsky [1]**  34/15
**Ms. Quinlan [4]**  52/10 59/12 62/6 62/18
**Ms. Quinlan's [3]**  56/9 56/19 62/5
**Ms. Ventrella [1]**  51/11
**Ms. Vorpe [1]**  47/3
**multi [1]**  33/22
**multi-defendant [1]**  33/22
**multiple [1]**  47/19
**murder [2]**  9/11 76/9

## N

**names [1]**  16/8
**Nancy [3]**  2/20 2/21 15/21
**nature [7]**  20/25 21/14 26/21 31/3 47/7 48/2 53/7
**nearly [1]**  6/25
**necessary [2]**  27/25 33/10
**Nevada [3]**  40/7 40/8 40/9
**nodding [2]**  18/25 53/23
**nondefendant [1]**  56/23
**none [3]**  20/23 46/4 68/4
**nonparties [1]**  28/20
**normal [1]**  61/19
**North [1]**  2/19
**notes [1]**  36/21
**number [10]**  4/4 6/11 8/23 18/6 25/21 26/1 31/10 37/16 39/13 51/21
**Number 58 [1]**  25/21

**numbers [6]**  31/7 31/7 33/2 34/11 46/7 46/7
**numerous [1]**  13/13
**NW [1]**  2/7

## O

**oath [11]**  30/7 36/12 38/15 45/24 46/16 64/3 64/12 70/18 71/17 72/3 72/17
**object [3]**  19/6 21/15 31/10
**objected [1]**  18/8
**objection [1]**  26/18
**objections [2]**  14/13 62/19
**obligation [5]**  44/18 48/5 48/8 50/12 60/4
**obligations [2]**  33/10 61/24
**observe [1]**  62/15
**obtained [1]**  24/16
**obvious [1]**  46/2
**Occasional [2]**  46/8 46/9
**October [1]**  9/16
**office [23]**
**officers [1]**  62/2
**offices [4]**  2/24 3/2 3/5 68/3
**Official [2]**  3/8 76/25
**officially [1]**  51/22
**oh [7]**  4/6 7/16 28/4 35/9 35/16 55/2 63/21
**omitted [1]**  59/20
**one million [1]**  30/21
**one terabyte [1]**  54/22
**open [3]**  37/23 55/19 57/15
**operating [1]**  25/14
**opportunity [6]**  13/20 20/14 27/7 36/11 50/16 56/8
**opposed [7]**  33/25 35/11 37/4 39/2 40/21 57/17 61/8
**order [48]**
**orders [1]**  38/6
**ordinary [1]**  16/25
**organization [1]**  34/4
**original [1]**  25/19
**originally [1]**  59/15
**originals [1]**  54/13
**Orlando [2]**  2/25 23/5
**ought [2]**  26/17 34/13
**outstanding [1]**  6/25
**owners [1]**  54/13

## P

**P.A [5]**  2/9 2/12 2/15 2/21 2/21
**P.O [1]**  2/4
**pad [1]**  42/24
**page [2]**  16/3 44/15
**page 10 [1]**  16/3
**page 2 [1]**  44/15
**pages [2]**  35/19 39/16
**Palm [4]**  2/17 2/19 2/22 9/12
**Palmetto [1]**  3/5
**paper [1]**  40/23
**paragraph [1]**  16/5
**paragraph E [1]**  16/5
**parallel [1]**  27/23
**pardon [1]**  69/7

