# EXHIBIT 1

## Blackstone Labs
## (1090 Holland Drive
## Boca Raton, Florida)

## Search Warrant, Agent Affidavit,
## Search Warrant Application



9:19-CR-80030
GOVERNMENT
EXHIBIT
016

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. __17-8047-WM__

**INRE SEALED SEARCH WARRANT**
_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes ___X___ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____

ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NO. ___17-8047-WM___

IN RE SEALED SEARCH WARRANT

_____/

FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**MOTION TO SEAL**

The United States of America, by and through its undersigned Assistant United States

Attorney, requests that, with the exception of those copies to be provided to the United States

Attorney's Office and its agents for use in the execution of the search warrant, the attached

search warrant application, application, affidavit, related documents, and any resulting orders

be SEALED until further order of this court, because public disclosure of the search warrant

affidavit and related documents might compromise the integrity of the ongoing investigation.

The United States is prepared to provide further information *in camera* should the Court so

require.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____

ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

NO. 1 7-8047-W M



FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## IN RE SEALED SEARCH WARRANT

_____/

### SEALED ORDER

The United States of America, having applied to this Court for an Order sealing the

search warrant, related documents, and this order, and the Court finding good cause:

IT IS HEREBY ORDERED that the search warrant, the application and affidavit in

support thereof, related documents, and this Order shall be filed under seal until further order

of this Court, however, the United States Attorney's Office may obtain copies of any search

warrant and related sealed documents for purposes of executing the search.

DONE AND ORDERED in chambers at Miami, Florida, this 3 Rd day of February,

2017.

_____

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:     Robert J. Lehner, AUSA

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk

Date 2/3/2017

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)   Case No. 17-8047-WM
Premises located at Blackstone Labs, LLC, )
1090 Holland Drive, Suites 1 and 2, )
Boca Raton, FL 33487 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### See Attachment A.1

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

### See Attachment B.1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
Deputy Clerk
Date 2/3/2017

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 331(a)(d)(v) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 21 U.S.C. § 333(a) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail and Wire Fraud |

The application is based on these facts:

### See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kelly McCoy, Special Agent, U.S. Food & Drug Admin.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: February 3, 2017

_____
*Judge's signature*

City and state:  West Palm Beach, Florida

William Matthewman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Kelly McCoy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for two warrants to search two premises: one located at Blackstone Labs, LLC, 1090 Holland Drive, Suites 1 and 2, Boca Raton, FL 33487 (the "Blackstone Search Premises"); and the second located at VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 (the "VBS Search Premises"). Pictures and a detailed description of the two locations are included in Attachment A.1 (Blackstone Search Premises) and Attachment A.2 (VBS Search Premises), both of which are incorporated herein by reference. This affidavit states probable cause that evidence and property used in the commission of crimes, as particularly described in Attachments B.1 and B.2, will be found at the Blackstone Search Premises and the VBS Search Premises, respectively.

2.      I am a Special Agent with the U.S. Food and Drug Administration's Office of Criminal Investigations ("FDA/OCI"), and have been since January of 2016. I am presently assigned to the Miami Field Office investigating violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. (the "FDCA"). I am a law enforcement officer of the United States, in that I am empowered under authority of the FDCA to conduct investigations and to make arrests. In my capacity as an FDA/OCI Special Agent, I have received extensive training in the investigation of the counterfeiting, diverting, misbranding, adulterating and tampering of drugs, medical devices, and dietary supplements. In addition, I have approximately six years of prior federal law enforcement experience as a Special Agent with the United States Secret Service. During this time, I received extensive training in investigations of computer crimes, internet

1

investigations, child exploitation, counterfeit currency, check fraud, access device fraud, and identity theft, among other things.

3.     I have on numerous occasions participated in the execution of search warrants, and based upon my experience and training, and further based upon discussions with fellow law enforcement agents with years of experience investigating adulterated and misbranded foods, including dietary supplements, and drugs, I know that it is common for individuals engaged in this activity:

> (A) to maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the daily purchase and sale of merchandise. These records are often kept on computers and cellular telephones. The aforementioned computers, cellular telephones, books, records, receipts, notes, ledgers, bank records, money orders, etc., are routinely maintained at the business where the owner/operator has ready access to such records;
>
> (B) to maintain books, papers, and electronic devices (computers, electronic Rolodexes, Caller ID devices, and digital pagers and cellular telephones with memory capabilities) which reflect names, addresses, and/or telephone numbers of their suppliers and/or customers;
>
> (C) to utilize computers, electronic storage media (including PCs, laptops, and thumb drives) and cellular telephones to store information regarding their business activities, including a list of suppliers and/or buyers.

4.     Based on my training and experience and facts as set forth in this affidavit, there is probable cause to believe that there will be found at the search premises the items, records, and information listed in Attachment B.1 and B.2, all of which constitute evidence, fruits and

instrumentalities of violations of federal laws, including, but not limited to: causing the introduction or delivery for introduction into interstate commerce of adulterated and misbranded foods, unapproved new drugs, and unsafe dietary supplements (21 U.S.C. §§ 331(a), (d), and (v) and 333(a)), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit mail and wire fraud (18 U.S.C. § 1349), committed by Blackstone Labs, LLC, VBS Laboratories, LLC, and their employees and agents.

5.      The facts in this affidavit come from my personal observations and knowledge of the investigation, observations of other law enforcement officers involved in this investigation and information obtained from other government agents and/or law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## SUMMARY OF INVESTIGATION

6.      From approximately 2012 to the present, Blackstone Labs, LLC ("Blackstone"), an internet-based bodybuilding supplement company founded by Aaron Singerman ("Singerman") and Phillip (PJ) Braun ("Braun"), has engaged in a multiyear scheme to market, promote, and sell illegal products labeled as dietary supplements, some of which are potentially dangerous. Evidence supports probable cause that Singerman, Braun, and their associated companies, including Blackstone and VBS Laboratories, LLC, intended to defraud and mislead the FDA and consumers throughout the United States and internationally by selling these products, notwithstanding receiving notice of legal violations through formal Warning Letters issued by the FDA.

7.      Blackstone's scheme includes a pattern of selling illegal products.  Evidence supports probable cause that through these companies, Singerman and Braun intentionally sell and

3

have sold misbranded, adulterated, and/or unsafe dietary supplements and unapproved new drugs, and committed mail fraud, wire fraud, and conspiracy to commit mail or wire fraud. This affidavit summarizes probable cause that Singerman, Braun, Blackstone, VBS Laboratories, LLC, and associated companies sell and have sold numerous adulterated and misbranded dietary supplements and unapproved new drugs, including products named:

> (A) Super DMZ Rx 2.0;
>
> (B) Angel Dust;
>
> (C) Cobra 6P Extreme;
>
> (D) Dust V2;
>
> (E) Brutal 4ce;
>
> (F) Dust Extreme;
>
> (G) Ostapro;
>
> (H) Growth;
>
> (I) Anesthetized;
>
> (J) Euphoria;
>
> (K) Gear Support; and
>
> (L) PCTV.

Three of these products include ingredients that are not listed on the labels.

8.    This investigation and affidavit is based on evidence from multiple sources, including online research, undercover purchases, physical surveillance, public and government records, financial and shipping records, and physical evidence procured from discarded trash at the two search premises.

**OVERVIEW OF APPLICABLE STATUTES**

The Federal Food, Drug, and Cosmetic Act

9.     The U.S. Food and Drug Administration ("FDA") is an agency of the United States Government charged with the responsibility of protecting the American public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*.  Among other responsibilities, FDA enforces laws and regulations intended to ensure the safety of dietary supplements and drugs.

10.     Under the FDCA, the term "label" means a display of written, printed, or graphic matter upon the immediate container of any article. 21 U.S.C. § 321(k).  The term "labeling" is broader, and is defined as all labels, as well as other printed or graphic matter upon any article or any of its containers or wrappers, or accompanying such article.  21 U.S.C. § 321(m).

### Prohibited Acts and Penalties under the FDCA

11.     Causing the introduction or delivery for introduction into interstate commerce of a misbranded or adulterated food or drug is a prohibited act.  21 U.S.C. § 331(a).

12.     Causing the introduction or delivery for introduction into interstate commerce of a new drug that is not approved by the FDA is a prohibited act.  21 U.S.C. § 331(d).

13.     Causing the introduction or delivery for introduction into interstate commerce of a dietary supplement that is unsafe under 21 U.S.C. § 350b is a prohibited act.  21 U.S.C. § 331(v).

14.     Commission of a prohibited act is a misdemeanor punishable by a fine and up to a year in prison for each violation.  21 U.S.C. § 333(a).  If the prohibited act is done with "intent to defraud or mislead" consumers or an identifiable government agency, such as the FDA, it is a felony punishable by a fine and up to three years in prison for each violation.  21 U.S.C. § 333(a)(2).

### Drugs under the FDCA

15.     Under the FDCA, "drug" is defined in relevant part as an article, other than food, intended to affect the structure or any function of the body of man.  21 U.S.C. § 321(g)(1)(C).

16.     A "new drug" is a drug that is not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under conditions prescribed, suggested, or recommended in the drug's labeling. 21 U.S.C. § 321(p).

17.     A "new drug" cannot be lawfully introduced into interstate commerce unless and until the FDA determines that the drug is safe and effective for its intended use and approves that drug.  21 U.S.C. § 355(a).

Foods and Dietary Supplements under the FDCA

18.     The FDCA defines "food" to include articles used for food or drink for man or other animals and articles used for components of such articles.  21 U.S.C. § 321(f).  Except for limited purposes, dietary supplements are deemed to be foods within the meaning of the FDCA.  21 U.S.C. § 321(ff).

19.     Under 21 U.S.C. § 321(ff), a "dietary supplement" is defined in relevant part as a product intended to supplement the diet that bears or contains one or more of the following dietary ingredients:

- vitamin;
- mineral;
- herb or botanical;
- amino acid;
- dietary substance for use by man to supplement the diet by increasing total dietary intake; or
- a concentrate, a metabolite, constituent, extract, or combination, of the preceding ingredients

and that is intended for ingestion, not represented for use as a conventional food or as a sole item of a meal or the diet, and is labeled as a dietary supplement.

20.     A product that includes an article that is approved as a "new drug" under 21 U.S.C. § 355 cannot be a dietary supplement unless the article was marketed as a dietary supplement or as a food prior to such approval.  21 U.S.C. § 321(ff)(3)(B)(i).

21.     A product that includes an article authorized for investigation as a "new drug" for which substantial clinical investigations have been instituted and made public cannot be a dietary supplement, unless the article was marketed as a dietary supplement or food before its authorization as an investigational new drug.  21 U.S.C. § 321(ff)(3)(B)(ii).

22.     A substance intended to become a component of a food, including a dietary supplement, is a food additive unless (1) it is generally recognized among experts qualified by scientific training and experience to evaluate its safety as having been adequately shown to be safe under the conditions of its intended use; (2) it is subject to prior sanction; or (3) it is an ingredient described in 21 U.S.C. § 321(ff) (a dietary ingredient).  21 U.S.C. § 321(s).  The other exceptions listed in 21 U.S.C. § 321(s) do not apply.

23.     A food additive is deemed unsafe unless it is used in conformity with a regulation prescribing conditions under which it may be safely used, it has been granted an exemption for investigational use under 21 U.S.C. § 348(j), or it is a food contact substance.  21 U.S.C. § 348(a).

24.     A food, including a dietary supplement, is adulterated if it contains a food additive that is unsafe within the meaning of 21 U.S.C. § 348.  21 U.S.C. § 342(a)(2)(C)(i).

25.     Under 21 U.S.C. § 350b, a dietary supplement that contains a new dietary ingredient (one not marketed in the United States before October 14, 1994) is deemed to be adulterated under 21 U.S.C. § 342(f) unless (1) the dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered, or (2) there is a history of use or other evidence of safety establishing that the

7

dietary ingredient will reasonably be expected to be safe and, at least 75 days before introducing the dietary supplement in interstate commerce, the manufacturer or distributor provides FDA with information which is the basis for its conclusion that the dietary supplement containing the new dietary ingredient will reasonably be expected to be safe ("premarket notification"). 21 U.S.C. § 350b.

26.     A dietary supplement also is deemed to be adulterated if: (1) it contains a dietary ingredient that presents a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in its labeling (21 U.S.C. § 342(f)(1)(A)(i)); or (2) it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury (21 U.S.C. § 342(f)(1)(B)).

27.     A food, including a dietary supplement, is misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 343(a)(1).

Relevant Title 18 Provisions

28.     18 U.S.C. § 1341 criminalizes mail fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, any such matter or thing, shall be fined or imprisoned not more than 20 years, or both.

29.     18 U.S.C. § 1343 criminalizes wire fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined or imprisoned not more than 20 years, or both.

30.     18 U.S.C. § 1349 criminalizes an attempt or conspiracy to commit mail fraud or wire fraud, stating that any person who attempts or conspires to commit such an offense shall be subject to the same penalties.

## FACTS ESTABLISHING PROBABLE CAUSE

31.     FDA/OCI is currently conducting an investigation of Blackstone Labs, LLC, VBS Laboratories, LLC, and their associated companies.  Blackstone is an active corporation incorporated in the State of Florida on or about August 29, 2012.  Since March 2016, Blackstone's principal address and mailing address is listed as 1090 Holland Drive, Suite 1, Boca Raton, FL 33487.  Surveillance in November 2016 confirmed that Suite 1 is labeled with a sign "Blackstone Labs Suite 1 Headquarters."  Suite 2, the next door, is labeled with a sign "Blackstone Labs Suite 2 Shipping and Receiving."  Collectively, 1090 Holland Drive, Suites 1 and 2 are the Blackstone Search Premises.

32.     The company was owned and operated by Phillip Braun and Aaron Singerman until July 2016, when records from the Florida Department of State, Division of Corporations show that Singerman's name no longer appears as an officer or director.  However, in a November 2016 video available online, Singerman stated that he still retains partial ownership of Blackstone, reviews the books, and gets paid.  Braun is currently listed as a manager for the company, and states in numerous videos posted on Blackstone's website that he is the president and CEO.

9

33. Blackstone sells products online through its own website, www.blackstonelabs.com, as well as wholesale and through other retail stores. Blackstone ships its products, including the products described herein, across the United States and internationally. Consumers using www.blackstonelabs.com are able to pay for their orders through PayPal, Inc. ("PayPal") an online payment system, Visa, MasterCard, American Express, and Discover. The website also offers the ability to chat directly with an employee at Blackstone, and has social networking profiles on Twitter, Facebook, Instagram, and YouTube, all of which promote Blackstone products.

34. Financial records and public records from the Florida Secretary of State, Division of Corporations show that Singerman and Braun (either both or individually) have management, shareholder, or financial signatory roles with Blackstone and several other dietary supplement companies including: VBS Laboratories, LLC; Singerman & Braun, LLC, dba Prime Nutrition or Platinum Labs; Boca Nutrition, LLC; Run Everything LLC; Steel Supps; Dynamik Muscle, LLC; SizeSlim, LLC; Redcon 1; Fight Pharm; Dragon Nutraceuticals, and Hardcore Ventures.

35. VBS Laboratories, LLC ("VBS Labs") is a Florida Limited Liability Company incorporated in November 2015. Although VBS Labs does not appear to have a website, evidence demonstrates probable cause that VBS Labs sells, manufactures and/or stores illegal products labeled as dietary supplements, including Blackstone's product Super DMZ Rx 2.0.

### Super DMZ Rx 2.0

36. Blackstone began with a product labeled as a dietary supplement containing two synthetic steroids. During an interview with an online entrepreneurship magazine "Secret Entourage," published prior to January 3, 2016, Singerman explained that Blackstone was created after a former business partner was worried that a product called Super DMZ "was going to become

10

illegal."  While describing how he and his "best friend" Braun founded Blackstone, Singerman stated, "In our business, sometimes gray market ingredients will become illegal and you have to take them off the market.  Basically anything that works too well will probably become illegal one day."

37.     During the same interview, Singerman also stated that Blackstone started when the former partner wanted to dispose of 7,000 units of Super DMZ, so Singerman took the legal risk himself and sold the products.  He explained that he and Braun started a website called SuperDMZ.com and a new company, Blackstone Labs, LLC.  According to Singerman, they sold all the units and also purchased more of the product, as the "ingredient had not become illegal yet."

38.     Notwithstanding Blackstone's claims, probable cause exists that their first product, Super DMZ Rx 2.0, was an unapproved new drug.  Using an internet archive tool called the "Wayback Machine," I reviewed a copy of the SuperDMZ.com website, as it existed in September 2012.  The website included a label for the product "Super DMZ Rx 2.0," and listed its only ingredients as 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, also known as methylstenbolone, and 17b-hydroxy 2a, 17b-demthyl 5a-androstan 3-one azine, also known as dimethazine or dymethazine.

39.     Methylstenbolone and dimethazine are synthetic steroids and are not dietary ingredients because they are not vitamins, minerals, herbs or other botanicals, amino acids, or concentrates, metabolites, constituents, or extracts of the same, nor are they dietary substances for use by man to supplement the diet by increasing total dietary intake.  Because Super DMZ Rx 2.0 did not bear or contain a dietary ingredient, Super DMZ Rx 2.0 was not a dietary supplement as defined in 21 U.S.C. 321(ff).

11

40.     As of September 2012, the labeling of Super DMZ Rx 2.0 stated that the product was "engineered and designed to increase, sustain, and strengthen muscularity," would result in "increased vascularity," and "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol." Accordingly, Super DMZ Rx 2.0 was a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it was an article other than food intended to affect the structure or function of the human body. Super DMZ Rx 2.0 was also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it was not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Super DMZ Rx 2.0 was not approved as safe and effective by the FDA, it was, and still is, an unapproved new drug.

41.     Since 2012, Blackstone and its associated companies have used the online payment system PayPal to transact sales of products. Blackstone PayPal records show financial transactions starting on August 30, 2012. This first transaction and many others in September 2012 have a listed "subject" of "SDMZ 2.0." Based on context and my knowledge of the investigation, I believe this refers to the Super DMZ Rx 2.0 product, and that the records indicate that Blackstone was selling the Super DMZ Rx 2.0 product online in 2012.

42.     In July 2013, the Blackstone product "Super DMZ Rx 2.0" was part of a voluntary recall by its manufacturer, Mira Health Products, Ltd. ("Mira Health"). Mira Health's recall letter noted that the raw materials used to manufacture Super DMZ Rx 2.0 included dimethazine. The Super DMZ Rx 2.0 label listed dimethazine and methylstenbolone as the only dietary ingredients. As described above, Super DMZ Rx 2.0 is an unapproved new drug. Mira Health also recalled another Blackstone product "Metha-Drol Extreme" that contained dimethazine.

43.     As part of the recall process, the FDA determined that the two Blackstone products posed a serious health hazard. The recall included 11,200 bottles of Super DMZ Rx 2.0 with lot numbers M55Q (expiration date 04/2016), M55Q, (expiration date 05/2016), and E07Q (expiration date unknown), and 5,555 bottles of Metha-Drol Extreme.

44.     Despite the recall, Blackstone continued to sell Super DMZ Rx 2.0. Using the "Wayback Machine," I reviewed a copy of Blackstone's website, www.blackstonelabs.com, as it existed in May 2015, which shows the company was still selling bottles of Super DMZ Rx 2.0 with methylstenbolone and dimethazine as the only dietary ingredients on the label. The product was still described as being "engineered and designed to increase, sustain, and strengthen muscularity," and that the product "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol, the only difference is it's 100% legal!"

45.     The Blackstone website no longer offers "Super DMZ Rx 2.0" for sale, but includes a picture of the product covered by the word "Discontinued." A Google search, however, revealed Blackstone's product "Super DMZ Rx 2.0" is currently for sale from multiple online dietary supplement vendors despite the prior recall and FDA's warning of health risks.

46.     On or about September 7, 2016, FDA/OCI agents made an undercover purchase of the Blackstone-branded product "Super DMZ Rx 2.0" from an online bodybuilding supplement retailer, Legendary Supplements, via the website www.legendarysupplements.com. As discussed in paragraph 113, documents show that Legendary Supplements purchases products directly from Blackstone.

47.     On or about September 14, 2016, FDA/OCI agents received the Super DMZ Rx 2.0 product via mail. Upon review, the label appeared to be identical to the label found in the dumpster

13

at the VBS Search Premises (see paragraph 115), other than the stamped expiration date and lot number. The expiration date for the purchased product was 05/18 and the lot number was 345, both of which were stamped in white rather than red. The label listed as the only dietary ingredients 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one (methylstenbolone) and dimethazine, which are the same ingredients as in the Blackstone Super DMZ Rx 2.0 product previously recalled. After inventorying the product into evidence, it was sent to the FDA Forensic Chemistry Center ("FDA FCC") for testing. FDA FCC test results confirmed that the product did contain dimethazine ("DMZ") but did not detect the presence of methylstenbolone.

48. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Super DMZ Rx 2.0, an unapproved new drug, in violation of 21 U.S.C. § 331(d).

Formal Warnings from FDA

49. Super DMZ Rx 2.0 was the first product in a pattern of selling illegal products labeled as dietary supplements. On April 24, 2015, the FDA issued a Warning Letter to Aaron Singerman at Blackstone Labs, LLC in reference to another Blackstone product "Angel Dust," which was also sold as a dietary supplement. The product label declared that it contained as a dietary ingredient a substance called AMP Citrate (2-Amino-4-Methylpentane or 4-amino-2-methylpentane citrate), also known as DMBA. The FDA issued a second Warning Letter on the same day to Singerman as CEO of Prime Nutrition, for another product labeled as a dietary supplement and containing DMBA as a dietary ingredient.

50. The Warning Letters informed Blackstone and Singerman that DMBA is a new dietary ingredient because there is no information demonstrating that DMBA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994. The Blackstone

Warning Letter stated that Angel Dust was adulterated because DMBA, as a new dietary ingredient, is subject to the premarket notification requirement and Blackstone had not submitted premarket notification to the FDA.

51.      The Blackstone Warning Letter also advised Blackstone that, even if the premarket notification had been submitted, Angel Dust would still be adulterated because it contained a new dietary ingredient (DMBA) for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury. The Blackstone Warning Letter further advised Blackstone that introduction of Angel Dust into interstate commerce is prohibited under 21 U.S.C. § 331(a) (adulterated dietary supplement) and 21 U.S.C. § 331(v) (unsafe dietary supplement).

52.      The Blackstone Warning Letter requested that Blackstone take prompt action to correct the violations, as well as any other violations associated with the product Angel Dust or other dietary supplement products marketed by the firm, including any containing DMBA. The letter also warned that "Failure to immediately cease distribution of your product Angel Dust and any other products you market that contain DMBA could result in enforcement action by FDA without further notice."

53.      In a May 19, 2015 response from counsel to the Blackstone Warning Letter, Blackstone stated that it "takes the allegations in the [Blackstone Warning Letter] very seriously," and acknowledged that FDA had sent Warning Letters to at least 16 companies using DMBA, and that the FDA posted a public Q&A addressing DMBA on the internet. Blackstone agreed to immediately discontinue distributing and selling the Angel Dust product. Blackstone also stated that "[i]n deference to FDA's concerns as expressed in the warning letter and the Q&A on DMBA,

if Blackstone ever elects to market and sell Angel Dust again, it will reformulate the product without Amp Citrate aka DMBA."

## Cobra 6P Extreme

54.     Notwithstanding the Warning Letter and Blackstone's response, Blackstone continued to sell products labeled as dietary supplements that contained DMBA as a dietary ingredient. For example, FDA twice purchased the product Cobra 6P Extreme from Blackstone, and there is probable cause to believe that both purchased products violated the law. The first Cobra 6P Extreme purchase contained DMBA and the DMBA was listed on the label, while the second Cobra 6P Extreme purchase also contained DMBA, but omitted the DMBA from the label. These purchases are described below.

55.     In August 2015, FDA made an undercover purchase from Blackstone of the product Cobra 6P Extreme via www.blackstonelabs.com.

56.     A review of the label affixed to the Cobra 6P Extreme revealed that the product ingredient list included 2-Amino-4-Methylpentane (DMBA) as a dietary ingredient, and FDA testing subsequently confirmed that the product contained DMBA.

57.     The ingredient DMBA caused the Cobra 6P Extreme to be adulterated because it contained a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury and because DMBA is subject to the premarket notification requirement and, as of January 26, 2017, no firm had submitted to the FDA premarket notification for DMBA.

58.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list Cobra 6P Extreme. Based

on context, I believe these entries refer to sales of the Cobra 6P Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

59. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, an adulterated food and an unsafe dietary supplement, in violation of 21 U.S.C. § 331(a) and 331(v).

60. On or about February 3, 2016, FDA/OCI agents made another undercover purchase, this time for products labeled Dust V2, Brutal 4ce (pronounced "Brutal Force"), and Cobra 6P Extreme via Blackstone's website. Blackstone included a free product labeled "Euphoria RX" in the order at no charge. Shortly after FDA/OCI agents placed their order online, an email was received from the email address "cs@blackstonelabs.com," confirming the purchase and listing information about the sale. Blackstone's website stated with respect to the Cobra 6P Extreme, "It's so strong we weren't sure if it was a good idea to bring it to the market."

61. On or about February 23, 2016, FDA/OCI agents received the undercover purchase of the aforementioned products. After inventorying the products into evidence, FDA/OCI sent the products to the FDA FCC for testing.