**Park [1]**  3/5
**part [5]**  28/3 49/20 61/3 63/21 68/4
**participate [1]**  20/24
**parties [1]**  57/23
**parts [1]**  37/5
**party [2]**  33/24 33/24
**passed [1]**  16/20
**password [2]**  42/24 43/4 64/17
**password-protected [2]**  43/4 64/17
**penalties [2]**  37/21 66/12
**penalty [2]**  9/14 64/7
**pending [1]**  25/13
**people [4]**  33/25 44/21 52/17 67/25
**people's [1]**  19/18
**percent [1]**  46/11
**perfectly [2]**  39/9 68/12
**perhaps [8]**  20/12 26/16 39/20 48/24 49/1 55/24 58/25 66/16
**peril [1]**  36/20
**perjury [6]**  37/21 64/7 70/20 71/19 72/5 72/19
**Perlet [1]**  2/21
**permissible [1]**  27/21
**permission [2]**  34/22 75/24
**permit [1]**  19/11
**permitted [1]**  39/9
**person [1]**  34/8
**personal [24]**
**perspective [1]**  69/19
**PHILLIP [5]**  1/10 4/20 4/25 70/3 72/14
**phone [16]**
**phones [33]**
**phonetic [1]**  30/19
**physical [3]**  58/15 58/19 64/22
**piece [2]**  37/17 40/25
**PII [4]**  33/13 33/16 34/8 42/9
**PJ [1]**  1/10
**place [7]**  9/21 14/5 19/9 33/23 58/18 58/19 65/4
**Plaintiff [1]**  1/8
**platform [1]**  40/19
**plea [1]**  5/6
**pleadings [3]**  16/19 18/16 76/1
**plus [1]**  52/14
**podium [1]**  7/6
**point [5]**  16/2 25/25 41/21 43/2 66/17
**pointed [1]**  35/10
**poke [1]**  57/17
**Pompano [1]**  3/3
**position [16]**
**possibility [2]**  21/22 22/17
**postpone [8]**  7/7 8/10 13/22 15/12 17/6 21/18 23/19 25/6
**postponement [1]**  8/7
**potential [4]**  38/9 41/3 46/17 66/24
**potentially [2]**  27/17 65/6
**powers [3]**  46/2 46/3 46/3
**practicable [1]**  5/20
**practical [1]**  56/12
**practicing [1]**  21/2
**practitioner [1]**  24/9
**precisely [1]**  53/16
**preclude [1]**  14/6

**P**

**prefer [2]** 35/4 35/10
**premise [2]** 26/8 53/18
**prepare [4]** 33/11 45/19 46/5 69/20
**prepared [1]** 27/6
**preparing [1]** 73/1
**prescription [1]** 28/22
**presence [1]** 31/11
**present [7]** 9/3 14/21 14/22 15/22 17/19 23/6 43/21
**president [1]** 38/8
**press [1]** 16/21
**presumed [1]** 41/15
**principally [1]** 7/2
**privacy [1]** 44/13
**private [1]** 51/10
**privilege [19]**
**privileged [9]** 27/18 27/20 29/8 47/11 48/15 51/22 67/1 67/2 68/15
**privy [1]** 33/24
**pro [8]** 17/21 18/11 18/18 18/23 19/6 19/9 19/14 21/4
**pro hac vice [7]** 17/21 18/11 18/18 18/23 19/6 19/9 21/4
**pro hac vices [1]** 19/14
**problem [18]**
**procedure [3]** 31/24 47/15 52/24
**Procedure 49.1 [1]** 31/24
**proceeding [3]** 27/19 38/24 65/22
**proceedings [4]** 1/24 65/15 76/18 76/22
**process [3]** 28/13 40/10 63/21
**produce [6]** 11/6 11/12 41/9 60/22 61/5 61/19
**produced [24]**
**producing [3]** 42/23 60/18 66/10
**product [3]** 27/18 28/13 67/2
**productions [1]** 49/20
**products [1]** 16/5
**prohibits [1]** 28/16
**promise [2]** 45/25 56/8
**promptly [1]** 28/10
**proposal [7]** 45/18 46/24 52/8 56/11 58/10 58/20 59/3
**propose [4]** 47/13 47/15 58/13 60/9
**proposed [8]** 14/2 26/24 28/25 31/20 39/8 45/9 46/15 74/4
**proposing [3]** 54/19 61/15 61/17
**proprietary [1]** 26/19
**prosecuted [1]** 73/6
**prosecution [4]** 70/19 71/18 72/5 72/18
**prosecutor [2]** 4/4 33/17
**protected [3]** 43/4 64/17 72/22
**protection [3]** 2/3 63/19 75/13
**protective [29]**
**prove [1]** 54/11
**provide [4]** 39/9 41/2 59/19 74/4
**provided [2]** 13/17 74/12
**providing [1]** 60/19
**provision [2]** 63/20 67/21
**publicly [1]** 29/3
**punch [1]** 42/24
**purposes [8]** 18/11 35/5 35/11 36/14

39/2 39/2 40/2 44/12
**pursuant [2]** 56/4 76/21
**push [1]** 10/20
**pushing [1]** 30/6