62. On or about October 21, 2016, a chemist from the FDA FCC sent results of the analysis of the Cobra 6P Extreme. The testing revealed that the Cobra 6P Extreme purchased on February 3, 2016, also contained DMBA. However, unlike the Cobra 6P Extreme product purchased in 2015, the label affixed to the 2016 Cobra 6P Extreme omitted DMBA from the product ingredient list. Accordingly, the Cobra 6P Extreme purchased in February 2016 was misbranded under 21 U.S.C. § 343(a)(1) because its labeling was false and misleading.

63. There is probable cause that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, a misbranded food, in violation of 21 U.S.C. § 331(a).

64. Blackstone intended to defraud consumers and the FDA by promoting Cobra 6P Extreme, accepting orders online, and mailing misbranded Cobra 6P Extreme products to consumers while intentionally not listing the potentially unsafe ingredient DMBA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

## Dust V2

65. Testing of the Dust V2 purchased in February 2016 revealed that the product contained DMAA, also known as 1,3-dimethylamylamine.

66. The FDA advises consumers not to buy or use dietary supplements that contain DMAA due to the health risks they present. FDA FCC's analysis also revealed that Dust V2 contains caffeine. FDA has publicly warned that "DMAA, especially in combination with other ingredients such as caffeine, can be a health risk to consumers." DMAA narrows blood vessels and arteries, which can elevate blood pressure, and may lead to cardiovascular problems such as shortness of breath, arrhythmias, tightening in the chest, and heart attack, as well as seizures and other neurological and psychological conditions.

67. A review of the label affixed to the Dust V2 purchased in 2016 revealed that the product ingredient list omitted DMAA from the label. Failure to include DMAA on the label as an ingredient causes the labeling to be false or misleading, and causes Dust V2 to be misbranded under 21 U.S.C. § 343(a)(1).

68. DMAA is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same,

18

nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake. DMAA is a food additive within the meaning of 21 U.S.C. § 321(s) because it is not a dietary ingredient, it is not generally recognized as safe under the conditions of use of Dust V2, and it is not the subject of a sanction or approval under the FDCA or other applicable statutes.

69.     DMAA is an unsafe food additive under 21 U.S.C. § 348 because it is not a food contact substance, there is no regulation prescribing the conditions under which it may be safely used, and no exemption for investigational use has been granted under 21 U.S.C. § 348(j). Therefore, the presence of DMAA in Dust V2 causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

70.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Dust V2." Based on context, I believe these entries refer to sales of the Dust V2 product, with shipping addresses that show the product was shipped to customers in multiple states.

71.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust V2, a misbranded and adulterated food, in violation of 21 U.S.C. § 331(a).

72.     Blackstone intended to defraud consumers and the FDA by promoting Dust V2, accepting orders online, and mailing Dust V2 products to consumers while intentionally not listing the potentially dangerous ingredient DMAA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, 1349.

### Brutal 4ce

73.     FDA FCC analysis of the Brutal 4ce product concluded that it contained 1-androsterone and 4-androstene-3, 17-dione, also known as androstenedione. Both 1-androsterone

19

and androstenedione are anabolic steroid precursors, meaning they are substances that are converted in the human body to testosterone, an anabolic steroid.

74.   As early as 2004, FDA publicly stated that products containing androstenedione are not lawful dietary supplements and may increase the risk of serious health problems. See "Questions and Answers: Androstenedione" available at:

http://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm

75.   The Brutal 4ce label does not list 1-androsterone or androstenedione as an ingredient in the product. Failure to include 1-androsterone or androstenedione on the label as an ingredient causes the labeling to be false and misleading and causes Brutal 4ce to be misbranded under 21 U.S.C. § 343(a)(1).

76.   Additional evidence suggests that Blackstone, Singerman, and Braun know that Brutal 4ce includes anabolic steroid precursors. A video posted on Blackstone's website shows Braun personally describing the product Brutal 4ce as the "strong stuff," the "bad daddies of Blackstone Labs," and states it is "the stuff people look for now that all the old prohormones are gone. This is your answer." He further explained that individuals who use this product "absolutely have to take PCTV" afterwards. The product PCTV[1] is displayed on Blackstone's website and is described as "The Next Evolution of Post Cycle Therapy." A "Post Cycle Therapy" generally refers to a course of drugs or dietary supplements used to restore the body's natural testosterone production after using anabolic steroids for a time period or "cycle." The Blackstone website states "PCTV defends and protects your body in five distinct ways; so now even more then [sic] ever you can be confident that you will not only bounce back after a cycle, but actually improve and be even better then [sic] ever. In fact, PCTV can even be used by natural competitors looking

---

[1] There is probable cause that PCTV is an unapproved new drug, as discussed in paragraph 109.

for an anabolic edge!" Based on my training and experience, this reference to "natural competitors" refers to athletes who do not use anabolic steroids, and demonstrates Braun's knowledge that he is recommending PCTV for use with products, such as Brutal 4ce, that contain anabolic steroids or anabolic precursors.

77. Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Brutal 4ce." Based on context, I believe these entries refer to sales of the Brutal 4ce product, with shipping addresses that show the product was shipped to customers in multiple states.

78. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Brutal 4ce, a misbranded food, in violation of 21 U.S.C. § 331(a).

79. Blackstone intended to defraud consumers and the FDA by promoting Brutal 4ce, accepting orders online, and mailing Brutal 4ce products to consumers while intentionally not listing 1-androsterone and/or androstenedione on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

Evidence from the Blackstone Premises

80. On or about June 24, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

81. Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises. These items include:

(A) An article of mail addressed to Blackstone Labs at the Blackstone Search Premises;

(B) Numerous UPS shipping invoices stating they were from Blackstone and addressed to customers who purchased products, including the Dust V2 and Dust Extreme products;

(C) A sample packet of the Dust V2 product; and

(D) A copy of a spreadsheet labeled "Blackstone Labs A/P Aging Detail." Upon information and belief, this document refers to Blackstone's Accounts Payable, and lists money owed to suppliers. The document includes two (2) transactions from a vendor by the name of "VBS Labs" in the amounts of $43,250.00 and $18,435.25 dated 05/06/16 and 05/19/16, showing that Blackstone pays VBS Labs for goods or services.

<u>Evidence from the VBS Search Premises</u>

82.     Additional evidence confirms that there is probable cause that some of the Blackstone illegal products are manufactured, assembled, and/or stored at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487, the VBS Search Premises.

83.     Surveillance in June 2016 revealed an individual outside the VBS Search Premises wearing a Blackstone Labs t-shirt and a surgical mask. This individual was outside Suite 12, and the garage door at Suite 12 was partially open. Based on my training and experience, I know that individuals who manufacture or package pharmaceuticals or dietary supplements often wear personal protective equipment such as surgical masks while working in close proximity to pharmaceuticals or dietary supplements to protect their health and ensure sanitary requirements.

22

84.     On or about June 24, 2016, FDA/OCI agents also procured items and documents from a dumpster outside the VBS Search Premises at 1140 Holland Drive, Boca Raton, FL 33487. Although the Florida Department of State Division of Corporations website listed the principal place of business and mailing address for VBS Laboratories LLC as 1140 Holland Drive, *Suite 2*, Boca Raton, Florida, several sources of evidence, including bank records and mail, list the address for VBS Labs as *Suite 12* (twelve). Surveillance in November 2016 revealed that the door to Suite 12 is labeled "VenTech." VenTech Labs, LLC is the name of a company registered to Anthony Ventrella, who is also the registered agent for VBS Labs.

85.     Several items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, and that the VBS Search Premises will contain evidence of criminal violations including violations of the FDCA, mail and wire fraud, and conspiracy to commit mail and wire fraud. These items include:

> (A) Loose labels for the Blackstone product "Super DMZ Rx 2.0," some of which had a stamped expiration date of 06/18 and a lot number of 370 in red coloring; however, the majority had no expiration date or lot number listed;
>
> (B) Loose labels for a "Fight Pharm" product named "Ostapro";
>
> (C) A color photocopy of a Florida Driver's License for Anthony Joseph Ventrella, the registered agent of VBS Laboratories, LLC;
>
> (D) A printed email from anthonyventrella@gmail.com dated June 22, 2016 asking for current prices on SARMs;[2]

---

[2] SARMs, or "Selective Androgen Receptor Modulators" are compounds that have similar properties to anabolic agents (e.g. steroids). As a general matter, SARMs are not appropriate for inclusion in a dietary supplement.

(E) Printed spreadsheets listing raw materials and pricing for ingredients from different companies. Items on the list included: Picamilon Base, N-Acetyl-Cysteine, methylstenbolone, dimethazine, Ostarine, and Amp Citrate (DMBA);[3]

(F) A handwritten note which included the words "BSL DMZ" and numbers;

(G) A handwritten list titled "To Do Pills" and "To Do Powders." Under "To Do Powders" was listed several items, including "DUST." Based on context and my training and experience, I believe these handwritten documents are evidence contributing to probable cause that VBS Labs is manufacturing or storing products for Blackstone at the VBS Search Premises, including Super DMZ and one or more of the "Dust" products discussed herein.

(H) A UPS shipping label from shipper: 2252818838, VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 (the VBS Search Premises);

(I) A Chase business/debit card (cut in half) in the name "Anthony J. Ventrella/Fight Pharm LLC."

### Ostapro

86.     The label for the Fight Pharm product "Ostapro" recovered from the dumpster at the VBS Search Premises revealed a listed ingredient of [(2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide, which is a "selective androgen

_____

[3] These substances are discussed herein at the following paragraphs: Picamilon, ¶¶ 100-103, N-Acetyl-Cysteine, ¶¶ 106-107, Ostarine, ¶¶ 86-88; and DMBA, ¶¶ 49-62.

receptor modulator" ("SARM"), also known as ostarine. The product label describes Ostapro as a dietary supplement.

87. Products that contain ostarine are not dietary supplements because ostarine is the subject of substantial clinical investigations which have been made public. To the best of FDA's knowledge, ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigations. Accordingly, Ostapro cannot be a dietary supplement.

88. The Ostapro label states the product was manufactured and distributed by "Fight Pharm" and states the product will "increase lean mass," "decrease body fat," "maximize strength," and is "physique enhancing." Accordingly, Ostapro is a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it is intended to affect the structure or function of the human body. Ostapro is also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it is not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Ostapro is not approved as safe and effective by the FDA, it is an unapproved new drug.

89. The introduction or delivery for introduction into interstate commerce of Ostapro, an unapproved new drug, is illegal under 21 U.S.C. 331(d).

90. According to the Florida Department of State, Division of Corporations website, the registered agent for Fight Pharm is Anthony Ventrella, and the principal and mailing address is listed as the VBS Search Premises.

91. Bank records confirm a financial connection between Blackstone and Fight Pharm. Former Blackstone CEO Singerman was listed on a Fight Pharm LLC bank account as a "Signer" in April 2014. Braun was added to the signature card of the same bank account in August 2015.

92.     VBS Labs and Blackstone are also linked in financial records, including the Blackstone Accounts Payable described in paragraph 81. Bank documents show that Singerman and Braun were authorized as "Signers" to VBS Labs' JP Morgan Chase business bank account in March 2016.

### Dust Extreme

93.     Based on evidence from the June 2016 trash pull at the Blackstone Search Premises, FDA/OCI agents made another undercover purchase via www.blackstonelabs.com on or about June 27, 2016. During this undercover transaction, the FDA/OCI purchased the product "Dust Extreme." According to Blackstone's website, the Dust Extreme product label lists DMAA as a dietary ingredient. Under the image of the product on the website, the website text stated "DMAA strikes back." Shortly after the purchase, an email was received from the email address: "cs@blackstonelabs.com," confirming the above referenced purchase, and listing information about the sale.

94.     On or about June 30, 2016, FDA/OCI agents received the package that contained the aforementioned product. The return address listed on the United States Postal Service ("USPS") Priority Mail package was "Blackstone Labs, LLC, 1090 Holland Drive, Suite 2, Boca Raton, Florida 33487." After inventorying the product into evidence, it was sent to the FDA FCC for testing.

95.     As described in paragraphs 68-69, DMAA is not a dietary ingredient and is an unsafe food additive. Accordingly, the presence of DMAA in Dust Extreme causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

96.     Even if DMAA were a dietary ingredient, it would be a new dietary ingredient subject to premarket notification. As of January 26, 2017, Blackstone has not submitted a

premarket notification for DMAA. Therefore, even if DMAA were a dietary ingredient, Dust Extreme would be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a).

97.    Even if Blackstone had submitted the required premarket notification, Dust Extreme would still be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a) because there is no adequate information to provide reasonable assurance that DMAA does not present a significant or unreasonable risk of illness or injury.

98.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that transactions of "Payments Received" specifically list "Dust Extreme." Based on context, I believe these entries refer to sales of the Dust Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

99.    There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust Extreme, an adulterated food and unsafe dietary supplement in violation of 21 U.S.C. §§ 331(a) and 331(v).

### Growth, Anesthetized, and Euphoria RX

100.    The Blackstone website also lists for sale other products that violate the FDCA, including products named "Growth," "Anesthetized," and "Euphoria RX." The website includes images of each product and their labels. According to the labels for the products, all three products contain 4-(pyridine-3-cabonylamino), also known as Pikatropin or Picamilon, and list it as one of the dietary ingredients.

101.    Picamilon is used as a prescription drug in Russia for a variety of neurological conditions. It is not approved as a drug in the United States. FDA has issued Warning Letters to five companies whose products marketed as dietary supplements claim to contain Picamilon and

27

listed it as a dietary ingredient. These products were misbranded because Picamilon does not meet the statutory definition of a dietary ingredient.

102. FDA has publicly stated that Picamilon is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same, nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake.

103. The inclusion of Picamilon as a dietary ingredient on the product label causes the Growth, Anesthetized, and Euphoria RX products to be misbranded in that the labeling is false and misleading within the meaning of 21 U.S.C. § 343(a)(1).

104. Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Growth," "Anesthetized," and "Euphoria." Based on context, I believe these entries refer to sales of the three products, with shipping addresses that show the products were shipped to multiple states.

105. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of misbranded foods Growth, Anesthetized, and Euphoria RX, in violation of 21 U.S.C. § 331(a).

Gear Support and PCTV

106. The Blackstone website also lists for sale other products that violate the FDCA, including products named "Gear Support" and "PCTV." The website includes images of each product and their labels. According to the products' labels, Gear Support and PCTV contain N-Acetyl-Cysteine ("NAC") and are described as dietary supplements.

107. Products that contain NAC are excluded from the definition of dietary supplement under 21 U.S.C. § 321(ff)(3)(B)(i) because FDA approved NAC as a "new drug" in 1985 and FDA

does not have any information that indicates that NAC was marketed as a dietary supplement or as a food prior to its approval as a "new drug."

108. A video advertising the product Gear Support located on Blackstone's website displayed Braun describing the product and stating "It'll decrease your blood pressure." A video advertising the product PCTV located on Blackstone's website displayed Braun describing the product and stating it "replenishes natural glutathione stores" and it "keeps the liver super healthy."

109. Accordingly, Gear Support and PCTV are drugs within the meaning of 21 U.S.C. § 321(g)(1)(C) because they are intended to affect the structure or function of the human body. They are also "new drugs" within the meaning of 21 U.S.C. § 321(p) because the products Gear Support and PCTV are not generally recognized among qualified experts as safe and effective for use suggested, recommended, or prescribed in its labeling. Gear Support and PCTV have not been approved by FDA as safe and effective for their intended uses, and therefore are unapproved "new drugs." *See* paragraphs 16-17 and 20-21 for explanation of "new drugs."

110. Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Gear Support" and "PCTV." Based on context, I believe these entries refer to sales of the products, with shipping addresses that show the products were shipped to customers in multiple states.

111. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of the unapproved "new drugs" Gear Support and PCTV, in violation of 21 U.S.C. § 331(d).

### Recent Evidence from the Premises

112. On or about October 14, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

29

113.    Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises.  These items include:

(A) Multiple printed emails from various employees of Blackstone including the director of sales, vice president, and inventory manager;

(B) Several order forms detailing who ordered the products, where the products were shipped to (including locations outside the state of Florida), and which products were ordered; one in particular stated a shipment was sent to Legendary Supplements[4] for a total of $12,500.00; however, it did not list the products ordered;

(C) A copy of Blackstone Labs Accounts Payable including multiple transactions from a vendor by the name of "Duracap Labs" ranging in amounts from $25,851.00 to $128,161.00 during July 2016.  According to the Georgia Secretary of State Corporations Division, Duracap Labs is also the name of a Georgia corporation founded by "Wesley Houser," and three other individuals in January 2014.  Upon information and belief, "Wesley Houser" is John Wesley Houser, IV, an individual under indictment for manufacturing and sale of controlled substances and illegal dietary supplements;

(D) Handwritten notes including one stating "Found emails of Aaron telling Wes: 1. underdose, but keep label same 2. mask ingredients + flavors".  Upon

---

[4] As discussed in paragraph 46, Legendary Supplements continues to sell Super DMZ Rx 2.0, notwithstanding the recall and FDA's determination that the product is an unapproved new drug and poses a serious health hazard.

information and belief, "Aaron" refers to Aaron Singerman, founder of Blackstone, and "Wes" refers to John Wesley Houser, IV. Based on my knowledge and context, I believe this document is evidence of Blackstone's intent to misrepresent information on product labels, and defraud consumers.

114. On or about October 14, 2016, FDA/OCI agents procured items from a large dumpster outside the VBS Search Premises.

115. Items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, the manufacturing of products labeled as dietary supplements, and will contain evidence of criminal violations, including violations of the FDCA, mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. These items included:

> (A) Loose labels for the Blackstone product "Super DMZ Rx 2.0"; no expiration date or lot number was visible on the front of the label; however, an imprint of an expiration date of 07/18 and a lot number of 512 was located on the inside;
>
> (B) Seven (7) loose pill capsules of assorted colors;
>
> (C) Two (2) empty bags of rice flour with a listed weight of 22.68 kg (50 pounds) each (rice flour is often used as a filler ingredient in supplements);
>
> (D) A large clear bag containing seven (7) empty red pill capsules; and
>
> (E) A large silver bag containing twelve (12) empty white pill capsules.

116. Upon information and belief, Blackstone continues to promote and sell products which violate the FDCA on their website, through other online retailers, and through wholesale distribution, including the products discussed herein: Brutal 4ce, Dust V2, Dust Extreme, Growth,

Anesthetized, Euphoria RX, Gear Support, and PCTV. (Note: this is not a complete list of all products labeled as dietary supplements currently marketed for sale by the company.)

## EXECUTION OF THE WARRANT

117. As described above and in Attachment B.1 and B.2, this application seeks permission to search for records that might be found on the Blackstone Search Premises and VBS Search Premises in whatever form they may be found, including data stored on a computer's hard drive or other storage media. One form in which records may exist is as paper documents, including financial records, invoices, and correspondence. For example, FDA/OCI has reviewed mail in the trash at the Blackstone Search Premises addressed to Blackstone or Blackstone employees, and shipping labels, invoices, ingredient sheets, and printed correspondence from the trash at the VBS Search Premises.

118. Another form in which records may exist is as data stored on computer hard drives or other storage media. A storage medium is any physical object upon which computer data can be recorded, which includes hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media. Based on my review of other evidence related to this investigation, I believe that there is a computer system or systems currently located at the Blackstone and VBS Search Premises. For example, I believe that emails from various employees of Blackstone including the director of sales, vice president, and inventory manager, as previously mentioned, will be found on a computer or computers at the Blackstone Search Premises. Documents found in the trash at the VBS Search Premises include documents printed from computers, such as spreadsheets and email from Anthony Ventrella and I believe that similar electronic documents will be found on a computer or computers at the VBS Search Premises. Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

32

119.    I submit that if a computer or storage medium is found at either of the search premises, there is probable cause to believe the records described above will be stored on that computer or storage medium, for at least the following reasons:

(A) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(B) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(C) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging

33

files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

(D) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

(E) Based on my review of evidence related to this investigation, including various financial records and other documents, I am aware that computer equipment was used to generate, store, and print documents used in the FDCA violations, mail and wire fraud, and conspiracy schemes. There is reason to believe that there are computer systems currently located at both the Blackstone and VBS Search Premises.

120. *Forensic evidence*. As further described in Attachment B.1 and B.2, this application seeks permission to locate not only computer files that might serve as direct evidence, instrumentalities or fruits of the crimes described in the warrants, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in both the Blackstone and VBS Search Premises because:

(A) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information

34

on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

(B) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein,

35

computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). This geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

(C) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

(D) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(E) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

121.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either

37

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

(A) *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(B) *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(C) *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

122.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), I seek permission to seize, image, or otherwise copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

123.   Blackstone and VBS Labs are functioning companies that may conduct legitimate business in addition to its participation in the distribution of illegal dietary supplements and drugs, mail fraud, and wire fraud. The seizure of Blackstone's or VBS's computers may limit their ability to conduct legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.

## REQUEST FOR SEALING

124.   Due to the ongoing nature of this investigation, I respectfully request that this Affidavit, Application, Search Warrant, and all attachments be sealed by the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents until further order of the Court because their premature disclosure may give

targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify co-conspirators, or otherwise seriously jeopardize the investigation.

## CONCLUSION

125.    I submit that this affidavit supports probable cause for a warrant to search the Blackstone Search Premises described in Attachment A.1 and seize the items described in Attachment B.1.

126.    I submit that this affidavit supports probable cause for a warrant to search the VBS Search Premises described in Attachment A.2 and seize the items described in Attachment B.2.

FURTHER AFFIANT SAYETH NAUGHT

Kelly McCoy
Special Agent
Food and Drug Administration,
Office of Criminal Investigations

Subscribed and sworn to before me
On this 3 Rd day of February, 2017.

The Honorable William Matthewman
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By
Deputy Clerk
Date 2/3/2017

## ATTACHMENT A.1

### Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building.  See Exhibit 1 below.  There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre."  The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



1

Exhibit 2



Exhibit 3



**ATTACHMENT A.2**

Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises"). The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes. See Exhibit 1 below. Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door. See Exhibit 2 below. The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



Exhibit 2



2

**ATTACHMENT B.1**

Particular Things to Be Seized

1.    All records and information that constitute fruits, contraband, evidence and
      instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C.
      §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated
      food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail
      fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud)
      occurring after January 1, 2012, including, but not limited to:

      a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping
          records, ledgers, money orders, checks, bank records, pedigrees, storage records and
          other papers and documents relating to the purchase, shipment, sale, manufacturing,
          storage and/or holding of banned, adulterated, or misbranded dietary supplements
          and/or unapproved new drugs;

      b.  any information related to customers, suppliers or sources of banned, adulterated, or
          misbranded dietary supplements and/or unapproved new drugs containing such
          ingredients and related identifying information;

      c.  evidence of occupancy, residency, and/or ownership of the premises, including utility
          and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages,
          photographs, personal telephone books, diaries, statements, identification cards and
          documents, airline tickets and related travel documents, bank books, checks and
          check registers, and public storage facilities receipts;

      d.  any and all corporate records pertaining to the establishment, ownership, agreements,
          method of operation and purchase, shipment, sale, storage and holding of banned,
          adulterated, or misbranded dietary supplements and/or unapproved new drugs
          containing such ingredients;

      e.  records of off-site locations to store records, banned, adulterated, or misbranded
          dietary supplements and/or unapproved new drugs containing such ingredients and/or
          currency, including safe deposit box keys, records and receipts, and rental agreements
          for storage facilities;

      f.  all bank records, checks, credit card bills, account information, and other financial
          records;

      g.  customer and employee records associated with the dispensing of banned, adulterated,
          or misbranded dietary supplements and/or unapproved new drugs containing such
          ingredients;

1

h.  any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.  advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.  correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.  tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.  records of or information about Internet Protocol addresses used by the COMPUTER;

e.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

## ATTACHMENT B.2

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and
    instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C.
    §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated
    food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail
    fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring
    after January 1, 2012 including, but not limited to:

    a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping
        records, ledgers, money orders, checks, bank records, pedigrees, storage records
        and other papers and documents relating to the purchase, shipment, sale,
        manufacturing, storage and/or holding of banned, adulterated, or misbranded
        dietary supplements and/or unapproved new drugs;

    b.  any information related to customers, suppliers or sources of banned, adulterated,
        or misbranded dietary supplements and/or unapproved new drugs containing such
        ingredients and related identifying information;

    c.  evidence of occupancy, residency, and/or ownership of the premises, including
        utility and telephone bills; mail, deeds, leases, rental agreements, loans,
        mortgages, photographs, personal telephone books, diaries, statements,
        identification cards and documents, airline tickets and related travel documents,
        bank books, checks and check registers, and public storage facilities receipts;

    d.  any and all corporate records pertaining to the establishment, ownership,
        agreements, method of operation and purchase, shipment, sale, storage and
        holding of banned, adulterated, or misbranded dietary supplements and/or
        unapproved new drugs containing such ingredients;

    e.  records of off-site locations to store records, banned, adulterated, or misbranded
        dietary supplements and/or unapproved new drugs containing such ingredients
        and/or currency, including safe deposit box keys, records and receipts, and rental
        agreements for storage facilities;

    f.  all bank records, checks, credit card bills, account information, and other financial
        records;

    g.  customer and employee records associated with the dispensing of banned,
        adulterated, or misbranded dietary supplements and/or unapproved new drugs
        containing such ingredients;

h.      any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.      advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.      correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.      tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.      records of or information about Internet Protocol addresses used by the COMPUTER;

e.      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.      contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

correspondence and email, including all email records and metadata information.