**Q**

**quarreling [1]** 76/8
**question [6]** 20/10 43/13 43/14 50/1 53/2 59/16
**questions [4]** 70/18 71/17 72/3 72/17
**quicker [1]** 43/10
**quickly [3]** 14/6 28/8 40/19
**Quinlan [8]** 2/20 2/21 15/21 47/3 52/10 59/12 62/6 62/18
**Quinlan's [3]** 56/9 56/19 62/5
**quo [1]** 22/21

**R**

**raining [1]** 54/2
**raise [9]** 66/23 70/2 70/5 70/8 70/11 70/14 71/14 71/25 72/13
**random [1]** 32/8
**rare [1]** 46/9
**Raton [1]** 3/6
**reach [1]** 31/20
**read [5]** 5/16 19/4 19/5 19/11 57/18
**Reader [14]** 2/5 6/9 6/20 6/22 7/1 10/22 11/2 30/12 37/2 46/13 48/9 60/15 62/15 64/5
**Reader's [1]** 59/11
**readily [1]** 50/8
**reading [1]** 19/4
**ready [6]** 10/3 11/7 15/3 16/14 16/17 20/6
**realize [1]** 55/21
**realizing [1]** 22/16
**reasons [3]** 5/14 5/21 50/24
**recall [9]** 7/11 8/15 13/25 14/1 15/15 17/9 22/24 23/22 25/10
**receipt [1]** 6/1
**receive [1]** 64/16
**received [6]** 6/5 9/22 24/9 53/4 55/22 56/1
**recess [1]** 4/11
**recopy [1]** 60/24
**record [21]**
**recorded [1]** 1/24
**records [12]** 11/12 28/23 28/24 31/10 33/8 33/8 39/14 39/14 39/15 40/21 40/21 48/15
**redact [11]** 31/23 32/11 35/17 35/19 35/22 36/1 37/6 48/2 62/22 68/5 68/9
**redactable [1]** 32/25
**redacted [12]** 32/20 35/4 35/10 35/12 39/9 44/16 48/16 49/12 51/9 51/12 60/9 68/4
**redacting [1]** 34/24
**redaction [1]** 62/23
**redactions [7]** 13/15 27/2 31/2 41/11 59/24 59/25 60/3
**reduced [1]** 21/24
**regulates [1]** 28/2
**relationship [1]** 21/15
**relatively [1]** 11/11

**releases [1]** 16/21
**relevant [4]** 41/4 51/23 53/8 57/1
**rely [1]** 41/17
**remaining [2]** 6/16 26/7
**remains [1]** 64/16
**remarks [1]** 20/7
**remedies [1]** 67/7
**remember [6]** 8/23 33/14
**remove [1]** 65/24
**renewed [1]** 9/7
**report [1]** 9/7
**reporter [6]** 3/7 3/8 4/18 53/23 75/16 76/25
**represent [5]** 7/22 17/18 21/8 25/4 69/15
**representation [3]** 18/13 21/1 52/15
**representations [1]** 21/14
**representative [9]** 7/18 8/23 24/4 25/1 67/22 68/21 68/22 70/15 72/14
**representatives [3]** 67/19 67/24 69/25
**representing [4]** 18/1 21/23 23/5 62/21
**request [1]** 33/14
**requested [2]** 5/8 13/5
**requesting [2]** 23/12 23/13
**requests [1]** 60/19
**required [1]** 18/16
**requirement [2]** 42/6 45/21
**reserve [2]** 27/15 29/6
**reserved [1]** 9/17
**resolution [1]** 8/21
**resolve [1]** 11/10
**respond [3]** 58/6 62/5 68/2
**responded [1]** 56/18
**response [2]** 38/10 74/8
**responsibility [1]** 21/24
**responsive [4]** 11/20 26/14 27/10 66/8
**rest [2]** 6/13 28/8
**restrict [1]** 30/16
**restricted [5]** 52/4 57/14 58/20 64/22 67/21
**restriction [1]** 56/14
**restrictions [1]** 14/8
**restrictive [2]** 26/3 29/24
**result [1]** 28/24
**return [2]** 65/9 73/3
**returned [2]** 54/13 65/14
**reveal [2]** 37/25 38/16
**review [18]**
**reviewable [1]** 50/8
**reviewed [4]** 30/16 37/7 49/23 52/13
**reviewing [2]** 28/7 38/2
**revised [8]** 12/22 14/2 14/11 25/18 26/4 64/8 66/3 74/4
**revocation [1]** 46/2
**revoke [1]** 63/22
**Richard [7]** 2/15 2/15 9/2 19/2 45/16 53/2 59/4
**rife [1]** 31/6
**rights [1]** 27/16
**rise [2]** 4/12 4/14
**RMR [2]** 3/7 76/24