     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

     The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

     Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No.  17-8047-WM |
| Premises located at Blackstone Labs, LLC, 1090 Holland Drive, Suites 1 and 2, Boca Raton, FL 33487 | ) |

**Certified to be a true and correct copy of the document on file Steven M. Larimore, Clerk, U.S. District Court Southern District of Florida**
By _____ Deputy Clerk
Date  2-13-2017

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A.1

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B.1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    *February 17, 2017*
                                                                                                                 *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty    *Duty U.S. Magistrate Judge* .
                                              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                                                                          ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    *February 3, 2017*                              *William Matthewman*
                                       *1: 23 p.m.*                                          *Judge's signature*

City and state:     West Palm Beach, Florida                       William Matthewman, United States Magistrate Judge
                                                                                                     *Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A.1

Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building. See Exhibit 1 below. There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre." The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



1

Exhibit 2



Exhibit 3



**ATTACHMENT B.1**

Particular Things to Be Seized

1.   All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

   a.   any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b.   any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c.   evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d.   any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e.   records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f.   all bank records, checks, credit card bills, account information, and other financial records;

   g.   customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

h. any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i. advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j. correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k. tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d. records of or information about Internet Protocol addresses used by the COMPUTER;

e. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

2

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

Case 9:19-cr-80030-WPD   Document 361-2   Entered on FLSD Docket 03/18/2020   Page 65 of
206
Case 9:19-cr-80030-WPD   Document 276-2   Entered on FLSD Docket 02/19/2020   Page 1 of 3

# EXHIBIT 2

## June 2017
## Email Exchange



9:19 - CR-80030
GOVERNMENT
EXHIBIT
017

| | |
|---|---|
| **From:** | Benedict P. Kuehne |
| **To:** | Reader, Alistair F. |
| **Cc:** | Frank, David |
| **Subject:** | Blackstone - Cell Phones & Privilege |
| **Date:** | Wednesday, June 21, 2017 12:08:52 PM |

███████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████

Regarding the cell phones of David Winsauer, JR Newton, and James Boccuzzi, I am informed all three exchanged regular communications (phone, text, and email) with company counsel Zachary Catanzaro on a myriad of attorney-client privileged matters. Mr. Catanzaro's cell phone number is ████████. His office number is ████████. His email address is ████████████.

Additionally, although not included in your inquiry, Phillip (PJ) Braun was also in regular communication with Mr. Catanzaro concerning legal matters. It is also likely Mr. Braun regularly communicated with his civil lawyers (Jeffrey Weissman, Gladstone & Weissman, P.A. ████████ or ████████ or ████████ about privileged matters. I am also gathering the names and numbers of the other civil lawyers with whom Mr. Braun was in regular communication. I should have that information shortly.

Ben Kuehne


Benedict P. Kuehne
Kuehne Davis Law, P.A.
100 S.E. 2d Street, Suite 3550
Miami, FL 33131-2154
305.789.5989 x7 Tel
305.789.5987 Fax
ben.kuehne@kuehnelaw.com
bkuehne@bellsouth.net
www.kuehnelaw.com

---

**From:** Reader, Alistair F. [mailto:Alistair.F.Reader@usdoj.gov]
**Sent:** Monday, June 12, 2017 6:17 PM
**To:** Benedict P. Kuehne <ben.kuehne@kuehnelaw.com>
**Cc:** Frank, David <David.Frank@usdoj.gov>
**Subject:** Cell phones & privilege

Dear Ben,

During the search of Blackstone Labs, FDA OCI seized the contents of cell phones from Blackstone employees David Winsauer, Richard "JR" Newton and James Boccuzzi.

We are preparing to review these items.  I am writing to give you an opportunity to identify whether any of these three individuals' phones contain attorney-related privileged materials.  For example, can you confirm whether any of these individuals were communicating directly with corporate counsel, or would have exchanged privileged text messages with Blackstone's former counsel?

Given their respective roles in the company, I presume that is not the case, but would appreciate your confirmation one way or the other.  If at all possible, we would greatly appreciate a response this week.

Thank you,

Alistair

Alistair Reader
Trial Attorney
Consumer Protection Branch
United States Department of Justice
450 Fifth Street, N.W.
Washington, D.C. 20530
202-353-9930
alistair.f.reader@usdoj.gov

# EXHIBIT 3

## May 3, 2019
## Government Discovery Letter



9:19-CR-80030
GOVERNMENT
EXHIBIT
018



**U.S. Department of Justice**
Consumer Protection Branch

| | | |
|---|---|---|
| **Alistair Reader** | **Overnight Delivery Address** | **Mailing Address** |
| Phone:  202-353-9930 | 450 Fifth Street, NW, Sixth Floor South | P.O. Box 386 |
| Alistair.F.Reader@usdoj.gov | Washington, D.C.  20001 | Washington, D.C.  20044 |

May 3, 2019

**VIA EMAIL AND FEDEX**

Benedict Kuehne, Esq.
Michael T. Davis, Esq.
Kuehne Davis Law
Miami Tower, Suite 3550
100 SE 2nd Street
Miami, Florida 33131-2154

Dear Counsel:

     Re:    *United States v Phillip Braun, et al*., **Docket No. 19-80030-CR-WPD**
                   **First Discovery Letter**

       Please find enclosed the government's first discovery productions in the above-captioned case regarding your clients Phillip Braun ("Braun") and Blackstone Labs, LLC ("Blackstone").  An index of the documents available and/or produced to date is attached. As you know, the Court entered a protective order restricting the use and review of materials marked as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER."

       The enclosed material and any future discovery that is provided to you that exceeds the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such material to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

**Documents and Items Available for Inspection**.

       <u>Forensic Images</u>.  The government is making available to you today for inspection and to copy the forensic image of your own client's electronic device(s), all located in Plantation, Florida.  **The government intends to ultimately provide a copy of *all* forensic images to each defendant to comply with its discovery obligations.**  On March, 26, 2019, the government wrote via letter to defendants Braun, Blackstone Labs, LLC, Singerman, Ventrella, DiMaggio, Boccuzzi, and Winsauer stating this position and seeking a response regarding these forensic images.  The government wrote to Ventech Labs, LLC regarding these forensic images on March 30, 2019 and again on April 15, 2019.  Several defendants (including Ventech's prior counsel) raised objections about confidential information on their respective forensic images, however, no defendant has sought a protective order from the Court.  The government will shortly propose a second protective order pursuant to the Court's authority under Federal Rule of Evidence 502(d), with the goal of producing all images and completing

this discovery obligation.  The combined data for the forensic images of seized computers and cell phones is approximately 4.5 Terabytes (TB).  Please contact me to make arrangements to obtain access to the images of your own client's electronic devices.

Also made available to you today are the physical materials seized during the search warrant executions.  Those materials, including paper documents and tangible objects, are in storage facilities in Plantation, Florida and Medley, Florida.  Please contact me to make arrangements to obtain access to those materials.  As described below, we are providing you with scanned copies of hard copy documents during the search warrant executions.  The government will also shortly produce photographs of certain tangible items that were seized or are otherwise evidence in this case.  However, we cannot warrant that every single seized paper document was scanned, and so there may be additional paper materials in storage in Plantation that are not on the drive, as well as items that have not been photographed.

### Potentially Privileged Documents

The hard copy and electronic documents seized pursuant to warrants in this matter underwent a filter review to ensure that the prosecution team will not have access to privileged materials.  There are a limited number of paper documents that were identified as possibly containing privileged information.  The prosecution team will not have access to those materials unless and until the filter team has determined no privilege exists. All privileged materials will be maintained by the filter team, and the prosecution will not have access to them.  The filter team will make those items available to you at your request.  Please contact Trial Attorney Joshua Rothman at Joshua.D.Rothman@usdoj.gov to make arrangements to access or copy any potentially privileged documents.

### Summary of Enclosed Media

The enclosed discovery production contains the following media (passwords will be redacted in the paper version of this letter enclosed with the productions):

One DVD containing encrypted zip files.

**Production One:** This DVD contains documents that are not currently subject to the Court's protective order.  First, the drive contains zipped folders with html copies of publicly available websites for Blackstone Labs, LLC, Prime Nutrition, LLC, and Legendary Supplements.  The password for each of the zip files is: "GovProd001!"

Second, the DVD contains "Prod Vol001" which is load-ready files with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file). The Bates range for these files is: GOV_00000001 to GOV_00088417.  The password is: "GovProd001!"

<u>One 1 TB Apricorn Aegis Fortress Hard Drive marked "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER"</u>

<u>This encrypted drive contains documents subject to the Court's protective order</u>.  The drive contains several productions.  Please refer to the attached index for additional information.   The password for the drive is: "257572522" and instructions to operate the drive are attached.

**Production Two**:  Folder Documents including Cell Phone Extracts, Defendants' Oral Statements, Forensic Reports, Proffer Letters, Search and Seizure Warrants, and Statements of Organizations pursuant to Rule 16(a)(1)(C).  These documents do not have Bates numbers.

**Production Three**: All information is load-ready with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file).
Tranche 1 of the production includes documents from search warrants.  The Bates range for these files is: GOV_00088418 - GOV_00541793.  Tranche 2 includes multiple sources relevant to the investigation.  The Bates range is for these files is: GOV_00541794 - GOV_01003336.  Tranche 3 contains documents produced by Blackstone Labs, LLC.  The Bates ranges for these files is GOV_01003337 - GOV_01865937.

**<u>Government's Disclosures</u>**.  The government makes the following disclosures, which are numbered to correspond with Local Rule 88.10.

a)

1. <u>Defendants' Oral Statements</u>.  The government is disclosing the substance of relevant oral statements made by the defendants, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.  Specifically, the government is disclosing in this production the substance of any relevant oral statements.

2. <u>Defendants' Written or Recorded Statements</u>.  The government is herein disclosing the written or recorded statements by defendants.

3. <u>Organizational Defendant</u>.  The government is disclosing statements described in Rule 16(a)(1)(A) and (B) where the government contends that the person making the statement:

3

(i) was legally able to bind the defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or

(ii) was personally involved in the alleged conduct constituting the offense and was legally able to bind the defendant regarding that conduct because of that person's position as the defendant's director, officer, employee, or agent.

The government reserves the right to produce additional materials should it determine that additional statements fall under Fed. Rule Crim. P. 16(a)(1)(C).

4. <u>Defendants' Prior Record</u>.  Blackstone Labs, LLC does not have a prior criminal record.  The government will produce, via separate email, a copy of each co-defendant's prior record to their own counsel.  You will receive a copy of Braun's record via email.

5. <u>Documents and Objects</u>.  As noted above, the government makes available today for inspection and to copy or photograph books, papers, documents, data, photographs, any tangible objects, or copies or portions of any of these items, described in Fed. R. Crim. P. 16(a)(1)(E).  In addition, the government is producing and/or will make available to each defendant a copy of all such materials that are in electronic format, including documents, books, photographs, and photographs of tangible objects.

6. <u>Reports of Examinations and Tests</u>.  The government will timely disclose the results or reports of any physical or mental examination and of any scientific test or experiment for items within the government's possession, custody, or control and material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

7. <u>Expert Witnesses</u>. The government will timely produce the results or reports of scientific tests or experiments. The government will produce a written summary of any additional testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.

b) <u>DEMAND FOR RECIPROCAL DISCOVERY</u>.  The United States requests the disclosure and production of materials enumerated as items 1, 2, and 3, of Section (b) of the Standing Discovery Order.  This request is also made pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.

c) The government will timely disclose information which may be favorable to the defendants on the issues of guilt or punishment within the scope of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

4

d)   The government will disclose any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, and will produce any such payments in the future.  The government is producing proffer letters agreements in the enclosed productions.

e)   There are currently no informants who will testify for the government at trial.

f)   No defendant was identified in a lineup, show up, photo array or similar identification proceeding.

g)   The government has advised its agents and officers involved in this case to preserve all rough notes.

h)   The government will timely advise the defendants of its intention to introduce extrinsic act evidence pursuant to Federal Rule of Evidence 404(b) and of the general nature of the evidence of the extrinsic acts.  You are hereby on notice that all evidence made available to you for inspection, or copied for you, as well as any statements disclosed herein or in any future discovery letter, may be offered in the case-in-chief, impeachment, or for possible rebuttal, under F.R.E. 404(b) or otherwise (including the inextricably-intertwined doctrine).

i)   No defendant is an aggrieved person, as defined in Title 18 U.S.C. § 2510(11), of any electronic surveillance.

j)   The government has transcribed the grand jury testimony of all witnesses who will testify for the government at trial.

k)   The government shall, upon request, deliver to any chemist selected by the defense, who is presently registered with the Attorney General in compliance with 21 U.S.C. §§ 822 and 823, and 21 C.F.R. § 101.22(8), a sufficient representative sample of any alleged contraband which is the subject of this indictment, to allow independent chemical analysis of such sample.

l)   The government does not know of any automobile, vessel, or aircraft allegedly utilized in the commission of any offenses charged that is in the government's possession.

m)  The defendant is a corporation and this section does not apply.  The government is not aware of any latent fingerprints or palm prints which have been identified by a government expert as those of co-defendants.

n)   The government shall make every possible effort in good faith to stipulate to all facts or points of law the truth and existence of which are not contested and the early resolution of which will expedite the trial.

<u>Reciprocal Discovery</u>

With this letter, the government also requests all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure, and the Standing Discovery Order.  The government also requests pursuant to Rules 12.1, 12.2, and 12.3 notice of any intention of your client to rely on an entrapment defense, a defense involving mental condition or duress, an alibi defense, or a public-authority defense.

Please do not hesitate to let us know if you encounter any issues with this production. This production represents the vast majority of the discoverable material in this case that is in the government's possession.  However, we are working on providing a limited amount of additional materials in the near future.

Should you have any questions, please feel free to contact me.  I can be reached via my direct line, (202) 353-9930.

Sincerely,

*/s/  Alistair Reader*
Alistair F. Reader
Trial Attorney
Consumer Protection Branch

Cc:    Trial Attorney David Frank
       AUSA Daren Grove
       Special Agent Kelly McCoy
       Special Agent Jonathan Frick

6

# EXHIBIT 4

## Blackstone Labs Search Warrant, Inventory of Items Seized



9:19-CR-80030
GOVERNMENT
EXHIBIT
019

Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 17-8047-WM |
| | ) |
| Premises located at Blackstone Labs, LLC, | ) |
| 1090 Holland Drive, Suites 1 and 2, | ) |
| Boca Raton, FL 33487 | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:
**See Attachment A.1**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**See Attachment B.1**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before  *February 17, 2017*
                                                                                                    *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty  *Duty U.S. Magistrate Judge*  .
                                 *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                                                      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  *February 3, 2017*
                                 *1:23 p.m.*                                            _____
                                                                                                            *Judge's signature*

City and state:     West Palm Beach, Florida                        William Matthewman, United States Magistrate Judge
                                                                                                *Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>17-8047-WM | Date and time warrant executed:<br>2/16/17   10:10 AM | Copy of warrant and inventory left with:<br>Richard Newton |
| Inventory made in the presence of:<br>Irene Lamer + SA Matt Heath | | |
| Inventory of the property taken and name of any person(s) seized:<br><br>See Attached | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/2/17

_Matt Heath_
Executing officer's signature

Matt Heath, Special Agent
Printed name and title

_Dave Lee Branны_   3-2-2017
Dave Lee Branны, USMJ

## ATTACHMENT A.1

### Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building. See Exhibit 1 below. There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre." The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



Exhibit 2



Exhibit 3



## ATTACHMENT B.1

Particular Things to Be Seized

1.    All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud) and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

   a.   any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b.   any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c.   evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d.   any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e.   records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f.   all bank records, checks, credit card bills, account information, and other financial records;

   g.   customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

h.  any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.  advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.  correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.  tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.  records of or information about Internet Protocol addresses used by the COMPUTER;

e.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

2

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017      **START TIME:** 10:10a.m.      **END TIME:**

**SITE ADDRESS:** 1090 Holland Drive, Suite 1 and 2, Boca Raton, Florida

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 1 | Evidence bag containing (8) bottles, labeled in part, PCTV, 60 capsule/btl, Lot #2046, Exp 12/18 |
| 2 | 1 | Evidence bag containing a total of (8) bottles without lot numbers or expiration dates:  PCTV (6); Brutal 4CE (1); Gear Support (1) |
| 3 | 1 | Evidence bag containing (14) bottles labeled as containing Euphoria RX, 16 capsules/btl, Lot #632, Exp 10/18. |
| 4 | 1 | Box containing (63) bottles labeled as containing Bear Support, 90 capsules/btl |
| 5 | 1 | Box (1 of 2) and Evidence Bag (2 of 2) containing a total of 81 bottles labeled as containing Blackstone Labs (Growth, 90 capsules/btl. |
| 6 | 1 | Box containing a total of (33) packets labeled as containing Dust V2, 500ml, 16.9 oz, TGropical Punch |
| 7 | 1 | Box containing a total of (21) bottles labeled as containing Anesthetized Pineapple Sweet Dreams |
| 8 | 1 | Box containing a total of (18) bottles labeled as containing Dust U2 – Blue Sky 300g |
| 9 | 1 | Box containing a total of (11) containers labeled as Dust V2, 250g, 25 servings, Black Lemonade |
| 10 | 1 | Box containing a total of (19) bottles labeled as containing Dust V2 – Red KE, 300g |
| 11 | 1 | Box containing a total of (25) bottles labeled as containing Dust Extreme, 75mg |
| 12 | 2 | Boxes containing a total of (128) bottles labeled as Cobra 6 Extreme Intense Stimulant, 60 capsules/btl |
| 13 | 2 | Boxes containing a total of (27) bottles labeled as Dust Extreme Sour Gummy Bear, 75mg |
| 14 | 2 | Evidence bags containing a total of (9) containers labeled as Dust V2, 30 servings, Watermelon |
| 15 | 2 | Boxes containing a total of (42) bottles labeled as Dust V2, Dietary Supplement |
| 16 | 1 | Box containing a total of (27) containers labeled as containing Cobra 6, 60 servings, Kiwi Strawberry Flavor |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 17 | 1 | Box containing a total of (94) bottles labeled as containing Brutal 4CE, 60 tablets/btl, Dietary Supplements |
| 18 | 1 | Box containing a total of (14) containers labeled as Dust V2, 30 servings, cut with cotton candy |
| 19 | 1 | Box containing a total of (21) bottles labeled as Dust Extreme Dietary Supplement |
| 20 | 1 | Box containing a total of (20) bottles labeled as Cobra 6, Dietary Supplement |
| 21 | 1 | Box containing a total of (11) bottles labeled Anesthetized - Sleep Formula |
| 22 | 2 | Boxes containing a total of (107) bottles labeled as Cobra 6, 60 caps/btl |
| 23 | 1 | Box containing a total of (15) bottles labeled as PCTV, 60 capsules/btl |
| 24 | 1 | Box containing a total of (155) bottles labeled as Euphoria Rx, 16 Capsules/btl |
| 25 | 3 | Boxes containing a total of (63) bottles labeled as Blackstone Labs, Dust V2, Extreme Pre-Workout Formula - Various Flavors |
| 26 | 1 | Evidence bag containing a total of (11) bottles labeled as Cobra 6 Extreme, 60 capsules |
| 27 | 1 | Evidence bag containing a total of (9) bottles labeled as Gear Support, 90 capsules/btl |
| 28 | 1 | Evidence bag containing a total of (7) bottles labeled as Growth Dietary Supplement, 90 capsules/btl |
| 29 | 1 | Evidence bag containing a total of (9) bottles labeled as Brutal, 60 tablets/btl, Dietary Supplements |
| 30 | 1 | Box containing a total of (75) bottles labeled as Dust V2, Bottle cap Infuser |
| 31 | 1 | Evidence bag containing a total of (3) bottles labeled as Brutal 4CE, 60 tablets/bottle |
| 32 | 1 | Evidence bag containing a total of (6) bottles labeled as Euphoria - Rx, 16 capsules/btl |
| 33 | 1 | Box containing a total of (12) bottles labeled as Blackstone Labs Anesthetized Hardcore Sleep Formula - Pineapple, 25 servings/btl |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 34 | 1 | Box containing a total of (21) bottles labeled as Blackstone Labs, Cobra 6 Extreme, 60 servings/bottle, multiple flavors - (Powder) |
| 35 | 1 | Box containing a total of (15) bottles labeled as Blacksone Labs, Dust Extreme, 75mg of 1.3 – DMAA – 30 servings/btl |
| 36 | 1 | Box containing a total of (15) bottles labeled as Cobra 6 Extreme, 60 capsules/btl |
| 37 | 1 | Box containing a total of (21) bottles labeled as Blackstone Labs PCTV - Post Cycle Therapy, 60 capsules/btl |
| 38 | 1 | Evidence bag containing (6) packs labeled as Angel Dust, Dietary Supplements |
| 39 | 1 | Evidence bag containing a total of (155 ) packets labeled as Dust V2, Dietary Supplement |
| 40 | 1 | Evidence bag containing (1) open container labeled as Dust V2 |
| 41 | 1 | Box containing a total of (9) containers labeled as Cobra 6 Extreme. |
| 42 | 1 | Box containing a total of (4) containers labeled as Gear Support |
| 43 | 1 | Box containing a total of (8) containers labeled as Growth |
| 44 | 1 | Evidence bag containing (3) sealed bottles labeled as Euphoria Rx, 16 Count |
| 45 | 1 | Evidence bag containing (9) bottles labeled as Blackstone Lab Ano-Genn Anabolic Activator, 60 capsules/btl |
| 46 | 1 | Evidence bag containing (6) bottles labeled as Blackstone Labs, Abnormal, 60 tabs/btl |
| 47 | 1 | Evidence bag containing (6) bottles labeled as Blackstone Labs, Crossed 1, 60 tabs/btl |
| 48 | 1 | Evidence bag containing (18) bottles labeled as Blackstone Labs, Eradicate, 90 caps/btl |
| 49 | 1 | Evidence bag containing a total of  (3) bottle, (1) labeled as Dust V2 and (2) labeled as PCTV |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 50 | 1 | Evidence bag containing (1) bottle labeled as Cobra 6 Extreme, Kiwi Strawberry Supplement |
| 51 | 1 | Evidence bag containing a total of (5) bottles: (2) bottles labeled as Dust Extreme, 360g; (1) bottle labeled as Grown 165g; (1) bottle labeled as PCT 150g; (1) bottle labeled as Euphoria Rx, 16 capsules |
| 52 | 1 | Evidence bag containing a total of (11) bottles: (3) labeled as Dust Extreme, 360g; (2) bottles labeled as Anesthetized, 25 servings; (4) bottles labeled as Dust V2 300g; (1) bottle labeled as Growth, 90 capsules; (1) bottle labeled as Brutal 4CE, 60 tablets; and (1) bottle labeled as Euphoria Rx, 16 capsules |
| 53 | 1 | Evidence bag containing (1) bottle containing black pills labeled as Eradicate 90 capsules, Exp 5/18, Lot 36D |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017          **START TIME:** _____     **END TIME:** _____

**SITE ADDRESS:** 1140 HOLLAND DRIVE, SUITE 12, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 1 | Apple iMAC model # A1419 bearing Serial #C02Q113DFY11 and power cord, SCERS # S1RIC1D1 |
| 2 | 1 | Apple iMAC model # A1418 bearing Serial # C02L7480F8J2 and power cord, SCERS # S1RIC2D1 |
| 3 | 1 | Apple iMAC model # A1419 bearing Serial # C02P33LOFY11 and power cord, SCERS # S1RHC2D1 |
| 4 | 1 | Apple iMAC model # A1419 bearing Serial # C02Q24BJF8J4 and power cord, SCERS # S1RPC3D1 |
| 5 | 1 | Forensic image of Apple iPhone Model # MKUQ2LL bearing Serial #F2LRFASVGRWV, SCERS #S1RPC1D1. |
| 6 | 1 | Forensic image of Apple iPhone Model # MGC52LL bearing Serial #F2LPCAJCG5QJ, SCERS #S1RPC2D1. |
| 7 | 1 | Forensic image of Apple iPhone Model # MN5T2LL bearing Serial #F2LSRC25HFXW, SCERS #S1RHC1D1. |
| 8 | 1 | Apple laptop Model # A1466 bearing Serial # C02NVDWJG085 and power block, SCERS # S1RFC1D1. |
| 9 | 1 | Apple iMAC model # A1418 bearing Serial #C02QD3Q8GG77 and power cord, SCERS # S1RIC3D1. |
| 10 | 1 | Seagate SATA Drive model # SRD00F1 bearing Serial # NA97FTKY, SCERS # S1RPC4D1 |
| 11 | 1 | Seagate SATA Drive model # SRD00F1 bearing Serial # NA7R9MYR with handwritten label-Aaron Singerman Desktop Backup 05/24/16, SCERS # S1RHC3D1 |
| 12 | 1 | Western Digital SATA Drive # WDBYNW0010BBK-08 bearing Serial # WX71A86K5C6C with handwritten label-Chris E. laptop backup Jan 9th 2017, SCERS # S1RHC4D1 |
| 13 | 1 | Western Digital SATA Drive model # WDBUZG0010BBK bearing Serial # WX71EB3CDW46, SCERS # S1RHC5D1 |