**R**

**RMR-CRR [1]** 76/24
**road [3]** 3/5 28/4 58/25
**Robert [11]** 2/23 2/24 3/4 3/5 14/16
 14/20 23/4 24/2 62/13 68/19 70/9
**room [2]** 3/9 40/24
**Rosenberg [1]** 9/16
**rule [10]** 18/19 18/22 19/1 19/4 19/11
 61/20 64/13 64/15 74/6 76/4
**Rule 16 [1]** 61/20
**rules [16]**
**run-of-the-mill [1]** 33/16
**Russell [1]** 14/19

**S**

**sales [1]** 31/3
**Salopek [2]** 3/7 76/24
**Salter [9]** 3/2 3/2 17/17 18/14 19/23
 20/5 22/4 22/15 75/21
**sanctions [1]** 66/12
**satisfied [1]** 49/9
**scattered [2]** 9/18 32/9
**scrutiny [1]** 48/25
**SE [2]** 2/10 2/13
**search [11]** 26/16 39/19 39/19 40/20
 41/7 43/19 43/22 54/8 56/5 57/3 57/4
**searchable [2]** 28/9 40/18
**seat [2]** 73/21 74/2
**second [6]** 40/25 50/9 60/10 64/8
 66/3 74/4
**secrets [5]** 26/20 27/18 28/16 28/20
 29/10
**Section [1]** 76/21
**Security [1]** 46/7
**seeking [5]** 12/14 26/23 31/12 38/10
 75/24
**sees [1]** 62/1
**seized [10]** 11/6 26/10 47/17 47/20
 48/6 53/18 54/9 54/12 56/4 68/7
**seizure [1]** 62/16
**send [5]** 31/22 35/25 37/3 56/2 62/4
**sending [1]** 61/8
**sense [2]** 41/5 54/20
**September [1]** 74/13
**serious [1]** 46/17
**serving [1]** 18/11
**seven [1]** 16/4
**sever [1]** 16/11
**severe [2]** 14/8 66/12
**share [9]** 26/12 36/13 39/5 58/23
 64/17 65/20 66/13 67/25 68/24
**shared [3]** 13/13 38/24 57/1
**Shearin [4]** 3/4 3/5 24/3 68/19
**Shiner [1]** 2/21
**Shores [2]** 3/3 17/18
**shorten [2]** 69/18 69/20
**shut [1]** 16/22
**sic [3]** 24/16 32/17 35/5
**side [2]** 29/10 31/25
**sift [1]** 41/19
**significance [1]** 41/24
**simple [2]** 55/14 76/13
**simplest [1]** 58/19
**Singerman [18]**