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

DATE OF SEARCH:  02/16/2017          START TIME:  10:10am          END TIME: _____

SITE ADDRESS:   1090 HOLLAND DRIVE, SUITE 1&2, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 1 | Evidence bag containing 3 manila folders with potential attorney-client documents |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017     **START TIME:** 10:10am     **END TIME:** _____

**SITE ADDRESS:** 1090 HOLLAND DRIVE, SUITE 1&2, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|--------------------------|
| 1 | 35 | Box containing dietary supplements and types as follows: R-redemption - silk; cobra 6 extreme; dust extreme sour gummy bear; anesthetized pineapple sweet; dust TV2 - redice; dust TV2 - blue sky; dust extreme pineapple mango; color 6 extreme kiwi strawberry; dust TV2 watermelon; growth; brutal 4ce - desired by force; geer support; dust TV2 - black lemonade; dust TV2 - tropical punch; euphoria RX; cobra 6C; andgemin; trojan horse - lemon lime; apex mule; ; EPI - test - tropical breeze; juiced up - sarge phytoformula betin berriz; trojan horse - black culment; BCAA resurgence - fruit punch; hype - orange; anormal; hype - fruit punch; BCAA - resurgenz - pinn colada; hype extreme - fruit punch; hype extreme - cotton candy; erudicat; eradicat - powered by arimistene; chosen 1 - destiny; EPI CAT; PCTV |
| 2 | 1 | Evidence bag containing sample for FCC; 1 bottle Glimmer 60ct; 1 bottle Dusk 30 servings; 1 bottle Drought 28 ct; 1 packet of Audade; 1 bottle Body Shaping 3fl oz; 1 bottle liquid coverup 8fl oz; 1 bottle sunless tanning lotion |
| 3 | 1 | Box containing bottle marked BSLPWV Peach Mango cc level, bottle marked partition MD, bottle marked sleepshred, bottle marked anesthetized, bottle with top marked CRV Rel, bottle marked primeur flavor, bottle marked EAAs |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017 **START TIME:** 10:10am **END TIME:**

**SITE ADDRESS:** 1090 Holland Drive, Suite 1 and 2, Boca Raton, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 120 | Boxes labeled as Dust Extreme Sour Gummy (SG) |
| 2 | 120 | Boxes labeled as Dust (WM) |
| 3 | 120 | Boxes labeled as Dust RI |
| 4 | 120 | Boxes labeled as Dust CC |
| 5 | 14 | Boxes labeled as Dust BS |
| 6 | 22 | Boxes labeled as Dust BL |
| 7 | 120 | Boxes labeled as Dust Extreme PAM |
| 8 | 100 | Boxes labeled as Dust Extreme SGB |
| 9 | 100 | Boxes labeled as Dust WM |
| 10 | 100 | Boxes labeled as Dust RF |
| 11 | 100 | Boxes labeled as Dust BS |
| 12 | 100 | Boxes labeled as Dust BL |
| 13 | 72 | Boxes labeled as Dust PAM |
| 14 | 54 | Boxes labeled as Dust SGB |
| 15 | 75 | Boxes labeled as Dust WM |
| 16 | 78 | Boxes labeled as Dust Misc Flavors |
| 17 | 93 | Boxes labeled as Dust CC |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|------------------------|
| 18 | 70 | Boxes labeled as Dust CC |
| 19 | 97 | Boxes labeled as Dust BL |
| 20 | 110 | Boxes Dust BS |
| 21 | 19 | Boxes Gear Support RL |
| 22 | 23 | Boxes Growth Pineapple |
| 23 | 39 | Boxes labeled as PCTV |
| 24 | 31 | Boxes labeled as Cobra Extreme |
| 25 | 114 | Boxes labeled as Brutal 4CE |
| 26 | 100 | Boxes labeled as Gear Support |
| 27 | 129 | Boxes labeled as Brutal 4CE |
| 28 | 128 | Boxes labeled as Brutal 4CE |
| 29 | 83 | Boxes labeled as Eradicate |
| 30 | 106 | Boxes labeled as Chosen 1 |
| 31 | 10 | Boxes labeled as Eradicate |
| 32 | 99 | Boxes labeled as Anogenin |
| 33 | 103 | Boxes labeled as Anogenin |
| 34 | 70 | Boxes labeled as Cobra 6P Extreme |
| 35 | 80 | Boxes labeled as Cobra 6P Extreme |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|--------------------------|
| 36 | 120 | Boxes labeled as Anestetized |
| 37 | 160 | Boxes labeled as Eradicate |
| 38 | 37 | Boxes labeled as Anesthetized |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| | | |
|---|---|---|
| **DATE OF SEARCH:** 02/16/2017 | **START TIME:** 10:10am | **END TIME:** |
| **SITE ADDRESS:** 1090 HOLLAND DRIVE, SUITE 1&2, BOCA RATON, FL | | |

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 1 | Evidence bag containing orders, R&L Carrier receipt |
| 2 | 1 | Evidence bag containing shipping and orders, inventory |
| 3 | 1 | Evidence bag containing a green cover inventory notebook,, DHL, black cover notebook; orange cover notebook, legal pad, green cover notebook |
| 4 | 1 | Evidence bag containing products; 2 notebooks re: sales, invoices |
| 5 | 1 | Evidence bag containing vendor information sheets, Checkers receipts |
| 6 | 1 | Evidence bag containing documents of ADP statement; W-2's; purchase invoices, earnings statement; cancelled checks. |
| 7 | 1 | Evidence bag containing documents – orders, ledgers, shippers orders, W-4's, ADP receipts |
| 8 | 1 | Evidence bag containing price sheets, invoices |
| 9 | 1 | Evidence bag containing 2 black books with financial ledgers, 1 blue folder with financial documents; 1 red/pink folder with financial documents, loose financial ledger documents |
| 10 | 1 | Evidence bag containing check#1054, check #1579, folder marked "CB Operating Agreement", manufacturing agreement, financial documents |
| 11 | 1 | Evidence bag containing financial/sale document and lab tests from clipboard |
| 12 | 1 | Evidence bag containing Financial/sales documents, envelope with financial documents |
| 13 | 1 | Evidence bag containing 5 folders of financial documents |
| 14 | 1 | Evidence bag containing financial documents |
| 15 | 1 | Evidence bag containing financial documents |
| 16 | 1 | Evidence bag containing 5 envelopes of receipts |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 17 | 1 | Evidence bag containing 2 legal pads |
| 18 | 1 | Evidence bag containing invoices |
| 19 | 1 | Evidence bag containing shipping labels |
| 20 | 1 | Evidence bag containing earning statements; BSL invoices; handwritten notes |
| 21 | 1 | Evidence bag containing note pad containing subjects names and phone numbers |
| 22 | 1 | Evidence bag containing email printouts of customer complaints; Dust V2 label |
| 23 | 1 | Evidence bag containing labels; Dust Extreme & Dust V2 |
| 24 | 1 | Evidence bag containing e-mail ADP earnings statements, handwritten note |
| 25 | 1 | Evidence bag containing 2 notepads and "field notes" earnings statements, folder |
| 26 | 1 | Evidence bag containing ledger; Winsauer earning statments; notebooks; lease; facebook ads paypal payments; profit/loss BSC paperwork; BSC earnings |
| 27 | 1 | Evidence bag containing documents including but not limited to Termination Agreemeent of Aaron Singerman, FDA WL, letter from Muscle Roge Ltd from PJ Brown, BSL Consulting Agreement with supplement safety solutions, signed terminations, BSL policy memos, resignation as manger of Prime Nutrition by Brown, BOCA Nutrition purchases; Blackstone labs handbook, envelope with return address of BSL, patent application file on various herbal ingredients, general nutrition corporation vendor book, ABC testing records, Blackstone labs order summary report, product pick lissts |
| 28 | 1 | Evidence bag containing financial documents |
| 29 | 1 | Evidence bag containing lab report documents |
| 30 | 1 | Evidence bag containing financial documents |
| 31 | 1 | Evidence bag containing miscellanous docuemnts |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 32 | 1 | Evidence bag containing file folders of invoices and box invoices |
| 33 | 1 | Evidence bag containing financial documents |
| 34 | 1 | Evidence bag containing financial documents individual payroll bank & credit car records |
| 35 | 1 | Evidence bag containing financial documents |
| 36 | 1 | Evidence bag containing financial documents |
| 37 | 1 | Evidence bag containing bills, password, records |
| 38 | 1 | Evidence bag containing bank documents shipping documents, ABC testing documents |
| 39 | 1 | Evidence bag containing bills of sole and earnings reports |

# Exhibit 1

1140 Holland Drive Search Warrant,
Agent Affidavit, and
Search Warrant Application



9:19-CR-80030
GOVERNMENT
EXHIBIT
020

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. _17-8048-WM_

INRE SEALED SEARCH WARRANT

_____/

## CRIMINAL COVER SHEET

     1.    Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes ___X___ No

     2.    Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes ___X___ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY:     _Robert J. Lehner_

ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

NO. 17 - 8048 - WM



FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## IN RE SEALED SEARCH WARRANT

_____/

## MOTION TO SEAL

The United States of America, by and through its undersigned Assistant United States

Attorney, requests that, with the exception of those copies to be provided to the United States

Attorney's Office and its agents for use in the execution of the search warrant, the attached

search warrant application, application, affidavit, related documents, and any resulting orders

be SEALED until further order of this court, because public disclosure of the search warrant

affidavit and related documents might compromise the integrity of the ongoing investigation.

The United States is prepared to provide further information *in camera* should the Court so

require.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NO. _17 - 8048 - WM_

FILED by ___ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**IN RE SEALED SEARCH WARRANT**

_____/

## SEALED ORDER

The United States of America, having applied to this Court for an Order sealing the

search warrant, related documents, and this order, and the Court finding good cause:

IT IS HEREBY ORDERED that the search warrant, the application and affidavit in

support thereof, related documents, and this Order shall be filed under seal until further order

of this Court, however, the United States Attorney's Office may obtain copies of any search

warrant and related sealed documents for purposes of executing the search.

DONE AND ORDERED in chambers at Miami, Florida, this 3ʳᵈ day of February,

2017.

_William Matthewman_
WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:     Robert J. Lehner, AUSA

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk
Date 2/3/2017

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida



FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Premises located at VBS Laboratories, LLC,
1140 Holland Drive, Suite 12,
Boca Raton, FL 33487

)
)
)
)
)

Case No. 17-8048-WM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.2

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Date 2/3/2017
Deputy Clerk

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 331(a)(d)(v) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 21 U.S.C. § 333(a) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail and Wire Fraud |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kelly McCoy, Special Agent, U.S. Food & Drug Admin.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: February 3, 2017

City and state: West Palm Beach, Florida

_____
*Judge's signature*

William Matthewman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Kelly McCoy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for two warrants to search two premises: one located at Blackstone Labs,

LLC, 1090 Holland Drive, Suites 1 and 2, Boca Raton, FL 33487 (the "Blackstone Search

Premises"); and the second located at VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca

Raton, FL 33487 (the "VBS Search Premises").  Pictures and a detailed description of the two

locations are included in Attachment A.1 (Blackstone Search Premises) and Attachment A.2 (VBS

Search Premises), both of which are incorporated herein by reference.  This affidavit states

probable cause that evidence and property used in the commission of crimes, as particularly

described in Attachments B.1 and B.2, will be found at the Blackstone Search Premises and the

VBS Search Premises, respectively.

2.       I am a Special Agent with the U.S. Food and Drug Administration's Office of

Criminal Investigations ("FDA/OCI"), and have been since January of 2016.  I am presently

assigned to the Miami Field Office investigating violations of the Federal Food, Drug, and

Cosmetic Act, 21 U.S.C. § 301 *et seq*. (the "FDCA").  I am a law enforcement officer of the United

States, in that I am empowered under authority of the FDCA to conduct investigations and to make

arrests.  In my capacity as an FDA/OCI Special Agent, I have received extensive training in the

investigation of the counterfeiting, diverting, misbranding, adulterating and tampering of drugs,

medical devices, and dietary supplements.  In addition, I have approximately six years of prior

federal law enforcement experience as a Special Agent with the United States Secret Service.

During this time, I received extensive training in investigations of computer crimes, internet

1

investigations, child exploitation, counterfeit currency, check fraud, access device fraud, and identity theft, among other things.

3. I have on numerous occasions participated in the execution of search warrants, and based upon my experience and training, and further based upon discussions with fellow law enforcement agents with years of experience investigating adulterated and misbranded foods, including dietary supplements, and drugs, I know that it is common for individuals engaged in this activity:

> (A) to maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the daily purchase and sale of merchandise. These records are often kept on computers and cellular telephones. The aforementioned computers, cellular telephones, books, records, receipts, notes, ledgers, bank records, money orders, etc., are routinely maintained at the business where the owner/operator has ready access to such records;

> (B) to maintain books, papers, and electronic devices (computers, electronic Rolodexes, Caller ID devices, and digital pagers and cellular telephones with memory capabilities) which reflect names, addresses, and/or telephone numbers of their suppliers and/or customers;

> (C) to utilize computers, electronic storage media (including PCs, laptops, and thumb drives) and cellular telephones to store information regarding their business activities, including a list of suppliers and/or buyers.

4. Based on my training and experience and facts as set forth in this affidavit, there is probable cause to believe that there will be found at the search premises the items, records, and information listed in Attachment B.1 and B.2, all of which constitute evidence, fruits and

instrumentalities of violations of federal laws, including, but not limited to: causing the introduction or delivery for introduction into interstate commerce of adulterated and misbranded foods, unapproved new drugs, and unsafe dietary supplements (21 U.S.C. §§ 331(a), (d), and (v) and 333(a)), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit mail and wire fraud (18 U.S.C. § 1349), committed by Blackstone Labs, LLC, VBS Laboratories, LLC, and their employees and agents.

5.     The facts in this affidavit come from my personal observations and knowledge of the investigation, observations of other law enforcement officers involved in this investigation and information obtained from other government agents and/or law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## SUMMARY OF INVESTIGATION

6.     From approximately 2012 to the present, Blackstone Labs, LLC ("Blackstone"), an internet-based bodybuilding supplement company founded by Aaron Singerman ("Singerman") and Phillip (PJ) Braun ("Braun"), has engaged in a multiyear scheme to market, promote, and sell illegal products labeled as dietary supplements, some of which are potentially dangerous. Evidence supports probable cause that Singerman, Braun, and their associated companies, including Blackstone and VBS Laboratories, LLC, intended to defraud and mislead the FDA and consumers throughout the United States and internationally by selling these products, notwithstanding receiving notice of legal violations through formal Warning Letters issued by the FDA.

7.     Blackstone's scheme includes a pattern of selling illegal products.  Evidence supports probable cause that through these companies, Singerman and Braun intentionally sell and

have sold misbranded, adulterated, and/or unsafe dietary supplements and unapproved new drugs, and committed mail fraud, wire fraud, and conspiracy to commit mail or wire fraud. This affidavit summarizes probable cause that Singerman, Braun, Blackstone, VBS Laboratories, LLC, and associated companies sell and have sold numerous adulterated and misbranded dietary supplements and unapproved new drugs, including products named:

> (A) Super DMZ Rx 2.0;
>
> (B) Angel Dust;
>
> (C) Cobra 6P Extreme;
>
> (D) Dust V2;
>
> (E) Brutal 4ce;
>
> (F) Dust Extreme;
>
> (G) Ostapro;
>
> (H) Growth;
>
> (I) Anesthetized;
>
> (J) Euphoria;
>
> (K) Gear Support; and
>
> (L) PCTV.

Three of these products include ingredients that are not listed on the labels.

    8.    This investigation and affidavit is based on evidence from multiple sources, including online research, undercover purchases, physical surveillance, public and government records, financial and shipping records, and physical evidence procured from discarded trash at the two search premises.

## OVERVIEW OF APPLICABLE STATUTES

### The Federal Food, Drug, and Cosmetic Act

9.     The U.S. Food and Drug Administration ("FDA") is an agency of the United States Government charged with the responsibility of protecting the American public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*.  Among other responsibilities, FDA enforces laws and regulations intended to ensure the safety of dietary supplements and drugs.

10.     Under the FDCA, the term "label" means a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).  The term "labeling" is broader, and is defined as all labels, as well as other printed or graphic matter upon any article or any of its containers or wrappers, or accompanying such article.  21 U.S.C. § 321(m).

<u>Prohibited Acts and Penalties under the FDCA</u>

11.     Causing the introduction or delivery for introduction into interstate commerce of a misbranded or adulterated food or drug is a prohibited act.  21 U.S.C. § 331(a).

12.     Causing the introduction or delivery for introduction into interstate commerce of a new drug that is not approved by the FDA is a prohibited act.  21 U.S.C. § 331(d).

13.     Causing the introduction or delivery for introduction into interstate commerce of a dietary supplement that is unsafe under 21 U.S.C. § 350b is a prohibited act.  21 U.S.C. § 331(v).

14.     Commission of a prohibited act is a misdemeanor punishable by a fine and up to a year in prison for each violation.  21 U.S.C. § 333(a).  If the prohibited act is done with "intent to defraud or mislead" consumers or an identifiable government agency, such as the FDA, it is a felony punishable by a fine and up to three years in prison for each violation.  21 U.S.C. § 333(a)(2).

<u>Drugs under the FDCA</u>

15.     Under the FDCA, "drug" is defined in relevant part as an article, other than food, intended to affect the structure or any function of the body of man.  21 U.S.C. § 321(g)(1)(C).

16.     A "new drug" is a drug that is not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under conditions prescribed, suggested, or recommended in the drug's labeling. 21 U.S.C. § 321(p).

17.     A "new drug" cannot be lawfully introduced into interstate commerce unless and until the FDA determines that the drug is safe and effective for its intended use and approves that drug.  21 U.S.C. § 355(a).

Foods and Dietary Supplements under the FDCA

18.     The FDCA defines "food" to include articles used for food or drink for man or other animals and articles used for components of such articles.  21 U.S.C. § 321(f).  Except for limited purposes, dietary supplements are deemed to be foods within the meaning of the FDCA.  21 U.S.C. § 321(ff).

19.     Under 21 U.S.C. § 321(ff), a "dietary supplement" is defined in relevant part as a product intended to supplement the diet that bears or contains one or more of the following dietary ingredients:

- vitamin;
- mineral;
- herb or botanical;
- amino acid;
- dietary substance for use by man to supplement the diet by increasing total dietary intake; or
- a concentrate, a metabolite, constituent, extract, or combination, of the preceding ingredients

and that is intended for ingestion, not represented for use as a conventional food or as a sole item of a meal or the diet, and is labeled as a dietary supplement.

20.     A product that includes an article that is approved as a "new drug" under 21 U.S.C. § 355 cannot be a dietary supplement unless the article was marketed as a dietary supplement or as a food prior to such approval.  21 U.S.C. § 321(ff)(3)(B)(i).

21.     A product that includes an article authorized for investigation as a "new drug" for which substantial clinical investigations have been instituted and made public cannot be a dietary supplement, unless the article was marketed as a dietary supplement or food before its authorization as an investigational new drug.  21 U.S.C. § 321(ff)(3)(B)(ii).

22.     A substance intended to become a component of a food, including a dietary supplement, is a food additive unless (1) it is generally recognized among experts qualified by scientific training and experience to evaluate its safety as having been adequately shown to be safe under the conditions of its intended use; (2) it is subject to prior sanction; or (3) it is an ingredient described in 21 U.S.C. § 321(ff) (a dietary ingredient).  21 U.S.C. § 321(s).  The other exceptions listed in 21 U.S.C. § 321(s) do not apply.

23.     A food additive is deemed unsafe unless it is used in conformity with a regulation prescribing conditions under which it may be safely used, it has been granted an exemption for investigational use under 21 U.S.C. § 348(j), or it is a food contact substance.  21 U.S.C. § 348(a).

24.     A food, including a dietary supplement, is adulterated if it contains a food additive that is unsafe within the meaning of 21 U.S.C. § 348.  21 U.S.C. § 342(a)(2)(C)(i).

25.     Under 21 U.S.C. § 350b, a dietary supplement that contains a new dietary ingredient (one not marketed in the United States before October 14, 1994) is deemed to be adulterated under 21 U.S.C. § 342(f) unless (1) the dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered, or (2) there is a history of use or other evidence of safety establishing that the

7

dietary ingredient will reasonably be expected to be safe and, at least 75 days before introducing the dietary supplement in interstate commerce, the manufacturer or distributor provides FDA with information which is the basis for its conclusion that the dietary supplement containing the new dietary ingredient will reasonably be expected to be safe ("premarket notification"). 21 U.S.C. § 350b.

26.     A dietary supplement also is deemed to be adulterated if: (1) it contains a dietary ingredient that presents a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in its labeling (21 U.S.C. § 342(f)(1)(A)(i)); or (2) it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury (21 U.S.C. § 342(f)(1)(B)).

27.     A food, including a dietary supplement, is misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 343(a)(1).

Relevant Title 18 Provisions

28.     18 U.S.C. § 1341 criminalizes mail fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, any such matter or thing, shall be fined or imprisoned not more than 20 years, or both.

29.     18 U.S.C. § 1343 criminalizes wire fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined or imprisoned not more than 20 years, or both.

30.     18 U.S.C. § 1349 criminalizes an attempt or conspiracy to commit mail fraud or wire fraud, stating that any person who attempts or conspires to commit such an offense shall be subject to the same penalties.

## FACTS ESTABLISHING PROBABLE CAUSE

31.     FDA/OCI is currently conducting an investigation of Blackstone Labs, LLC, VBS Laboratories, LLC, and their associated companies.    Blackstone is an active corporation incorporated in the State of Florida on or about August 29, 2012.  Since March 2016, Blackstone's principal address and mailing address is listed as 1090 Holland Drive, Suite 1, Boca Raton, FL 33487.  Surveillance in November 2016 confirmed that Suite 1 is labeled with a sign "Blackstone Labs Suite 1 Headquarters."  Suite 2, the next door, is labeled with a sign "Blackstone Labs Suite 2 Shipping and Receiving."  Collectively, 1090 Holland Drive, Suites 1 and 2 are the Blackstone Search Premises.

32.     The company was owned and operated by Phillip Braun and Aaron Singerman until July 2016, when records from the Florida Department of State, Division of Corporations show that Singerman's name no longer appears as an officer or director.  However, in a November 2016 video available online, Singerman stated that he still retains partial ownership of Blackstone, reviews the books, and gets paid.  Braun is currently listed as a manager for the company, and states in numerous videos posted on Blackstone's website that he is the president and CEO.

9

33. Blackstone sells products online through its own website, www.blackstonelabs.com, as well as wholesale and through other retail stores. Blackstone ships its products, including the products described herein, across the United States and internationally. Consumers using www.blackstonelabs.com are able to pay for their orders through PayPal, Inc. ("PayPal") an online payment system, Visa, MasterCard, American Express, and Discover. The website also offers the ability to chat directly with an employee at Blackstone, and has social networking profiles on Twitter, Facebook, Instagram, and YouTube, all of which promote Blackstone products.

34. Financial records and public records from the Florida Secretary of State, Division of Corporations show that Singerman and Braun (either both or individually) have management, shareholder, or financial signatory roles with Blackstone and several other dietary supplement companies including: VBS Laboratories, LLC; Singerman & Braun, LLC, dba Prime Nutrition or Platinum Labs; Boca Nutrition, LLC; Run Everything LLC; Steel Supps; Dynamik Muscle, LLC; SizeSlim, LLC; Redcon 1; Fight Pharm; Dragon Nutraceuticals, and Hardcore Ventures.

35. VBS Laboratories, LLC ("VBS Labs") is a Florida Limited Liability Company incorporated in November 2015. Although VBS Labs does not appear to have a website, evidence demonstrates probable cause that VBS Labs sells, manufactures and/or stores illegal products labeled as dietary supplements, including Blackstone's product Super DMZ Rx 2.0.

### Super DMZ Rx 2.0

36. Blackstone began with a product labeled as a dietary supplement containing two synthetic steroids. During an interview with an online entrepreneurship magazine "Secret Entourage," published prior to January 3, 2016, Singerman explained that Blackstone was created after a former business partner was worried that a product called Super DMZ "was going to become

illegal." While describing how he and his "best friend" Braun founded Blackstone, Singerman stated, "In our business, sometimes gray market ingredients will become illegal and you have to take them off the market. Basically anything that works too well will probably become illegal one day."

37.     During the same interview, Singerman also stated that Blackstone started when the former partner wanted to dispose of 7,000 units of Super DMZ, so Singerman took the legal risk himself and sold the products. He explained that he and Braun started a website called SuperDMZ.com and a new company, Blackstone Labs, LLC. According to Singerman, they sold all the units and also purchased more of the product, as the "ingredient had not become illegal yet."

38.     Notwithstanding Blackstone's claims, probable cause exists that their first product, Super DMZ Rx 2.0, was an unapproved new drug. Using an internet archive tool called the "Wayback Machine," I reviewed a copy of the SuperDMZ.com website, as it existed in September 2012. The website included a label for the product "Super DMZ Rx 2.0," and listed its only ingredients as 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, also known as methylstenbolone, and 17b-hydroxy 2a, 17b-demthyl 5a-androstan 3-one azine, also known as dimethazine or dymethazine.

39.     Methylstenbolone and dimethazine are synthetic steroids and are not dietary ingredients because they are not vitamins, minerals, herbs or other botanicals, amino acids, or concentrates, metabolites, constituents, or extracts of the same, nor are they dietary substances for use by man to supplement the diet by increasing total dietary intake. Because Super DMZ Rx 2.0 did not bear or contain a dietary ingredient, Super DMZ Rx 2.0 was not a dietary supplement as defined in 21 U.S.C. 321(ff).