**Singerman's [1]** 22/11
**single [7]** 33/25 51/25 54/23 55/13
 56/13 58/15 62/24
**site [1]** 47/1
**situation [2]** 40/3 62/20
**six months [1]** 17/3
**six-terabyte [2]** 9/24 53/10
**skipping [1]** 73/23
**slight [1]** 22/17
**slim [1]** 21/22
**slow [3]** 40/10 42/2 57/10
**small [1]** 31/9
**Social [1]** 46/7
**solo [1]** 24/9
**solution [2]** 61/7 63/13
**solve [1]** 36/15
**someone's [1]** 40/23
**sometime [1]** 24/12
**soon [3]** 27/7 41/2 60/22
**sooner [1]** 11/17
**sorted [1]** 12/8
**sound [2]** 4/18 35/16
**sounds [1]** 50/20
**SOUTHERN [3]** 1/2 30/18 47/19
**special [1]** 44/1
**specially [3]** 9/12 9/15 9/19
**speed [2]** 46/19 46/22
**speedy [11]** 7/8 8/11 8/12 13/22
 15/12 17/6 21/19 23/19 25/7 46/22
 74/25
**spend [2]** 35/17 36/5
**spending [2]** 36/24 36/25
**spent [2]** 12/20 23/15
**split [4]** 56/16 56/17 61/3 61/9
**spreadsheet [2]** 49/19 49/21
**staff [1]** 36/5
**stand [2]** 9/5 17/13
**standing [1]** 17/19
**state [2]** 40/6 66/17
**stated [1]** 23/11
**statement [1]** 46/25
**STATES [16]**
**States vs [9]** 4/20 7/12 8/18 9/1
 14/16 15/17 17/11 23/1 23/24
**status [9]** 5/2 5/8 7/24 8/2 9/7 14/23
 15/24 22/21 23/7
**status quo [1]** 22/21
**statute [2]** 16/19 28/15
**stenography [1]** 1/24
**Step [1]** 21/17
**Stephen [2]** 3/2 3/2
**Steve [2]** 17/17 75/21
**stick [3]** 22/8 22/15 22/16
**stipulate [1]** 50/15
**stole [1]** 34/8
**stop [1]** 16/23
**storage [1]** 53/19
**story [1]** 60/13
**Street [4]** 2/7 2/10 2/13 2/24
**strongly [1]** 31/10
**study [1]** 39/15
**stuff [3]** 6/20 35/25 46/8
**subject [5]** 10/11 29/3 51/1 60/13
 66/11

**submit [1]** 64/8
**substances [1]** 28/2
**substantively [1]** 13/20
**suggested [2]** 24/14 38/23
**suggesting [1]** 58/6
**suggestion [1]** 46/11
**Suite [4]** 2/9 2/13 2/22 3/6
**supervision [2]** 29/2 34/14
**suppress [2]** 47/22 47/23
**Susan [1]** 2/11 7/15 7/16
**swear [19]**
**swearing [3]** 36/20 38/15 70/1
**sworn [13]** 36/13 46/25 67/14 70/3
 70/6 70/9 70/12 70/16 71/15 71/23
 72/1 72/7 72/15
**system [1]** 4/18

**T**

**taint [8]** 48/14 48/16 49/3 49/4 49/5
 49/8 59/25 67/3
**take [30]**
**taken [3]** 37/24 52/15 63/11
**takes [1]** 63/2
**talk [6]** 29/11 30/2 38/12 39/4 45/3
 45/7
**talked [1]** 74/5
**talking [11]** 28/21 30/5 32/8 34/10
 39/16 44/21 46/6 46/8 51/3 51/4
 53/16
**team [15]** 47/18 47/20 48/14 48/16
 49/3 49/4 49/5 49/8 52/5 58/21 59/25
 64/19 66/14 67/3 72/25
**technically [2]** 21/3 68/10
**technology [1]** 63/6
**telephone [1]** 44/1
**telephones [1]** 45/10
**tell [3]** 23/15 55/5 62/15
**telling [1]** 50/10
**tens [1]** 28/6
**terabyte [4]** 9/24 53/10 53/11 54/22
**terabytes [1]** 54/24
**terms [2]** 9/20 10/12
**test [1]** 55/8
**testimony [1]** 41/6
**text [7]** 45/2 45/2 45/3 48/11 48/12
 49/16 50/10
**texts [3]** 43/25 44/21 49/21
**thank [27]**
**Thanks [1]** 74/17
**theft [1]** 33/12
**think [96]**
**thinking [2]** 18/10 76/15
**thinks [3]** 33/4 41/17 68/15
**thorny [1]** 58/12
**thought [7]** 26/2 30/1 39/10 56/6 59/6
 76/11 76/14
**thousand [4]** 31/5 32/6 36/2 39/16
**thousands [5]** 28/6 30/6 30/6 36/3
 37/1
**throw [1]** 21/5
**time [40]**
**times [1]** 64/16
**tiny [1]** 55/1
**Title [1]** 76/21

**T**

**toll [8]**  7/8 8/12 13/22 15/12 17/6 21/19 23/19 25/7
**totally [1]**  29/16
**totals [1]**  54/23
**towards [2]**  14/3 56/7
**Tower [2]**  2/9 2/13
**track [2]**  27/23 66/18
**trade [5]**  26/20 27/18 28/16 28/20 29/10
**transcript [3]**  1/15 1/24 76/22
**transfer [1]**  25/12
**transit [1]**  6/10
**travel [1]**  65/2
**treat [1]**  58/17
**treated [2]**  58/16 59/8
**trial [50]**
**true [3]**  18/12 49/4 76/21
**truth [1]**  50/10
**two-terabyte [1]**  53/11
**typical [1]**  34/8