11

40.     As of September 2012, the labeling of Super DMZ Rx 2.0 stated that the product was "engineered and designed to increase, sustain, and strengthen muscularity," would result in "increased vascularity," and "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol." Accordingly, Super DMZ Rx 2.0 was a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it was an article other than food intended to affect the structure or function of the human body. Super DMZ Rx 2.0 was also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it was not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Super DMZ Rx 2.0 was not approved as safe and effective by the FDA, it was, and still is, an unapproved new drug.

41.     Since 2012, Blackstone and its associated companies have used the online payment system PayPal to transact sales of products. Blackstone PayPal records show financial transactions starting on August 30, 2012. This first transaction and many others in September 2012 have a listed "subject" of "SDMZ 2.0." Based on context and my knowledge of the investigation, I believe this refers to the Super DMZ Rx 2.0 product, and that the records indicate that Blackstone was selling the Super DMZ Rx 2.0 product online in 2012.

42.     In July 2013, the Blackstone product "Super DMZ Rx 2.0" was part of a voluntary recall by its manufacturer, Mira Health Products, Ltd. ("Mira Health"). Mira Health's recall letter noted that the raw materials used to manufacture Super DMZ Rx 2.0 included dimethazine. The Super DMZ Rx 2.0 label listed dimethazine and methylstenbolone as the only dietary ingredients. As described above, Super DMZ Rx 2.0 is an unapproved new drug. Mira Health also recalled another Blackstone product "Metha-Drol Extreme" that contained dimethazine.

43.    As part of the recall process, the FDA determined that the two Blackstone products posed a serious health hazard.  The recall included 11,200 bottles of Super DMZ Rx 2.0 with lot numbers M55Q (expiration date 04/2016), M55Q, (expiration date 05/2016), and E07Q (expiration date unknown), and 5,555 bottles of Metha-Drol Extreme.

44.    Despite the recall, Blackstone continued to sell Super DMZ Rx 2.0.  Using the "Wayback Machine," I reviewed a copy of Blackstone's website, www.blackstonelabs.com, as it existed in May 2015, which shows the company was still selling bottles of Super DMZ Rx 2.0 with methylstenbolone and dimethazine as the only dietary ingredients on the label.  The product was still described as being "engineered and designed to increase, sustain, and strengthen muscularity," and that the product "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol, the only difference is it's 100% legal!"

45.    The Blackstone website no longer offers "Super DMZ Rx 2.0" for sale, but includes a picture of the product covered by the word "Discontinued."  A Google search, however, revealed Blackstone's product "Super DMZ Rx 2.0" is currently for sale from multiple online dietary supplement vendors despite the prior recall and FDA's warning of health risks.

46.    On or about September 7, 2016, FDA/OCI agents made an undercover purchase of the Blackstone-branded product "Super DMZ Rx 2.0" from an online bodybuilding supplement retailer, Legendary Supplements, via the website www.legendarysupplements.com.  As discussed in paragraph 113, documents show that Legendary Supplements purchases products directly from Blackstone.

47.    On or about September 14, 2016, FDA/OCI agents received the Super DMZ Rx 2.0 product via mail.  Upon review, the label appeared to be identical to the label found in the dumpster

13

at the VBS Search Premises (see paragraph 115), other than the stamped expiration date and lot number. The expiration date for the purchased product was 05/18 and the lot number was 345, both of which were stamped in white rather than red. The label listed as the only dietary ingredients 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one (methylstenbolone) and dimethazine, which are the same ingredients as in the Blackstone Super DMZ Rx 2.0 product previously recalled. After inventorying the product into evidence, it was sent to the FDA Forensic Chemistry Center ("FDA FCC") for testing. FDA FCC test results confirmed that the product did contain dimethazine ("DMZ") but did not detect the presence of methylstenbolone.

48.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Super DMZ Rx 2.0, an unapproved new drug, in violation of 21 U.S.C. § 331(d).

Formal Warnings from FDA

49.     Super DMZ Rx 2.0 was the first product in a pattern of selling illegal products labeled as dietary supplements. On April 24, 2015, the FDA issued a Warning Letter to Aaron Singerman at Blackstone Labs, LLC in reference to another Blackstone product "Angel Dust," which was also sold as a dietary supplement. The product label declared that it contained as a dietary ingredient a substance called AMP Citrate (2-Amino-4-Methylpentane or 4-amino-2-methylpentane citrate), also known as DMBA. The FDA issued a second Warning Letter on the same day to Singerman as CEO of Prime Nutrition, for another product labeled as a dietary supplement and containing DMBA as a dietary ingredient.

50.     The Warning Letters informed Blackstone and Singerman that DMBA is a new dietary ingredient because there is no information demonstrating that DMBA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994. The Blackstone

Warning Letter stated that Angel Dust was adulterated because DMBA, as a new dietary ingredient, is subject to the premarket notification requirement and Blackstone had not submitted premarket notification to the FDA.

51.    The Blackstone Warning Letter also advised Blackstone that, even if the premarket notification had been submitted, Angel Dust would still be adulterated because it contained a new dietary ingredient (DMBA) for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury.  The Blackstone Warning Letter further advised Blackstone that introduction of Angel Dust into interstate commerce is prohibited under 21 U.S.C. § 331(a) (adulterated dietary supplement) and 21 U.S.C. § 331(v) (unsafe dietary supplement).

52.    The Blackstone Warning Letter requested that Blackstone take prompt action to correct the violations, as well as any other violations associated with the product Angel Dust or other dietary supplement products marketed by the firm, including any containing DMBA.  The letter also warned that "Failure to immediately cease distribution of your product Angel Dust and any other products you market that contain DMBA could result in enforcement action by FDA without further notice."

53.    In a May 19, 2015 response from counsel to the Blackstone Warning Letter, Blackstone stated that it "takes the allegations in the [Blackstone Warning Letter] very seriously," and acknowledged that FDA had sent Warning Letters to at least 16 companies using DMBA, and that the FDA posted a public Q&A addressing DMBA on the internet.  Blackstone agreed to immediately discontinue distributing and selling the Angel Dust product.  Blackstone also stated that "[i]n deference to FDA's concerns as expressed in the warning letter and the Q&A on DMBA,

if Blackstone ever elects to market and sell Angel Dust again, it will reformulate the product without Amp Citrate aka DMBA."

Cobra 6P Extreme

54.     Notwithstanding the Warning Letter and Blackstone's response, Blackstone continued to sell products labeled as dietary supplements that contained DMBA as a dietary ingredient. For example, FDA twice purchased the product Cobra 6P Extreme from Blackstone, and there is probable cause to believe that both purchased products violated the law. The first Cobra 6P Extreme purchase contained DMBA and the DMBA was listed on the label, while the second Cobra 6P Extreme purchase also contained DMBA, but omitted the DMBA from the label. These purchases are described below.

55.     In August 2015, FDA made an undercover purchase from Blackstone of the product Cobra 6P Extreme via www.blackstonelabs.com.

56.     A review of the label affixed to the Cobra 6P Extreme revealed that the product ingredient list included 2-Amino-4-Methylpentane (DMBA) as a dietary ingredient, and FDA testing subsequently confirmed that the product contained DMBA.

57.     The ingredient DMBA caused the Cobra 6P Extreme to be adulterated because it contained a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury and because DMBA is subject to the premarket notification requirement and, as of January 26, 2017, no firm had submitted to the FDA premarket notification for DMBA.

58.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list Cobra 6P Extreme. Based

on context, I believe these entries refer to sales of the Cobra 6P Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

59.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, an adulterated food and an unsafe dietary supplement, in violation of 21 U.S.C. § 331(a) and 331(v).

60.     On or about February 3, 2016, FDA/OCI agents made another undercover purchase, this time for products labeled Dust V2, Brutal 4ce (pronounced "Brutal Force"), and Cobra 6P Extreme via Blackstone's website. Blackstone included a free product labeled "Euphoria RX" in the order at no charge. Shortly after FDA/OCI agents placed their order online, an email was received from the email address "cs@blackstonelabs.com," confirming the purchase and listing information about the sale. Blackstone's website stated with respect to the Cobra 6P Extreme, "It's so strong we weren't sure if it was a good idea to bring it to the market."

61.     On or about February 23, 2016, FDA/OCI agents received the undercover purchase of the aforementioned products. After inventorying the products into evidence, FDA/OCI sent the products to the FDA FCC for testing.

62.     On or about October 21, 2016, a chemist from the FDA FCC sent results of the analysis of the Cobra 6P Extreme. The testing revealed that the Cobra 6P Extreme purchased on February 3, 2016, also contained DMBA. However, unlike the Cobra 6P Extreme product purchased in 2015, the label affixed to the 2016 Cobra 6P Extreme omitted DMBA from the product ingredient list. Accordingly, the Cobra 6P Extreme purchased in February 2016 was misbranded under 21 U.S.C. § 343(a)(1) because its labeling was false and misleading.

63.     There is probable cause that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, a misbranded food, in violation of 21 U.S.C. § 331(a).

64.     Blackstone intended to defraud consumers and the FDA by promoting Cobra 6P Extreme, accepting orders online, and mailing misbranded Cobra 6P Extreme products to consumers while intentionally not listing the potentially unsafe ingredient DMBA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

Dust V2

65.     Testing of the Dust V2 purchased in February 2016 revealed that the product contained DMAA, also known as 1,3-dimethylamylamine.

66.     The FDA advises consumers not to buy or use dietary supplements that contain DMAA due to the health risks they present.  FDA FCC's analysis also revealed that Dust V2 contains caffeine.  FDA has publicly warned that "DMAA, especially in combination with other ingredients such as caffeine, can be a health risk to consumers."  DMAA narrows blood vessels and arteries, which can elevate blood pressure, and may lead to cardiovascular problems such as shortness of breath, arrhythmias, tightening in the chest, and heart attack, as well as seizures and other neurological and psychological conditions.

67.     A review of the label affixed to the Dust V2 purchased in 2016 revealed that the product ingredient list omitted DMAA from the label.  Failure to include DMAA on the label as an ingredient causes the labeling to be false or misleading, and causes Dust V2 to be misbranded under 21 U.S.C. § 343(a)(1).

68.     DMAA is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same,

nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake. DMAA is a food additive within the meaning of 21 U.S.C. § 321(s) because it is not a dietary ingredient, it is not generally recognized as safe under the conditions of use of Dust V2, and it is not the subject of a sanction or approval under the FDCA or other applicable statutes.

69.     DMAA is an unsafe food additive under 21 U.S.C. § 348 because it is not a food contact substance, there is no regulation prescribing the conditions under which it may be safely used, and no exemption for investigational use has been granted under 21 U.S.C. § 348(j). Therefore, the presence of DMAA in Dust V2 causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

70.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Dust V2." Based on context, I believe these entries refer to sales of the Dust V2 product, with shipping addresses that show the product was shipped to customers in multiple states.

71.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust V2, a misbranded and adulterated food, in violation of 21 U.S.C. § 331(a).

72.     Blackstone intended to defraud consumers and the FDA by promoting Dust V2, accepting orders online, and mailing Dust V2 products to consumers while intentionally not listing the potentially dangerous ingredient DMAA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, 1349.

## Brutal 4ce

73.     FDA FCC analysis of the Brutal 4ce product concluded that it contained 1-androsterone and 4-androstene-3, 17-dione, also known as androstenedione. Both 1-androsterone

19

and androstenedione are anabolic steroid precursors, meaning they are substances that are converted in the human body to testosterone, an anabolic steroid.

74.     As early as 2004, FDA publicly stated that products containing androstenedione are not lawful dietary supplements and may increase the risk of serious health problems. See "Questions and Answers: Androstenedione" available at:

http://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm

75.     The Brutal 4ce label does not list 1-androsterone or androstenedione as an ingredient in the product. Failure to include 1-androsterone or androstenedione on the label as an ingredient causes the labeling to be false and misleading and causes Brutal 4ce to be misbranded under 21 U.S.C. § 343(a)(1).

76.     Additional evidence suggests that Blackstone, Singerman, and Braun know that Brutal 4ce includes anabolic steroid precursors. A video posted on Blackstone's website shows Braun personally describing the product Brutal 4ce as the "strong stuff," the "bad daddies of Blackstone Labs," and states it is "the stuff people look for now that all the old prohormones are gone. This is your answer." He further explained that individuals who use this product "absolutely have to take PCTV" afterwards. The product PCTV[1] is displayed on Blackstone's website and is described as "The Next Evolution of Post Cycle Therapy." A "Post Cycle Therapy" generally refers to a course of drugs or dietary supplements used to restore the body's natural testosterone production after using anabolic steroids for a time period or "cycle." The Blackstone website states "PCTV defends and protects your body in five distinct ways; so now even more then [sic] ever you can be confident that you will not only bounce back after a cycle, but actually improve and be even better then [sic] ever. In fact, PCTV can even be used by natural competitors looking

---

[1] There is probable cause that PCTV is an unapproved new drug, as discussed in paragraph 109.

for an anabolic edge!" Based on my training and experience, this reference to "natural competitors" refers to athletes who do not use anabolic steroids, and demonstrates Braun's knowledge that he is recommending PCTV for use with products, such as Brutal 4ce, that contain anabolic steroids or anabolic precursors.

77. Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Brutal 4ce." Based on context, I believe these entries refer to sales of the Brutal 4ce product, with shipping addresses that show the product was shipped to customers in multiple states.

78. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Brutal 4ce, a misbranded food, in violation of 21 U.S.C. § 331(a).

79. Blackstone intended to defraud consumers and the FDA by promoting Brutal 4ce, accepting orders online, and mailing Brutal 4ce products to consumers while intentionally not listing 1-androsterone and/or androstenedione on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

Evidence from the Blackstone Premises

80. On or about June 24, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

81. Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises. These items include:

21

      (A) An article of mail addressed to Blackstone Labs at the Blackstone Search Premises;

      (B) Numerous UPS shipping invoices stating they were from Blackstone and addressed to customers who purchased products, including the Dust V2 and Dust Extreme products;

      (C) A sample packet of the Dust V2 product; and

      (D) A copy of a spreadsheet labeled "Blackstone Labs A/P Aging Detail." Upon information and belief, this document refers to Blackstone's Accounts Payable, and lists money owed to suppliers. The document includes two (2) transactions from a vendor by the name of "VBS Labs" in the amounts of $43,250.00 and $18,435.25 dated 05/06/16 and 05/19/16, showing that Blackstone pays VBS Labs for goods or services.

### Evidence from the VBS Search Premises

82. Additional evidence confirms that there is probable cause that some of the Blackstone illegal products are manufactured, assembled, and/or stored at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487, the VBS Search Premises.

83. Surveillance in June 2016 revealed an individual outside the VBS Search Premises wearing a Blackstone Labs t-shirt and a surgical mask. This individual was outside Suite 12, and the garage door at Suite 12 was partially open. Based on my training and experience, I know that individuals who manufacture or package pharmaceuticals or dietary supplements often wear personal protective equipment such as surgical masks while working in close proximity to pharmaceuticals or dietary supplements to protect their health and ensure sanitary requirements.

84. On or about June 24, 2016, FDA/OCI agents also procured items and documents from a dumpster outside the VBS Search Premises at 1140 Holland Drive, Boca Raton, FL 33487. Although the Florida Department of State Division of Corporations website listed the principal place of business and mailing address for VBS Laboratories LLC as 1140 Holland Drive, *Suite 2*, Boca Raton, Florida, several sources of evidence, including bank records and mail, list the address for VBS Labs as *Suite 12* (twelve). Surveillance in November 2016 revealed that the door to Suite 12 is labeled "VenTech." VenTech Labs, LLC is the name of a company registered to Anthony Ventrella, who is also the registered agent for VBS Labs.

85. Several items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, and that the VBS Search Premises will contain evidence of criminal violations including violations of the FDCA, mail and wire fraud, and conspiracy to commit mail and wire fraud. These items include:

(A) Loose labels for the Blackstone product "Super DMZ Rx 2.0," some of which had a stamped expiration date of 06/18 and a lot number of 370 in red coloring; however, the majority had no expiration date or lot number listed;

(B) Loose labels for a "Fight Pharm" product named "Ostapro";

(C) A color photocopy of a Florida Driver's License for Anthony Joseph Ventrella, the registered agent of VBS Laboratories, LLC;

(D) A printed email from anthonyventrella@gmail.com dated June 22, 2016 asking for current prices on SARMs;[2]

---

[2] SARMs, or "Selective Androgen Receptor Modulators" are compounds that have similar properties to anabolic agents (e.g. steroids). As a general matter, SARMs are not appropriate for inclusion in a dietary supplement.

(E) Printed spreadsheets listing raw materials and pricing for ingredients from different companies. Items on the list included: Picamilon Base, N-Acetyl-Cysteine, methylstenbolone, dimethazine, Ostarine, and Amp Citrate (DMBA);[3]

(F) A handwritten note which included the words "BSL DMZ" and numbers;

(G) A handwritten list titled "To Do Pills" and "To Do Powders." Under "To Do Powders" was listed several items, including "DUST." Based on context and my training and experience, I believe these handwritten documents are evidence contributing to probable cause that VBS Labs is manufacturing or storing products for Blackstone at the VBS Search Premises, including Super DMZ and one or more of the "Dust" products discussed herein.

(H) A UPS shipping label from shipper: 2252818838, VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 (the VBS Search Premises);

(I) A Chase business/debit card (cut in half) in the name "Anthony J. Ventrella/Fight Pharm LLC."

<u>Ostapro</u>

86. The label for the Fight Pharm product "Ostapro" recovered from the dumpster at the VBS Search Premises revealed a listed ingredient of [(2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide, which is a "selective androgen

_____

[3] These substances are discussed herein at the following paragraphs: Picamilon, ¶¶ 100-103, N-Acetyl-Cysteine, ¶¶ 106-107, Ostarine, ¶¶ 86-88; and DMBA, ¶¶ 49-62.

receptor modulator" ("SARM"), also known as ostarine. The product label describes Ostapro as a dietary supplement.

87. Products that contain ostarine are not dietary supplements because ostarine is the subject of substantial clinical investigations which have been made public. To the best of FDA's knowledge, ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigations. Accordingly, Ostapro cannot be a dietary supplement.

88. The Ostapro label states the product was manufactured and distributed by "Fight Pharm" and states the product will "increase lean mass," "decrease body fat," "maximize strength," and is "physique enhancing." Accordingly, Ostapro is a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it is intended to affect the structure or function of the human body. Ostapro is also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it is not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Ostapro is not approved as safe and effective by the FDA, it is an unapproved new drug.

89. The introduction or delivery for introduction into interstate commerce of Ostapro, an unapproved new drug, is illegal under 21 U.S.C. 331(d).

90. According to the Florida Department of State, Division of Corporations website, the registered agent for Fight Pharm is Anthony Ventrella, and the principal and mailing address is listed as the VBS Search Premises.

91. Bank records confirm a financial connection between Blackstone and Fight Pharm. Former Blackstone CEO Singerman was listed on a Fight Pharm LLC bank account as a "Signer" in April 2014. Braun was added to the signature card of the same bank account in August 2015.

92.     VBS Labs and Blackstone are also linked in financial records, including the Blackstone Accounts Payable described in paragraph 81. Bank documents show that Singerman and Braun were authorized as "Signers" to VBS Labs' JP Morgan Chase business bank account in March 2016.

Dust Extreme

93.     Based on evidence from the June 2016 trash pull at the Blackstone Search Premises, FDA/OCI agents made another undercover purchase via www.blackstonelabs.com on or about June 27, 2016. During this undercover transaction, the FDA/OCI purchased the product "Dust Extreme." According to Blackstone's website, the Dust Extreme product label lists DMAA as a dietary ingredient. Under the image of the product on the website, the website text stated "DMAA strikes back." Shortly after the purchase, an email was received from the email address: "cs@blackstonelabs.com," confirming the above referenced purchase, and listing information about the sale.

94.     On or about June 30, 2016, FDA/OCI agents received the package that contained the aforementioned product. The return address listed on the United States Postal Service ("USPS") Priority Mail package was "Blackstone Labs, LLC, 1090 Holland Drive, Suite 2, Boca Raton, Florida 33487." After inventorying the product into evidence, it was sent to the FDA FCC for testing.

95.     As described in paragraphs 68-69, DMAA is not a dietary ingredient and is an unsafe food additive. Accordingly, the presence of DMAA in Dust Extreme causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

96.     Even if DMAA were a dietary ingredient, it would be a new dietary ingredient subject to premarket notification. As of January 26, 2017, Blackstone has not submitted a

premarket notification for DMAA.  Therefore, even if DMAA were a dietary ingredient, Dust Extreme would be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a).

97.     Even if Blackstone had submitted the required premarket notification, Dust Extreme would still be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a) because there is no adequate information to provide reasonable assurance that DMAA does not present a significant or unreasonable risk of illness or injury.

98.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that transactions of "Payments Received" specifically list "Dust Extreme."  Based on context, I believe these entries refer to sales of the Dust Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

99.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust Extreme, an adulterated food and unsafe dietary supplement in violation of 21 U.S.C. §§ 331(a) and 331(v).

Growth, Anesthetized, and Euphoria RX

100.     The Blackstone website also lists for sale other products that violate the FDCA, including products named "Growth," "Anesthetized," and "Euphoria RX."  The website includes images of each product and their labels.  According to the labels for the products, all three products contain 4-(pyridine-3-cabonylamino), also known as Pikatropin or Picamilon, and list it as one of the dietary ingredients.

101.     Picamilon is used as a prescription drug in Russia for a variety of neurological conditions.  It is not approved as a drug in the United States.  FDA has issued Warning Letters to five companies whose products marketed as dietary supplements claim to contain Picamilon and

listed it as a dietary ingredient. These products were misbranded because Picamilon does not meet the statutory definition of a dietary ingredient.

102.    FDA has publicly stated that Picamilon is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same, nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake.

103.    The inclusion of Picamilon as a dietary ingredient on the product label causes the Growth, Anesthetized, and Euphoria RX products to be misbranded in that the labeling is false and misleading within the meaning of 21 U.S.C. § 343(a)(1).

104.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Growth," "Anesthetized," and "Euphoria." Based on context, I believe these entries refer to sales of the three products, with shipping addresses that show the products were shipped to multiple states.

105.    There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of misbranded foods Growth, Anesthetized, and Euphoria RX, in violation of 21 U.S.C. § 331(a).

Gear Support and PCTV

106.    The Blackstone website also lists for sale other products that violate the FDCA, including products named "Gear Support" and "PCTV." The website includes images of each product and their labels. According to the products' labels, Gear Support and PCTV contain N-Acetyl-Cysteine ("NAC") and are described as dietary supplements.

107.    Products that contain NAC are excluded from the definition of dietary supplement under 21 U.S.C. § 321(ff)(3)(B)(i) because FDA approved NAC as a "new drug" in 1985 and FDA

28

does not have any information that indicates that NAC was marketed as a dietary supplement or as a food prior to its approval as a "new drug."

108.    A video advertising the product Gear Support located on Blackstone's website displayed Braun describing the product and stating "It'll decrease your blood pressure." A video advertising the product PCTV located on Blackstone's website displayed Braun describing the product and stating it "replenishes natural glutathione stores" and it "keeps the liver super healthy."

109.    Accordingly, Gear Support and PCTV are drugs within the meaning of 21 U.S.C. § 321(g)(1)(C) because they are intended to affect the structure or function of the human body. They are also "new drugs" within the meaning of 21 U.S.C. § 321(p) because the products Gear Support and PCTV are not generally recognized among qualified experts as safe and effective for use suggested, recommended, or prescribed in its labeling. Gear Support and PCTV have not been approved by FDA as safe and effective for their intended uses, and therefore are unapproved "new drugs." *See* paragraphs 16-17 and 20-21 for explanation of "new drugs."

110.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Gear Support" and "PCTV." Based on context, I believe these entries refer to sales of the products, with shipping addresses that show the products were shipped to customers in multiple states.

111.    There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of the unapproved "new drugs" Gear Support and PCTV, in violation of 21 U.S.C. § 331(d).

<u>Recent Evidence from the Premises</u>

112.    On or about October 14, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

113.    Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises.  These items include:

> (A) Multiple printed emails from various employees of Blackstone including the director of sales, vice president, and inventory manager;
>
> (B) Several order forms detailing who ordered the products, where the products were shipped to (including locations outside the state of Florida), and which products were ordered; one in particular stated a shipment was sent to Legendary Supplements[4] for a total of $12,500.00; however, it did not list the products ordered;
>
> (C) A copy of Blackstone Labs Accounts Payable including multiple transactions from a vendor by the name of "Duracap Labs" ranging in amounts from $25,851.00 to $128,161.00 during July 2016.  According to the Georgia Secretary of State Corporations Division, Duracap Labs is also the name of a Georgia corporation founded by "Wesley Houser," and three other individuals in January 2014.  Upon information and belief, "Wesley Houser" is John Wesley Houser, IV, an individual under indictment for manufacturing and sale of controlled substances and illegal dietary supplements;
>
> (D) Handwritten notes including one stating "Found emails of Aaron telling Wes: 1. underdose, but keep label same 2. mask ingredients + flavors".  Upon

---

[4] As discussed in paragraph 46, Legendary Supplements continues to sell Super DMZ Rx 2.0, notwithstanding the recall and FDA's determination that the product is an unapproved new drug and poses a serious health hazard.

information and belief, "Aaron" refers to Aaron Singerman, founder of Blackstone, and "Wes" refers to John Wesley Houser, IV. Based on my knowledge and context, I believe this document is evidence of Blackstone's intent to misrepresent information on product labels, and defraud consumers.