**U**

**U.S [2]**  2/3 2/6
**U.S. [1]**  30/19
**U.S. v. Groh [1]**  30/19
**U.S.C. [1]**  28/17
**ultimately [2]**  20/24 56/14
**unaware [1]**  7/1
**understand [23]**
**understanding [3]**  6/19 21/14 46/16
**undertaken [1]**  16/9
**undoubtedly [1]**  27/11
**unindicted [3]**  50/23 68/23 69/4
**UNITED [16]**
**unless [2]**  50/9 55/16
**unlikely [1]**  68/14
**unredacted [3]**  32/15 33/6 42/20
**unrelated [1]**  29/16
**us [12]**  11/9 20/14 28/5 46/22 57/24 59/19 59/23 59/24 60/7 60/10 61/8 61/8
**useful [1]**  50/4
**utilize [2]**  37/19 40/1

**V**

**v. [1]**  30/19
**value [1]**  54/11
**Vassar [1]**  2/24
**vast [3]**  11/4 30/22 37/16
**Vegas [1]**  16/22
**Ventach [1]**  3/5
**Ventech [9]**  23/24 24/3 25/4 26/9 26/12 34/2 43/20 68/20 70/15
**Ventrella [28]**
**Ventrella's [4]**  15/24 54/17 59/22 59/23
**Ventrellas [1]**  75/4
**versions [1]**  48/17
**versus [2]**  18/11 46/24
**via [2]**  39/18 39/19
**viable [1]**  38/3
**vice [7]**  17/21 18/11 18/18 18/23 19/6 19/9 21/4

**vices [1]**  19/14
**victims [1]**  33/9
**view [2]**  33/6 43/2
**violate [1]**  12/7
**violated [1]**  16/5
**violation [1]**  46/16
**volume [1]**  32/5
**volumes [1]**  60/24
**voluminous [4]**  15/2 20/13 42/13 54/20
**Vorpe [2]**  15/21 47/3

**W**

**wait [3]**  29/8 50/9 76/12
**waive [3]**  19/15 22/14 28/11
**waiver [2]**  12/15 26/5
**waiving [1]**  27/14
**Wakely [11]**  24/4 24/21 24/22 24/25 68/22 69/6 69/8 70/13 70/15 71/8 73/19
**warrant [5]**  39/19 39/20 43/20 43/22 56/5
**warrants [4]**  26/8 41/7 53/18 54/8
**Washington [2]**  2/4 2/7
**Washington, [1]**  6/10
**Washington, D.C [1]**  6/10
**waste [3]**  60/25 60/25 75/11
**we'd [5]**  11/6 28/10 35/10 61/25 72/9
**week [3]**  13/13 23/15 27/1
**Weekly [1]**  24/20
**weeks [7]**  9/17 12/1 12/1 12/2 13/2 54/14 63/15
**West [4]**  2/17 2/19 2/22 9/12
**whichever [1]**  14/5
**white [1]**  16/3
**who's [4]**  7/18 17/19 23/6 68/23
**wholesale [2]**  44/24 52/17
**wife [6]**  43/22 44/2 47/6 47/7 49/7 51/6
**wife's [1]**  44/8
**William [1]**  1/16
**Williams [1]**  14/19
**willing [1]**  34/13
**Winsauer [15]**  2/24 23/1 23/5 23/18 59/17 62/10 62/14 66/6 71/6 71/13 71/15 71/19 73/22 73/23 73/24
**Winsauer's [2]**  23/7 75/7
**wiretap [2]**  44/25 47/16
**wiretaps [1]**  44/18
**wise [1]**  38/25
**witness [1]**  38/9
**work [8]**  19/22 27/18 28/13 32/1 33/22 36/4 36/25 67/2
**workable [1]**  36/23
**worked [3]**  26/12 26/13 33/25
**working [1]**  7/16
**worth [1]**  46/23
**WPD [1]**  1/4
**wrath [1]**  36/20
**writ [2]**  32/11 51/20
**writing [1]**  38/11
**wrong [1]**  51/12

**Z**

**Zachary [1]**  2/12

**zip [1]**  42/8