114.   On or about October 14, 2016, FDA/OCI agents procured items from a large dumpster outside the VBS Search Premises.

115.   Items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, the manufacturing of products labeled as dietary supplements, and will contain evidence of criminal violations, including violations of the FDCA, mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. These items included:

(A) Loose labels for the Blackstone product "Super DMZ Rx 2.0"; no expiration date or lot number was visible on the front of the label; however, an imprint of an expiration date of 07/18 and a lot number of 512 was located on the inside;

(B) Seven (7) loose pill capsules of assorted colors;

(C) Two (2) empty bags of rice flour with a listed weight of 22.68 kg (50 pounds) each (rice flour is often used as a filler ingredient in supplements);

(D) A large clear bag containing seven (7) empty red pill capsules; and

(E) A large silver bag containing twelve (12) empty white pill capsules.

116.   Upon information and belief, Blackstone continues to promote and sell products which violate the FDCA on their website, through other online retailers, and through wholesale distribution, including the products discussed herein: Brutal 4ce, Dust V2, Dust Extreme, Growth,

31

Anesthetized, Euphoria RX, Gear Support, and PCTV. (Note: this is not a complete list of all products labeled as dietary supplements currently marketed for sale by the company.)

### EXECUTION OF THE WARRANT

117.    As described above and in Attachment B.1 and B.2, this application seeks permission to search for records that might be found on the Blackstone Search Premises and VBS Search Premises in whatever form they may be found, including data stored on a computer's hard drive or other storage media.  One form in which records may exist is as paper documents, including financial records, invoices, and correspondence.  For example, FDA/OCI has reviewed mail in the trash at the Blackstone Search Premises addressed to Blackstone or Blackstone employees, and shipping labels, invoices, ingredient sheets, and printed correspondence from the trash at the VBS Search Premises.

118.    Another form in which records may exist is as data stored on computer hard drives or other storage media.  A storage medium is any physical object upon which computer data can be recorded, which includes hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.  Based on my review of other evidence related to this investigation, I believe that there is a computer system or systems currently located at the Blackstone and VBS Search Premises.  For example, I believe that emails from various employees of Blackstone including the director of sales, vice president, and inventory manager, as previously mentioned, will be found on a computer or computers at the Blackstone Search Premises.  Documents found in the trash at the VBS Search Premises include documents printed from computers, such as spreadsheets and email from Anthony Ventrella and I believe that similar electronic documents will be found on a computer or computers at the VBS Search Premises.  Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

119.	I submit that if a computer or storage medium is found at either of the search premises, there is probable cause to believe the records described above will be stored on that computer or storage medium, for at least the following reasons:

(A)	Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(B)	Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(C)	Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging

files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

(D) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

(E) Based on my review of evidence related to this investigation, including various financial records and other documents, I am aware that computer equipment was used to generate, store, and print documents used in the FDCA violations, mail and wire fraud, and conspiracy schemes. There is reason to believe that there are computer systems currently located at both the Blackstone and VBS Search Premises.

120. *Forensic evidence*. As further described in Attachment B.1 and B.2, this application seeks permission to locate not only computer files that might serve as direct evidence, instrumentalities or fruits of the crimes described in the warrants, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in both the Blackstone and VBS Search Premises because:

(A) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information

34

on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

(B) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein,

computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). This geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

(C) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

(D) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(E) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

121.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

(A) *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(B) *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(C) *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

122.    *Nature of examination*.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), I seek permission to seize, image, or otherwise copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

123.    Blackstone and VBS Labs are functioning companies that may conduct legitimate business in addition to its participation in the distribution of illegal dietary supplements and drugs, mail fraud, and wire fraud. The seizure of Blackstone's or VBS's computers may limit their ability to conduct legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.

## REQUEST FOR SEALING

124.    Due to the ongoing nature of this investigation, I respectfully request that this Affidavit, Application, Search Warrant, and all attachments be sealed by the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents until further order of the Court because their premature disclosure may give

targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify co-conspirators, or otherwise seriously jeopardize the investigation.

## CONCLUSION

125.    I submit that this affidavit supports probable cause for a warrant to search the Blackstone Search Premises described in Attachment A.1 and seize the items described in Attachment B.1.

126.    I submit that this affidavit supports probable cause for a warrant to search the VBS Search Premises described in Attachment A.2 and seize the items described in Attachment B.2.


FURTHER AFFIANT SAYETH NAUGHT


_____
Kelly McCoy
Special Agent
Food and Drug Administration,
Office of Criminal Investigations


Subscribed and sworn to before me
On this 3 Rd day of February, 2017.

_____
The Honorable William Matthewman
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk
Date 2/3/2017

## ATTACHMENT A.1

Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building. See Exhibit 1 below. There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre." The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



Exhibit 2



Exhibit 3



**ATTACHMENT A.2**

Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises"). The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes. See Exhibit 1 below. Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door. See Exhibit 2 below. The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



Exhibit 2



**ATTACHMENT B.1**

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

    a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

    b.  any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

    c.  evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

    d.  any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

    e.  records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

    f.  all bank records, checks, credit card bills, account information, and other financial records;

    g.  customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

h. any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i. advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j. correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k. tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d. records of or information about Internet Protocol addresses used by the COMPUTER;

e. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

2

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

**ATTACHMENT B.2**

Particular Things to Be Seized

1.   All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012 including, but not limited to:

   a.   any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b.   any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c.   evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d.   any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e.   records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f.   all bank records, checks, credit card bills, account information, and other financial records;

   g.   customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

h. any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i. advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j. correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k. tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d. records of or information about Internet Protocol addresses used by the COMPUTER;

e. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No.   17-8048-WM |
| Premises located at VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 | ) ) ) |

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 2/21/2017

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:
### See Attachment A.2

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
### See Attachment B.2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before   *February 17, 2017*
                                                             *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.   ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
     *Duty U.S. Magistrate Judge*  .
                *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30).*

                                    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   *February 3, 2017*          *William Matthewman*
                        *1:26 p.m.*                                *Judge's signature*

City and state:    West Palm Beach, Florida          William Matthewman, United States Magistrate Judge
                                                              *Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

*Inventory made in the presence of :*

*Inventory of the property taken and name of any person(s) seized:*

| Certification |
|---|

    *I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A.2

Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises"). The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes. See Exhibit 1 below. Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door. See Exhibit 2 below. The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



Exhibit 2



**ATTACHMENT B.2**

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012 including, but not limited to:

    a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

    b.  any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

    c.  evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

    d.  any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

    e.  records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

    f.  all bank records, checks, credit card bills, account information, and other financial records;

    g.  customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

1

h.    any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.    advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.    correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.    tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.    records of or information about Internet Protocol addresses used by the COMPUTER;

e.    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.    contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

2

correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

Case 9:19-cr-80030-WPD   Document 361-2   Entered on FLSD Docket 03/18/2020   Page 160 of
206
Case 9:19-cr-80030-WPD   Document 259-2   Entered on FLSD Docket 02/13/2020   Page 1 of 8

# EXHIBIT 2

## April 3, 2019

## Government Discovery Letter



9:19-CR-80030
GOVERNMENT
EXHIBIT

021



**U.S. Department of Justice**
Consumer Protection Branch

| | | |
|---|---|---|
| **Alistair Reader** | **Overnight Delivery Address** | **Mailing Address** |
| Phone: 202-353-9930 | 450 Fifth Street, NW, Sixth Floor South | P.O. Box 386 |
| Alistair.F.Reader@usdoj.gov | Washington, D.C. 20001 | Washington, D.C. 20044 |

April 3, 2019

**VIA EMAIL AND FEDEX**

Richard Lubin, Esq.
Amy Morse, Esq.
Richard G. Lubin, P.A.
707 North Flagler Drive,
West Palm Beach, FL 33401

Nancy Vorpe Quinlan, Esq.
Perlet & Shiner, P.A.
205 Worth Ave Ste 320
Palm Beach, FL 33480-4618

Robert J. Buonauro, BCS
722 Vassar Street
Orlando, Florida 32804

J. Stephen Salter, Esq.
Law Office of J. Stephen Salter
8975 Pompano Way
Gulf Shores, Alabama 36542-8123

Russell J. Williams, Esq.
Williams, Hilal, Wigand, Grande, PLLC
633 Southeast 3rd Avenue, Suite 301
Ft. Lauderdale, Florida 33301

Dear Counsel:

>    Re:    *United States v Phillip Braun, et al.*, **Docket No. 19-80030-CR-WPD**
>    **First Discovery Letter**

Please find enclosed the government's first discovery productions in the above-captioned case. An index of the documents available and/or produced to date is attached. As you know, the Court entered a protective order restricting the use and review of materials marked as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER."

We are providing discovery on hard drives belonging to the government to attorney Nancy Quinlan for Anthony Ventrella, attorney Robert Buonaro for David Winsauer, attorney J. Stephen Salter for James Boccuzzi, and attorney Russell J. Williams for Robert DiMaggio. Each of you have agreed to return these drives to the government at the conclusion of this matter. Attorney Richard Lubin provided blank drives and is receiving a copy on his own drives.

The enclosed material and any future discovery that is provided to you that exceeds the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute or relevant case law is provided voluntarily and solely as a matter of discretion. By producing such material to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

**Documents and Items Available for Inspection**.

      <u>Forensic Images</u>.  The government is making available to you today for inspection and to copy the forensic image of your own client's electronic device(s), all located in Plantation, Florida.  **The government intends to ultimately provide a copy of *all* forensic images to each defendant to comply with its discovery obligations.**  On March, 26, 2019, the government wrote via letter to defendants Braun, Blackstone Labs, LLC, Singerman, Ventrella, DiMaggio, Boccuzzi, and Winsauer stating this position and seeking a response regarding these forensic images.  The government wrote to Ventech Labs, LLC regarding these forensic images on March 30, 2019.  Several defendants raised objections about confidential information on their respective forensic images, however, no defendant has sought a protective order from the Court.  The government will shortly propose a second protective order pursuant to the Court's authority under Federal Rule of Evidence 502(d), with the goal of producing all images and completing this discovery obligation.  The combined data for the forensic images of seized computers and cell phones is approximately 4.5 Terabytes (TB).  Please contact me to make arrangements to obtain access to the images of your own client's electronic devices.

      Also made available to you today are the physical materials seized during the search warrant executions, and any other tangible objects which the government intends to use at trial to prove its case-in-chief, or were obtained from a defendant.  Those materials, including paper documents and tangible objects, are in storage facilities in Plantation, Florida and Medley, Florida.  Please contact me to make arrangements to obtain access to those materials.  As described below, we are providing you with scanned copies of hard copy documents during the search warrant executions.  The government will also shortly produce photographs of certain tangible items that were seized or are otherwise evidence in this case.  However, we cannot warrant that every single seized paper document was scanned, and so there may be additional paper materials in storage in Plantation that are not on the drive, as well as items that have not been photographed.

### Potentially Privileged Documents

      The hard copy and electronic documents seized pursuant to warrants in this matter underwent a filter review to ensure that the prosecution team will not have access to privileged materials.  There are a limited number of paper documents that were identified as possibly containing privileged information.  The prosecution team will not have access to those materials unless and until the filter team has determined no privilege exists.  All privileged materials will be maintained by the filter team, and the prosecution will not have access to them.  The filter team will make those items available to you at your request.  Please contact Trial Attorney Joshua Rothman at Joshua.D.Rothman@usdoj.gov to make arrangements to access or copy any potentially privileged documents.

## **Summary of Enclosed Media**

The enclosed discovery production contains the following media (passwords will be redacted in the paper version of this letter enclosed with the productions):

One 8GB USB Flash Drive containing encrypted zip files.

**Production One:** This flash drive contains documents that are not currently subject to the Court's protective order. First, the drive contains zipped folders with html copies of publicly available websites for Blackstone Labs, LLC, Prime Nutrition, LLC, and Legendary Supplements. The password for each of the zip files is: "█████████"

Second, the drive contains "Prod Vol001" which is load-ready files with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file). The Bates range for these files is: GOV_00000001 to GOV_00088417. The password is: "█████████"

One 1 TB Apricorn Aegis Fortress Hard Drive[1] marked "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER"

**This encrypted drive contains documents subject to the Court's protective order**. The drive contains several productions. Please refer to the attached index for additional information. The password for the drive is: "███████" and instructions to operate the drive are attached.

**Production Two**: Folder Documents including Cell Phone Extracts, Defendants' Oral Statements, Forensic Reports, Proffer Letters, Search and Seizure Warrants, and Statements of Organizations pursuant to Rule 16(a)(1)(C). These documents do not have Bates numbers.

**Production Three**: All information is load-ready with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file).
Tranche 1 of the production includes documents from search warrants. The Bates range for these files is: GOV_00088418 - GOV_00541793. Tranche 2 includes documents from multiple sources relevant to the investigation. The Bates range is for these files is: GOV_00541794 - GOV_01003336. Tranche 3 contains documents produced by Blackstone Labs, LLC. The Bates ranges for these files is GOV_01003337 - GOV_01865937.

---

[1] Attorney Richard Lubin is receiving his own drive.

3

**Government's Disclosures**.  The government makes the following disclosures, which are numbered to correspond with Local Rule 88.10.

a)

1.  Defendants' Oral Statements.  The government is disclosing the substance of relevant oral statements made by the defendants, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.  Specifically, the government is disclosing in this production the substance of any relevant oral statements.

2.  Defendants' Written or Recorded Statements.  The government is herein disclosing the written or recorded statements by defendants.

3.  Organizational Defendant.  The government is disclosing statements described in Rule 16(a)(1)(A) and (B) where the government contends that the person making the statement:

    (i) was legally able to bind an organizational defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or
    (ii) was personally involved in the alleged conduct constituting the offense and was legally able to bind the organizational defendant regarding that conduct because of that person's position as the defendant's director, officer, employee, or agent.

    The government reserves the right to produce additional materials should it determine that additional statements fall under Fed. Rule Crim. P. 16(a)(1)(C).

4.  Defendants' Prior Record.  The government is producing today, via email, a copy of each defendant's prior record to their own counsel.

5.  Documents and Objects.  As noted above, the government makes available today for inspection and to copy or photograph books, papers, documents, data, photographs, any tangible objects, or copies or portions of any of these items, described in Fed. R. Crim. P. 16(a)(1)(E).  In addition, the government is producing and/or will make available to each defendant a copy of all such materials that are in electronic format, including documents, books, photographs, and photographs of tangible objects.

6.  Reports of Examinations and Tests.  The government will timely disclose the results or reports of any physical or mental examination and of any scientific

test or experiment for items within the government's possession, custody, or control where the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

7. <u>Expert Witnesses</u>. The government will timely produce the results or reports of scientific tests or experiments. The government will produce a written summary of any additional testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.

b) <u>DEMAND FOR RECIPROCAL DISCOVERY</u>. The United States requests the disclosure and production of materials enumerated as items 1, 2, and 3, of Section (b) of the Standing Discovery Order. This request is also made pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.

c) The government will timely disclose information which may be favorable to the defendants on the issues of guilt or punishment within the scope of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

d) The government will disclose any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, and will produce any such payments in the future. The government is producing proffer letters agreements in the enclosed productions.

e) There are currently no informants who will testify for the government at trial.

f) No defendant was identified in a lineup, show up, photo array or similar identification proceeding.

g) The government has advised its agents and officers involved in this case to preserve all rough notes.

h) The government will timely advise the defendants of its intention to introduce extrinsic act evidence pursuant to Federal Rule of Evidence 404(b) and of the general nature of the evidence of the extrinsic acts. You are hereby on notice that all evidence made available to you for inspection, or copied for you, as well as any statements disclosed herein or in any future discovery letter, may be offered in the case-in-chief, impeachment, or for possible rebuttal, under F.R.E. 404(b) or otherwise (including the inextricably-intertwined doctrine).

i) No defendant is an aggrieved person, as defined in Title 18 U.S.C. § 2510(11), of any electronic surveillance.

j)   The government has transcribed the grand jury testimony of all witnesses who will testify for the government at trial.

k)   The government shall, upon request, deliver to any chemist selected by the defense, who is presently registered with the Attorney General in compliance with 21 U.S.C. §§ 822 and 823, and 21 C.F.R. § 101.22(8), a sufficient representative sample of any alleged contraband which is the subject of this indictment, to allow independent chemical analysis of such sample.

l)   The government does not know of any automobile, vessel, or aircraft allegedly utilized in the commission of any offenses charged that is in the government's possession.

m)   The government is not aware of any latent fingerprints or palm prints which have been identified by a government expert as those of the defendant.

n)   The government shall make every possible effort in good faith to stipulate to all facts or points of law the truth and existence of which are not contested and the early resolution of which will expedite the trial.

<u>Reciprocal Discovery</u>

With this letter, the government also requests all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure, and the Standing Discovery Order.  The government also requests pursuant to Rules 12.1, 12.2, and 12.3 notice of any intention of your clients to rely on an entrapment defense, a defense involving mental condition or duress, an alibi defense, or a public-authority defense.

Please do not hesitate to let us know if you encounter any issues with this production.  This production represents the vast majority of the discoverable material in this case that is in the government's possession.  However, we are working on providing a limited amount of additional materials in the near future.

Should you have any questions, please feel free to contact me.  I can be reached via my direct line, (202) 353-9930.

Sincerely,

*/s/  Alistair Reader*
Alistair F. Reader
Trial Attorney
Consumer Protection Branch

Cc:   Trial Attorney David Frank

AUSA Daren Grove
Special Agent Kelly McCoy
Special Agent Jonathan Frick

# EXHIBIT 3

## April 24, 2019

## Government Discovery Letter



9:19-CR-80030
GOVERNMENT
EXHIBIT

022



**U.S. Department of Justice**
Consumer Protection Branch

| **Alistair Reader** | **Overnight Delivery Address** | **Mailing Address** |
|---|---|---|
| Phone:  202-353-9930 | 450 Fifth Street, NW, Sixth Floor South | P.O. Box 386 |
| Alistair.F.Reader@usdoj.gov | Washington, D.C.  20001 | Washington, D.C.  20044 |

April 24, 2019

**VIA EMAIL AND FEDEX**

Robert L. Shearin, Esq.
Law Offices of Robert L. Shearin
1700 South Federal Highway
Suite 501
Boca Raton, FL 33432

Dear Mr. Shearin:

> Re:     *United States v Phillip Braun, et al.*, Docket No. 19-80030-CR-WPD
>           First Discovery Letter

Please find enclosed the government's first discovery productions in the above-captioned case regarding your client Ventech Labs, LLC ("Ventech").  An index of the documents available and/or produced to date is attached.  As you know, the Court entered a protective order restricting the use and review of materials marked as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER."  In our telephone discussion on April 23, 2019, you agreed that Ventech would agree to and abide by the existing Protective Order.

At your request, we are providing discovery for Ventech on hard drives belonging to the government.  These drives must be returned to the government at the conclusion of this matter.

The enclosed material and any future discovery that is provided to you that exceeds the scope of discovery mandated by the Federal Rules of Criminal Procedure, federal statute or relevant case law is provided voluntarily and solely as a matter of discretion.  By producing such material to you, the government does not waive its right to object to any future discovery requests beyond the ambit of its legal obligations.

**Documents and Items Available for Inspection**.

Forensic Images.  The government is making available to you today for inspection and to copy the forensic image of your own client's electronic device(s), all located in Plantation, Florida. **The government intends to ultimately provide a copy of *all* forensic images to each defendant to comply with its discovery obligations.**  On March, 26, 2019, the government wrote via letter to defendants Braun, Blackstone Labs, LLC, Singerman, Ventrella, DiMaggio, Boccuzzi, and Winsauer stating this position and seeking a response regarding these forensic images.  The government wrote to Ventech Labs, LLC regarding these forensic images on March 30, 2019 and again on April 15, 2019.  Several defendants (including Ventech's prior counsel) raised objections about confidential information on their respective

forensic images, however, no defendant has sought a protective order from the Court.  The government will shortly propose a second protective order pursuant to the Court's authority under Federal Rule of Evidence 502(d), with the goal of producing all images and completing this discovery obligation.  The combined data for the forensic images of seized computers and cell phones is approximately 4.5 Terabytes (TB).  Please contact me to make arrangements to obtain access to the images of your own client's electronic devices.

Also made available to you today are the physical materials seized during the search warrant executions.  Those materials, including paper documents and tangible objects, are in storage facilities in Plantation, Florida and Medley, Florida.  Please contact me to make arrangements to obtain access to those materials.  As described below, we are providing you with scanned copies of hard copy documents during the search warrant executions.  The government will also shortly produce photographs of certain tangible items that were seized or are otherwise evidence in this case.  However, we cannot warrant that every single seized paper document was scanned, and so there may be additional paper materials in storage in Plantation that are not on the drive, as well as items that have not been photographed.

## Potentially Privileged Documents

The hard copy and electronic documents seized pursuant to warrants in this matter underwent a filter review to ensure that the prosecution team will not have access to privileged materials.  There are a limited number of paper documents that were identified as possibly containing privileged information.  The prosecution team will not have access to those materials unless and until the filter team has determined no privilege exists. All privileged materials will be maintained by the filter team, and the prosecution will not have access to them.  The filter team will make those items available to you at your request.  Please contact Trial Attorney Joshua Rothman at Joshua.D.Rothman@usdoj.gov to make arrangements to access or copy any potentially privileged documents.

## Summary of Enclosed Media

The enclosed discovery production contains the following media (passwords will be redacted in the paper version of this letter enclosed with the productions):

One DVD containing encrypted zip files.

**Production One:** This DVD contains documents that are not currently subject to the Court's protective order.  First, the drive contains zipped folders with html copies of publicly available websites for Blackstone Labs, LLC, Prime Nutrition, LLC, and Legendary Supplements.  The password for each of the zip files is: "███████████"

Second, the DVD contains "Prod Vol001" which is load-ready files with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file). The Bates range for these files is: GOV_00000001 to GOV_00088417.  The password is: "████████████"

One 1 TB Apricorn Aegis Fortress Hard Drive marked "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER"

This encrypted drive contains documents subject to the Court's protective order. The drive contains several productions. Please refer to the attached index for additional information. The password for the drive is: "████████" and instructions to operate the drive are attached.

**Production Two**: Folder Documents including Cell Phone Extracts, Defendants' Oral Statements, Forensic Reports, Proffer Letters, Search and Seizure Warrants, and Statements of Organizations pursuant to Rule 16(a)(1)(C). These documents do not have Bates numbers.

**Production Three**: All information is load-ready with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file).
Tranche 1 of the production includes documents from search warrants. The Bates range for these files is: GOV_00088418 - GOV_00541793. Tranche 2 includes multiple sources relevant to the investigation. The Bates range is for these files is: GOV_00541794 - GOV_01003336. Tranche 3 contains documents produced by Blackstone Labs, LLC. The Bates ranges for these files is GOV_01003337 - GOV_01865937.

**Government's Disclosures**. The government makes the following disclosures, which are numbered to correspond with Local Rule 88.10.

a)

1. Defendants' Oral Statements. The government is disclosing the substance of relevant oral statements made by the defendants, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial. Specifically, the government is disclosing in this production the substance of any relevant oral statements.

2. Defendants' Written or Recorded Statements. The government is herein disclosing the written or recorded statements by defendants.

3. Organizational Defendant. The government is disclosing statements described in Rule 16(a)(1)(A) and (B) where the government contends that the person making the statement:

(i) was legally able to bind the defendant regarding the subject of the statement because of that person's position as the defendant's director, officer, employee, or agent; or
(ii) was personally involved in the alleged conduct constituting the offense and was legally able to bind the defendant regarding that conduct because of that person's position as the defendant's director, officer, employee, or agent.

The government reserves the right to produce additional materials should it determine that additional statements fall under Fed. Rule Crim. P. 16(a)(1)(C).

4. <u>Defendants' Prior Record</u>.  Ventech Labs, LLC does not have a prior criminal record.  The government has produced, via separate email, a copy of each co-defendant's prior record to their own counsel.

5. <u>Documents and Objects</u>.  As noted above, the government makes available today for inspection and to copy or photograph books, papers, documents, data, photographs, any tangible objects, or copies or portions of any of these items, described in Fed. R. Crim. P. 16(a)(1)(E).  In addition, the government is producing and/or will make available to each defendant a copy of all such materials that are in electronic format, including documents, books, photographs, and photographs of tangible objects.

6. <u>Reports of Examinations and Tests</u>.  The government will timely disclose the results or reports of any physical or mental examination and of any scientific test or experiment for items within the government's possession, custody, or control and material to preparing the defense or the government intends to use the item in its case-in-chief at trial.

7. <u>Expert Witnesses</u>. The government will timely produce the results or reports of scientific tests or experiments. The government will produce a written summary of any additional testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.

b) <u>DEMAND FOR RECIPROCAL DISCOVERY</u>.  The United States requests the disclosure and production of materials enumerated as items 1, 2, and 3, of Section (b) of the Standing Discovery Order.  This request is also made pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.

c) The government will timely disclose information which may be favorable to the defendants on the issues of guilt or punishment within the scope of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

4

d)   The government will disclose any payments, promises of immunity, leniency,
preferential treatment, or other inducements made to prospective government witnesses,
and will produce any such payments in the future.  The government is producing proffer
letters agreements in the enclosed productions.

e)   There are currently no informants who will testify for the government at trial.

f)   No defendant was identified in a lineup, show up, photo array or similar identification
proceeding.

g)   The government has advised its agents and officers involved in this case to preserve all
rough notes.

h)   The government will timely advise the defendants of its intention to introduce extrinsic
act evidence pursuant to Federal Rule of Evidence 404(b) and of the general nature of
the evidence of the extrinsic acts.  You are hereby on notice that all evidence made
available to you for inspection, or copied for you, as well as any statements disclosed
herein or in any future discovery letter, may be offered in the case-in-chief,
impeachment, or for possible rebuttal, under F.R.E. 404(b) or otherwise (including the
inextricably-intertwined doctrine).

i)   No defendant is an aggrieved person, as defined in Title 18 U.S.C. § 2510(11), of any
electronic surveillance.

j)   The government has transcribed the grand jury testimony of all witnesses who will
testify for the government at trial.

k)   The government shall, upon request, deliver to any chemist selected by the defense, who
is presently registered with the Attorney General in compliance with 21 U.S.C. §§ 822
and 823, and 21 C.F.R. § 101.22(8), a sufficient representative sample of any alleged
contraband which is the subject of this indictment, to allow independent chemical
analysis of such sample.

l)   The government does not know of any automobile, vessel, or aircraft allegedly utilized
in the commission of any offenses charged that is in the government's possession.

m)   The defendant is a corporation and this section does not apply.  The government is not
aware of any latent fingerprints or palm prints which have been identified by a
government expert as those of co-defendants.

n)   The government shall make every possible effort in good faith to stipulate to all facts or
points of law the truth and existence of which are not contested and the early resolution
of which will expedite the trial.

<u>Reciprocal Discovery</u>

     With this letter, the government also requests all reciprocal discovery to which it is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure, and the Standing Discovery Order.  The government also requests pursuant to Rules 12.1, 12.2, and 12.3 notice of any intention of your client to rely on an entrapment defense, a defense involving mental condition or duress, an alibi defense, or a public-authority defense.

     Please do not hesitate to let us know if you encounter any issues with this production. This production represents the vast majority of the discoverable material in this case that is in the government's possession.  However, we are working on providing a limited amount of additional materials in the near future.

     Should you have any questions, please feel free to contact me.  I can be reached via my direct line, (202) 353-9930.

Sincerely,

*/s/  Alistair Reader*

Alistair F. Reader
Trial Attorney
Consumer Protection Branch

Cc:    Trial Attorney David Frank
       AUSA Daren Grove
       Special Agent Kelly McCoy
       Special Agent Jonathan Frick

# EXHIBIT 4

## September 13, 2019

## Government Discovery Letter



9:19-CR-80030
GOVERNMENT
EXHIBIT
023



**U.S. Department of Justice**
Consumer Protection Branch

| | | |
|---|---|---|
| **Alistair Reader** | **Overnight Delivery Address** | **Mailing Address** |
| Phone: 202-353-9930 | 450 Fifth Street, NW, Sixth Floor South | P.O. Box 386 |
| Alistair.F.Reader@usdoj.gov | Washington, D.C. 20001 | Washington, D.C. 20044 |

September 13, 2019

**VIA EMAIL AND FEDEX**

Benedict Kuehne, Esq.
Michael T. Davis, Esq.
Susan Dmitrovsky, Esq.
Kuehne Davis Law
Miami Tower, Suite 3550
100 SE 2nd Street
Miami, FL 33131-2154

Richard Lubin, Esq.
Amy Morse, Esq.
Richard G. Lubin, P.A.
707 North Flagler Drive,
West Palm Beach, FL 33401

Nancy Vorpe Quinlan, Esq.
Perlet & Shiner, P.A.
515 N. Flagler Drive, Suite 701
West Palm Beach, FL 33401

Robert J. Buonauro, BCS
722 Vassar Street
Orlando, FL 32804

J. Stephen Salter, Esq.
Law Office of J. Stephen Salter
8975 Pompano Way
Gulf Shores, AL 36542-8123

Russell J. Williams, Esq.
Williams, Hilal, Wigand, Grande, PLLC
633 Southeast 3rd Avenue, Suite 301
Ft. Lauderdale, FL 33301

Robert L. Shearin, Esq.
1700 South Federal Highway, Suite 501
Boca Raton, FL 33432

Dear Counsel:

    **Re:**    *United States v Phillip Braun, et al.*, **Docket No. 19-80030-CR-WPD**
                **Seventh Discovery Production**

    Please find enclosed one encrypted hard drive with several government discovery productions in the above-captioned case. The PIN will be sent via email. The documents in this production are marked as CONFIDENTIAL and are subject to the Court's Second Revised Protective Order, ECF No. 155. Please refer to the attached cumulative production log for specific details.

    The enclosed hard drive consists of the following:

1. PROD VOL013: Records produced by FDA (GOV-02037494 – GOV-02046091);

2. PROD VOL014: Records from Robert DiMaggio's computer (GOV-02046092 – GOV-02055717);

3.   PROD VOL015:

    a.   Phone communications between Anthony Ventrella and Ashley Ventrella (no bates numbering) (Text messages between Mr. and Mrs. Ventrella were previously produced to you in a forensic image; this production contains extracted messages that relate to business communications and charged conspiracies);

    b.   Phone communications produced by government witness Paul Jasinto (no bates numbering); and

    c.   Forensic image of Robert DiMaggio's mobile phone (no bates numbering).

The hard drive must be returned to us at the address on the label affixed to the hard drive.

The FDA email and Robert DiMaggio email files are produced to you as load-ready files with metadata and standardized with government Bates numbers (extracted text, tiff, and images with Concordance load file).

In addition to the encrypted hard drive, a forensic image of Robert DiMaggio's computer is being made available for your review at the FDA's Office of Criminal Investigations in Plantation, Florida by contacting Special Agent Kelly McCoy for an appointment.  SA McCoy may be reached at (954) 476-5400.

Should you have any questions about these productions or the discovery produced in this matter, please contact me as soon as possible.  I can be reached via my direct line, (202) 353-9930.

Sincerely,

    */s/  Alistair Reader*
Alistair F. Reader
Trial Attorney

Cc:    Trial Attorney David Frank
    T: (202) 307-0061
    Paralegal Specialist Samantha Miner
    T: (202) 307-0044

GOV-01867899





## Blackstone Labs Sketch Key

Room A

Room B – Chris Herron (desk 3)

Room C – Celeste Braun

Room D – Bathrooms

Room E – Kitchen

Room F – Office (James Boccuzzi's backpack was located in this room)

Room G - Office

Room H – David Winsauer (desk 2)

Room I – Phillip Braun (desk 1)

Room I – Salvina Vitale (desk 2)

Room I – Amber Gingerich (desk 3)

Room J – Call Center

Room K - Hallway

Room L – The Guerilla Chemist (Bryan Moskowitz)

Room M – Warehouse

Room N – Warehouse

Room O – Office

Room P – Richard Newton

Room Q – Office

Room R – Bathroom



9:19-CR-80030
GOVERNMENT
EXHIBIT
025
GOV-01868263



*Site 1   IE 16-0166-19169*
*Item 1*

## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location: *I / Site 1*

[✓] Warrant    [ ] Consent    [ ] Subpoena    [ ] Other (See Comments)

## Device Information

System Name: *S1R1C1D1*

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | *Apple* | Model | *A1419* |
|---|---|---|---|
| Serial / Service Tag | *C02Q113DFY11* | Type | *iMac* |
| Owner | *Phillip Braun* | Passwords | *Unknown at present* |
| BIOS Date/Time | *2-21-17 / 10:01am* | Actual Date/Time | *Same* |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| *Apple HD* | | *1 TB* | *S1R1C1D1* |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: *Schillinger @ MIF on 2-21-17*

Imaging device S/N and version used: *MacAquisition, MIF Dongle # 070727422807YE87, version - 2016.1*

Destination Drive: *Seagate 2TB S/N W422xTTX*

Notes:

*Apple iMac was found in room I not powered on. RJ45 cable and 4 usb cables were connected. The wireless mouse pad A1339 and the wireless keyboard A1314/1350 were also found with the iMac. Mouse and keyboard were not seized.*

*Mouse Pad S/N ~~8B325~~ 8B325093PBRDB*

*Keyboard S/N DG7332519HADPQY1E*

9:19-CR-80030
GOVERNMENT
EXHIBIT
026



*Site 1   IE 16-0166-19169*
*Item 2*

# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Agent: SA Kelly McCoy

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Case Number: 2016-MIF-735-0166

SCERS Agent: SA Schillinger (LEAD)

Room/Location: *I / Site 1*

[✓] Warrant   [ ] Consent   [ ] Subpoena   [ ] Other (See Comments)

## Device Information

System Name: *SIRIC2DI*

Site Number, Room Letter, Device Number, (S_R_C_) Example: SIRAC1

| Manufacturer | *Apple* | Model | *A1418* |
|---|---|---|---|
| Serial / Service Tag | *C02L7480F8J2* | Type | *iMac* |
| Owner / User | *Salvina Laila Vitale* | Passwords | *Unknown at Present* |
| BIOS Date/Time | *2-21-17 / 21:52* | Actual Date/Time | *Same* |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| *Apple* | | *2 TB* | *SIRIC2DI* |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: *Schillinger @ MIF on 2-21-17*

Imaging device S/N and version used: *(NEL) MacQuisition Version 2016.1, Dongle #0707C2034437AE33*

Destination Drive: *Seagate 2TB S/N W422XTTX*

Notes: *iMac found in room I powered on with locked screen. Epson scanner/printer connected to USB port. USB to HDMI and USB Apple charger USB also connected. Wireless keyboard ( DG752430JIZDPQYAQ) and wireless mouse ( CC260140UM7GRHQAP). iMac was labeled as I-2. Mouse and keyboard were not seized.*



*Site 1   IE 16-0166-19169   Item 3*

## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location: H / Site 1

[✓] Warrant     [ ] Consent     [ ] Subpoena     [ ] Other (See Comments)

## Device Information

System Name: S1RHC2D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | Apple | Model | A1419 |
|---|---|---|---|
| Serial / Service Tag | C02P33LOFY11 | Type | iMac |
| Owner / User | David Winsauer (VP) | Passwords | Link 2016! |
| BIOS Date/Time | 2-21-17 / 15:03 | Actual Date/Time | Same |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | | 1 TB | S1RHC2D1 |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger @ MIF on 2-21-17

Imaging device S/N and version used: Macquisition version 2016.1, Dongle # 07072742280D74E87

Destination Drive: Seagate 2TB S/N W422XTTX

Notes: imac was found in room H powered on with a locked screen. The Computer was powered down with the power switch. The User is David Winsauer. Wireless mouse and other USB device were connected. Also connected were the power cables and a RJ-45 cable. The wireless keyboard (DG750210BB2DPQYAB) and Logitech USB mouse (LZ420EF) were also connected. Mouse and keyboard were not seized.



Site 1  IE 16-0166-19169
Item 4

# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL     Room/Location: P

[✓] Warrant     [ ] Consent     [ ] Subpoena     [ ] Other (See Comments)

## Device Information

System Name: S1RPC3D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| | | | |
|---|---|---|---|
| Manufacturer | Apple | Model | A1419 |
| Serial / Service Tag | C02Q24BJF8J4 | Type | iMac |
| Owner / User | Richard Newton | Passwords | Prime |
| BIOS Date/Time | 2-21-17 / 22:01 | Actual Date/Time | Same |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | | 1 TB | S1RPC3D1 |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger @ MIF on 2-21-17

Imaging device S/N and version used: Macquisition version 2016.1, Dongle # 0707C2034437AE33

Destination Drive: Seagate 2TB S/N W422xTTX

Notes:

iMac was found in room P powered on. Case agent and the user, Richard Newton used the computer for shipping information



Sik 1   IE 16-0166-19169
Item #5

## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location: P

[✓] Warrant     [ ] Consent     [ ] Subpoena     [ ] Other (See Comments)

## Device Information

System Name: S1RPC1D1   Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| | | | |
|---|---|---|---|
| Manufacturer | Apple | Model | MKUQ2LL |
| Serial / Service Tag | F2LRFA5VGRWV | Type | iPhone |
| Owner | James Boccuzzi | Passwords | 198415 |
| BIOS Date/Time | 2/16/17   12:14p | Actual Date/Time | Same |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | F2LRFA5VGRWV | 64 GB | S1RPC1D1 |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger

Imaging device S/N and version used: Cellebrite P.A. ver. 6.0.0. 126

Destination Drive: Seagate 2TB S/N W422XW78

Notes: Phone: (203) 313-5623

　　　　T-Mobile

eMailAddress: James @ blackstone labs.com



Sik 1  IE 16-0166-19169
Item 6

# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location: P

[✓] Warrant  [ ] Consent  [ ] Subpoena  [ ] Other (See Comments)

## Device Information

System Name: S1RPC2D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | Apple | Model | M6C52LL |
|---|---|---|---|
| Serial / Service Tag | F2LPCAJCG5QJ | Type | iPhone |
| Owner | Richard Newton | Passwords | 11111 |
| BIOS Date/Time | 2/16/17 / 12:42p | Actual Date/Time | 2/16/17 / 12:42pm |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | F2LPCAJCG5QJ | 64GB | S1RPC2D1 |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger

Imaging device S/N and version used: Cellebrite P.A. ver. 6.0.0.126

Destination Drive: Seagate 2TB S/N WY22xw78

Notes: Phone: (754) 802-8072
T-Mobile
Name of Phone: "JRiPhone"

iCloud: mmabronco@gmail.com



Site 1   IE 16-0166-19169
Item 7

## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL        Room/Location: H

[✓] Warrant      [ ] Consent      [ ] Subpoena      [ ] Other (See Comments)

## Device Information

System Name: S1RHC1D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | Apple | Model | MN5T2LL |
|---|---|---|---|
| Serial / Service Tag | F2LSRC25HFXW | Type | iPhone |
| Owner | David Winsauer | Passwords | 1979 |
| BIOS Date/Time | 12:03 / 2/16/17 | Actual Date/Time | Same |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | F2LSRC25HFXW | 128 GB | S1RHC1D1 |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger

Imaging device S/N and version used: Cellebrite P.A. ver. 6.0.0.126

Destination Drive: Imaged to staging media, transfered to Seagate 2TB S/N W422xw78

Notes:  Phone: (561) 676-8390
Verision

iCloud ID: davidwinsauer@gmail.com

Site 1   IE 16-0166-19169
Item 8



## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location:

[✓] Warrant      [ ] Consent      [ ] Subpoena      [ ] Other (See Comments)

## Device Information

System Name: S1 RFC1D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: SIRAC1

| | | | |
|---|---|---|---|
| Manufacturer | Apple | Model | A1466 |
| Serial / Service Tag | C02NVDWJG085 | Type | laptop |
| Owner | James Boccuzzi | Passwords | Chosen1 0015 |
| BIOS Date/Time | 2-23-17 / 10:06 | Actual Date/Time | Same |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | | 128gb | S1RFC1D1 |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger (S) MIF on 2-23-17

Imaging device S/N and version used: Macquisition Version 2016.1 Dongle # 0707274228D74E87

Destination Drive: Seagate 2TB S/N W422XTTX

Notes: Apple MacBook Air was found in room F by SA Gilbert Mendoza.

Phone password 198,415



*Sik 1*  *IE 16-0166-19169*
*Item 9*

# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location: I / Site 1

[✓] Warrant  [ ] Consent  [ ] Subpoena  [ ] Other (See Comments)

## Device Information

System Name: S1R1C3D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | Apple | Model | A1418 |
|---|---|---|---|
| Serial / Service Tag | C02QD3Q8GG77 | Type | iMac |
| Owner / User | Amber | Passwords | Unknown |
| BIOS Date/Time | 2-23-17 / 9:50 | Actual Date/Time | Same |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| Apple | | 1 TB | S1R1C3D1 |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger @ MIF on 2-23-17

Imaging device S/N and version used: Macquisition Version 2016.1, Dongle # 0707C20 3443 7AE33

Destination Drive: Seagate 2TB S/N W422XTTX

Notes: iMac was found in room I powered on. Computer was shut down with mouse through OS. Mac wired USB Keyboard (DG763B101LJDPQWAM) and wireless mouse (CC2535313PSGRHQA9) were connected along with HDMI and HP Scanner/printer Serial # CN4CDEK463.

*Site 1*    *IE 16-0166-19169*
*Item 10*



## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location:

[✓] Warrant   [ ] Consent   [ ] Subpoena   [ ] Other (See Comments)

## Device Information

System Name: *S1RPC4D1*

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | *Seagate* | Model | *SRD00F1* |
|---|---|---|---|
| Serial / Service Tag | *NA97FTKY* | Type | |
| Owner | *Richard Newton* | Passwords | |
| BIOS Date/Time | | Actual Date/Time | |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| | | *2TB* | *S1RPC4D1* |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: *Schillinger @ MEF on 2-22-17*

Imaging device S/N and version used:
*TD2u Serial# 20075105c, Version 1.2.0 (4847.ic2FO Build*

Destination Drive: *Seagate 2TB S/N W422XW78*

Notes:

*External Drive*

IE # 16-0166-19169
# 11



## U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location:

[✓] Warrant    [ ] Consent    [ ] Subpoena    [ ] Other (See Comments)

## Device Information

System Name: SIRHC3DI

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | Seagate | Model | SRD00F1 |
|---|---|---|---|
| Serial / Service Tag | NA7R9MYR | Type | External HD |
| Owner | Aaron Singerman | Passwords | |
| BIOS Date/Time | | Actual Date/Time | |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| | | 1TB | SIRHC3DI |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger @ MIF on 2-22-17

Imaging device S/N and version used: TD2u S/N 0075105C version 1.20

Destination Drive: Seagate 2TB S/N W422XW78

Notes: 1TB Seagate external HD found in room H bottom left drawer of David Winsauer's desk. Item was found by SA Houston Ramsey



Sik 1   FE 16-0166-19169
Item 12

## U.S. FOOD AND DRUG ADMINISTRATION
### OFFICE OF CRIMINAL INVESTIGATIONS

## Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location:

[✓] Warrant   [ ] Consent   [ ] Subpoena   [ ] Other (See Comments)

## Device Information

System Name: S1RHC4D1

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | Western Digital | Model | WDBYNN0010BBK-08 |
|---|---|---|---|
| Serial / Service Tag | WX71A86K5C6C | Type | External HD |
| Owner | Chris E | Passwords | |
| BIOS Date/Time | | Actual Date/Time | |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| | | 1 TB | S1RHC4D1 |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: Schillinger @ MIF on 2-22-17

Imaging device S/N and version used:

Destination Drive: TD2u S/N 0075105c   version 1.20

Seagate 2TB S/N W422XW78

Notes: Western Digital

Seagate external HD found in room H bottom left drawer of David Winsaver's desk. Item was found by SA Houston Ramsay

*IE 16-0166-19169*
*Site 1*
*Item 13*



# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 1, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Room/Location:

[✓] Warrant    [ ] Consent    [ ] Subpoena    [ ] Other (See Comments)

## Device Information

System Name: *SIRHC5D1*

Site Number, Room Letter, Device Number, (S_R_C_) Example: SIRAC1

| Manufacturer | Western Digital | Model | WDBUZG0010BBK |
|---|---|---|---|
| Serial / Service Tag | ~~WX~~ WX71EB3CDW46 | Type | External HD |
| Owner | | Passwords | Unknown |
| BIOS Date/Time | | Actual Date/Time | |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| | | 1 TB | SIRHC5D1 |
| | | | |
| | | | |
| | | | |
| | | | |

## Comments

Imaged by: *Schillinger @ MIF  2-23-17*

Imaging device S/N and version used:

Destination Drive: *TD2u S/N 0075105c version 1.20*

Notes: *Seagate 2TB S/N W422XW9W*

*~~Seagate~~*

*Western Digital external HD found in room H bottom left drawer of David Winsaver's desk. Item was found by SA*

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY



# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## REPORT OF INVESTIGATION

**REPORTING OFFICE:**  Miami Field Office

**DOCUMENT NUMBER:**  255204

**CASE NUMBER:**  2016-MIF-735-0166

**RELATED CASE NUMBER:**  2016-IOD-715-0001

**TYPE OF CASE:**  735.300, DIETARY SUPPLEMENTS - CFSAN

**CASE TITLE:**  BLACKSTONE LABS, LLC

**CASE AGENT:**  KELLY MCCOY

**INVESTIGATION MADE AT:**  South Florida

**INVESTIGATION MADE BY:**  SA K. McCoy

**REPORTING PERIOD:**  **FROM:** 02/14/2017  **TO:** 05/08/2017

**STATUS OF CASE:**  Continued

**SYNOPSIS:**  ███████████████████████████████████

---

**RESTRICTED INFORMATION**

This report is furnished on an official need-to-know basis and must be protected from dissemination which might compromise the best interests of the Food and Drug Administration, Office of Criminal Investigations.  This report shall not be released in response to a Freedom of Information Act or Privacy Act request or disseminated to other parties without prior consultation with the FDA Office of Criminal Investigations.

**UNAUTHORIZED RELEASE MAY RESULT IN CRIMINAL PROSECUTION**

---

**REPORT SUBMITTED BY:**  Electronically submitted by KELLY MCCOY     DATE: 05/08/2017

KELLY MCCOY, SPECIAL AGENT

**REPORT APPROVED BY:**  Electronically approved by JUSTIN GREEN     DATE: 05/08/2017

JUSTIN GREEN, SPECIAL AGENT IN CHARGE

**DISTRIBUTION:**  MIF: Original and 1cc.



9:19-CR-80030
GOVERNMENT
EXHIBIT
027

2016-MIF-735-0166
Page 2 of 5

## 1. INTRODUCTION:



## 2. DETAILS OF INVESTIGATION:

On February 16, 2017, Federal search warrants were executed at Blackstone Labs, 1090 Holland Drive, Suites 1 and 2, Boca Raton, FL and at VBS Labs, 1140 Holland Drive, Suite 12, Boca Raton, FL.

Several employees were present upon entry at both locations; however, the current president of Blackstone Labs, Phillip (PJ) Braun, was not present. The following employees were interviewed at Blackstone Labs: Richard (JR) Newton, Clayton Hodges, David Winsauer, James Boccuzzi, Christopher Herron, David Jimenez III, Matthew Rossi, and Salvina Vitale. Reference is made to the Memorandum of Interviews (MOI's) submitted by various agents.

The following employees were interviewed at VBS Laboratories: Matthew Mosier, Anthony Ventrella, Ashley Ventrella, Juan Moran, and Matthew Thomas. Reference is made to the MOI's submitted by SA Stephanie Kirby.

Several items were seized from Blackstone Labs and were inventoried on the following Inventory of Evidence (IE) forms: 16-0166-87402, 16-0166-97803, 16-0166-19169, 16-0166-14700, 16-0166-78799, and 16-166-74967. Items 1-4 and 8-13 listed on IE 16-0166-19169 were imaged and the imaged copy was placed on IE 16-0166-14574, along with items 5-7 which were transferred from IE 16-0166-19169 to IE 16-0166-14574. Items 1-4 and 8-13 on IE 16-0166-19169 were returned to Salvina Vitale at Blackstone Labs on February 24, 2017.

Several items were seized from VBS Labs and were inventoried on the following IE's: 16-0166-83306, 16-0166-69860, 16-0166-28053, and 16-0166-73900. Items 1-4 listed on IE 16-0166-73900 were imaged and the imaged copy was placed on IE 16-0166-70652, along with item 5 which was transferred from IE 16-0166-73900 to IE 16-0166-70652. Items 1-4 listed on IE 16-0166-73900 were returned to Anthony Ventrella at VBS Labs on February 22, 2017.

Continuing on February 16, 2017, SA's Michelle Ciolek, Brian Kriplean, and I attempted to interview Aaron Singerman at his current business, Redcon1 located at 1141 S. Rogers Circle, Suite 3, Boca Raton, FL. Singerman advised he did not wish to speak with agents without his attorney present.



**3. JUDICIAL ACTION:**

N/A

**4. DISPOSITION OF EVIDENCE, CONTRABAND, AND PERSONAL PROPERTY:**

IE #16-0166-87402: On February 16, 2017, all items (1-54) were obtained as a result of a search warrant and subsequently secured in the Miami Field Office evidence vault.

IE #16-0166-97803: On February 16, 2017, all items (1-39) were obtained as a result of a search warrant and subsequently secured in the Miami Field Office evidence vault. On March 10, 2017, items 25 and 26 were returned to Attorney Barney Brown for Blackstone Labs. On April 4, 2017, all remaining items were forwarded to CPB and subsequently sent to and received by the Document Analysis Center on April 11, 2017.

IE #16-0166-74967: On February 16, 2017, all items (1-50) were obtained as a result of a search warrant and secured in the Miami Field Office evidence vault. On February 23, 2017, all items were forwarded to FCC for testing and analysis.

IE #16-0166-78799: On February 16, 2017, all items (1-38) were obtained as a result of a search warrant and transferred to VSE.

IE #16-0166-19169: On February 16, 2017, all items (1-13) were obtained as a result of a search warrant and secured in the Miami Field Office evidence vault.Continuing on February 16, 2017, items 5-7 were transferred to IE #16-0166-14574. On February 24, 2017, items 1-4 and 8-13 were released/returned to Salvina Vitale on behalf of Blackstone Labs.

IE # 16-0166-14574: On February 16, 2017, all items (1-3) are imaged copies created by SCERS agents of devices obtained as a result of a search warrant (items listed on IE# 16-0166-19169); items were maintained by SCERS agent S. Schillinger. On March 1, 2017, all items were secured in the Miami Field Office evidence vault.

IE #16-0166-14700: On February 16, 2017, the item was obtained as a result of a search warrant and secured in the Miami Field Office evidence vault. On March 27, 2017, the item was forwarded to CPB.

IE #16-0166-28053: On February 16, 2017, all items (1-86) were obtained as a result of a search warrant and secured in the Miami Field Office evidence vault.

IE #16-0166-83306: On February 16, 2017, all items (1-13) were obtained as a result of a search warrant and subsequently secured in the Miami Field Office evidence vault.  On April 4, 2017, items 1-12 were forwarded to CPB and subsequently sent to and received by the Document Analysis Center on April 11, 2017.

IE #16-0166-73900: On February 16, 2017, all items (1-5) were obtained as a result of a search warrant and secured in the Miami Field Office evidence vault. On February 16, 2017, item 5 was transferred to IE #16-0166-70652. On February 22, 2017, items 1-4 were returned to Anthony Ventrella.

IE #16-0166-70652: On February 16, 2017, the item contains imaged copies created by SCERS agents of devices obtained as a result of a search warrant (items listed on IE #16-0166-73900); items were maintained by SCERS agent S. Schillinger and entered into the Miami Field Office evidence vault on March 1, 2017.

IE #16-0166-69860: On February 28, 2017, all items (1-60) were transferred from IE #16-0166-28053 and secured in the Miami Field Office evidence vault. On March 6, 2017, all items were transferred to FCC for testing and analysis.

IE #16-0166-99907: On March 3, 2017, all items (1-2) were transerred from IE #15-0319-10358 and secured in the Miami Field Office evidence vault.

**5. STATUS OF INVESTIGATION:**

**6. SUSPECTS/DEFENDANTS/OTHER:**



**7. ATTACHMENTS:**

None



# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

### SCERS Activity Report

| | |
|---|---|
| **Date:** | 02/16/2017 |
| **Case Number:** | 2016-MIF-735-0166 |
| **Case Title:** | Blackstone Labs, LLC |
| **Case Agent:** | SA Kelly McCoy |
| **Examiner:** | SA Scott Schillinger |

## I.   Case Background Information

On 2-16-17, federal search warrants were conducted by Food and Drug Administration, Office of Criminal Investigations (FDA-OCI) and other members working in such capacity, at the two following locations:
- Blackstone Labs, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL 33487, designated as Site 1
- VBS Laboratories, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487, designated as Site 2

At these locations, numerous digital items were forensically copied or physically seized. Upon entry, after the scene was secured and the warrant was presented to the subjects on the location, SCERS (Seized Computer Evidence Recovery Specialist) Special Agent (SA) Scott Schillinger and the team leaders identified the digital items to be seized and forensically imaged. SAs Gene Zumwalt, Timothy Griffin, Brian Kriplean, and James Miller were assigned to assist with SCERS.

## II.   Summary of Acquisition

The following items were forensically imaged from the Site 1 location:

Item # 1:  Apple iMac model # A1419 bearing serial # C02Q113DFY11, identified as S1RIC1D1.
(Image Notes: MacQuistion was used to image a 1 TB hard drive contained inside. This item was imaged on 2-21-17 by SA Schillinger at the Miami Field Office (MIF).

Item # 2:  Apple iMac model # A1418 bearing serial # C02L7480F8J2, identified as S1RIC2D1.
(Image Notes: MacQuistion was used to image a 1 TB hard drive contained inside. This item was imaged on 2-21-17 by SA Schillinger at the MIF.

Item # 3: Apple iMac model # A1419 bearing serial # C02P33L0FY11, identified as S1RHC2D1
(Image Notes: MacQuistion was used to image a 1 TB hard drive contained inside. This item was imaged on 2-21-17 by SA Schillinger at the MIF.

Item # 4: Apple iMac model # A1419 bearing serial # C02Q24BJF8J4, identified as S1RPC3D1.
(Image Notes: MacQuistion was used to image a 1 TB hard drive contained inside. This item was imaged on 2-21-17 by SA Schillinger at the MIF.

Item # 5: Apple iPhone model  # MKUQ2LL bearing serial # F2LRFASVGRWV, 64 GB, James Boccuzzi, identified as S1RPC1D1.
(Image Notes: A SCERS laptop and Cellebrite Physical Analyzer were used to image this device on 2-16-17 by SA Schillinger at the Site 1 location.)

9:19-CR-80030
**GOVERNMENT EXHIBIT**
028

Revised 08/14

U.S. FOOD AND DRUG ADMINISTRATION

OFFICE OF CRIMINAL INVESTIGATIONS

---

**SCERS Activity Report (Cont.)**

II      **Summary of Acquisition (Cont.)**

Item # 6: Apple iPhone model # MGC52LL bearing serial # F2LPCAJCG5QJ, 64 GB, Richard Newton, identified as S1RPC2D1.
(Image Notes: A SCERS laptop and Cellebrite Physical Analyzer were used to image this device on 2-16-17 by SA Schillinger at the Site 1 location.)

Item # 7: Apple iPhone model # MN5T2LL bearing serial # F2LSRC25HFXW, 128 GB, David Winsauer, identified as S1RHC1D1.
(Image Notes: A SCERS laptop and Cellebrite Physical Analyzer was used to image data on 2-16-17 by SA Schillinger at the Site 1 location.)

Item # 8: Apple laptop model # A1466 bearing serial # C02NVDWJG085, 128 GB, identified as S1RFC1D1.
Image Notes: MacQuistion was used to image a 1TB hard drive contained inside. This item was imaged on 2-23-17 by SA Schillinger at the MIF.

Item # 9: Apple iMac model # A1418 bearing serial #C02QD3Q8GG77, identified as S1RIC3D1.
Image Notes: MacQuistion was used to image a 1TB hard drive contained inside. This item was imaged on 2-23-17 by SA Schillinger at the MIF.

Item # 10: Seagate external 2 TB hard drive model # SRD00F1 bearing serial # NA97FTKY, identified as S1RPC4D1.
(Image Notes: This item was imaged using a TD2u, serial # 20075105c by SA Schillinger on 2-22-17 at MIF.)

Item # 11: Seagate external 1 TB hard drive model # SRD00F1 bearing serial # NA7R9MYR with handwritten label-Aaron Singerman Desktop Backup 05/24/16, identified as S1RHC3D1.
(Image Notes: This item was imaged using a TD2u, serial # 20075105c by SA Schillinger on 2-22-17 at MIF.)

Item # 12: Western Digital external 1 TB hard drive model # WDBYNW0010BBK-08 bearing serial # WX71A86K5C6C with handwritten label-Chris E. laptop backup Jan 9th 2017, identified as S1RHC4D1.
(Image Notes: This item was imaged using a TD2u, serial # 20075105c by SA Schillinger on 2-22-17 at MIF.)

Item # 13: Western Digital external 1 TB hard drive model # WDBUZG0010BBK bearing Serial # WX71EB3CDW46, identified as S1RHC5D1.
(Image Notes: This item was imaged using a TD2u, serial # 20075105c by SA Schillinger on 2-23-17 at MIF.)

The following items were forensically imaged from the Site 2 location:

Item # 1: MacBook Air model # A 1465 bearing serial # C02QLG3YGFWM, identified as S2RCC1D1.
(Image Notes: MacQuistion was used to image a 128 GB hard drive contained inside. This item was imaged on 2-17-17 by SA Schillinger at the MIF.

Item # 2: Mac All-in-One model # A 1419 bearing Serial # C02PD57GFY10, identified as S2RAC2D1.
(Image Notes: MacQuistion was used to image a 1 TB hard drive contained inside. This item was imaged on 2-17-17 by SA Schillinger at the MIF.)

Item # 3: Mac All-in-One model # A1418 bearing Serial # C02MCBDKF8J2, identified as S2RAC3D1.
(Image Notes: MacQuistion was used to image a 1 TB hard drive contained inside. This item was imaged on 2-17-17 by SA Schillinger at the MIF.)

Item # 4: HP Elite One 800 G1 Touch AiO Business PC bearing Serial # MXL6261V91, identified as S2RAC3D1.

U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

---

### SCERS Activity Report (Cont.)

---

(Image Notes: The hard drive was removed and identified as a Toshiba 1 TB, serial # 66CHP02LT.  This hard drive was imaged using a TD2u, serial # 200759068 by SA Brian Kriplean on 2-16-17 at MIF.)

Item # 5: Apple iphone, serial # F9CR26FFG5QJ, Anthony Ventrella, 64 GB, identified as S2RAC4D1.
(Image Notes: A SCERS laptop and Cellebrite Physical Analyzer were used to image this device on 2-16-17 by SA Griffin at the Site 2 location.)

Item # 6: Apple iphone, serial # F9CQW2YNG5QJ, Ashley Ventrella, 64 GB, identified as S2RAC5D1.
(Image Notes: A SCERS laptop and Cellebrite Physical Analyzer were used to image this device on 2-16-17 by SA Griffin at the Site 2 location.)

All imaged items were visually verified using FTK Imager version 3.4.2.6.

SA Zumwalt took photos from Site 1 and provided them to SA Schillinger at the completion of the search.
SA Kriplean took photos from Site 2 and provided them to SA Schillinger at the completion of the search.

The evidence custodian on scene created an Inventory of Evidence (IE) for both sites. The SCERS items for Site 1 were documented on IE # 16-0166-19169 and the Site 2 items were documented on IE # 16-0166-73900.  These items were later turned over to the evidence custodian at each site and were transported to MIF on 2-16-17.

*Software and version information used for imaging and capturing data*: MacQuisition version 2016.1, Tableau TD2u version 1.2.0, Access Data FTK Imager 3.4.2.6 and Cellebrite Physical Analyzer version 6.0.0.126.

Once imaging completed, SA Schillinger inventoried and transferred the above IEs to IE # 16-0166-14574 for Site 1 and IE # 16-0166-70652 for Site 2.  All seized items were returned to each site location by the SA McCoy and SA Schillinger.  See IEs for more information.

---

### III.    Summary of Analysis

---

To be completed.

---

Scott W. Schillinger -S

Digitally signed by Scott W. Schillinger -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, 0.9.2342.19200300.100.1.1=2000764669, cn=Scott W. Schillinger -S
Date: 2017.04.17 11:11:53 -04'00'

**Special Agent Digital Signature**

Daniel G. Burke -S

Digitally signed by Daniel G. Burke -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, 0.9.2342.19200300.100.1.1=2000344496, cn=Daniel G. Burke -S
Date: 2017.04.17 09:15:41 -06'00'

**SCERS SOM Digital Signature**

Mott W. Heath -S

Digitally signed by Mott W. Heath -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, ou=Mott W. Heath -S, 0.9.2342.19200300.100.1.1=2000543134
Date: 2017.04.21 13:21:30 -04'00'

**Special Agent in Charge Digital Signature**

---

### IV.    Attachments(s) and Distribution

---

None.

---

U.S. FOOD AND DRUG ADMINISTRATION

## OFFICE OF CRIMINAL INVESTIGATIONS

---

**SCERS Activity Report (Cont.)**

**IV.** **Attachments(s) and Distribution  (Cont.)**

**Distribution:**

Case File: Original
Case Agent: 1cc
SCERS Agent: 1cc



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

SERIAL NO: 16 - 0166 - 19169

## INVENTORY OF EVIDENCE

| | |
|---|---|
| CASE NUMBER: 16 - MIF - 735 - 0166 | CASE TITLE: BLACKSTONE LABS, LLC |
| INVENTORY DATE: 02/16/2017 | INVENTORIED BY: SA SCHILLINGER |
| DATE RECEIVED: 02/16/2017 | SOURCE: 1090 HOLLAND DRIVE, SUITES 1,2 BOCA RATON, FL |

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 1 | Apple iMAC model # A1419 bearing Serial #C02Q113DFY11 and power cord, SCERS # S1RIC1D1 |
| | | BOX:    ROOM: I    FIXTURE: Desk-Phillip Braun    LOCATING AGENT: SA ZUMWALT |
| 2 | 1 | Apple iMAC model # A1418 bearing Serial # C02L7480F8J2 and power cord, SCERS # S1RIC2D1 |
| | | BOX:    ROOM: I    FIXTURE: Desk-Salvina Laila Vitale    LOCATING AGENT: SA ZUMWALT |
| 3 | 1 | Apple iMAC model # A1419 bearing Serial # C02P33LOFY11 and power cord, SCERS # S1RHC2D1 |
| | | BOX:    ROOM: H    FIXTURE: Desk-David Winsauer    LOCATING AGENT: SA ZUMWALT |
| 4 | 1 | Apple iMAC model # A1419 bearing Serial # C02Q24BJF8J4 and power cord, SCERS # S1RPC3D1 |
| | | BOX:    ROOM: P    FIXTURE: Desk-Richard Newton    LOCATING AGENT: SA ZUMWALT |
| 5 | 1 | Forensic image of Apple iPhone Model # MKUQ2LL bearing Serial #F2LRFASVGRWV, SCERS #S1RPC1D1. |
| | | BOX:    ROOM: P    FIXTURE: Desk-James Boccuzzi    LOCATING AGENT: SA SCHILLINGER |
| 6 | 1 | Forensic image of Apple iPhone Model # MGC52LL bearing Serial #F2LPCAJCG5QJ, SCERS #S1RPC2D1. |
| | | BOX:    ROOM: P    FIXTURE: Desk-Richard Newton    LOCATING AGENT: SA SCHILLINGER |
| 7 | 1 | Forensic image of Apple iPhone Model # MN5T2LL bearing Serial #F2LSRC25HFXW, SCERS #S1RHC1D1. |
| | | BOX:    ROOM: H    FIXTURE: David Winsauer    LOCATING AGENT: SA SCHILLINGER |
| 8 | 1 | Apple laptop Model # A1466 bearing Serial # C02NVDWJG085 and power block, SCERS # S1RFC1D1. |
| | | BOX:    ROOM: F    FIXTURE: Backpack-James Boccuzzi    LOCATING AGENT: SA MENDOZA |
| 9 | 1 | Apple iMAC model # A1418 bearing Serial #C02QD3Q8GG77 and power cord, SCERS # S1RIC3D1. |
| | | BOX:    ROOM: I    FIXTURE: Desk-Amber    LOCATING AGENT: SA ZUMWALT |

OCI Form 4200

___ Evidence
___ Custodian
___ Case File
___ Agent Copy



9:19-CR-80030
GOVERNMENT
EXHIBIT
029

U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

---

# INVENTORY OF EVIDENCE

**CASE NUMBER:**   16 - MIF - 735 - 0166          **SERIAL NO.:**   16 - 0166 - 19169

---

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 10 | 1 | Seagate SATA Drive model # SRD00F1 bearing Serial # NA97FTKY, SCERS # S1RPC4D1 |
| | BOX: | ROOM: P   FIXTURE: Desk-Richard Newton          LOCATING AGENT: SA ZUMWALT |
| 11 | 1 | Seagate SATA Drive model # SRD00F1 bearing Serial # NA7R9MYR with handwritten label-Aaron Singerman Desktop Backup 05/24/16, SCERS # S1RHC3D1 |
| | BOX: | ROOM: H   FIXTURE: Desk-David Winsauer          LOCATING AGENT: SA ZUMWALT |
| 12 | 1 | Western Digital SATA Drive model # WDBYNW0010BBK-08 bearing Serial # WX71A86K5C6C with handwritten label-Chris E. laptop backup Jan 9th 2017, SCERS # S1RHC4D1 |
| | BOX: | ROOM: H   FIXTURE: Desk-David Winsauer          LOCATING AGENT: SA ZUMWALT |
| 13 | 1 | Western Digital SATA Drive model # WDBUZG0010BBK bearing Serial # WX71EB3CDW46, SCERS # S1RHC5D1 |
| | BOX: | ROOM: H   FIXTURE: Desk-David Winsauer          LOCATING AGENT: SA ZUMWALT |

---

## CHAIN OF CUSTODY

| ITEM #(s) | DATE | ACTION | TRACKING | SIGNATURE |
|---|---|---|---|---|
| 1-13 | 2-16-17 | Received as Evidence | SA Schellinger | |
| 1-13 | 2-16-17 | Entered into Evidence | SA Schellinger | |
| 1-13 | 2-16-17 | Entered into Evidence | Matthew Hewitt | |
| 1-4 and 8-13 | 2-16-17 | Released to SCERS | SA Schellinger | |
| 1-4 and 8-13 | 2-24-17 | Released to Solvina Vitale | | |
| 5-7 | 2/16/17 | Permanent Transfer to IE 16-0166-18574 | SA Schellinger | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

OCI Form 4200





9:19-CR-3008
**GOVERNMENT
EXHIBIT**
030

# Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## MEMORANDUM OF INTERVIEW

**CASE NUMBER:** 2016-MIF-735-0166

**CASE TITLE:** BLACKSTONE LABS, LLC

**DOCUMENT NUMBER:** 253383

**PERSON INTERVIEWED:** David Thomas Winsauer

**PLACE OF INTERVIEW:** Blackstone Labs, 1090 Holland Dr., Boca Raton, FL

**DATE OF INTERVIEW:** 02/16/2017

**TIME OF INTERVIEW:** 10:00am to 11:10am

**INTERVIEWED BY:** SA Houston E. Ramsey Jr.

**OTHER PERSONS PRESENT:** SA Megan Allen

On 02/16/17 at approximately 10:00am, SA Houston Ramsey and SA Megan Allen, FDA/OCI/MIF, interviewed David Thomas Winsauer at Blackstone Labs located at 1090 Holland Dr., Boca Raton, Florida.  Prior to this interview, Winsauer provided his personal identifiers.  Winsauer provided the following statement:

Winsauer stated he is the vice president of Blackstone Labs (BSL) and has held this position since June of 2016.  Winsauer stated as the vice president he helps the owners with the vision of the company and ensures employees do their job.  Winsauer stated his main focus is with marketing for the company.  Winsauer stated he first started with BSL in August of 2014 as the Director of IT.  Winsauer stated the owners of BSL are Phillip "PJ" Braun, Aaron Singerman and Joseph Safina.  Winsauer stated Braun is listed on corporate filings as the owner and Singerman and Safina are silent owners.  Winsauer stated currently Braun is the operating manager and owner that makes all of the day to day decisions at BSL but this was not always the case.  Winsauer stated Braun and Singerman had disagreements and could not both work together at BSL.  Winsauer stated Singerman fired Braun's friend that Braun hired at BSL and their relationship was never the same.  Winsauer stated in May of 2016 Safina made the decision to keep Braun inside and involved at BSL and Singerman became a silent owner who no longer worked inside BSL.  Winsauer stated only Duracap Labs, Hi-Tech Pharmaceuticals and VenTech have manufactured products for BSL.  Winsauer stated currently BSL has the majority of their products made by Hi-Tech Pharmaceuticals.  Winsauer stated Duracap Labs used to be BSL's leading manufacturer however over the past year and a half it has steadily transitioned to Hi-Tech Pharmaceuticals.  Winsauer stated this is primarily due to Hi-Tech Pharmaceuticals ability to manufacture the products cheaper.  Winsauer stated Hi-Tech Pharmaceuticals currently manufactures a little more than half of BSL's products and Duracap Labs does the rest.  Winsauer stated BSL only uses VenTech in emergencies for the manufacturing of products.  Winsauer stated BSL only uses VenTech about two percent of the time.  Winsauer stated he did not know which products were manufactured by which manufacturer but did know the owners of each manufacturer.  Winsauer stated Ben Mesika and Wes owned Duracap Labs, Jared Wheat or Wheaten owned Hi-Tech Pharmaceuticals and Joey Ventrella owned VenTech.  Winsauer stated he learned just over the past couple of months that Jared had purchased Duracap Labs from Ben and Wes.  Winsauer stated the formulas that are created for the products at BSL are created by the "Gorilla Chemist", Bryan Moskowitz, and the manufacturers.  Winsauer stated Moskowitz is BSL's Chief Science Officer or Head Chemist.  Winsauer stated he knew the BSL product "Dust Extreme" contained DMAA and the manufacturer had an issue late last year.  Winsauer stated BSL came out with a new version

or is currently working on a new version. Winsauer stated the earlier version of Cobra 6p was manufactured by VenTech. Winsauer stated in early 2015 BSL received a letter concerning the BSL products "Ostapure," "LGD Elite," and "MK Ultra" regarding an issue with SARMS and BSL was worried they were going to be illegal. Winsauer stated he was instructed to make these products unavailable to purchase on the BSL website. Winsauer stated he did not know who manufactured the BSL product "Super DMZ" and didn't believe it existed anymore. Winsauer stated in December of 2014 BSL stopped selling "Super DMZ" and he believed it was being manufactured by Duracap Labs because they were manufacturing all of BSL's products back then. Winsauer stated the BSL products "Dust V2" and "Dust Extreme" were manufactured by both Duracap Labs and Hi-Tech Pharmaceuticals. Winsauer stated these products were manufactured by Duracap Labs in the past however they recently have transitioned to Hi-Tech Pharmaceuticals. Winsauer stated this transition was due primarily because Hi-Tech Pharmaceuticals could manufacture these products cheaper. Winsauer stated BSL even conducted independent testing on the BSL product "Dust Extreme" which was manufactured by Hi-Tech Pharmaceuticals to ensure its ingredients matched because BSL didn't believe Hi-Tech Pharmaceuticals could do it. Winsauer stated the difference in these BSL products is "Dust Extreme" contains DMAA and caffeine. Winsauer stated the BSL products "Dust V2" and "Dust Extreme" are "reformulated" products that are evolutions of the BSL product "Angel Dust." Winsauer stated in December of 2014 BSL stopped selling "Angel Dust" and it became "Dust V2." Winsauer stated the BSL product "Angel Dust" was determined to contain "AMP Citrate" which was the subject of an FDA letter in which BSL was asked to remove from their products. Winsauer stated BSL sells products to the following Australian companies: Spartan Supps, Nutrition Systems and PHD Distribution. Winsauer stated BSL cannot sell products which contain gelatin capsules to Australia because this is unlawful in their country. Winsauer stated BSL does not and cannot control what and where BSL products are shipped. Winsauer stated if a customer in Australia ordered an illegal product from the BSL website and the package was seized, the customer would not be reimbursed by BSL. Winsauer stated no BSL products omit ingredients from their label and everything in the product is listed on the label. Winsauer stated BSL stopped doing proprietary blends a year and a half ago. Winsauer stated BSL receives customer complaints, usually by emails, which are handled by the Director of IT and Head of Customer Service, Christopher Herron, that are maintained at BSL both digitally and in hard copy filing. Winsauer stated the following products are BSL products: Super DMZ Rx 2.0, Brutal 4ce, Cobra 6p Extreme, Dust V2, Dust Extreme, Growth, Anesthetized, Euphoria, Gear Support, PCTV and Angel Dust. Winsauer stated most of these BSL products were manufactured by Duracap Labs in the beginning and now are increasingly being manufactured by Hi-Tech Pharmaceuticals. Winsauer stated the reason BSL products have been made by different manufacturers is because the manufacturer either makes a better quality product, makes it cheaper or faster. Winsauer stated Hi-Tech Pharmaceuticals manufactures the BSL products with a better quality and cheaper but they take longer than Duracap Labs to make them. Winsauer stated the owners of BSL take dividends from the profits of the company and he is paid by salary and commissions based on BSL sales performance. Winsauer stated Celeste Braun sponsors athletes for BSL and is not involved with operating BSL. Winsauer stated James Boccuzzi is BSL's East Coast Director of Sales and Jodie Minear, ████████ is BSL's West Coast Director of Sales. Winsauer stated Richard "JR" Newton is BSL's Shipping Manager who helps make decisions and has sent products out for testing. Winsauer stated Amber Gingerich is BSL's contracted Bookkeeper but doesn't think she is a W2 employee of BSL. Winsauer stated Christopher Niemczyk, ████████ is BSL's International Director of Sales. Winsauer stated Zachary Catanzaro is BSL's legal advisor and he was not sure if he was an attorney. Winsauer stated BSL received a "fake FDA letter" in which DMAA was the subject. Winsauer stated BSL consulted with Hi-Tech Pharmaceuticals who told BSL that DMAA was not illegal. Winsauer stated BSL's attorney said this was ok and DMAA BSL products continued. Winsauer stated BSL does not conduct their own independent testing of the products they receive from the manufactures. Winsauer stated December 1 2014 is a significant date because this was when "HR 4771" came out and products were checked to this lis to determine if they could be sold anymore at BSL. Winsauer stated many BSL products were checked and this is why BSL stopped selling some of them.

This interview concluded at approximately 11:10am.

**SUBMITTED:** Electronically submitted by HOUSTON, JR. RAMSEY

HOUSTON, JR. RAMSEY, SPECIAL AGENT          DATE:   02/21/2017

**APPROVED:** Electronically approved by JUSTIN GREEN

JUSTIN GREEN, SPECIAL AGENT IN CHARGE       DATE:   02/22/2017

**DISTRIBUTION:**   MIF:  Original and 1cc

**ATTACHMENTS:**  N/A