# EXHIBIT 1



9:19-CR-80030
GOVERNMENT
EXHIBIT
031

| From: | James Boccuzzi <jamesbocc@gmail.com> |
| --- | --- |
| Sent: | Thursday, August 4, 2016 2:34 PM |
| To: | Rob Aleong <floridauniversalinvestment@gmail.com> |
| Subject: | Re: blackstone |
| Attach: | scan0014.pdf |

On Thu, Aug 4, 2016 at 1:10 PM, James Boccuzzi <jamesbocc@gmail.com> wrote:
let me ask

On Thu, Aug 4, 2016 at 1:07 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:
Blackstonelabs letterhead?

Regards Rob

On Thu, Aug 4, 2016 at 1:03 PM -0400, "James Boccuzzi" <jamesbocc@gmail.com> wrote:

This is the best I can do.  I dont even feel comfortable doing this because I am impersonating the FDA and our business could get shut down, tons of people will lose their jobs.  Its maybe something we did a couple years ago but our company has grown tremendously since then and I can't take the risk.

On Thu, Aug 4, 2016 at 1:01 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:
We need a letterhead:(

Regards Rob

On Thu, Aug 4, 2016 at 12:47 PM -0400, "James Boccuzzi" <jamesbocc@gmail.com> wrote:

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) ███████

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) ███████

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          GOV_00671134

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) ███████████

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) ███████████

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    GOV_00671135



May 14, 2016

TO WHOM IT MAY CONCERN

We have reviewed correspondence on behalf of:

Blackstone Labs, LLC
1090 Holland Drive 1
Boca Raton, FL 33487

concerning the status of:

"Certificate of Free Sale Product List"

These products are regulated by the Food and Drug Administration (FDA) pursuant to the requirements of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Fair Packaging and Labeling Act (FPLA) and other related laws.

The Food and Drug Administration does not have statutory authority to approve any food or any food manufacturer or distributor of such products.

The above referenced products are under the jurisdiction of the Food and Drug Administration which has primary responsibility for the administration and enforcement of the FD&C Act and the FPLA and other related laws. We have not examined the specific products being offered for export or reviewed the labels. Under the FD&C Act, such products may be exported if:

    1. It is not adulterated or misbranded and it meets the other requirements of the FD&C Act for marketing in the U.S.; or

    2. It cannot be lawfully marketed in the U.S. but meets the requirements of section 801(e) of the FD&C Act (21 U.S.C. 381(e)).

        Sincerely yours,

        James Boccuzzi, Ph.D.
        Dietary Supplements Regulations Implementation Team
        Division of Dietary Supplement Programs
        Office of Nutrition, Labeling and Dietary Supplements
        Center for Food Safety and Applied Nutrition

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

GOV_0067137



Certificate of Free Sale Product List

May 14, 2016

1.  DUST v2: Ultimate Pre-Workout
2.  DUST Extreme: Perfect Pre-Workout
3.  Chosen1: 1-Testosterone Precursor
4.  Brutal 4ce: Testosterone Precursor
5.  AbNORmal: 19-nor-4-androstenediol Precursor
6.  3-Whey: Time-Released Whey Protein Blend
7.  Isolation: 100% Whey Protein Blend
8.  Anesthetized: Extreme Sleep Aid
9.  Anogenin: Laxogenin Plant Based Steroid
10. Epi-Cat: Maximize Muscle Growth
11. Growth: Muscle Growth Extreme Powder
12. Cobra 6p: Thermogenic Fat Burner
13. Cobra 6P Extreme: Fat Burner and Intense Stimulant
14. Glycolog: Insulin Mimetic
15. HYPE: Nitric Oxide Booster
16. Juiced Up: Micronized Fruits & Greens
17. PCTV: Complete Post Cycle Therapy
18. Gear Support: Total Body Health
19. Eradicate: Estrogen Control
20. Euphoria: Party Supplement
21. BCAAs Resurgence: Branched Chain Amino Acids
22. Trojan Horse: Non-stimulant Fat Burner

| PARTICIPANTS | FROM | BODY | STATUS | TIMESTAMP: TIME | READ: TIME |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Hey buddy | Sent | 8/3/2016 2:57:40 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Hi | Read | 8/3/2016 2:58:35 PM(UTC-4) | 8/3/2016 3:00:36 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Email u the the custom certificate pj used back in 2014... That worked | Read | 8/4/2016 10:16:34 AM(UTC-4) | 8/4/2016 10:16:57 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | 2014 way back lol | Sent | 8/4/2016 10:17:05 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Yes lol | Read | 8/4/2016 10:17:15 AM(UTC-4) | 8/4/2016 10:19:31 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Certificate of free sale | Sent | 8/4/2016 10:19:38 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | That's what it is | Sent | 8/4/2016 10:19:41 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Yes | Read | 8/4/2016 10:19:48 AM(UTC-4) | 8/4/2016 10:19:48 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Hey buddy | Sent | 8/4/2016 10:34:18 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | We actually don't have one of those | Sent | 8/4/2016 10:34:24 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Anything like that | Read | 8/4/2016 10:44:52 AM(UTC-4) | 8/4/2016 10:45:12 AM(UTC-4) |


9:19-CR-80030
GOVERNMENT EXHIBIT
032

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | ? | Read | 8/4/2016 10:44:54 AM(UTC-4) | 8/4/2016 10:45:12 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | If u make something like it | Read | 8/4/2016 10:45:07 AM(UTC-4) | 8/4/2016 10:45:12 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Letterhead wise | Read | 8/4/2016 10:45:17 AM(UTC-4) | 8/4/2016 10:45:17 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | I would have to fake it | Sent | 8/4/2016 10:45:21 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Yeh | Read | 8/4/2016 10:45:26 AM(UTC-4) | 8/4/2016 10:45:26 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | U see its stamped by the fda | Sent | 8/4/2016 10:45:30 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | It's doesn't matter | Read | 8/4/2016 10:45:34 AM(UTC-4) | 8/4/2016 10:45:34 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Pj made that | Read | 8/4/2016 10:45:42 AM(UTC-4) | 8/4/2016 10:45:42 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I thing | Read | 8/4/2016 10:45:44 AM(UTC-4) | 8/4/2016 10:45:44 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Think | Read | 8/4/2016 10:45:48 AM(UTC-4) | 8/4/2016 10:45:48 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Ask Trevor | Read | 8/4/2016 10:45:59 AM(UTC-4) | 8/4/2016 10:46:04 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Does it need to be signed by someone ? | Sent | 8/4/2016 10:51:49 AM(UTC-4) | |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Yeh | Read | 8/4/2016 10:52:12 AM(UTC-4) | 8/4/2016 10:52:13 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | U lol | Read | 8/4/2016 10:52:14 AM(UTC-4) | 8/4/2016 10:52:14 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Doesn't really matter | Read | 8/4/2016 10:52:23 AM(UTC-4) | 8/4/2016 10:52:23 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Ok let me work this up | Sent | 8/4/2016 10:52:42 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | K | Read | 8/4/2016 10:52:48 AM(UTC-4) | 8/4/2016 10:59:51 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | | Sent | 8/4/2016 11:48:15 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Does this work | Sent | 8/4/2016 11:48:26 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | | Sent | 8/4/2016 11:48:26 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Let's try | Read | 8/4/2016 12:07:55 PM(UTC-4) | 8/4/2016 12:15:10 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | This can get me in trouble I am impersonating the fda | Sent | 8/4/2016 12:15:25 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Oh | Read | 8/4/2016 12:15:49 PM(UTC-4) | 8/4/2016 12:17:11 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | So no one else can see this | Sent | 8/4/2016 12:17:40 PM(UTC-4) | |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Just your contact | Sent | 8/4/2016 12:18:00 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Ok | Read | 8/4/2016 12:18:16 PM(UTC-4) | 8/4/2016 12:22:33 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Ok | Sent | 8/4/2016 12:22:55 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Let me know what else u need from me | Sent | 8/4/2016 12:23:11 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | U emailed it? | Read | 8/4/2016 12:23:47 PM(UTC-4) | 8/4/2016 12:23:55 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Not yet | Sent | 8/4/2016 12:23:58 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | K | Read | 8/4/2016 12:24:03 PM(UTC-4) | 8/4/2016 12:24:03 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | I'm goin to put u in contact with chris n | Sent | 8/5/2016 7:16:59 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Please do not show him the fake certificate of free sale we made | Sent | 8/5/2016 7:17:13 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Ok sure | Read | 8/5/2016 7:24:26 AM(UTC-4) | 8/5/2016 7:36:51 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | No problem | Read | 8/5/2016 7:24:31 AM(UTC-4) | 8/5/2016 7:36:51 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | U know I spoke with him before right? | Read | 8/5/2016 7:24:58 AM(UTC-4) | 8/5/2016 7:36:51 AM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | But he was busy so trevor put me on to u | Read | 8/5/2016 7:25:31 AM(UTC-4) | 8/5/2016 7:36:51 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Jus don't want to butt heads | Read | 8/5/2016 7:25:49 AM(UTC-4) | 8/5/2016 7:36:51 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Ya I just don't know what else I can do wo the paperwork | Sent | 8/5/2016 7:37:15 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | So he had the paperwork? | Read | 8/5/2016 7:37:40 AM(UTC-4) | 8/5/2016 7:47:03 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Has | Read | 8/5/2016 7:37:45 AM(UTC-4) | 8/5/2016 7:47:03 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | No | Sent | 8/5/2016 7:47:05 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | We don't have any of that stuff yet | Sent | 8/5/2016 7:47:14 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | We have been trying to get it for a while now | Sent | 8/5/2016 7:47:23 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | So what will be able to do | Read | 8/5/2016 7:49:58 AM(UTC-4) | 8/5/2016 7:50:43 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | That u can't? | Read | 8/5/2016 7:50:08 AM(UTC-4) | 8/5/2016 7:50:43 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Seeing that u guys don't have the paper work? | Read | 8/5/2016 7:50:29 AM(UTC-4) | 8/5/2016 7:50:43 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Nothing really lol | Sent | 8/5/2016 7:50:51 AM(UTC-4) | |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | He did say he knows about/has all the necessary paperwork needed | Read | 8/5/2016 7:51:08 AM(UTC-4) | 8/5/2016 7:52:34 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | You guys have been selling to Trinidad | Read | 8/5/2016 7:51:52 AM(UTC-4) | 8/5/2016 7:52:34 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | And you have to have given this other guy these certificates | Read | 8/5/2016 7:52:24 AM(UTC-4) | 8/5/2016 7:52:34 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | He buys Alotta of prime | Read | 8/5/2016 7:52:34 AM(UTC-4) | 8/5/2016 7:52:34 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I jus don't understand | Read | 8/5/2016 7:52:43 AM(UTC-4) | 8/5/2016 7:52:43 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Prime has the paperwork done | Sent | 8/5/2016 7:52:49 AM(UTC-4) | |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Well let's see if we can use that | Read | 8/5/2016 7:57:43 AM(UTC-4) | 8/5/2016 7:57:55 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Wouldn't work | Sent | 8/5/2016 7:58:05 AM(UTC-4) | |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Completely different company | Sent | 8/5/2016 7:58:11 AM(UTC-4) | |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | It's ok | Read | 8/5/2016 7:58:23 AM(UTC-4) | 8/5/2016 7:58:35 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Jus need the letter head | Read | 8/5/2016 7:58:31 AM(UTC-4) | 8/5/2016 7:58:35 AM(UTC-4) |
| +12033135623 Boca James (owner)<br>+19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | And I will change the products | Read | 8/5/2016 7:58:41 AM(UTC-4) | 8/5/2016 7:58:42 AM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Ok I'll get it to u Monday | Sent | 8/5/2016 7:59:03 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | I'm leaving for a trip now | Sent | 8/5/2016 7:59:12 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Idk what else to do | Read | 8/5/2016 7:59:18 AM(UTC-4) | 8/5/2016 7:59:18 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | No sale if they can't get that | Read | 8/5/2016 7:59:33 AM(UTC-4) | 8/5/2016 7:59:33 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I wonder what papers chris says he has or knows about then | Read | 8/5/2016 8:00:13 AM(UTC-4) | 8/5/2016 8:00:13 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | I asked him yesterday | Sent | 8/5/2016 8:00:32 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Maybe he's cockblocking u | Read | 8/5/2016 8:00:47 AM(UTC-4) | 8/5/2016 8:02:01 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | And knows exactly what we need | Read | 8/5/2016 8:01:03 AM(UTC-4) | 8/5/2016 8:02:01 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Seems like | Read | 8/5/2016 8:01:08 AM(UTC-4) | 8/5/2016 8:02:01 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | I'll ask him again today | Sent | 8/5/2016 8:02:23 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Hey | Read | 8/8/2016 9:33:00 AM(UTC-4) | 8/8/2016 9:33:57 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | So what's the update... Really need these certs | Read | 8/8/2016 9:33:24 AM(UTC-4) | 8/8/2016 9:33:57 AM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | I won't be at work for another few hours | Sent | 8/8/2016 9:35:10 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I have another $26k order | Read | 8/8/2016 9:35:21 AM(UTC-4) | 8/8/2016 9:35:30 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | This is not good | Read | 8/8/2016 9:35:27 AM(UTC-4) | 8/8/2016 9:35:30 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | ☺ | Read | 8/8/2016 9:35:33 AM(UTC-4) | 8/8/2016 9:35:34 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I'm sellin Dymatize | Read | 8/8/2016 9:36:00 AM(UTC-4) | 8/8/2016 9:36:00 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | They have all the certs | Read | 8/8/2016 9:36:11 AM(UTC-4) | 8/8/2016 9:36:12 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Of course | Sent | 8/8/2016 9:36:16 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | And lipo6 | Read | 8/8/2016 9:36:17 AM(UTC-4) | 8/8/2016 9:36:18 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Those r monster companies | Sent | 8/8/2016 9:36:29 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Blackstone too | Read | 8/8/2016 9:36:37 AM(UTC-4) | 8/8/2016 9:36:38 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Blackstone is nothing compared to them | Sent | 8/8/2016 9:36:54 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | They are mainstream companies | Sent | 8/8/2016 9:37:01 AM(UTC-4) | |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Well we to get there | Read | 8/8/2016 9:37:09 AM(UTC-4) | 8/8/2016 9:37:09 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | And fast | Read | 8/8/2016 9:37:12 AM(UTC-4) | 8/8/2016 9:37:12 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | They prob have a staff devoted to just paperwork | Sent | 8/8/2016 9:37:13 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Ok | Read | 8/8/2016 9:37:27 AM(UTC-4) | 8/8/2016 9:40:01 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Let me know | Read | 8/8/2016 9:37:31 AM(UTC-4) | 8/8/2016 9:40:01 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | We gonna loose out on this... It's money in hand | Read | 8/8/2016 9:38:04 AM(UTC-4) | 8/8/2016 9:40:01 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | It's just hard cause we don't have those certificates yet | Sent | 8/8/2016 9:40:31 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | But it's nothing to get | Read | 8/8/2016 9:40:57 AM(UTC-4) | 8/8/2016 9:42:36 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I don't understand | Read | 8/8/2016 9:41:04 AM(UTC-4) | 8/8/2016 9:42:36 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | It takes 5 days | Read | 8/8/2016 9:41:15 AM(UTC-4) | 8/8/2016 9:42:36 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Cost $10 ☐ | Read | 8/8/2016 9:41:27 AM(UTC-4) | 8/8/2016 9:42:36 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | But u have to have compliant labels | Sent | 8/8/2016 9:42:54 AM(UTC-4) | |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Which we don't have | Sent | 8/8/2016 9:42:57 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | So | Read | 8/8/2016 9:43:20 AM(UTC-4) | 8/8/2016 9:49:31 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Cancel this then? | Read | 8/8/2016 9:43:28 AM(UTC-4) | 8/8/2016 9:49:31 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Might be the best bet | Sent | 8/8/2016 9:49:36 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Ok | Read | 8/8/2016 9:49:46 AM(UTC-4) | 8/8/2016 9:53:42 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Ty | Read | 8/8/2016 9:49:49 AM(UTC-4) | 8/8/2016 9:53:42 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | What I sent u was he best we can do | Sent | 8/8/2016 11:22:24 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Any other ideas ? | Sent | 8/8/2016 11:39:34 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Going into meeting now | Read | 8/8/2016 3:38:16 PM(UTC-4) | 8/8/2016 3:38:38 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Maybe resend me those papers again | Read | 8/8/2016 3:38:34 PM(UTC-4) | 8/8/2016 3:38:38 PM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Ok | Sent | 8/8/2016 3:38:39 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | We talk tomorrow | Read | 8/8/2016 3:38:40 PM(UTC-4) | 8/8/2016 3:38:40 PM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Ok | Sent | 8/8/2016 4:02:00 PM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Hey | Read | 8/9/2016 9:06:30 AM(UTC-4) | 8/9/2016 9:06:42 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | Hi | Sent | 8/9/2016 9:06:46 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | I received your last email | Read | 8/9/2016 9:06:52 AM(UTC-4) | 8/9/2016 9:06:58 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | No attachments doh | Read | 8/9/2016 9:07:02 AM(UTC-4) | 8/9/2016 9:09:03 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | | Read | 8/9/2016 9:07:18 AM(UTC-4) | 8/9/2016 9:09:03 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | This is what Trevor found | Read | 8/9/2016 9:07:18 AM(UTC-4) | 8/9/2016 9:09:03 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Is there more like this for the rest of the items on the order? | Read | 8/9/2016 9:07:39 AM(UTC-4) | 8/9/2016 9:09:03 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | No | Sent | 8/9/2016 9:09:10 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | That's only 4 protein | Sent | 8/9/2016 9:09:28 AM(UTC-4) | |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Oh | Read | 8/9/2016 9:09:31 AM(UTC-4) | 8/9/2016 9:09:31 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | So no analysis or any of the other products? | Read | 8/9/2016 9:10:00 AM(UTC-4) | 8/9/2016 9:10:45 AM(UTC-4) |

| | | | | | |
|---|---|---|---|---|---|
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +19548643844 Rob A. Trinidad Contact | Or anything along these lines? | Read | 8/9/2016 9:10:17 AM(UTC-4) | 8/9/2016 9:10:45 AM(UTC-4) |
| +12033135623 Boca James (owner) +19548643844 Rob A. Trinidad Contact | +12033135623 Boca James | No | Sent | 8/9/2016 9:10:50 AM(UTC-4) | |

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
College Park, MD 20740

May 14, 2013

TO WHOM IT MAY CONCERN

We have reviewed correspondence on behalf of:

Designer Protein, LLC
5050 Avenida Encinas Ste 350
Carlsbad, CA 92008

concerning the status of:

"Certificate of Free Sale Product List"

These products are regulated by the Food and Drug Administration (FDA) pursuant to the requirements of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Fair Packaging and Labeling Act (FPLA) and other related laws.

The Food and Drug Administration does not have statutory authority to approve any food or any food manufacturer or distributor of such products.

The above referenced products are under the jurisdiction of the Food and Drug Administration which has primary responsibility for the administration and enforcement of the FD&C Act and the FPLA and other related laws. We have not examined the specific products being offered for export or reviewed the labels. Under the FD&C Act, such products may be exported if:

   1. It is not adulterated or misbranded and it meets the other requirements of the FD&C Act for marketing in the U.S.; or

   2. It cannot be lawfully marketed in the U.S. but meets the requirements of section 801(e) of the FD&C Act (21 U.S.C. 381(e)).

Sincerely yours,

Steven Casper, Ph.D.
Dietary Supplements Regulations Implementation Team
Division of Dietary Supplement Programs
Office of Nutrition, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition

9:19-CR-80030
GOVERNMENT
EXHIBIT
033

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPARTMENT OF HEALTH & HUMAN SERVICES                                    Public Health Service

Food and Drug Administration
College Park, MD 20740

### Certificate of Free Sale Product List

May 14, 2013

1. Designer Whey 100% Premium Whey Protein Powder French Vanilla (12oz)
2. Designer Whey 100% Premium Whey Protein Powder French Vanilla (1.72lb)
3. Designer Whey 100% Premium Whey Protein Powder French Vanilla (2lb)
4. Designer Whey 100% Premium Whey Protein Powder French Vanilla (4lb)
5. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (12oz)
6. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (1.72lb)
7. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (2lb)
8. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (4lb)
9. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (12oz)
10. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (2lb)
11. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (4lb)
12. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (12oz)
13. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (2lb)
14. Designer Whey 100% Premium Whey Protein Powder Vanilla Praline (2lb.)
15. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (12oz)
16. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (2lb)
17. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (12oz)
18. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (1.9lb)
19. Designer Whey 100% Premium Whey Protein Powder White Chocolate (12oz.)
20. Designer Whey 100% Premium Whey Protein Powder White Chocolate (2lb.)
21. Designer Whey High Protein Shake French Vanilla (4 - 10.5 fl. oz. Shakes)
22. Designer Whey High Protein Shake Gourmet Chocolate (4 - 10.5 fl. oz. Shakes)
23. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Lemonade (5 Packets - 0.56oz./New Wt 2.82oz.)
24. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Tropical Orange (5 Packets - 0.56oz (16g)/Net Wt 2.82oz.)
25. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Mixed Berry (5 Packets - 0.56 oz./Net Wt 2.82 oz.)
26. Designer Whey Protein Bar Peanut Butter Crunch (12 Bars - 40g)
27. Designer Whey Protein Bar Triple Chocolate Crunch (12 Bars - 40g)
28. Designer Whey Protein Bar Chocolate Caramel Crunch (12 Bars - 40g)
29. Aria Vanilla (12oz)
30. Aria Chocolate (12oz.)
31. Designer Whey Sustained Energy Vanilla Bean (12oz.)
32. Designer Whey Sustained Energy Vanilla Bean (1.5lb)
33. Designer Whey Sustained Energy Chocolate Velvet (12oz.)
34. Designer Whey Sustained Energy Chocolate Velvet (1.5lb.)
35. Designer Whey Fit & Trim French Vanilla (10oz.)
36. Designer Whey Fit & Trim Chocolate Bliss (10oz.)

GOV_00671310

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
College Park, MD 20740

## CERTIFICATE OF FREE SALE

1. Pursuant to the provisions of Rule 44 of the Federal Rules of Civil Procedure, I hereby certify that the copy attached (see attached list) is a true copy of material on file in the Food and Drug Administration, Department of Health and Human Services and is a part of the official records of said Administration and Department.

Letter Dated:

May 14, 2013

To Whom it May Concern

from, Steven Casper

regarding

"Certificate of Free Sale Product List"

2. In witness whereof, I have pursuant to the provisions of Title 42, United States Code, Section 3505, and 1410.20 of the FDA Staff Manual Guide, hereto set my hand and cause the seal of the Department of Health and Human Services to be affixed this  14th day of May, 2013.

Daniel Fabricant, Ph.D.
Director, Division of Dietary and Supplement Programs
Office of Nutrition, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition

By direction of the Secretary of Health and Human Services

**This Certificate expires on  May 14, 2015.**



DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
College Park, MD 20740

## Certificate of Free Sale Product List
May 14, 2013

1. Designer Whey 100% Premium Whey Protein Powder French Vanilla (12oz)
2. Designer Whey 100% Premium Whey Protein Powder French Vanilla (1.72lb)
3. Designer Whey 100% Premium Whey Protein Powder French Vanilla (2lb)
4. Designer Whey 100% Premium Whey Protein Powder French Vanilla (4lb)
5. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (12oz)
6. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (1.72lb)
7. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (2lb)
8. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (4lb)
9. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (12oz)
10. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (2lb)
11. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (4lb)
12. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (12oz)
13. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (2lb)
14. Designer Whey 100% Premium Whey Protein Powder Vanilla Praline (2lb.)
15. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (12oz)
16. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (2lb)
17. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (12oz)
18. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (1.9lb)
19. Designer Whey 100% Premium Whey Protein Powder White Chocolate (12oz.)
20. Designer Whey 100% Premium Whey Protein Powder White Chocolate (2lb.)
21. Designer Whey High Protein Shake French Vanilla (4 - 10.5 fl. oz. Shakes)
22. Designer Whey High Protein Shake Gourmet Chocolate (4 - 10.5 fl. oz. Shakes)
23. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Lemonade (5 Packets - 0.56oz./New Wt 2.82oz.)
24. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Tropical Orange (5 Packets - 0.56oz (16g)/Net Wt 2.82oz.)
25. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Mixed Berry (5 Packets - 0.56 oz./Net Wt 2.82 oz.)
26. Designer Whey Protein Bar Peanut Butter Crunch (12 Bars - 40g)
27. Designer Whey Protein Bar Triple Chocolate Crunch (12 Bars - 40g)
28. Designer Whey Protein Bar Chocolate Caramel Crunch (12 Bars - 40g)
29. Aria Vanilla (12oz)
30. Aria Chocolate (12oz.)
31. Designer Whey Sustained Energy Vanilla Bean (12oz.)
32. Designer Whey Sustained Energy Vanilla Bean (1.5lb)
33. Designer Whey Sustained Energy Chocolate Velvet (12oz.)
34. Designer Whey Sustained Energy Chocolate Velvet (1.5lb.)
35. Designer Whey Fit & Trim French Vanilla (10oz.)
36. Designer Whey Fit & Trim Chocolate Bliss (10oz.)



GOV_00671312

| From: | Prime Nutrition <trevor@primenutrition.com> |
|-------|---------------------------------------------|
| Sent: | Monday, August 8, 2016 2:44 PM |
| To: | Robert Aleong <robaleong@gmail.com> |
| Subject: | Fwd: Trinidad Shipment |
| Attach: | Starlite PN Commercial invoice (2).xlsx; Certificate of Free Sale.2013.pdf; 2GO Mixed Berry.pdf |

Old email

---------- Forwarded message ----------
From: "big rob" <robaleong@gmail.com>
Date: Apr 22, 2014 11:34 AM
Subject: Fwd: Trinidad Shipment
To: <trevor@primenutrition.com>
Cc:


---------- Forwarded message ----------
From: **big rob** <robaleong@gmail.com>
Date: Tue, Apr 22, 2014 at 11:33 AM
Subject: Re: Trinidad Shipment
To: Blackstone Labs <shippingdeptbslprime@gmail.com>


You need to include in the shipment a commercial invoice as attached, a certificate of free sale 2014 as example attached or .certificate of Analysis as example attached.
That's all that is need in Trinidad for customs.
The shipping address is:

Fairyway Freight Consolidators
9949 NW 89th Avenue
Bay #15, Medley, Florida 33178


On Tue, Apr 22, 2014 at 11:32 AM, big rob <robaleong@gmail.com> wrote:
> You need to include in the shipment a commercial invoice as attached, a certificate of free sale 2014 as example attached or .certificate of Analysis as example attached.
> That's all that is need in Trinidad for customs.
> The shipping address is:
>
> Fairyway Freight Consolidators
> 9949 NW 89th Avenue
> Bay #15, Medley, Florida 33178


On Tue, Apr 22, 2014 at 11:15 AM, big rob <robaleong@gmail.com> wrote:
> can you call me 9548643844


On Mon, Apr 21, 2014 at 9:36 AM, Blackstone Labs <shippingdeptbslprime@gmail.com> wrote:

9:19- CR- 80030
**GOVERNMENT
EXHIBIT**
034

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

This is sean from Blackstone labs, I really need your assistance. There has been a misunderstanding at our office, and has delayed this shipment to Trinidad.

I need to make sure somethings are certain. I am sending this to a company and Medley Florida. Where they will handle our prime nutrition order.

However. I need to know what to include in the shipment. Do I do the customs forms? Or do I just send 3 sales invoices? What is a must to send to the freight company from us?

Please fill me in.


Thanks

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| From: | Rob Aleong <floridauniversalinvestment@gmail.com> |
|---|---|
| Sent: | Thursday, August 4, 2016 2:16 PM |
| To: | James Boccuzzi <james@blackstonelabs.com> |
| Subject: | Trinidad custom certificates |
| Attach: | Certificate of Free Sale.2013.pdf |

I found this.... This was done by PJ.... When we shipped the first order in 2014... You can use this as a guideline I guess.... But something like this is what they require for customs

Regards Rob



9:19-CR-80030
GOVERNMENT
EXHIBIT
035

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-323336
GOV_01473502

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

                                                        _____

                                                        Food and Drug Administration
                                                        College Park, MD 20740

                                   May 14, 2013

TO WHOM IT MAY CONCERN

We have reviewed correspondence on behalf of:

Designer Protein, LLC
5050 Avenida Encinas Ste 350
Carlsbad, CA 92008

concerning the status of:

                        "Certificate of Free Sale Product List"

These products are regulated by the Food and Drug Administration (FDA) pursuant to the requirements
of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Fair Packaging and Labeling Act
(FPLA) and other related laws.

The Food and Drug Administration does not have statutory authority to approve any food or any food
manufacturer or distributor of such products.

The above referenced products are under the jurisdiction of the Food and Drug Administration which has
primary responsibility for the administration and enforcement of the FD&C Act and the FPLA and other
related laws. We have not examined the specific products being offered for export or reviewed the
labels. Under the FD&C Act, such products may be exported if:

    1. It is not adulterated or misbranded and it meets the other requirements of the FD&C Act for
    marketing in the U.S.; or

    2. It cannot be lawfully marketed in the U.S. but meets the requirements of section 801(e) of
    the FD&C Act (21 U.S.C. 381(e)).

                        Sincerely yours,

                        Steven Casper, Ph.D.
                        Dietary Supplements Regulations Implementation Team
                        Division of Dietary Supplement Programs
                        Office of Nutrition, Labeling and Dietary Supplements
                        Center for Food Safety and Applied Nutrition

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPARTMENT OF HEALTH & HUMAN SERVICES                        Public Health Service

Food and Drug Administration
College Park, MD 20740

## Certificate of Free Sale Product List

May 14, 2013

1. Designer Whey 100% Premium Whey Protein Powder French Vanilla (12oz)
2. Designer Whey 100% Premium Whey Protein Powder French Vanilla (1.72lb)
3. Designer Whey 100% Premium Whey Protein Powder French Vanilla (2lb)
4. Designer Whey 100% Premium Whey Protein Powder French Vanilla (4lb)
5. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (12oz)
6. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (1.72lb)
7. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (2lb)
8. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (4lb)
9. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (12oz)
10. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (2lb)
11. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (4lb)
12. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (12oz)
13. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (2lb)
14. Designer Whey 100% Premium Whey Protein Powder Vanilla Praline (2lb.)
15. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (12oz)
16. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (2lb)
17. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (12oz)
18. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (1.9lb)
19. Designer Whey 100% Premium Whey Protein Powder White Chocolate (12oz.)
20. Designer Whey 100% Premium Whey Protein Powder White Chocolate (2lb.)
21. Designer Whey High Protein Shake French Vanilla (4 - 10.5 fl. oz. Shakes)
22. Designer Whey High Protein Shake Gourmet Chocolate (4 - 10.5 fl. oz. Shakes)
23. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Lemonade (5 Packets - 0.56oz./New Wt 2.82oz.)
24. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Tropical Orange (5 Packets - 0.56oz (16g)/Net Wt 2.82oz.)
25. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Mixed Berry (5 Packets - 0.56 oz./Net Wt 2.82 oz.)
26. Designer Whey Protein Bar Peanut Butter Crunch (12 Bars - 40g)
27. Designer Whey Protein Bar Triple Chocolate Crunch (12 Bars - 40g)
28. Designer Whey Protein Bar Chocolate Caramel Crunch (12 Bars - 40g)
29. Aria Vanilla (12oz)
30. Aria Chocolate (12oz.)
31. Designer Whey Sustained Energy Vanilla Bean (12oz.)
32. Designer Whey Sustained Energy Vanilla Bean (1.5lb)
33. Designer Whey Sustained Energy Chocolate Velvet (12oz.)
34. Designer Whey Sustained Energy Chocolate Velvet (1.5lb.)
35. Designer Whey Fit & Trim French Vanilla (10oz.)
36. Designer Whey Fit & Trim Chocolate Bliss (10oz.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-323338
GOV_01473504

DEPARTMENT OF HEALTH & HUMAN SERVICES          Public Health Service

Food and Drug Administration
College Park, MD 20740

### CERTIFICATE OF FREE SALE

1. Pursuant to the provisions of Rule 44 of the Federal Rules of Civil Procedure, I hereby certify that the copy attached (see attached list) is a true copy of material on file in the Food and Drug Administration, Department of Health and Human Services and is a part of the official records of said Administration and Department.

Letter Dated:

May 14, 2013

To Whom it May Concern

from, Steven Casper

regarding

"Certificate of Free Sale Product List"

2. In witness whereof, I have pursuant to the provisions of Title 42, United States Code, Section 3505, and 1410.20 of the FDA Staff Manual Guide, hereto set my hand and cause the seal of the Department of Health and Human Services to be affixed this  14th day of May, 2013.

Daniel Fabricant, Ph.D.
Director, Division of Dietary and Supplement Programs
Office of Nutrition, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition

By direction of the Secretary of Health and Human Services

**This Certificate expires on  May 14, 2015.**



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-323339
GOV_01473505

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
College Park, MD 20740

## Certificate of Free Sale Product List
May 14, 2013

1. Designer Whey 100% Premium Whey Protein Powder French Vanilla (12oz)
2. Designer Whey 100% Premium Whey Protein Powder French Vanilla (1.72lb)
3. Designer Whey 100% Premium Whey Protein Powder French Vanilla (2lb)
4. Designer Whey 100% Premium Whey Protein Powder French Vanilla (4lb)
5. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (12oz)
6. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (1.72lb)
7. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (2lb)
8. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (4lb)
9. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (12oz)
10. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (2lb)
11. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (4lb)
12. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (12oz)
13. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (2lb)
14. Designer Whey 100% Premium Whey Protein Powder Vanilla Praline (2lb.)
15. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (12oz)
16. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (2lb)
17. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (12oz)
18. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (1.9lb)
19. Designer Whey 100% Premium Whey Protein Powder White Chocolate (12oz.)
20. Designer Whey 100% Premium Whey Protein Powder White Chocolate (2lb.)
21. Designer Whey High Protein Shake French Vanilla (4 - 10.5 fl. oz. Shakes)
22. Designer Whey High Protein Shake Gourmet Chocolate (4 - 10.5 fl. oz. Shakes)
23. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Lemonade (5 Packets - 0.56oz./New Wt 2.82oz.)
24. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Tropical Orange (5 Packets - 0.56oz (16g)/Net Wt 2.82oz.)
25. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Mixed Berry (5 Packets - 0.56 oz./Net Wt 2.82 oz.)
26. Designer Whey Protein Bar Peanut Butter Crunch (12 Bars - 40g)
27. Designer Whey Protein Bar Triple Chocolate Crunch (12 Bars - 40g)
28. Designer Whey Protein Bar Chocolate Caramel Crunch (12 Bars - 40g)
29. Aria Vanilla (12oz)
30. Aria Chocolate (12oz.)
31. Designer Whey Sustained Energy Vanilla Bean (12oz.)
32. Designer Whey Sustained Energy Vanilla Bean (1.5lb)
33. Designer Whey Sustained Energy Chocolate Velvet (12oz.)
34. Designer Whey Sustained Energy Chocolate Velvet (1.5lb.)
35. Designer Whey Fit & Trim French Vanilla (10oz.)
36. Designer Whey Fit & Trim Chocolate Bliss (10oz.)



BSL-323340
GOV_01473506

| | |
|---|---|
| **From:** | James Boccuzzi <jamesbocc@gmail.com> |
| **Sent:** | Thursday, August 4, 2016 2:34 PM |
| **To:** | Rob Aleong <floridauniversalinvestment@gmail.com> |
| **Subject:** | Re: blackstone |
| **Attach:** | scan0014.pdf |

On Thu, Aug 4, 2016 at 1:10 PM, James Boccuzzi <jamesbocc@gmail.com> wrote:
let me ask

On Thu, Aug 4, 2016 at 1:07 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:
Blackstonelabs letterhead?

Regards Rob

On Thu, Aug 4, 2016 at 1:03 PM -0400, "James Boccuzzi" <jamesbocc@gmail.com> wrote:

This is the best I can do.  I dont even feel comfortable doing this because I am impersonating the FDA and our business could get shut down, tons of people will lose their jobs.  Its maybe something we did a couple years ago but our company has grown tremendously since then and I can't take the risk.

On Thu, Aug 4, 2016 at 1:01 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:
We need a letterhead:(

Regards Rob

On Thu, Aug 4, 2016 at 12:47 PM -0400, "James Boccuzzi" <jamesbocc@gmail.com> wrote:

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) 203-313-5623

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) 203-313-5623

9:19-CR-80030
**GOVERNMENT EXHIBIT**
036

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) 203-313-5623

--
James Boccuzzi
Blackstone Labs
Director of sales
(c) 203-313-5623

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

GOV_00671135



May 14, 2018

TO WHOM IT MAY CONCERN

We have reviewed correspondence on behalf of:

Blackstone Labs, LLC
1090 Holland Drive 1
Boca Raton, FL 33487

concerning the status of:

"Certificate of Free Sale Product List"

These products are regulated by the Food and Drug Administration (FDA) pursuant to the requirements of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Fair Packaging and Labeling Act (FPLA) and other related laws.

The Food and Drug Administration does not have statutory authority to approve any food or any food manufacturer or distributor of such products.

The above referenced products are under the jurisdiction of the Food and Drug Administration which has primary responsibility for the administration and enforcement of the FD&C Act and the FPLA and other related laws. We have not examined the specific products being offered for export or reviewed the labels. Under the FD&C Act, such products may be exported if:

1. It is not adulterated or misbranded and it meets the other requirements of the FD&C Act for marketing in the U.S.; or

2. It cannot be lawfully marketed in the U.S. but meets the requirements of section 801(e) of the FD&C Act (21 U.S.C. 381(e)).

Sincerely yours,

James Boccuzzi, Ph.D.
Dietary Supplements Regulations Implementation Team
Division of Dietary Supplement Programs
Office of Nutrition, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition



BLACKSTONE LABS

Certificate of Free Sale Product List
May 14, 2015

1. DUST V2: Ultimate Pre-Workout
2. DUST Extreme: Perfect Pre-Workout
3. Chosen1: 1-Testosterone Precursor
4. Brutal 4ce: Testosterone Precursor
5. AbNORmal: 19-nor-4-androstenediol Precursor
6. 3-Whey: Time-Released Whey Protein Blend
7. Isolation: 100% Whey Protein Blend
8. Anesthetized: Extreme Sleep Aid
9. Anogenin: Laxogenin Plant Based Steroid
10. Epi-Cat: Maximize Muscle Growth
11. Growth: Muscle Growth Extreme Powder
12. Cobra 6p: Thermogenic Fat Burner
13. Cobra 6P Extreme: Fat Burner and Intense Stimulant
14. Glycolog: Insulin Mimetic
15. HYPE: Nitric Oxide Booster
16. Juiced Up: Micronized Fruits & Greens
17. PCT\/: Complete Post Cycle Therapy
18. Gear Support: Total Body Health
19. Eradicate: Estrogen Control
20. Euphoria: Party Supplement
21. BCAAs Resurgence: Branched Chain Amino Acids
22. Trojan Horse: Non-stimulant Fat Burner

| | |
|---|---|
| **From:** | James Boccuzzi <james@blackstonelabs.com> |
| **Sent:** | Thursday, August 4, 2016 3:05 PM |
| **To:** | Rob Aleong <floridauniversalinvestment@gmail.com> |
| **Subject:** | Re: Trinidad custom certificates |
| **Attach:** | bsl_lebanon_102015.pdf |

On Thu, Aug 4, 2016 at 10:15 AM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:
I found this.... This was done by PJ.... When we shipped the first order in 2014... You can use this as a guideline I guess.... But something like this is what they require for customs

Regards Rob

--
James Boccuzzi
Director of Sales
Blackstone Labs
Cell - 203-313-5623



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-343989
GOV_01494155

# WM Formulations

### 227 Sandy Springs Pl. Ste D-233 Atlanta GA, 30328

# CERTIFICATE OF ANALYSIS

PRODUCT DESCRIPTION

Product: BSL Cobra6P Extreme S Kiwi
Dosage form: Scoop
Serving Size: 1.466mg

LOT NO: 1508040

Manufacture Date: 08/18/2015

Best Before Date: 08/2017

## PHYSICAL – CHEMICAL TEST

| TEST | SPECIFICATIONS | RESULT | METHOD |
|------|----------------|--------|--------|
| Appearance | powder | conforms | Visual |
| Color | Reddish | conforms | Visual |
| Odor | Fruit Like | conforms | Organoleptic |

| Active Ingredients per serving | Lower Limit | U | Upper Limit | U | Label Claim | U | Assay Result | U | % Label Claim |
|--------------------------------|-------------|---|-------------|---|-------------|---|--------------|---|---------------|
| Caffeine Anhydrous, Achyranthes Aspera,Higenamine, Theobromine, Dendrobium, Advantra Z, Bioperine | 90 | % | 110 | % | 1.466 | MG | 1.466 | MG | 100% |
| | | | | | | | | | |

## MICROBIOLOGICAL TEST

| TEST | SPECIFICATIONS | REESULTS | METHOD |
|------|----------------|----------|--------|
| Total Aerobic Count | NMT 10.000 cfu/mg | <10.00 cfu/mg | USP 25 <2021> |
| Total Molds & Yeasts | Conforms | Conforms | Visual |
| Salmonella | Negative | Negative | USP 25 <2021> |
| E. Coli | Negative | Negative | USP 25 <2021 |

08/19/15
Date

QA/QC Manager

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-343990

GOV_01494156

# WM Formulations

**227 Sandy Springs Pl. Ste D-233 Atlanta GA, 30328**

# CERTIFICATE OF ANALYSIS

PRODUCT DESCRIPTION

Product: BSL Cobra6P Extreme WM
Dosage form: Scoop
Serving Size: 1.466mg

LOT NO: 1508041

Manufacture Date: 08/18/2015

Best Before Date: 08/2017

## PHYSICAL – CHEMICAL TEST

| TEST | SPECIFICATIONS | RESULT | METHOD |
|------|----------------|--------|--------|
| Appearance | powder | conforms | Visual |
| Color | Reddish | conforms | Visual |
| Odor | Fruit Like | conforms | Organoleptic |

| Active Ingredients per serving | Lower Limit | U | Upper Limit | U | Label Claim | U | Assay Result | U | % Label Claim |
|---|---|---|---|---|---|---|---|---|---|
| Caffeine Anhydrous, Achyranthes Aspera, Higenamine, Theobromine, Dendrobium, Advantra Z, Bioperine | 90 | % | 110 | % | 1.466 | MG | 1.466 | MG | 100% |
| | | | | | | | | | |

## MICROBIOLOGICAL TEST

| TEST | SPECIFICATIONS | REESULTS | METHOD |
|------|----------------|----------|--------|
| Total Aerobic Count | NMT 10.000 cfu/mg | <10.00 cfu/mg | USP 25 <2021> |
| Total Molds & Yeasts | Conforms | Conforms | Visual |
| Salmonella | Negative | Negative | USP 25 <2021> |
| E. Coli | Negative | Negative | USP 25 <2021 |

08/19/15
Date

QA/QC Manager

BSL-343991
GOV_01494157

# WM Formulations

**227 Sandy Springs Pl. Ste D-233 Atlanta GA, 30328**

# CERTIFICATE OF ANALYSIS

PRODUCT DESCRIPTION

Product: BSL Hype Orange
Dosage form: scoop
Serving Size: 5 grams

LOT NO: 1510006

Manufacture Date: 10/02/2015

Best Before Date: 10/2017

## PHYSICAL – CHEMICAL TEST

| TEST | SPECIFICATIONS | RESULT | METHOD |
|------|---------------|--------|--------|
| Appearance | powder | conforms | Visual |
| Color | Orange | conforms | Visual |
| Odor | Fruit | conforms | Organoleptic |

| Active Ingredients per serving | Lower Limit | U | Upper Limit | U | Label Claim | Yeild | U | % Label Claim |
|---|---|---|---|---|---|---|---|---|
| Proprietary Blend | 90 | % | 110 | % | 5 | 5 | G | 100% |
| Glycerol Monostearate, Citrulline Malate 2:1, Agmatine Sulfate, L-Norvaline, Icariin(Horny Goat 20%) | | | | | | | | |

## MICROBIOLOGICAL TEST

| TEST | SPECIFICATIONS | REESULTS | METHOD |
|------|---------------|----------|--------|
| Total Aerobic Count | NMT 10.000 cfu/g | <10.00 cfu/g | BioLumix |
| Total Molds & Yeasts | Conforms | Conforms | Visual |
| Salmonella | Negative | Negative | BioLumix |
| E. Coli | Negative | Negative | BioLumix |

10/4/15
Date

QA/QC Manager

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-343992
GOV_01494158

# WM Formulations

## 227 Sandy Springs Pl. Ste D-233 Atlanta GA, 30328

# CERTIFICATE OF ANALYSIS

PRODUCT DESCRIPTION

Product: BSL Hype Fruit Punch
Dosage form: scoop
Serving Size: 5 grams

LOT NO: 1510007

Manufacture Date: 10/02/2015

Best Before Date: 10/2017

## PHYSICAL – CHEMICAL TEST

| TEST | SPECIFICATIONS | RESULT | METHOD |
|---|---|---|---|
| Appearance | powder | conforms | Visual |
| Color | Light Red | conforms | Visual |
| Odor | Fruit | conforms | Organoleptic |

| Active Ingredients per serving | Lower Limit | U | Upper Limit | U | Label Claim | Yield | U | % Label Claim |
|---|---|---|---|---|---|---|---|---|
| Proprietary Blend | 90 | % | 110 | % | 5 | 5 | G | 100% |
| Glycerol Monostearate, Citrulline Malate 2:1, Agmatine Sulfate, L-Norvaline, Icariin(Horny Goat 20%) | | | | | | | | |

## MICROBIOLOGICAL TEST

| TEST | SPECIFICATIONS | REESULTS | METHOD |
|---|---|---|---|
| Total Aerobic Count | NMT 10.000 cfu/g | <10.00 cfu/g | BioLumix |
| Total Molds & Yeasts | Conforms | Conforms | Visual |
| Salmonella | Negative | Negative | BioLumix |
| E. Coli | Negative | Negative | BioLumix |

10/4/15

Date

QA/QC Manager

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-343993
GOV_01494159

| From: | James Boccuzzi <james@blackstonelabs.com> |
|---|---|
| Sent: | Monday, August 8, 2016 7:42 PM |
| To: | Rob Aleong <floridauniversalinvestment@gmail.com> |
| Subject: | Re: Another example |
| Attach: | Certificate of Free Sale.2013.pdf |

On Thu, Aug 4, 2016 at 4:15 PM, James Boccuzzi <james@blackstonelabs.com> wrote:
I will speak with him

On Thu, Aug 4, 2016 at 4:14 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:

Its easy to get

http://www.fda.gov/Food/GuidanceRegulation/ImportsExports/Exporting/ucm2006911.htm

From: James Boccuzzi [mailto:james@blackstonelabs.com]
Sent: Thursday, August 4, 2016 4:11 PM
To: Rob Aleong <floridauniversalinvestment@gmail.com>
Subject: Re: Another example

Which Chris, Chris E or Chris N?

On Thu, Aug 4, 2016 at 4:09 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:

So what does chris use when he exports?

He said he has all the necessary paperwork needed to export these products

All countries require this cert.

Regards Rob

On Thu, Aug 4, 2016 at 3:06 PM -0400, "James Boccuzzi" <james@blackstonelabs.com> wrote:

I just did with our lawyer and he said we can't do that unit we have all of the correct paperwork

9:19-CR-80030
GOVERNMENT
EXHIBIT
038

BSL-336641
GOV_01486807

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

On Thu, Aug 4, 2016 at 2:57 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:

Is there anyone u can discuss with?

Regards Rob

On Thu, Aug 4, 2016 at 2:42 PM -0400, "James Boccuzzi" <james@blackstonelabs.com> wrote:

We dont have anything like that yet.  I can't risk faking it either.  There is too much at stake.

On Thu, Aug 4, 2016 at 2:34 PM, Rob Aleong <floridauniversalinvestment@gmail.com> wrote:

Regards Rob

--

James Boccuzzi

Director of Sales

Blackstone Labs

Cell - 203-313-5623

--

James Boccuzzi

Director of Sales

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Blackstone Labs

Cell - 203-313-5623

--

James Boccuzzi

Director of Sales

Blackstone Labs

Cell - 203-313-5623

--
James Boccuzzi
Director of Sales
Blackstone Labs
Cell - 203-313-5623

-
James Boccuzzi
Director of Sales
Blackstone Labs
Cell - 203-313-5623

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-336643
GOV_01486809

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

Food and Drug Administration
College Park, MD 20740

May 14, 2013

TO WHOM IT MAY CONCERN

We have reviewed correspondence on behalf of:

Designer Protein, LLC
5050 Avenida Encinas Ste 350
Carlsbad, CA 92008

concerning the status of:

"Certificate of Free Sale Product List"

These products are regulated by the Food and Drug Administration (FDA) pursuant to the requirements of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Fair Packaging and Labeling Act (FPLA) and other related laws.

The Food and Drug Administration does not have statutory authority to approve any food or any food manufacturer or distributor of such products.

The above referenced products are under the jurisdiction of the Food and Drug Administration which has primary responsibility for the administration and enforcement of the FD&C Act and the FPLA and other related laws. We have not examined the specific products being offered for export or reviewed the labels. Under the FD&C Act, such products may be exported if:

    1. It is not adulterated or misbranded and it meets the other requirements of the FD&C Act for marketing in the U.S.; or

    2. It cannot be lawfully marketed in the U.S. but meets the requirements of section 801(e) of the FD&C Act (21 U.S.C. 381(e)).

    Sincerely yours,

    Steven Casper, Ph.D.
    Dietary Supplements Regulations Implementation Team
    Division of Dietary Supplement Programs
    Office of Nutrition, Labeling and Dietary Supplements
    Center for Food Safety and Applied Nutrition

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-336645
GOV_01486811

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
College Park, MD 20740

## Certificate of Free Sale Product List

May 14, 2013

1. Designer Whey 100% Premium Whey Protein Powder French Vanilla (12oz)
2. Designer Whey 100% Premium Whey Protein Powder French Vanilla (1.72lb)
3. Designer Whey 100% Premium Whey Protein Powder French Vanilla (2lb)
4. Designer Whey 100% Premium Whey Protein Powder French Vanilla (4lb)
5. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (12oz)
6. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (1.72lb)
7. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (2lb)
8. Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (4lb)
9. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (12oz)
10. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (2lb)
11. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (4lb)
12. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (12oz)
13. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (2lb)
14. Designer Whey 100% Premium Whey Protein Powder Vanilla Praline (2lb.)
15. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (12oz)
16. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (2lb)
17. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (12oz)
18. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (1.9lb)
19. Designer Whey 100% Premium Whey Protein Powder White Chocolate (12oz.)
20. Designer Whey 100% Premium Whey Protein Powder White Chocolate (2lb.)
21. Designer Whey High Protein Shake French Vanilla (4 - 10.5 fl. oz. Shakes)
22. Designer Whey High Protein Shake Gourmet Chocolate (4 - 10.5 fl. oz. Shakes)
23. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Lemonade (5 Packets - 0.56oz./New Wt 2.82oz.)
24. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Tropical Orange (5 Packets - 0.56oz (16g)/Net Wt 2.82oz.)
25. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Mixed Berry (5 Packets - 0.56 oz./Net Wt 2.82 oz.)
26. Designer Whey Protein Bar Peanut Butter Crunch (12 Bars - 40g)
27. Designer Whey Protein Bar Triple Chocolate Crunch (12 Bars - 40g)
28. Designer Whey Protein Bar Chocolate Caramel Crunch (12 Bars - 40g)
29. Aria Vanilla (12oz)
30. Aria Chocolate (12oz.)
31. Designer Whey Sustained Energy Vanilla Bean (12oz.)
32. Designer Whey Sustained Energy Vanilla Bean (1.5lb)
33. Designer Whey Sustained Energy Chocolate Velvet (12oz.)
34. Designer Whey Sustained Energy Chocolate Velvet (1.5lb.)
35. Designer Whey Fit & Trim French Vanilla (10oz.)
36. Designer Whey Fit & Trim Chocolate Bliss (10oz.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-336646
GOV_01486812

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
College Park, MD 20740

### CERTIFICATE OF FREE SALE

1. Pursuant to the provisions of Rule 44 of the Federal Rules of Civil Procedure, I hereby certify that the copy attached (see attached list) is a true copy of material on file in the Food and Drug Administration, Department of Health and Human Services and is a part of the official records of said Administration and Department.

Letter Dated:

May 14, 2013

To Whom it May Concern

from, Steven Casper

regarding

"Certificate of Free Sale Product List"

2. In witness whereof, I have pursuant to the provisions of Title 42, United States Code, Section 3505, and 1410.20 of the FDA Staff Manual Guide, hereto set my hand and cause the seal of the Department of Health and Human Services to be affixed this 14th day of May, 2013.

Daniel Fabricant, Ph.D.
Director, Division of Dietary and Supplement Programs
Office of Nutrition, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition

By direction of the Secretary of Health and Human Services

**This Certificate expires on  May 14, 2015.**



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

BSL-336647
GOV_01486813

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

Food and Drug Administration
College Park, MD 20740

## Certificate of Free Sale Product List
May 14, 2013

1.  Designer Whey 100% Premium Whey Protein Powder French Vanilla (12oz)
2.  Designer Whey 100% Premium Whey Protein Powder French Vanilla (1.72lb)
3.  Designer Whey 100% Premium Whey Protein Powder French Vanilla (2lb)
4.  Designer Whey 100% Premium Whey Protein Powder French Vanilla (4lb)
5.  Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (12oz)
6.  Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (1.72lb)
7.  Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (2lb)
8.  Designer Whey 100% Premium Whey Protein Powder Gourmet Chocolate (4lb)
9.  Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (12oz)
10. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (2lb)
11. Designer Whey 100% Premium Whey Protein Powder Luscious Strawberry (4lb)
12. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (12oz)
13. Designer Whey 100% Premium Whey Protein Powder Plain & Simple (2lb)
14. Designer Whey 100% Premium Whey Protein Powder Vanilla Praline (2lb.)
15. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (12oz)
16. Designer Whey 100% Premium Whey Protein Powder Double Chocolate (2lb)
17. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (12oz)
18. Designer Whey 100% Premium Whey Protein Powder Vanilla Almond (1.9lb)
19. Designer Whey 100% Premium Whey Protein Powder White Chocolate (12oz.)
20. Designer Whey 100% Premium Whey Protein Powder White Chocolate (2lb.)
21. Designer Whey High Protein Shake French Vanilla (4 - 10.5 fl. oz. Shakes)
22. Designer Whey High Protein Shake Gourmet Chocolate (4 - 10.5 fl. oz. Shakes)
23. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Lemonade (5 Packets - 0.56oz./New Wt 2.82oz.)
24. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Tropical Orange (5 Packets - 0.56oz (16g)/Net Wt 2.82oz.)
25. Designer Whey Protein 2Go Post Workout Recovery Drink Mix Mixed Berry (5 Packets - 0.56 oz./Net Wt 2.82 oz.)
26. Designer Whey Protein Bar Peanut Butter Crunch (12 Bars - 40g)
27. Designer Whey Protein Bar Triple Chocolate Crunch (12 Bars - 40g)
28. Designer Whey Protein Bar Chocolate Caramel Crunch (12 Bars - 40g)
29. Aria Vanilla (12oz)
30. Aria Chocolate (12oz.)
31. Designer Whey Sustained Energy Vanilla Bean (12oz.)
32. Designer Whey Sustained Energy Vanilla Bean (1.5lb)
33. Designer Whey Sustained Energy Chocolate Velvet (12oz.)
34. Designer Whey Sustained Energy Chocolate Velvet (1.5lb.)
35. Designer Whey Fit & Trim French Vanilla (10oz.)
36. Designer Whey Fit & Trim Chocolate Bliss (10oz.)



BSL-336648
GOV_01486814

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY



Food and Drug Administration
## OFFICE OF CRIMINAL INVESTIGATIONS
## MEMORANDUM OF INTERVIEW

| | |
|---|---|
| **CASE NUMBER:** | 2016-MIF-735-0166 |
| **CASE TITLE:** | BLACKSTONE LABS, LLC |
| **DOCUMENT NUMBER:** | 270696 |
| **PERSON INTERVIEWED:** | Robert Aleong |
| **PLACE OF INTERVIEW:** | Miami Field Office |
| **DATE OF INTERVIEW:** | 01/09/2019 |
| **TIME OF INTERVIEW:** | ~3:12p to 4:35pm |
| **INTERVIEWED BY:** | CPB Attorney's Reader & Frank & SA McCoy |
| **OTHER PERSONS PRESENT:** | Defense Attorney Phillip Mendito and Paralegal Samantha Miner |

Robert Aleong

████████████████ Boca Raton, FL 33487

DOB: ███████

Phone Number: 954-864-3844

On January 9, 2019, a proffer was conducted with Robert Aleong in reference to his involvement with Blackstone Labs at the Office of Criminal Investigations, Miami Field Office (OCI/MIF). Present during this proffer were: Consumer Protection Branch, Department of Justice (CPB/DOJ) Trial Attorneys Alistair Reader and David Frank, Paralegal Samantha Miner, OCI Special Agent (SA) Kelly McCoy, and Defense Attorney Phillip Menditto. Aleong signed the proffer letter (Attachment A) before beginning the proffer and Aleong confirmed that he had discussed the terms with his attorney.

Aleong advised he was born in Trinidad and received his degree in Computer Science in Trinidad. He stated he has been working in the computer IT field and doing photography for over 25 years. He stated he mainly deals with small network domains and trouble shooting. Aleong also advised he has a drone pilot license and does a lot of real estate videos and photography. He stated he has his own business, PC Express, which he runs out of his home.

Aleong stated he has been going to the gym and working out for over 30 years and started using supplements while still living in Trinidad. He stated he takes supplements like protein and creatine adding he does not use steroids or prohormones. He stated prohormones are worse than steroids because of the way they break down in "the system" and advised they are bad for the liver. Aleong also stated he has never smoked or used drugs.

Aleong stated one of his best friends, Trevor Fyfe, who he has known for 20 years, worked at Blackstone Labs and recorded their videos. He stated he helped Trevor do a couple videos and that is how he met Phillip Braun and others at Blackstone. He also advised Blackstone was all over social media at that time. Aleong stated the first video he assisted with was at Braun's house and he used a drone. He stated he helped with another video at Braun's house and with one at a gym. He stated he was paid approximately $200 for doing

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY


9:19-80030
**GOVERNMENT EXHIBIT**
039

LAW ENFORCEMENT SENSITIVE - FOR OFFICIAL USE ONLY

the last video. He stated he did not hang out with them after shooting the videos and added when he was done with the videos he would leave and go home.

Aleong advised he did try a few of Blackstone's products including their protein and ice cream and he stated the ice cream was good. He stated he also tried one of their Dust products which he did not like because he did not like the way he felt after taking it.

Aleong stated he had a lot of contacts in Trinidad including Gerald Aboud (Gery), the owner of Starlite Group which is a company that sells supplements. He stated Aboud asked him about Blackstone Labs and Aleong told him he knew the owner and would check on the prices of their products for him. Aleong explained he thought he could profit from exporting Blackstone's products to Starlite and also give Aboud products to sell. However, he stated he only exported for Blackstone twice and made $830 for an export done in 2014 and $600 for an export done in 2016.

Emails between Aleong and Braun dated March 29, 2014, and April 1, 2014 (Attachment B), were shown to Aleong. He advised the attachments to the emails listed products Aboud had ordered which included Super DMZ, which is a prohormone.

An email between Aleong and Braun dated April 7, 2014 (Attachment C), was shown to Aleong. In the email Aleong was asking for documents including Free Sale Certificates and Certificates of Anlaysis. Aleong stated his contact with Starlite, Cindy, would have asked for these documents in case Trinidad requested them to go through Customs. However, he stated he thinks this shipment went out without these forms because they did not need them.

Another email between Aleong and Braun dated April 7, 2014 (Attachment D), was shown to Aleong which included an attachment listing nutrient content for a protein supplement. He stated the attachment was most likely provided to him from Trinidad to show Braun an example of what they needed to export Blackstone's products.

Aleong was shown text messages between him and James Boccuzzi (Attachment E), a former sales rep for Blackstone Labs. Aleong confirmed his phone number is 954-864-3844 and advised Fyfe introduced him to Boccuzzi and Chris "N." who also worked at Blackstone Labs.

Aleong was asked to review a text from Attachment E dated 8/4/16 10:16:34 which states "Email u the the custom certificate pj used back in 2014... That worked." He was then shown two emails dated July 2, 2016 (Attachment F), and Aleong stated one email included an attachment listing the second order he exported to Trinidad for Blackstone and the other email made reference to the order made in 2014. Two other emails dated August 4, 2016 (Attachment G), were shown to Aleong. Aleong stated one of the August 4, 2016, emails included an attachment Boccuzzi sent to him which was a Certificate of Free Sale letter on Blackstone letterhead indicating it was from James Boccuzzi who was representing himself as an FDA employee. The other email, according to Aleong, included an attachment he sent to Boccuzzi.

Aleong explained the attachment he sent to Boccuzzi was only an example of what he needed, and it was the example Braun had sent to him in 2014. He continued stating even though he said "done by PJ" he only meant it was an example Braun had sent. He stated they did not use this letter because it was for a different order and added they would not use it in Trinidad. Aleong stated when he was coordinating an export with Braun in 2014 Cindy with Starlite kept asking for a Certificate of Free Sale so Braun provided this example. He stated after showing this example to Cindy she confirmed this is what she needed. Aleong stated in 2014 Blackstone Labs had not done much exporting and he did not know where Braun got the example from.

Text messages dated August 4, 2016, starting at 10:45am in Attachment E were shown to Aleong. In the texts Aleong and Boccuzzi were discussing making a fake certificate of free sale and Aleong stated they ended up not needing the certificate of free sale because the shipment was added to another shipment and exported out.

Aleong was asked to read text messages dated August 8, 2016, 9:37am from Attachment E in which Aleong texts "it takes 5 days" and "cost $10." Aleong explained he was telling this to Boccuzzi because he could not understand why he could not get a certificate of free sale, but added he just wanted to get the deal done so he could make some money. During the same text conversation on August 8, 2016, Boccuzzi wrote "But u have to have compliant labels" and Aleong stated he thought Boccuzzi was talking about the right Blackstone labels. He stated he went back and forth with Boccuzzi about getting the certificate of free sale and again advised he did not understand why he could not get one.

Another text dated August 4, 2016, at 11:48am from Boccuzzi to Aleong was shown to Aleong. The text read "Does this work." Aleong confirmed this text coincided with the email he received on August 4, 2016, from Boccuzzi (Attachment G) in which Boccuzzi attached a certificate of free sale and represented he worked for the FDA. Aleong advised he did not think Boccuzzi worked for the FDA, but also stated he did not even read the letter. He stated he just sent the letter to Cindy and again reiterated he wanted to get the job done. Aleong stated he did understand Boccuzzi was impersonating the FDA and he should not have done that. He also confirmed he knew the letter was fake and reviewed a text message he received from Boccuzzi on August 5, 2016, in which Boccuzzi stated "Please do not show him the fake certificate of free sale we made."

Aleong stated Cindy with Starlite ultimately told him they could not use the letter Boccuzzi sent, but Aleong was not sure why. He stated he thought she wanted something with the FDA and referred to the stamp on the example Braun had provided.

An email dated August 4, 2016, from Boccuzzi to Aleong (Attachment H) was shown to Aleong. Aleong stated this email included certificate of analysis forms Boccuzzi sent to him.

Aleong was asked to review text messages dated October 17, 2016, from Attachment E. Aleong confirmed this text which stated "As they need to ship/ combine with another shipment to get pas that cert of sales crap," was referring to including the products in another shipment that was being exported to Trinidad.

Aleong stated he has talked to Fyfe regarding the search warrant that was executed at Blackstone Labs and heard over 1 million dollars' worth of products were seized during the search. He stated he goes to LA Fitness in Boca and has heard other people in the gym talking about it as well.

**SUBMITTED:** Electronically submitted by KELLY MCCOY

_____

KELLY MCCOY, SPECIAL AGENT                    DATE:    02/12/2019

**APPROVED:** Electronically approved by JUSTIN FIELDER

_____

JUSTIN FIELDER, ASSISTANT SPECIAL AGENT IN CHARGE    DATE:    02/12/2019

**DISTRIBUTION:**    MIF: original & 1cc.

**ATTACHMENTS:**    Attachment A: Proffer Agreement
                    Attachment B: Emal
                    Attachment C: Email
                    Attachment D: Email
                    Attachment E: Text Messages
                    Attachment F: Email
                    Attachment G: Email
                    Attachment H: Email

# EXHIBIT 040

## Euphoria Video



9:19-CR-80030
GOVERNMENT
EXHIBIT
040

**From:** McCoy, Kelly <Kelly.McCoy@fda.hhs.gov>
**Sent:** Monday, February 13, 2017 3:36 PM
**To:** Schillinger, Scott <Scott.Schillinger@fda.hhs.gov>
**Subject:** Search Warrant

Site 1 – Blacskstone Labs, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL

Employees:
Phillip Braun – President / CEO
Bryan Moscowitz – The Guerilla Chemist
James Boccuzi – Director of Sales
Richard Newton
David Winsauer

Amber Gingerich – workstation

Site 2 – VBS Laboratory, 1140 Holland Drive, Suite 12, Boca Raton, FL

Employees:
Anthony Ventrella – owner
Ashley Ventrella – owner
Juan Moran
David Mosier
Paul Jasinto

1


9:19-CR-80030
GOVERNMENT
EXHIBIT
041

**From:** Schillinger, Scott
**Sent:** Monday, February 13, 2017 4:50 PM
**To:** Miller, James (OCI) <James.Miller2@fda.hhs.gov>; Zumwalt, Gene <Gene.Zumwalt@fda.hhs.gov>; Griffin, Timothy <Timothy.Griffin@fda.hhs.gov>; Griffin, Timothy <Timothy.Griffin@fda.hhs.gov>; Kriplean, Brian <Brian.Kriplean@fda.hhs.gov>
**Subject:** RE: Blackstone Drug Import Funding Request

Case # 2016-MIF-735-0166

Attached are my preferred settings.  Please let me know if you have any questions.

I will be preparing two boxes for the following two sites.   These are the preliminary names I gathered from the case agent.  I will try to make this as smooth as possible.   Phones are supported in the warrant.  I already got some information regarding the onsite IT.

**<u>SCERS: Schillinger, Zumwalt, Miller</u>**

**Site 1 – Blacskstone Labs, 1090 Holland Drive, Suites 1 & 2, Boca Raton, FL**

Employees:
Phillip Braun – President / CEO
Bryan Moscowitz – The Guerilla Chemist
James Boccuzi – Director of Sales
Richard Newton
David Winsauer

Amber Gingerich – workstation

**<u>SCERS: Griffin, Kriplean</u>**

**Site 2 – VBS Laboratory, 1140 Holland Drive, Suite 12, Boca Raton, FL**

Employees:
Anthony Ventrella – owner
Ashley Ventrella – owner
Juan Moran
David Mosier
Paul Jasinto

1



Name convention:  S1RAC1D1

Site 1, Room A, Computer 1, Drive 1.   This applies for all items such as USB, Server, Mobile items. Please specify a brief description on the case description of the TD2 log.  Examples, John Smith, sales director or External hard drive found in drawer or USB thumb drive found in room A.

TD2/TD2U settings:

System Options:

- Start Up: File

- Examiner Name:  SA [Last name].  Be sure to enter your name.

- Date and Time:  EST

Imaging Options:

- ImagType: Encase E01

- File Size: 4GB

- Dir Prompt: Yes

- **Dir Name: S/N** (this is important and will avoid typos of naming the same image name from previous)

- File Prompt: Yes  (This is where you name the image name – S1RAC1D1 Etc)

- Case ID: Case number, Name, Site number

- Case Note:  Brief description Examples, John Smith, sales director, External hard drive found in drawer or USB thumb drive found in room A.

- Err Recov: Fast

- Err Limit: One

- Verify Hash: Off

Visual verification:  Once completed, attach destination drive (agency drive) to a write blocker (if possible) and use FTK imager to open image to see folder or directory structure.   This will help us quickly determine if we got a good / viewable image (not encrypted).  No need for hash verification. Note, I have heard that newer versions of FTK Imager had problems opening of E01 files.  To avoid this, use FTK Lite or an older version of FTK Imager to open image.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No. _17-8047-WM_

INRE SEALED SEARCH WARRANT

_____/

### CRIMINAL COVER SHEET

　　　1.　　Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes ___X___ No

　　　2.　　Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes ___X___ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____

ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov



9:19-cr-80030
**GOVERNMENT
EXPUBIT**
043

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NO. ___17-8047-WM___

FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**IN RE SEALED SEARCH WARRANT**
_____/

## MOTION TO SEAL

The United States of America, by and through its undersigned Assistant United States Attorney, requests that, with the exception of those copies to be provided to the United States Attorney's Office and its agents for use in the execution of the search warrant, the attached search warrant application, application, affidavit, related documents, and any resulting orders be SEALED until further order of this court, because public disclosure of the search warrant affidavit and related documents might compromise the integrity of the ongoing investigation. The United States is prepared to provide further information *in camera* should the Court so require.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____

ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NO. _17-8047-WM_



FILED by ___ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**IN RE SEALED SEARCH WARRANT**

_____/

**SEALED ORDER**

The United States of America, having applied to this Court for an Order sealing the

search warrant, related documents, and this order, and the Court finding good cause:

IT IS HEREBY ORDERED that the search warrant, the application and affidavit in

support thereof, related documents, and this Order shall be filed under seal until further order

of this Court, however, the United States Attorney's Office may obtain copies of any search

warrant and related sealed documents for purposes of executing the search.

DONE AND ORDERED in chambers at Miami, Florida, this 3ʳᵈ day of February,

2017.

_____

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:    Robert J. Lehner, AUSA

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By_____ Deputy Clerk

Date _2/3/2017_

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Florida

FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Premises located at Blackstone Labs, LLC,<br>1090 Holland Drive, Suites 1 and 2,<br>Boca Raton, FL 33487 | )<br>)<br>)<br>)<br>)<br>)    Case No. **17-8047-WM** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.1

located in the    **Southern**    District of    **Florida**    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*Certified to be a true and correct copy of the document on file*
*Steven M. Larimore, Clerk,*
*U.S. District Court*
*Southern District of Florida*
*By: _____ Deputy Clerk*
*Date 2/3/2017*

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 331(a)(d)(v) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 21 U.S.C. § 333(a) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail and Wire Fraud |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kelly McCoy, Special Agent, U.S. Food & Drug Admin.
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   **February 3, 2017**

_____
*Judge's signature*

City and state:   West Palm Beach, Florida

William Matthewman, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Kelly McCoy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for two warrants to search two premises: one located at Blackstone Labs, LLC, 1090 Holland Drive, Suites 1 and 2, Boca Raton, FL 33487 (the "Blackstone Search Premises"); and the second located at VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 (the "VBS Search Premises"). Pictures and a detailed description of the two locations are included in Attachment A.1 (Blackstone Search Premises) and Attachment A.2 (VBS Search Premises), both of which are incorporated herein by reference. This affidavit states probable cause that evidence and property used in the commission of crimes, as particularly described in Attachments B.1 and B.2, will be found at the Blackstone Search Premises and the VBS Search Premises, respectively.

2.      I am a Special Agent with the U.S. Food and Drug Administration's Office of Criminal Investigations ("FDA/OCI"), and have been since January of 2016. I am presently assigned to the Miami Field Office investigating violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. (the "FDCA"). I am a law enforcement officer of the United States, in that I am empowered under authority of the FDCA to conduct investigations and to make arrests. In my capacity as an FDA/OCI Special Agent, I have received extensive training in the investigation of the counterfeiting, diverting, misbranding, adulterating and tampering of drugs, medical devices, and dietary supplements. In addition, I have approximately six years of prior federal law enforcement experience as a Special Agent with the United States Secret Service. During this time, I received extensive training in investigations of computer crimes, internet

1

investigations, child exploitation, counterfeit currency, check fraud, access device fraud, and identity theft, among other things.

3.     I have on numerous occasions participated in the execution of search warrants, and based upon my experience and training, and further based upon discussions with fellow law enforcement agents with years of experience investigating adulterated and misbranded foods, including dietary supplements, and drugs, I know that it is common for individuals engaged in this activity:

(A) to maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the daily purchase and sale of merchandise. These records are often kept on computers and cellular telephones.   The aforementioned computers, cellular telephones, books, records, receipts, notes, ledgers, bank records, money orders, etc., are routinely maintained at the business where the owner/operator has ready access to such records;

(B) to maintain books, papers, and electronic devices (computers, electronic Rolodexes, Caller ID devices, and digital pagers and cellular telephones with memory capabilities) which reflect names, addresses, and/or telephone numbers of their suppliers and/or customers;

(C) to utilize computers, electronic storage media (including PCs, laptops, and thumb drives) and cellular telephones to store information regarding their business activities, including a list of suppliers and/or buyers.

4.     Based on my training and experience and facts as set forth in this affidavit, there is probable cause to believe that there will be found at the search premises the items, records, and information listed in Attachment B.1 and B.2, all of which constitute evidence, fruits and

2

instrumentalities of violations of federal laws, including, but not limited to: causing the introduction or delivery for introduction into interstate commerce of adulterated and misbranded foods, unapproved new drugs, and unsafe dietary supplements (21 U.S.C. §§ 331(a), (d), and (v) and 333(a)), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit mail and wire fraud (18 U.S.C. § 1349), committed by Blackstone Labs, LLC, VBS Laboratories, LLC, and their employees and agents.

5.     The facts in this affidavit come from my personal observations and knowledge of the investigation, observations of other law enforcement officers involved in this investigation and information obtained from other government agents and/or law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## SUMMARY OF INVESTIGATION

6.     From approximately 2012 to the present, Blackstone Labs, LLC ("Blackstone"), an internet-based bodybuilding supplement company founded by Aaron Singerman ("Singerman") and Phillip (PJ) Braun ("Braun"), has engaged in a multiyear scheme to market, promote, and sell illegal products labeled as dietary supplements, some of which are potentially dangerous. Evidence supports probable cause that Singerman, Braun, and their associated companies, including Blackstone and VBS Laboratories, LLC, intended to defraud and mislead the FDA and consumers throughout the United States and internationally by selling these products, notwithstanding receiving notice of legal violations through formal Warning Letters issued by the FDA.

7.     Blackstone's scheme includes a pattern of selling illegal products. Evidence supports probable cause that through these companies, Singerman and Braun intentionally sell and

3

have sold misbranded, adulterated, and/or unsafe dietary supplements and unapproved new drugs, and committed mail fraud, wire fraud, and conspiracy to commit mail or wire fraud. This affidavit summarizes probable cause that Singerman, Braun, Blackstone, VBS Laboratories, LLC, and associated companies sell and have sold numerous adulterated and misbranded dietary supplements and unapproved new drugs, including products named:

        (A) Super DMZ Rx 2.0;

        (B) Angel Dust;

        (C) Cobra 6P Extreme;

        (D) Dust V2;

        (E) Brutal 4ce;

        (F) Dust Extreme;

        (G) Ostapro;

        (H) Growth;

        (I) Anesthetized;

        (J) Euphoria;

        (K) Gear Support; and

        (L) PCTV.

Three of these products include ingredients that are not listed on the labels.

    8.    This investigation and affidavit is based on evidence from multiple sources, including online research, undercover purchases, physical surveillance, public and government records, financial and shipping records, and physical evidence procured from discarded trash at the two search premises.

## OVERVIEW OF APPLICABLE STATUTES

### The Federal Food, Drug, and Cosmetic Act

9.      The U.S. Food and Drug Administration ("FDA") is an agency of the United States Government charged with the responsibility of protecting the American public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. Among other responsibilities, FDA enforces laws and regulations intended to ensure the safety of dietary supplements and drugs.

10.      Under the FDCA, the term "label" means a display of written, printed, or graphic matter upon the immediate container of any article. 21 U.S.C. § 321(k). The term "labeling" is broader, and is defined as all labels, as well as other printed or graphic matter upon any article or any of its containers or wrappers, or accompanying such article. 21 U.S.C. § 321(m).

Prohibited Acts and Penalties under the FDCA

11.      Causing the introduction or delivery for introduction into interstate commerce of a misbranded or adulterated food or drug is a prohibited act. 21 U.S.C. § 331(a).

12.      Causing the introduction or delivery for introduction into interstate commerce of a new drug that is not approved by the FDA is a prohibited act. 21 U.S.C. § 331(d).

13.      Causing the introduction or delivery for introduction into interstate commerce of a dietary supplement that is unsafe under 21 U.S.C. § 350b is a prohibited act. 21 U.S.C. § 331(v).

14.      Commission of a prohibited act is a misdemeanor punishable by a fine and up to a year in prison for each violation. 21 U.S.C. § 333(a). If the prohibited act is done with "intent to defraud or mislead" consumers or an identifiable government agency, such as the FDA, it is a felony punishable by a fine and up to three years in prison for each violation. 21 U.S.C. § 333(a)(2).

Drugs under the FDCA

15.      Under the FDCA, "drug" is defined in relevant part as an article, other than food, intended to affect the structure or any function of the body of man. 21 U.S.C. § 321(g)(1)(C).

5

16.     A "new drug" is a drug that is not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under conditions prescribed, suggested, or recommended in the drug's labeling. 21 U.S.C. § 321(p).

17.     A "new drug" cannot be lawfully introduced into interstate commerce unless and until the FDA determines that the drug is safe and effective for its intended use and approves that drug.  21 U.S.C. § 355(a).

Foods and Dietary Supplements under the FDCA

18.     The FDCA defines "food" to include articles used for food or drink for man or other animals and articles used for components of such articles.  21 U.S.C. § 321(f).  Except for limited purposes, dietary supplements are deemed to be foods within the meaning of the FDCA.  21 U.S.C. § 321(ff).

19.     Under 21 U.S.C. § 321(ff), a "dietary supplement" is defined in relevant part as a product intended to supplement the diet that bears or contains one or more of the following dietary ingredients:

- vitamin;
- mineral;
- herb or botanical;
- amino acid;
- dietary substance for use by man to supplement the diet by increasing total dietary intake; or
- a concentrate, a metabolite, constituent, extract, or combination, of the preceding ingredients

and that is intended for ingestion, not represented for use as a conventional food or as a sole item of a meal or the diet, and is labeled as a dietary supplement.

20.     A product that includes an article that is approved as a "new drug" under 21 U.S.C. § 355 cannot be a dietary supplement unless the article was marketed as a dietary supplement or as a food prior to such approval.  21 U.S.C. § 321(ff)(3)(B)(i).

21.     A product that includes an article authorized for investigation as a "new drug" for which substantial clinical investigations have been instituted and made public cannot be a dietary supplement, unless the article was marketed as a dietary supplement or food before its authorization as an investigational new drug.  21 U.S.C. § 321(ff)(3)(B)(ii).

22.     A substance intended to become a component of a food, including a dietary supplement, is a food additive unless (1) it is generally recognized among experts qualified by scientific training and experience to evaluate its safety as having been adequately shown to be safe under the conditions of its intended use; (2) it is subject to prior sanction; or (3) it is an ingredient described in 21 U.S.C. § 321(ff) (a dietary ingredient).  21 U.S.C. § 321(s).  The other exceptions listed in 21 U.S.C. § 321(s) do not apply.

23.     A food additive is deemed unsafe unless it is used in conformity with a regulation prescribing conditions under which it may be safely used, it has been granted an exemption for investigational use under 21 U.S.C. § 348(j), or it is a food contact substance.  21 U.S.C. § 348(a).

24.     A food, including a dietary supplement, is adulterated if it contains a food additive that is unsafe within the meaning of 21 U.S.C. § 348.  21 U.S.C. § 342(a)(2)(C)(i).

25.     Under 21 U.S.C. § 350b, a dietary supplement that contains a new dietary ingredient (one not marketed in the United States before October 14, 1994) is deemed to be adulterated under 21 U.S.C. § 342(f) unless (1) the dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered, or (2) there is a history of use or other evidence of safety establishing that the

7

dietary ingredient will reasonably be expected to be safe and, at least 75 days before introducing the dietary supplement in interstate commerce, the manufacturer or distributor provides FDA with information which is the basis for its conclusion that the dietary supplement containing the new dietary ingredient will reasonably be expected to be safe ("premarket notification"). 21 U.S.C. § 350b.

26.     A dietary supplement also is deemed to be adulterated if: (1) it contains a dietary ingredient that presents a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in its labeling (21 U.S.C. § 342(f)(1)(A)(i)); or (2) it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury (21 U.S.C. § 342(f)(1)(B)).

27.     A food, including a dietary supplement, is misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 343(a)(1).

Relevant Title 18 Provisions

28.     18 U.S.C. § 1341 criminalizes mail fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, any such matter or thing, shall be fined or imprisoned not more than 20 years, or both.

29.     18 U.S.C. § 1343 criminalizes wire fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined or imprisoned not more than 20 years, or both.

30.     18 U.S.C. § 1349 criminalizes an attempt or conspiracy to commit mail fraud or wire fraud, stating that any person who attempts or conspires to commit such an offense shall be subject to the same penalties.

## FACTS ESTABLISHING PROBABLE CAUSE

31.     FDA/OCI is currently conducting an investigation of Blackstone Labs, LLC, VBS Laboratories, LLC, and their associated companies.   Blackstone is an active corporation incorporated in the State of Florida on or about August 29, 2012.  Since March 2016, Blackstone's principal address and mailing address is listed as 1090 Holland Drive, Suite 1, Boca Raton, FL 33487.  Surveillance in November 2016 confirmed that Suite 1 is labeled with a sign "Blackstone Labs Suite 1 Headquarters."  Suite 2, the next door, is labeled with a sign "Blackstone Labs Suite 2 Shipping and Receiving."  Collectively, 1090 Holland Drive, Suites 1 and 2 are the Blackstone Search Premises.

32.     The company was owned and operated by Phillip Braun and Aaron Singerman until July 2016, when records from the Florida Department of State, Division of Corporations show that Singerman's name no longer appears as an officer or director.  However, in a November 2016 video available online, Singerman stated that he still retains partial ownership of Blackstone, reviews the books, and gets paid.  Braun is currently listed as a manager for the company, and states in numerous videos posted on Blackstone's website that he is the president and CEO.

9

33.     Blackstone sells products online through its own website, www.blackstonelabs.com, as well as wholesale and through other retail stores. Blackstone ships its products, including the products described herein, across the United States and internationally. Consumers using www.blackstonelabs.com are able to pay for their orders through PayPal, Inc. ("PayPal") an online payment system, Visa, MasterCard, American Express, and Discover. The website also offers the ability to chat directly with an employee at Blackstone, and has social networking profiles on Twitter, Facebook, Instagram, and YouTube, all of which promote Blackstone products.

34.     Financial records and public records from the Florida Secretary of State, Division of Corporations show that Singerman and Braun (either both or individually) have management, shareholder, or financial signatory roles with Blackstone and several other dietary supplement companies including: VBS Laboratories, LLC; Singerman & Braun, LLC, dba Prime Nutrition or Platinum Labs; Boca Nutrition, LLC; Run Everything LLC; Steel Supps; Dynamik Muscle, LLC; SizeSlim, LLC; Redcon 1; Fight Pharm; Dragon Nutraceuticals, and Hardcore Ventures.

35.     VBS Laboratories, LLC ("VBS Labs") is a Florida Limited Liability Company incorporated in November 2015. Although VBS Labs does not appear to have a website, evidence demonstrates probable cause that VBS Labs sells, manufactures and/or stores illegal products labeled as dietary supplements, including Blackstone's product Super DMZ Rx 2.0.

Super DMZ Rx 2.0

36.     Blackstone began with a product labeled as a dietary supplement containing two synthetic steroids. During an interview with an online entrepreneurship magazine "Secret Entourage," published prior to January 3, 2016, Singerman explained that Blackstone was created after a former business partner was worried that a product called Super DMZ "was going to become

10

illegal." While describing how he and his "best friend" Braun founded Blackstone, Singerman stated, "In our business, sometimes gray market ingredients will become illegal and you have to take them off the market. Basically anything that works too well will probably become illegal one day."

37.     During the same interview, Singerman also stated that Blackstone started when the former partner wanted to dispose of 7,000 units of Super DMZ, so Singerman took the legal risk himself and sold the products. He explained that he and Braun started a website called SuperDMZ.com and a new company, Blackstone Labs, LLC. According to Singerman, they sold all the units and also purchased more of the product, as the "ingredient had not become illegal yet."

38.     Notwithstanding Blackstone's claims, probable cause exists that their first product, Super DMZ Rx 2.0, was an unapproved new drug. Using an internet archive tool called the "Wayback Machine," I reviewed a copy of the SuperDMZ.com website, as it existed in September 2012. The website included a label for the product "Super DMZ Rx 2.0," and listed its only ingredients as 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, also known as methylstenbolone, and 17b-hydroxy 2a, 17b-demthyl 5a-androstan 3-one azine, also known as dimethazine or dymethazine.

39.     Methylstenbolone and dimethazine are synthetic steroids and are not dietary ingredients because they are not vitamins, minerals, herbs or other botanicals, amino acids, or concentrates, metabolites, constituents, or extracts of the same, nor are they dietary substances for use by man to supplement the diet by increasing total dietary intake. Because Super DMZ Rx 2.0 did not bear or contain a dietary ingredient, Super DMZ Rx 2.0 was not a dietary supplement as defined in 21 U.S.C. 321(ff).

40.    As of September 2012, the labeling of Super DMZ Rx 2.0 stated that the product was "engineered and designed to increase, sustain, and strengthen muscularity," would result in "increased vascularity," and "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol." Accordingly, Super DMZ Rx 2.0 was a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it was an article other than food intended to affect the structure or function of the human body. Super DMZ Rx 2.0 was also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it was not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Super DMZ Rx 2.0 was not approved as safe and effective by the FDA, it was, and still is, an unapproved new drug.

41.    Since 2012, Blackstone and its associated companies have used the online payment system PayPal to transact sales of products. Blackstone PayPal records show financial transactions starting on August 30, 2012. This first transaction and many others in September 2012 have a listed "subject" of "SDMZ 2.0." Based on context and my knowledge of the investigation, I believe this refers to the Super DMZ Rx 2.0 product, and that the records indicate that Blackstone was selling the Super DMZ Rx 2.0 product online in 2012.

42.    In July 2013, the Blackstone product "Super DMZ Rx 2.0" was part of a voluntary recall by its manufacturer, Mira Health Products, Ltd. ("Mira Health"). Mira Health's recall letter noted that the raw materials used to manufacture Super DMZ Rx 2.0 included dimethazine. The Super DMZ Rx 2.0 label listed dimethazine and methylstenbolone as the only dietary ingredients. As described above, Super DMZ Rx 2.0 is an unapproved new drug. Mira Health also recalled another Blackstone product "Metha-Drol Extreme" that contained dimethazine.

43.     As part of the recall process, the FDA determined that the two Blackstone products posed a serious health hazard. The recall included 11,200 bottles of Super DMZ Rx 2.0 with lot numbers M55Q (expiration date 04/2016), M55Q, (expiration date 05/2016), and E07Q (expiration date unknown), and 5,555 bottles of Metha-Drol Extreme.

44.     Despite the recall, Blackstone continued to sell Super DMZ Rx 2.0. Using the "Wayback Machine," I reviewed a copy of Blackstone's website, www.blackstonelabs.com, as it existed in May 2015, which shows the company was still selling bottles of Super DMZ Rx 2.0 with methylstenbolone and dimethazine as the only dietary ingredients on the label. The product was still described as being "engineered and designed to increase, sustain, and strengthen muscularity," and that the product "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol, the only difference is it's 100% legal!"

45.     The Blackstone website no longer offers "Super DMZ Rx 2.0" for sale, but includes a picture of the product covered by the word "Discontinued." A Google search, however, revealed Blackstone's product "Super DMZ Rx 2.0" is currently for sale from multiple online dietary supplement vendors despite the prior recall and FDA's warning of health risks.

46.     On or about September 7, 2016, FDA/OCI agents made an undercover purchase of the Blackstone-branded product "Super DMZ Rx 2.0" from an online bodybuilding supplement retailer, Legendary Supplements, via the website www.legendarysupplements.com. As discussed in paragraph 113, documents show that Legendary Supplements purchases products directly from Blackstone.

47.     On or about September 14, 2016, FDA/OCI agents received the Super DMZ Rx 2.0 product via mail. Upon review, the label appeared to be identical to the label found in the dumpster

13

at the VBS Search Premises (see paragraph 115), other than the stamped expiration date and lot number. The expiration date for the purchased product was 05/18 and the lot number was 345, both of which were stamped in white rather than red. The label listed as the only dietary ingredients 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one (methylstenbolone) and dimethazine, which are the same ingredients as in the Blackstone Super DMZ Rx 2.0 product previously recalled. After inventorying the product into evidence, it was sent to the FDA Forensic Chemistry Center ("FDA FCC") for testing. FDA FCC test results confirmed that the product did contain dimethazine ("DMZ") but did not detect the presence of methylstenbolone.

48.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Super DMZ Rx 2.0, an unapproved new drug, in violation of 21 U.S.C. § 331(d).

Formal Warnings from FDA

49.     Super DMZ Rx 2.0 was the first product in a pattern of selling illegal products labeled as dietary supplements. On April 24, 2015, the FDA issued a Warning Letter to Aaron Singerman at Blackstone Labs, LLC in reference to another Blackstone product "Angel Dust," which was also sold as a dietary supplement. The product label declared that it contained as a dietary ingredient a substance called AMP Citrate (2-Amino-4-Methylpentane or 4-amino-2-methylpentane citrate), also known as DMBA. The FDA issued a second Warning Letter on the same day to Singerman as CEO of Prime Nutrition, for another product labeled as a dietary supplement and containing DMBA as a dietary ingredient.

50.     The Warning Letters informed Blackstone and Singerman that DMBA is a new dietary ingredient because there is no information demonstrating that DMBA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994. The Blackstone

14

Warning Letter stated that Angel Dust was adulterated because DMBA, as a new dietary ingredient, is subject to the premarket notification requirement and Blackstone had not submitted premarket notification to the FDA.

51.     The Blackstone Warning Letter also advised Blackstone that, even if the premarket notification had been submitted, Angel Dust would still be adulterated because it contained a new dietary ingredient (DMBA) for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury.  The Blackstone Warning Letter further advised Blackstone that introduction of Angel Dust into interstate commerce is prohibited under 21 U.S.C. § 331(a) (adulterated dietary supplement) and 21 U.S.C. § 331(v) (unsafe dietary supplement).

52.     The Blackstone Warning Letter requested that Blackstone take prompt action to correct the violations, as well as any other violations associated with the product Angel Dust or other dietary supplement products marketed by the firm, including any containing DMBA.  The letter also warned that "Failure to immediately cease distribution of your product Angel Dust and any other products you market that contain DMBA could result in enforcement action by FDA without further notice."

53.     In a May 19, 2015 response from counsel to the Blackstone Warning Letter, Blackstone stated that it "takes the allegations in the [Blackstone Warning Letter] very seriously," and acknowledged that FDA had sent Warning Letters to at least 16 companies using DMBA, and that the FDA posted a public Q&A addressing DMBA on the internet.  Blackstone agreed to immediately discontinue distributing and selling the Angel Dust product.  Blackstone also stated that "[i]n deference to FDA's concerns as expressed in the warning letter and the Q&A on DMBA,

if Blackstone ever elects to market and sell Angel Dust again, it will reformulate the product without Amp Citrate aka DMBA."

### Cobra 6P Extreme

54.    Notwithstanding the Warning Letter and Blackstone's response, Blackstone continued to sell products labeled as dietary supplements that contained DMBA as a dietary ingredient. For example, FDA twice purchased the product Cobra 6P Extreme from Blackstone, and there is probable cause to believe that both purchased products violated the law. The first Cobra 6P Extreme purchase contained DMBA and the DMBA was listed on the label, while the second Cobra 6P Extreme purchase also contained DMBA, but omitted the DMBA from the label. These purchases are described below.

55.    In August 2015, FDA made an undercover purchase from Blackstone of the product Cobra 6P Extreme via www.blackstonelabs.com.

56.    A review of the label affixed to the Cobra 6P Extreme revealed that the product ingredient list included 2-Amino-4-Methylpentane (DMBA) as a dietary ingredient, and FDA testing subsequently confirmed that the product contained DMBA.

57.    The ingredient DMBA caused the Cobra 6P Extreme to be adulterated because it contained a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury and because DMBA is subject to the premarket notification requirement and, as of January 26, 2017, no firm had submitted to the FDA premarket notification for DMBA.

58.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list Cobra 6P Extreme. Based

16

on context, I believe these entries refer to sales of the Cobra 6P Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

59. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, an adulterated food and an unsafe dietary supplement, in violation of 21 U.S.C. § 331(a) and 331(v).

60. On or about February 3, 2016, FDA/OCI agents made another undercover purchase, this time for products labeled Dust V2, Brutal 4ce (pronounced "Brutal Force"), and Cobra 6P Extreme via Blackstone's website. Blackstone included a free product labeled "Euphoria RX" in the order at no charge. Shortly after FDA/OCI agents placed their order online, an email was received from the email address "cs@blackstonelabs.com," confirming the purchase and listing information about the sale. Blackstone's website stated with respect to the Cobra 6P Extreme, "It's so strong we weren't sure if it was a good idea to bring it to the market."

61. On or about February 23, 2016, FDA/OCI agents received the undercover purchase of the aforementioned products. After inventorying the products into evidence, FDA/OCI sent the products to the FDA FCC for testing.

62. On or about October 21, 2016, a chemist from the FDA FCC sent results of the analysis of the Cobra 6P Extreme. The testing revealed that the Cobra 6P Extreme purchased on February 3, 2016, also contained DMBA. However, unlike the Cobra 6P Extreme product purchased in 2015, the label affixed to the 2016 Cobra 6P Extreme omitted DMBA from the product ingredient list. Accordingly, the Cobra 6P Extreme purchased in February 2016 was misbranded under 21 U.S.C. § 343(a)(1) because its labeling was false and misleading.

63.     There is probable cause that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, a misbranded food, in violation of 21 U.S.C. § 331(a).

64.     Blackstone intended to defraud consumers and the FDA by promoting Cobra 6P Extreme, accepting orders online, and mailing misbranded Cobra 6P Extreme products to consumers while intentionally not listing the potentially unsafe ingredient DMBA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

## Dust V2

65.     Testing of the Dust V2 purchased in February 2016 revealed that the product contained DMAA, also known as 1,3-dimethylamylamine.

66.     The FDA advises consumers not to buy or use dietary supplements that contain DMAA due to the health risks they present. FDA FCC's analysis also revealed that Dust V2 contains caffeine. FDA has publicly warned that "DMAA, especially in combination with other ingredients such as caffeine, can be a health risk to consumers." DMAA narrows blood vessels and arteries, which can elevate blood pressure, and may lead to cardiovascular problems such as shortness of breath, arrhythmias, tightening in the chest, and heart attack, as well as seizures and other neurological and psychological conditions.

67.     A review of the label affixed to the Dust V2 purchased in 2016 revealed that the product ingredient list omitted DMAA from the label. Failure to include DMAA on the label as an ingredient causes the labeling to be false or misleading, and causes Dust V2 to be misbranded under 21 U.S.C. § 343(a)(1).

68.     DMAA is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same,

18

nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake. DMAA is a food additive within the meaning of 21 U.S.C. § 321(s) because it is not a dietary ingredient, it is not generally recognized as safe under the conditions of use of Dust V2, and it is not the subject of a sanction or approval under the FDCA or other applicable statutes.

69.     DMAA is an unsafe food additive under 21 U.S.C. § 348 because it is not a food contact substance, there is no regulation prescribing the conditions under which it may be safely used, and no exemption for investigational use has been granted under 21 U.S.C. § 348(j). Therefore, the presence of DMAA in Dust V2 causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

70.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Dust V2."  Based on context, I believe these entries refer to sales of the Dust V2 product, with shipping addresses that show the product was shipped to customers in multiple states.

71.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust V2, a misbranded and adulterated food, in violation of 21 U.S.C. § 331(a).

72.     Blackstone intended to defraud consumers and the FDA by promoting Dust V2, accepting orders online, and mailing Dust V2 products to consumers while intentionally not listing the potentially dangerous ingredient DMAA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, 1349.

### Brutal 4ce

73.     FDA FCC analysis of the Brutal 4ce product concluded that it contained 1-androsterone and 4-androstene-3, 17-dione, also known as androstenedione.  Both 1-androsterone

19

and androstenedione are anabolic steroid precursors, meaning they are substances that are converted in the human body to testosterone, an anabolic steroid.

74.     As early as 2004, FDA publicly stated that products containing androstenedione are not lawful dietary supplements and may increase the risk of serious health problems. See "Questions and Answers: Androstenedione" available at:

http://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm

75.     The Brutal 4ce label does not list 1-androsterone or androstenedione as an ingredient in the product. Failure to include 1-androsterone or androstenedione on the label as an ingredient causes the labeling to be false and misleading and causes Brutal 4ce to be misbranded under 21 U.S.C. § 343(a)(1).

76.     Additional evidence suggests that Blackstone, Singerman, and Braun know that Brutal 4ce includes anabolic steroid precursors. A video posted on Blackstone's website shows Braun personally describing the product Brutal 4ce as the "strong stuff," the "bad daddies of Blackstone Labs," and states it is "the stuff people look for now that all the old prohormones are gone. This is your answer." He further explained that individuals who use this product "absolutely have to take PCTV" afterwards. The product PCTV[1] is displayed on Blackstone's website and is described as "The Next Evolution of Post Cycle Therapy." A "Post Cycle Therapy" generally refers to a course of drugs or dietary supplements used to restore the body's natural testosterone production after using anabolic steroids for a time period or "cycle." The Blackstone website states "PCTV defends and protects your body in five distinct ways; so now even more then [sic] ever you can be confident that you will not only bounce back after a cycle, but actually improve and be even better then [sic] ever. In fact, PCTV can even be used by natural competitors looking

---

[1] There is probable cause that PCTV is an unapproved new drug, as discussed in paragraph 109.

for an anabolic edge!"   Based on my training and experience, this reference to "natural competitors" refers to athletes who do not use anabolic steroids, and demonstrates Braun's knowledge that he is recommending PCTV for use with products, such as Brutal 4ce, that contain anabolic steroids or anabolic precursors.

77.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Brutal 4ce."   Based on context, I believe these entries refer to sales of the Brutal 4ce product, with shipping addresses that show the product was shipped to customers in multiple states.

78.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Brutal 4ce, a misbranded food, in violation of 21 U.S.C. § 331(a).

79.     Blackstone intended to defraud consumers and the FDA by promoting Brutal 4ce, accepting orders online, and mailing Brutal 4ce products to consumers while intentionally not listing 1-androsterone and/or androstenedione on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

Evidence from the Blackstone Premises

80.     On or about June 24, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

81.     Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises.   These items include:

(A) An article of mail addressed to Blackstone Labs at the Blackstone Search Premises;

(B) Numerous UPS shipping invoices stating they were from Blackstone and addressed to customers who purchased products, including the Dust V2 and Dust Extreme products;

(C) A sample packet of the Dust V2 product; and

(D) A copy of a spreadsheet labeled "Blackstone Labs A/P Aging Detail." Upon information and belief, this document refers to Blackstone's Accounts Payable, and lists money owed to suppliers. The document includes two (2) transactions from a vendor by the name of "VBS Labs" in the amounts of $43,250.00 and $18,435.25 dated 05/06/16 and 05/19/16, showing that Blackstone pays VBS Labs for goods or services.

Evidence from the VBS Search Premises

82.     Additional evidence confirms that there is probable cause that some of the Blackstone illegal products are manufactured, assembled, and/or stored at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487, the VBS Search Premises.

83.     Surveillance in June 2016 revealed an individual outside the VBS Search Premises wearing a Blackstone Labs t-shirt and a surgical mask. This individual was outside Suite 12, and the garage door at Suite 12 was partially open. Based on my training and experience, I know that individuals who manufacture or package pharmaceuticals or dietary supplements often wear personal protective equipment such as surgical masks while working in close proximity to pharmaceuticals or dietary supplements to protect their health and ensure sanitary requirements.

22

84.     On or about June 24, 2016, FDA/OCI agents also procured items and documents from a dumpster outside the VBS Search Premises at 1140 Holland Drive, Boca Raton, FL 33487. Although the Florida Department of State Division of Corporations website listed the principal place of business and mailing address for VBS Laboratories LLC as 1140 Holland Drive, *Suite 2*, Boca Raton, Florida, several sources of evidence, including bank records and mail, list the address for VBS Labs as *Suite 12* (twelve). Surveillance in November 2016 revealed that the door to Suite 12 is labeled "VenTech." VenTech Labs, LLC is the name of a company registered to Anthony Ventrella, who is also the registered agent for VBS Labs.

85.     Several items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, and that the VBS Search Premises will contain evidence of criminal violations including violations of the FDCA, mail and wire fraud, and conspiracy to commit mail and wire fraud. These items include:

>     (A) Loose labels for the Blackstone product "Super DMZ Rx 2.0," some of which had a stamped expiration date of 06/18 and a lot number of 370 in red coloring; however, the majority had no expiration date or lot number listed;
>
>     (B) Loose labels for a "Fight Pharm" product named "Ostapro";
>
>     (C) A color photocopy of a Florida Driver's License for Anthony Joseph Ventrella, the registered agent of VBS Laboratories, LLC;
>
>     (D) A printed email from anthonyventrella@gmail.com dated June 22, 2016 asking for current prices on SARMs;[2]

---

[2] SARMs, or "Selective Androgen Receptor Modulators" are compounds that have similar properties to anabolic agents (e.g. steroids). As a general matter, SARMs are not appropriate for inclusion in a dietary supplement.

(E) Printed spreadsheets listing raw materials and pricing for ingredients from different companies. Items on the list included: Picamilon Base, N-Acetyl-Cysteine, methylstenbolone, dimethazine, Ostarine, and Amp Citrate (DMBA);[3]

(F) A handwritten note which included the words "BSL DMZ" and numbers;

(G) A handwritten list titled "To Do Pills" and "To Do Powders." Under "To Do Powders" was listed several items, including "DUST." Based on context and my training and experience, I believe these handwritten documents are evidence contributing to probable cause that VBS Labs is manufacturing or storing products for Blackstone at the VBS Search Premises, including Super DMZ and one or more of the "Dust" products discussed herein.

(H) A UPS shipping label from shipper: 2252818838, VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 (the VBS Search Premises);

(I) A Chase business/debit card (cut in half) in the name "Anthony J. Ventrella/Fight Pharm LLC."

Ostapro

86.     The label for the Fight Pharm product "Ostapro" recovered from the dumpster at the VBS Search Premises revealed a listed ingredient of [(2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide, which is a "selective androgen

---

[3] These substances are discussed herein at the following paragraphs: Picamilon, ¶¶ 100-103, N-Acetyl-Cysteine, ¶¶ 106-107, Ostarine, ¶¶ 86-88; and DMBA, ¶¶ 49-62.

receptor modulator" ("SARM"), also known as ostarine. The product label describes Ostapro as a dietary supplement.

87.     Products that contain ostarine are not dietary supplements because ostarine is the subject of substantial clinical investigations which have been made public. To the best of FDA's knowledge, ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigations. Accordingly, Ostapro cannot be a dietary supplement.

88.     The Ostapro label states the product was manufactured and distributed by "Fight Pharm" and states the product will "increase lean mass," "decrease body fat," "maximize strength," and is "physique enhancing." Accordingly, Ostapro is a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it is intended to affect the structure or function of the human body. Ostapro is also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it is not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Ostapro is not approved as safe and effective by the FDA, it is an unapproved new drug.

89.     The introduction or delivery for introduction into interstate commerce of Ostapro, an unapproved new drug, is illegal under 21 U.S.C. 331(d).

90.     According to the Florida Department of State, Division of Corporations website, the registered agent for Fight Pharm is Anthony Ventrella, and the principal and mailing address is listed as the VBS Search Premises.

91.     Bank records confirm a financial connection between Blackstone and Fight Pharm. Former Blackstone CEO Singerman was listed on a Fight Pharm LLC bank account as a "Signer" in April 2014. Braun was added to the signature card of the same bank account in August 2015.

92.     VBS Labs and Blackstone are also linked in financial records, including the Blackstone Accounts Payable described in paragraph 81. Bank documents show that Singerman and Braun were authorized as "Signers" to VBS Labs' JP Morgan Chase business bank account in March 2016.

### Dust Extreme

93.     Based on evidence from the June 2016 trash pull at the Blackstone Search Premises, FDA/OCI agents made another undercover purchase via www.blackstonelabs.com on or about June 27, 2016. During this undercover transaction, the FDA/OCI purchased the product "Dust Extreme." According to Blackstone's website, the Dust Extreme product label lists DMAA as a dietary ingredient. Under the image of the product on the website, the website text stated "DMAA strikes back." Shortly after the purchase, an email was received from the email address: "cs@blackstonelabs.com," confirming the above referenced purchase, and listing information about the sale.

94.     On or about June 30, 2016, FDA/OCI agents received the package that contained the aforementioned product. The return address listed on the United States Postal Service ("USPS") Priority Mail package was "Blackstone Labs, LLC, 1090 Holland Drive, Suite 2, Boca Raton, Florida 33487." After inventorying the product into evidence, it was sent to the FDA FCC for testing.

95.     As described in paragraphs 68-69, DMAA is not a dietary ingredient and is an unsafe food additive. Accordingly, the presence of DMAA in Dust Extreme causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

96.     Even if DMAA were a dietary ingredient, it would be a new dietary ingredient subject to premarket notification. As of January 26, 2017, Blackstone has not submitted a

26

premarket notification for DMAA. Therefore, even if DMAA were a dietary ingredient, Dust Extreme would be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a).

97.    Even if Blackstone had submitted the required premarket notification, Dust Extreme would still be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a) because there is no adequate information to provide reasonable assurance that DMAA does not present a significant or unreasonable risk of illness or injury.

98.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that transactions of "Payments Received" specifically list "Dust Extreme." Based on context, I believe these entries refer to sales of the Dust Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

99.    There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust Extreme, an adulterated food and unsafe dietary supplement in violation of 21 U.S.C. §§ 331(a) and 331(v).

Growth, Anesthetized, and Euphoria RX

100.    The Blackstone website also lists for sale other products that violate the FDCA, including products named "Growth," "Anesthetized," and "Euphoria RX." The website includes images of each product and their labels. According to the labels for the products, all three products contain 4-(pyridine-3-cabonylamino), also known as Pikatropin or Picamilon, and list it as one of the dietary ingredients.

101.    Picamilon is used as a prescription drug in Russia for a variety of neurological conditions. It is not approved as a drug in the United States. FDA has issued Warning Letters to five companies whose products marketed as dietary supplements claim to contain Picamilon and

listed it as a dietary ingredient. These products were misbranded because Picamilon does not meet the statutory definition of a dietary ingredient.

102. FDA has publicly stated that Picamilon is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same, nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake.

103. The inclusion of Picamilon as a dietary ingredient on the product label causes the Growth, Anesthetized, and Euphoria RX products to be misbranded in that the labeling is false and misleading within the meaning of 21 U.S.C. § 343(a)(1).

104. Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Growth," "Anesthetized," and "Euphoria." Based on context, I believe these entries refer to sales of the three products, with shipping addresses that show the products were shipped to multiple states.

105. There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of misbranded foods Growth, Anesthetized, and Euphoria RX, in violation of 21 U.S.C. § 331(a).

Gear Support and PCTV

106. The Blackstone website also lists for sale other products that violate the FDCA, including products named "Gear Support" and "PCTV." The website includes images of each product and their labels. According to the products' labels, Gear Support and PCTV contain N-Acetyl-Cysteine ("NAC") and are described as dietary supplements.

107. Products that contain NAC are excluded from the definition of dietary supplement under 21 U.S.C. § 321(ff)(3)(B)(i) because FDA approved NAC as a "new drug" in 1985 and FDA

28

does not have any information that indicates that NAC was marketed as a dietary supplement or as a food prior to its approval as a "new drug."

108.   A video advertising the product Gear Support located on Blackstone's website displayed Braun describing the product and stating "It'll decrease your blood pressure." A video advertising the product PCTV located on Blackstone's website displayed Braun describing the product and stating it "replenishes natural glutathione stores" and it "keeps the liver super healthy."

109.   Accordingly, Gear Support and PCTV are drugs within the meaning of 21 U.S.C. § 321(g)(1)(C) because they are intended to affect the structure or function of the human body. They are also "new drugs" within the meaning of 21 U.S.C. § 321(p) because the products Gear Support and PCTV are not generally recognized among qualified experts as safe and effective for use suggested, recommended, or prescribed in its labeling. Gear Support and PCTV have not been approved by FDA as safe and effective for their intended uses, and therefore are unapproved "new drugs." *See* paragraphs 16-17 and 20-21 for explanation of "new drugs."

110.   Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Gear Support" and "PCTV." Based on context, I believe these entries refer to sales of the products, with shipping addresses that show the products were shipped to customers in multiple states.

111.   There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of the unapproved "new drugs" Gear Support and PCTV, in violation of 21 U.S.C. § 331(d).

### Recent Evidence from the Premises

112.   On or about October 14, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

113.     Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises.  These items include:

> (A) Multiple printed emails from various employees of Blackstone including the director of sales, vice president, and inventory manager;
>
> (B) Several order forms detailing who ordered the products, where the products were shipped to (including locations outside the state of Florida), and which products were ordered; one in particular stated a shipment was sent to Legendary Supplements[4] for a total of $12,500.00; however, it did not list the products ordered;
>
> (C) A copy of Blackstone Labs Accounts Payable including multiple transactions from a vendor by the name of "Duracap Labs" ranging in amounts from $25,851.00 to $128,161.00 during July 2016.  According to the Georgia Secretary of State Corporations Division, Duracap Labs is also the name of a Georgia corporation founded by "Wesley Houser," and three other individuals in January 2014.  Upon information and belief, "Wesley Houser" is John Wesley Houser, IV, an individual under indictment for manufacturing and sale of controlled substances and illegal dietary supplements;
>
> (D) Handwritten notes including one stating "Found emails of Aaron telling Wes: 1. underdose, but keep label same 2. mask ingredients + flavors".  Upon

---

[4] As discussed in paragraph 46, Legendary Supplements continues to sell Super DMZ Rx 2.0, notwithstanding the recall and FDA's determination that the product is an unapproved new drug and poses a serious health hazard.

information and belief, "Aaron" refers to Aaron Singerman, founder of Blackstone, and "Wes" refers to John Wesley Houser, IV. Based on my knowledge and context, I believe this document is evidence of Blackstone's intent to misrepresent information on product labels, and defraud consumers.

114.    On or about October 14, 2016, FDA/OCI agents procured items from a large dumpster outside the VBS Search Premises.

115.    Items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, the manufacturing of products labeled as dietary supplements, and will contain evidence of criminal violations, including violations of the FDCA, mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. These items included:

> (A) Loose labels for the Blackstone product "Super DMZ Rx 2.0"; no expiration date or lot number was visible on the front of the label; however, an imprint of an expiration date of 07/18 and a lot number of 512 was located on the inside;
>
> (B) Seven (7) loose pill capsules of assorted colors;
>
> (C) Two (2) empty bags of rice flour with a listed weight of 22.68 kg (50 pounds) each (rice flour is often used as a filler ingredient in supplements);
>
> (D) A large clear bag containing seven (7) empty red pill capsules; and
>
> (E) A large silver bag containing twelve (12) empty white pill capsules.

116.    Upon information and belief, Blackstone continues to promote and sell products which violate the FDCA on their website, through other online retailers, and through wholesale distribution, including the products discussed herein: Brutal 4ce, Dust V2, Dust Extreme, Growth,

Anesthetized, Euphoria RX, Gear Support, and PCTV. (Note: this is not a complete list of all products labeled as dietary supplements currently marketed for sale by the company.)

EXECUTION OF THE WARRANT

117.    As described above and in Attachment B.1 and B.2, this application seeks permission to search for records that might be found on the Blackstone Search Premises and VBS Search Premises in whatever form they may be found, including data stored on a computer's hard drive or other storage media.  One form in which records may exist is as paper documents, including financial records, invoices, and correspondence.  For example, FDA/OCI has reviewed mail in the trash at the Blackstone Search Premises addressed to Blackstone or Blackstone employees, and shipping labels, invoices, ingredient sheets, and printed correspondence from the trash at the VBS Search Premises.

118.    Another form in which records may exist is as data stored on computer hard drives or other storage media.  A storage medium is any physical object upon which computer data can be recorded, which includes hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.  Based on my review of other evidence related to this investigation, I believe that there is a computer system or systems currently located at the Blackstone and VBS Search Premises.  For example, I believe that emails from various employees of Blackstone including the director of sales, vice president, and inventory manager, as previously mentioned, will be found on a computer or computers at the Blackstone Search Premises.  Documents found in the trash at the VBS Search Premises include documents printed from computers, such as spreadsheets and email from Anthony Ventrella and I believe that similar electronic documents will be found on a computer or computers at the VBS Search Premises.  Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

32

119. I submit that if a computer or storage medium is found at either of the search premises, there is probable cause to believe the records described above will be stored on that computer or storage medium, for at least the following reasons:

(A) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(B) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(C) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging

33

files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

(D) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

(E) Based on my review of evidence related to this investigation, including various financial records and other documents, I am aware that computer equipment was used to generate, store, and print documents used in the FDCA violations, mail and wire fraud, and conspiracy schemes.  There is reason to believe that there are computer systems currently located at both the Blackstone and VBS Search Premises.

120.  *Forensic evidence.*  As further described in Attachment B.1 and B.2, this application seeks permission to locate not only computer files that might serve as direct evidence, instrumentalities or fruits of the crimes described in the warrants, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in both the Blackstone and VBS Search Premises because:

(A) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information

34

on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

(B) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein,

35

computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). This geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

(C) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

(D) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(E) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

121.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either

37

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

(A) *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(B) *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(C) *Variety of forms of electronic media.*  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

122.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), I seek permission to seize, image, or otherwise copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

123.    Blackstone and VBS Labs are functioning companies that may conduct legitimate business in addition to its participation in the distribution of illegal dietary supplements and drugs, mail fraud, and wire fraud.  The seizure of Blackstone's or VBS's computers may limit their ability to conduct legitimate business.  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.

## REQUEST FOR SEALING

124.    Due to the ongoing nature of this investigation, I respectfully request that this Affidavit, Application, Search Warrant, and all attachments be sealed by the Court.  As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents until further order of the Court because their premature disclosure may give

targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify co-conspirators, or otherwise seriously jeopardize the investigation.

## CONCLUSION

125.    I submit that this affidavit supports probable cause for a warrant to search the Blackstone Search Premises described in Attachment A.1 and seize the items described in Attachment B.1.

126.    I submit that this affidavit supports probable cause for a warrant to search the VBS Search Premises described in Attachment A.2 and seize the items described in Attachment B.2.

FURTHER AFFIANT SAYETH NAUGHT

Kelly McCoy
Special Agent
Food and Drug Administration,
Office of Criminal Investigations

Subscribed and sworn to before me
On this 3 Rd day of February, 2017.

The Honorable William Matthewman
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 2/3/2017

**ATTACHMENT A.1**

Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building.  See Exhibit 1 below.  There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre."  The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



1

Exhibit 2



Exhibit 3



**ATTACHMENT A.2**

Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises"). The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes. See Exhibit 1 below. Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door. See Exhibit 2 below. The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



Exhibit 2



**ATTACHMENT B.1**

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

   a. any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b. any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c. evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d. any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e. records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f. all bank records, checks, credit card bills, account information, and other financial records;

   g. customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

1

h.  any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.  advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.  correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.  tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.  records of or information about Internet Protocol addresses used by the COMPUTER;

e.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

**ATTACHMENT B.2**

Particular Things to Be Seized

1.    All records and information that constitute fruits, contraband, evidence and
      instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C.
      §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated
      food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail
      fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring
      after January 1, 2012 including, but not limited to:

      a.    any invoices, purchase orders, packing slips, receipts, notes, records, shipping
            records, ledgers, money orders, checks, bank records, pedigrees, storage records
            and other papers and documents relating to the purchase, shipment, sale,
            manufacturing, storage and/or holding of banned, adulterated, or misbranded
            dietary supplements and/or unapproved new drugs;

      b.    any information related to customers, suppliers or sources of banned, adulterated,
            or misbranded dietary supplements and/or unapproved new drugs containing such
            ingredients and related identifying information;

      c.    evidence of occupancy, residency, and/or ownership of the premises, including
            utility and telephone bills; mail, deeds, leases, rental agreements, loans,
            mortgages, photographs, personal telephone books, diaries, statements,
            identification cards and documents, airline tickets and related travel documents,
            bank books, checks and check registers, and public storage facilities receipts;

      d.    any and all corporate records pertaining to the establishment, ownership,
            agreements, method of operation and purchase, shipment, sale, storage and
            holding of banned, adulterated, or misbranded dietary supplements and/or
            unapproved new drugs containing such ingredients;

      e.    records of off-site locations to store records, banned, adulterated, or misbranded
            dietary supplements and/or unapproved new drugs containing such ingredients
            and/or currency, including safe deposit box keys, records and receipts, and rental
            agreements for storage facilities;

      f.    all bank records, checks, credit card bills, account information, and other financial
            records;

      g.    customer and employee records associated with the dispensing of banned,
            adulterated, or misbranded dietary supplements and/or unapproved new drugs
            containing such ingredients;

h.     any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.      advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.      correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.     tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.     records of or information about Internet Protocol addresses used by the COMPUTER;

e.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.      contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

2

correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Premises located at Blackstone Labs, LLC,<br>1090 Holland Drive, Suites 1 and 2,<br>Boca Raton, FL 33487 | )<br>)<br>)  Case No.  1 7-8047-WM<br>)<br>)<br>) |

**SEARCH AND SEIZURE WARRANT**

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Date 2-13-2017
Deputy Clerk

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the          Southern          District of          Florida          *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.1

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B.1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before          *February 17, 2017*
                                                                                                        *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been
                                                                                    established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty          *Duty U.S. Magistrate Judge* .
                                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*     ☐ for _____ days *(not to exceed 30)*.

                                                ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     *February 3, 2017*
                                        *1: 23 p.m.*                              *William Matthewman*
                                                                                                *Judge's signature*

City and state:     West Palm Beach, Florida          William Matthewman, United States Magistrate Judge
                                                                                            *Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

                             _____

                                        *Executing officer's signature*

                             _____

                                          *Printed name and title*

## ATTACHMENT A.1

### Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building. See Exhibit 1 below. There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre." The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



Exhibit 2



Exhibit 3



### ATTACHMENT B.1

Particular Things to Be Seized

1.   All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

   a.   any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b.   any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c.   evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d.   any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e.   records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f.   all bank records, checks, credit card bills, account information, and other financial records;

   g.   customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

1

    h.  any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

    i.  advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

    j.  correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

    k.  tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

    2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    c.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    d.  records of or information about Internet Protocol addresses used by the COMPUTER;

    e.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

MAR - 2 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

Premises located at Blackstone Labs, LLC,
1090 Holland Drive, Suites 1 and 2,
Boca Raton, FL 33487

Case No. 17-8047-WM

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location):*
**See Attachment A.1**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
**See Attachment B.1**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 17, 2017 _____
*(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty _____ Duty U.S. Magistrate Judge _____.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____

Date and time issued: _____ February 3, 2017 _____
1:23 p.m.

City and state:  West Palm Beach, Florida

_____ William Matthewman _____
*Judge's signature*

William Matthewman, United States Magistrate Judge
*Printed name and title*

9:19-CR-80030
**GOVERNMENT EXHIBIT**
044

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>17-8047-WM | Date and time warrant executed:<br>2/16/17 10:10 AM | Copy of warrant and inventory left with:<br>Richard Newton |
| Inventory made in the presence of:<br>Irene Nunez + SA Matt Heath | | |
| Inventory of the property taken and name of any person(s) seized:<br><br>See Attached | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/2/17

_____
Executing officer's signature

Matt W Heath, Special Agent
Printed name and title

Dave Lee Brannon, USMJ    3-2-2017

## ATTACHMENT A.1

### Property to Be Searched

    The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building.  See Exhibit 1 below.  There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre."  The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



1

Exhibit 2



Exhibit 3



**ATTACHMENT B.1**

Particular Things to Be Seized

1.   All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud) and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

   a.   any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b.   any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c.   evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d.   any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e.   records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f.   all bank records, checks, credit card bills, account information, and other financial records;

   g.   customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

1

h. any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i. advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j. correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k. tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d. records of or information about Internet Protocol addresses used by the COMPUTER;

e. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

2

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017      **START TIME:** 10:10a.m.      **END TIME:**

**SITE ADDRESS:** 1090 Holland Drive, Suite 1 and 2, Boca Raton, Florida

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 1 | Evidence bag containing (8) bottles, labeled in part, PCTV, 60 capsule/btl, Lot #2046, Exp 12/18 |
| 2 | 1 | Evidence bag containing a total of (8) bottles without lot numbers or expiration dates:  PCTV (6); Brutal 4CE (1); Gear Support (1) |
| 3 | 1 | Evidence bag containing (14) bottles labeled as containing Euphoria RX, 16 capsules/btl, Lot #632, Exp 10/18. |
| 4 | 1 | Box containing (63) bottles labeled as containing Bear Support, 90 capsules/btl |
| 5 | 1 | Box (1 of 2) and Evidence Bag (2 of 2) containing a total of 81 bottles labeled as containing Blackstone Labs (Growth, 90 capsules/btl. |
| 6 | 1 | Box containing a total of (33) packets labeled as containing Dust V2, 500ml, 16.9 oz, TGropical Punch |
| 7 | 1 | Box containing a total of (21) bottles labeled as containing Anesthetized Pineapple Sweet Dreams |
| 8 | 1 | Box containing a total of (18) bottles labeled as containing Dust U2 - Blue Sky 300g |
| 9 | 1 | Box containing a total of (11) containers labeled as Dust V2, 250g, 25 servings, Black Lemonade |
| 10 | 1 | Box containing a total of (19) bottles labeled as containing Dust V2 - Red KE, 300g |
| 11 | 1 | Box containing a total of (25) bottles labeled as containing Dust Extreme, 75mg |
| 12 | 2 | Boxes containing a total of (128) bottles labeled as Cobra 6 Extreme Intense Stimulant, 60 capsules/btl |
| 13 | 2 | Boxes containing a total of (27) bottles labeled as Dust Extreme Sour Gummy Bear, 75mg |
| 14 | 2 | Evidence bags containing a total of (9) containers labeled as Dust V2, 30 servings, Watermelon |
| 15 | 2 | Boxes containing a total of (42) bottles labeled as containing Dust V2, Dietary Supplement |
| 16 | 1 | Box containing a total of (27) containers labeled as containing Cobra 6, 60 servings, Kiwi Strawberry Flavor |



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 17 | 1 | Box containing a total of (94) bottles labeled as containing Brutal 4CE, 60 tablets/btl, Dietary Supplements |
| 18 | 1 | Box containing a total of (14) containers labeled as Dust V2, 30 servings, cut with cotton candy |
| 19 | 1 | Box containing a total of (21) bottles labeled as Dust Extreme Dietary Supplement |
| 20 | 1 | Box containing a total of (20) bottles labeled as Cobra 6, Dietary Supplement |
| 21 | 1 | Box containing a total of (11) bottles labeled Anesthetized - Sleep Formula |
| 22 | 2 | Boxes containing a total of (107) bottles labeled as Cobra 6, 60 caps/btl |
| 23 | 1 | Box containing a total of (15) bottles labeled as PCTV, 60 capsules/btl |
| 24 | 1 | Box containing a total of (155) bottles labeled as Euphoria Rx, 16 Capsules/btl |
| 25 | 3 | Boxes containing a total of (63) bottles labeled as Blackstone Labs, Dust V2, Extreme Pre-Workout Formula - Various Flavors |
| 26 | 1 | Evidence bag containing a total of (11) bottles labeled as Cobra 6 Extreme, 60 capsules |
| 27 | 1 | Evidence bag containing a total of (9) bottles labeled as Gear Support, 90 capsules/btl |
| 28 | 1 | Evidence bag containing a total of (7) bottles labeled as Growth Dietary Supplement, 90 capsules/btl |
| 29 | 1 | Evidence bag containing a total of (9) bottles labeled as Brutal, 60 tablets/btl, Dietary Supplements |
| 30 | 1 | Box containing a total of (75) bottles labeled as Dust V2, Bottle cap Infuser |
| 31 | 1 | Evidence bag containing a total of (3) bottles labeled as Brutal 4CE, 60 tablets/bottle |
| 32 | 1 | Evidence bag containing a total of (6) bottles labeled as Euphoria - Rx, 16 capsules/btl |
| 33 | 1 | Box containing a total of (12) bottles labeled as Blackstone Labs Anesthetized Hardcore Sleep Formula - Pineapple, 25 servings/btl |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 34 | 1 | Box containing a total of (21) bottles labeled as Blackstone Labs, Cobra 6 Extreme, 60 servings/bottle, multiple flavors - (Powder) |
| 35 | 1 | Box containing a total of (15) bottles labeled as Blacksone Labs, Dust Extreme, 75mg of 1.3 – DMAA – 30 servings/btl |
| 36 | 1 | Box containing a total of (15) bottles labeled as Cobra 6 Extreme, 60 capsules/btl |
| 37 | 1 | Box containing a total of (21) bottles labeled as Blackstone Labs PCTV - Post Cycle Therapy, 60 capsules/btl |
| 38 | 1 | Evidence bag containing (6) packs labeled as Angel Dust, Dietary Supplements |
| 39 | 1 | Evidence bag containing a total of (155 ) packets labeled as Dust V2, Dietary Supplement |
| 40 | 1 | Evidence bag containing (1) open container labeled as Dust V2 |
| 41 | 1 | Box containing a total of (9) containers labeled as Cobra 6 Extreme. |
| 42 | 1 | Box containing a total of (4) containers labeled as Gear Support |
| 43 | 1 | Box containing a total of (8) containers labeled as Growth |
| 44 | 1 | Evidence bag containing (3) sealed bottles labeled as Euphoria Rx, 16 Count |
| 45 | 1 | Evidence bag containing (9) bottles labeled as Blackstone Lab Ano-Genn Anabolic Activator, 60 capsules/btl |
| 46 | 1 | Evidence bag containing (6) bottles labeled as Blackstone Labs, Abnormal, 60 tabs/btl |
| 47 | 1 | Evidence bag containing (6) bottles labeled as Blackstone Labs, Crossed 1, 60 tabs/btl |
| 48 | 1 | Evidence bag containing (18) bottles labeled as Blackstone Labs, Eradicate, 90 caps/btl |
| 49 | 1 | Evidence bag containing a total of  (3) bottle, (1) labeled as Dust V2 and (2) labeled as PCTV |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 50 | 1 | Evidence bag containing (1) bottle labeled as Cobra 6 Extreme, Kiwi Strawberry Supplement |
| 51 | 1 | Evidence bag containing a total of (5) bottles: (2) bottles labeled as Dust Extreme, 360g; (1) bottle labeled as Grown 165g; (1) bottle labeled as PCT 150g; (1) bottle labeled as Euphoria Rx, 16 capsules |
| 52 | 1 | Evidence bag containing a total of (11) bottles: (3) labeled as Dust Extreme, 360g; (2) bottles labeled as Anesthetized, 25 servings; (4) bottles labeled as Dust V2 300g; (1) bottle labeled as Growth, 90 capsules; (1) bottle labeled as Brutal 4CE, 60 tablets; and (1) bottle labeled as Euphoria Rx, 16 capsules |
| 53 | 1 | Evidence bag containing (1) bottle containing black pills labeled as Eradicate 90 capsules, Exp 5/18, Lot 36D |



## U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017     **START TIME:**     **END TIME:**

**SITE ADDRESS:** 1140 HOLLAND DRIVE, SUITE 12, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 1 | Apple iMAC model # A1419 bearing Serial #C02Q113DFY11 and power cord, SCERS # S1RIC1D1 |
| 2 | 1 | Apple iMAC model # A1418 bearing Serial # C02L7480F8J2 and power cord, SCERS # S1RIC2D1 |
| 3 | 1 | Apple iMAC model # A1419 bearing Serial # C02P33LOFY11 and power cord, SCERS # S1RHC2D1 |
| 4 | 1 | Apple iMAC model # A1419 bearing Serial # C02Q24BJF8J4 and power cord, SCERS # S1RPC3D1 |
| 5 | 1 | Forensic image of Apple iPhone Model # MKUQ2LL bearing Serial #F2LRFASVGRWV, SCERS #S1RPC1D1. |
| 6 | 1 | Forensic image of Apple iPhone Model # MGC52LL bearing Serial #F2LPCAJCG5QJ, SCERS #S1RPC2D1. |
| 7 | 1 | Forensic image of Apple iPhone Model # MN5T2LL bearing Serial #F2LSRC25HFXW, SCERS #S1RHC1D1. |
| 8 | 1 | Apple laptop Model # A1466 bearing Serial # C02NVDWJG085 and power block, SCERS # S1RFC1D1. |
| 9 | 1 | Apple iMAC model # A1418 bearing Serial #C02QD3Q8GG77 and power cord, SCERS # S1RIC3D1. |
| 10 | 1 | Seagate SATA Drive model # SRD00F1 bearing Serial # NA97FTKY, SCERS # S1RPC4D1 |
| 11 | 1 | Seagate SATA Drive model # SRD00F1 bearing Serial # NA7R9MYR with handwritten label-Aaron Singerman Desktop Backup 05/24/16, SCERS # S1RHC3D1 |
| 12 | 1 | Western Digital SATA Drive model # WDBYNW0010BBK-08 bearing Serial # WX71A86K5C6C with handwritten label-Chris E. laptop backup Jan 9th 2017, SCERS # S1RHC4D1 |
| 13 | 1 | Western Digital SATA Drive model # WDBUZG0010BBK bearing Serial # WX71EB3CDW46, SCERS # S1RHC5D1 |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017    **START TIME:** 10:10am    **END TIME:** _____

**SITE ADDRESS:** 1090 HOLLAND DRIVE, SUITE 1&2, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|--------------------------|
| 1 | 1 | Evidence bag containing 3 manila folders with potential attorney-client documents |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017     **START TIME:** 10:10am     **END TIME:**

**SITE ADDRESS:** 1090 HOLLAND DRIVE, SUITE 1&2, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 35 | Box containing dietary supplements and types as follows: R-redemption - silk; cobra 6 extreme; dust extreme sour gummy bear; anesthetized pineapple sweet; dust TV2 - redice; dust TV2 - blue sky; dust extreme pineapple mango; color 6 extreme kiwi strawberry; dust TV2 watermelon; growth; brutal 4ce - desired by force; geer support; dust TV2 - black lemonade; dust TV2 - tropical punch; euphoria RX; cobra 6C; andgemin; trojan horse - lemon lime; apex mule; ; EPI - test - tropical breeze; juiced up - sarge phytoformula betin berriz; trojan horse - black culment; BCAA resurgence - fruit punch; hype - orange; anormal; hype - fruit punch; BCAA - resurgenz - pinn colada; hype extreme - fruit punch; hype extreme - cotton candy; erudicat; eradicat - powered by arimistene; chosen 1 - destiny; EPI CAT; PCTV |
| 2 | 1 | Evidence bag containing sample for FCC; 1 bottle Glimmer 60ct; 1 bottle Dusk 30 servings; 1 bottle Drought 28 ct; 1 packet of Audade; 1 bottle Body Shaping 3fl oz; 1 bottle liquid coverup 8fl oz; 1 bottle sunless tanning lotion |
| 3 | 1 | Box containing bottle marked BSLPWV Peach Mango cc level, bottle marked partition MD, bottle marked sleepshred, bottle marked anesthetized, bottle with top marked CRV Rel, bottle marked primeur flavor, bottle marked EAAs |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017     **START TIME:** 10:10am     **END TIME:**

**SITE ADDRESS:** 1090 Holland Drive, Suite 1 and 2, Boca Raton, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 120 | Boxes labeled as Dust Extreme Sour Gummy (SG) |
| 2 | 120 | Boxes labeled as Dust (WM) |
| 3 | 120 | Boxes labeled as Dust RI |
| 4 | 120 | Boxes labeled as Dust CC |
| 5 | 14 | Boxes labeled as Dust BS |
| 6 | 22 | Boxes labeled as Dust BL |
| 7 | 120 | Boxes labeled as Dust Extreme PAM |
| 8 | 100 | Boxes labeled as Dust Extreme SGB |
| 9 | 100 | Boxes labeled as Dust WM |
| 10 | 100 | Boxes labeled as Dust RF |
| 11 | 100 | Boxes labeled as Dust BS |
| 12 | 100 | Boxes labeled as Dust BL |
| 13 | 72 | Boxes labeled as Dust PAM |
| 14 | 54 | Boxes labeled as Dust SGB |
| 15 | 75 | Boxes labeled as Dust WM |
| 16 | 78 | Boxes labeled as Dust Misc Flavors |
| 17 | 93 | Boxes labeled as Dust CC |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 18 | 70 | Boxes labeled as Dust CC |
| 19 | 97 | Boxes labeled as Dust BL |
| 20 | 110 | Boxes Dust BS |
| 21 | 19 | Boxes Gear Support RL |
| 22 | 23 | Boxes Growth Pineapple |
| 23 | 39 | Boxes labeled as PCTV |
| 24 | 31 | Boxes labeled as Cobra Extreme |
| 25 | 114 | Boxes labeled as Brutal 4CE |
| 26 | 100 | Boxes labeled as Gear Support |
| 27 | 129 | Boxes labeled as Brutal 4CE |
| 28 | 128 | Boxes labeled as Brutal 4CE |
| 29 | 83 | Boxes labeled as Eradicate |
| 30 | 106 | Boxes labeled as Chosen 1 |
| 31 | 10 | Boxes labeled as Eradicate |
| 32 | 99 | Boxes labeled as Anogenin |
| 33 | 103 | Boxes labeled as Anogenin |
| 34 | 70 | Boxes labeled as Cobra 6P Extreme |
| 35 | 80 | Boxes labeled as Cobra 6P Extreme |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 36 | 120 | Boxes labeled as Anestetized |
| 37 | 160 | Boxes labeled as Eradicate |
| 38 | 37 | Boxes labeled as Anesthetized |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| | | | | |
|---|---|---|---|---|
| **DATE OF SEARCH:** | 02/16/2017 | **START TIME:** 10:10am | **END TIME:** | |
| **SITE ADDRESS:** | 1090 HOLLAND DRIVE, SUITE 1&2, BOCA RATON, FL | | | |

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 1 | Evidence bag containing orders, R&L Carrier receipt |
| 2 | 1 | Evidence bag containing shipping and orders, inventory |
| 3 | 1 | Evidence bag containing a green cover inventory notebook,, DHL, black cover notebook; orange cover notebook, legal pad, green cover notebook |
| 4 | 1 | Evidence bag containing products; 2 notebooks re: sales, invoices |
| 5 | 1 | Evidence bag containing vendor information sheets, Checkers receipts |
| 6 | 1 | Evidence bag containing documents of ADP statement; W-2's; purchase invoices, earnings statement; cancelled checks. |
| 7 | 1 | Evidence bag containing documents – orders, ledgers, shippers orders, W-4's, ADP receipts |
| 8 | 1 | Evidence bag containing price sheets, invoices |
| 9 | 1 | Evidence bag containing 2 black books with financial ledgers, 1 blue folder with financial documents; 1 red/pink folder with financial documents, loose financial ledger documents |
| 10 | 1 | Evidence bag containing check#1054, check #1579, folder marked "CB Operating Agreement", manufacturing agreement, financial documents |
| 11 | 1 | Evidence bag containing financial/sale document and lab tests from clipboard |
| 12 | 1 | Evidence bag containing Financial/sales documents, envelope with financial documents |
| 13 | 1 | Evidence bag containing 5 folders of financial documents |
| 14 | 1 | Evidence bag containing financial documents |
| 15 | 1 | Evidence bag containing financial documents |
| 16 | 1 | Evidence bag containing 5 envelopes of receipts |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 17 | 1 | Evidence bag containing 2 legal pads |
| 18 | 1 | Evidence bag containing invoices |
| 19 | 1 | Evidence bag containing shipping labels |
| 20 | 1 | Evidence bag containing earning statements; BSL invoices; handwritten notes |
| 21 | 1 | Evidence bag containing note pad containing subjects names and phone numbers |
| 22 | 1 | Evidence bag containing email printouts of customer complaints; Dust V2 label |
| 23 | 1 | Evidence bag containing labels; Dust Extreme & Dust V2 |
| 24 | 1 | Evidence bag containing e-mail ADP earnings statements, handwritten note |
| 25 | 1 | Evidence bag containing 2 notepads and "field notes" earnings statements, folder |
| 26 | 1 | Evidence bag containing ledger; Winsauer earning statments; notebooks; lease; facebook ads paypal payments; profit/loss BSC paperwork; BSC earnings |
| 27 | 1 | Evidence bag containing documents including but not limited to Termination Agreemeent of Aaron Singerman, FDA WL, letter from Muscle Roge Ltd from PJ Brown, BSL Consulting Agreement with supplement safety solutions, signed terminations, BSL policy memos, resignation as manger of Prime Nutrition by Brown, BOCA Nutrition purchases; Blackstone labs handbook, envelope with return address of BSL, patent application file on various herbal ingredients, general nutrition corporation vendor book, ABC testing records, Blackstone labs order summary report, product pick lissts |
| 28 | 1 | Evidence bag containing financial documents |
| 29 | 1 | Evidence bag containing lab report documents |
| 30 | 1 | Evidence bag containing financial documents |
| 31 | 1 | Evidence bag containing miscellanous docuemnts |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

## INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 32 | 1 | Evidence bag containing file folders of invoices and box invoices |
| 33 | 1 | Evidence bag containing financial documents |
| 34 | 1 | Evidence bag containing financial documents individual payroll bank & credit car records |
| 35 | 1 | Evidence bag containing financial documents |
| 36 | 1 | Evidence bag containing financial documents |
| 37 | 1 | Evidence bag containing bills, password, records |
| 38 | 1 | Evidence bag containing bank documents shipping documents, ABC testing documents |
| 39 | 1 | Evidence bag containing bills of sole and earnings reports |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. *17-8048-WM*

INRE SEALED SEARCH WARRANT

_____/

## CRIMINAL COVER SHEET

1.      Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes ___X___ No

2.      Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?     _____ Yes ___X___ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY:      _____
ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov


9:19-CR-80030
**GOVERNMENT EXHIBIT**
045

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

NO. 17- 8048- WM



FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**IN RE SEALED SEARCH WARRANT**

_____/

## MOTION TO SEAL

The United States of America, by and through its undersigned Assistant United States

Attorney, requests that, with the exception of those copies to be provided to the United States

Attorney's Office and its agents for use in the execution of the search warrant, the attached

search warrant application, application, affidavit, related documents, and any resulting orders

be SEALED until further order of this court, because public disclosure of the search warrant

affidavit and related documents might compromise the integrity of the ongoing investigation.

The United States is prepared to provide further information *in camera* should the Court so

require.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____

ROBERT J. LEHNER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0861669
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9020
FAX (305) 530-6168
robert.lehner@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. _17-8048-WM_

IN RE SEALED SEARCH WARRANT

FILED by _____ D.C.

FEB 03 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

_____/

## SEALED ORDER

The United States of America, having applied to this Court for an Order sealing the

search warrant, related documents, and this order, and the Court finding good cause:

IT IS HEREBY ORDERED that the search warrant, the application and affidavit in

support thereof, related documents, and this Order shall be filed under seal until further order

of this Court, however, the United States Attorney's Office may obtain copies of any search

warrant and related sealed documents for purposes of executing the search.

DONE AND ORDERED in chambers at Miami, Florida, this 3rd day of February,

2017.

William Matthewman

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:     Robert J. Lehner, AUSA

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk
Date 2/3/2017

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida



FILED by _____ D.C.

FEB 0 3 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Premises located at VBS Laboratories, LLC,
1140 Holland Drive, Suite 12,
Boca Raton, FL 33487

)
)
)
)
)

Case No. 17-8048-WM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.2

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date 2/3/2017

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 331(a)(d)(v) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 21 U.S.C. § 333(a) | Interstate Distribution of Misbranded and Adulterated Dietary Supplements and Unapproved New Drugs |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail and Wire Fraud |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kelly McCoy, Special Agent, U.S. Food & Drug Admin.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _February 3, 2017_

City and state:  West Palm Beach, Florida

_____
*Judge's signature*

William Matthewman, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Kelly McCoy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for two warrants to search two premises: one located at Blackstone Labs,

LLC, 1090 Holland Drive, Suites 1 and 2, Boca Raton, FL 33487 (the "Blackstone Search

Premises"); and the second located at VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca

Raton, FL 33487 (the "VBS Search Premises").  Pictures and a detailed description of the two

locations are included in Attachment A.1 (Blackstone Search Premises) and Attachment A.2 (VBS

Search Premises), both of which are incorporated herein by reference.  This affidavit states

probable cause that evidence and property used in the commission of crimes, as particularly

described in Attachments B.1 and B.2, will be found at the Blackstone Search Premises and the

VBS Search Premises, respectively.

2.      I am a Special Agent with the U.S. Food and Drug Administration's Office of

Criminal Investigations ("FDA/OCI"), and have been since January of 2016.  I am presently

assigned to the Miami Field Office investigating violations of the Federal Food, Drug, and

Cosmetic Act, 21 U.S.C. § 301 *et seq*. (the "FDCA").  I am a law enforcement officer of the United

States, in that I am empowered under authority of the FDCA to conduct investigations and to make

arrests.  In my capacity as an FDA/OCI Special Agent, I have received extensive training in the

investigation of the counterfeiting, diverting, misbranding, adulterating and tampering of drugs,

medical devices, and dietary supplements.  In addition, I have approximately six years of prior

federal law enforcement experience as a Special Agent with the United States Secret Service.

During this time, I received extensive training in investigations of computer crimes, internet

1

investigations, child exploitation, counterfeit currency, check fraud, access device fraud, and identity theft, among other things.

3.      I have on numerous occasions participated in the execution of search warrants, and based upon my experience and training, and further based upon discussions with fellow law enforcement agents with years of experience investigating adulterated and misbranded foods, including dietary supplements, and drugs, I know that it is common for individuals engaged in this activity:

        (A) to maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the daily purchase and sale of merchandise. These records are often kept on computers and cellular telephones. The aforementioned computers, cellular telephones, books, records, receipts, notes, ledgers, bank records, money orders, etc., are routinely maintained at the business where the owner/operator has ready access to such records;

        (B) to maintain books, papers, and electronic devices (computers, electronic Rolodexes, Caller ID devices, and digital pagers and cellular telephones with memory capabilities) which reflect names, addresses, and/or telephone numbers of their suppliers and/or customers;

        (C) to utilize computers, electronic storage media (including PCs, laptops, and thumb drives) and cellular telephones to store information regarding their business activities, including a list of suppliers and/or buyers.

4.      Based on my training and experience and facts as set forth in this affidavit, there is probable cause to believe that there will be found at the search premises the items, records, and information listed in Attachment B.1 and B.2, all of which constitute evidence, fruits and

instrumentalities of violations of federal laws, including, but not limited to: causing the
introduction or delivery for introduction into interstate commerce of adulterated and misbranded
foods, unapproved new drugs, and unsafe dietary supplements (21 U.S.C. §§ 331(a), (d), and (v)
and 333(a)), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to
commit mail and wire fraud (18 U.S.C. § 1349), committed by Blackstone Labs, LLC, VBS
Laboratories, LLC, and their employees and agents.

     5.     The facts in this affidavit come from my personal observations and knowledge of
the investigation, observations of other law enforcement officers involved in this investigation and
information obtained from other government agents and/or law enforcement officers. This
affidavit is intended to show merely that there is sufficient probable cause for the requested
warrants and does not set forth all of my knowledge about this matter.

## SUMMARY OF INVESTIGATION

     6.     From approximately 2012 to the present, Blackstone Labs, LLC ("Blackstone"), an
internet-based bodybuilding supplement company founded by Aaron Singerman ("Singerman")
and Phillip (PJ) Braun ("Braun"), has engaged in a multiyear scheme to market, promote, and sell
illegal products labeled as dietary supplements, some of which are potentially dangerous.
Evidence supports probable cause that Singerman, Braun, and their associated companies,
including Blackstone and VBS Laboratories, LLC, intended to defraud and mislead the FDA and
consumers throughout the United States and internationally by selling these products,
notwithstanding receiving notice of legal violations through formal Warning Letters issued by the
FDA.

     7.     Blackstone's scheme includes a pattern of selling illegal products.  Evidence
supports probable cause that through these companies, Singerman and Braun intentionally sell and

have sold misbranded, adulterated, and/or unsafe dietary supplements and unapproved new drugs, and committed mail fraud, wire fraud, and conspiracy to commit mail or wire fraud.  This affidavit summarizes probable cause that Singerman, Braun, Blackstone, VBS Laboratories, LLC, and associated companies sell and have sold numerous adulterated and misbranded dietary supplements and unapproved new drugs, including products named:

> (A) Super DMZ Rx 2.0;
>
> (B) Angel Dust;
>
> (C) Cobra 6P Extreme;
>
> (D) Dust V2;
>
> (E) Brutal 4ce;
>
> (F) Dust Extreme;
>
> (G) Ostapro;
>
> (H) Growth;
>
> (I) Anesthetized;
>
> (J) Euphoria;
>
> (K) Gear Support; and
>
> (L) PCTV.

Three of these products include ingredients that are not listed on the labels.

    8.    This investigation and affidavit is based on evidence from multiple sources, including online research, undercover purchases, physical surveillance, public and government records, financial and shipping records, and physical evidence procured from discarded trash at the two search premises.

## OVERVIEW OF APPLICABLE STATUTES

### The Federal Food, Drug, and Cosmetic Act

9.      The U.S. Food and Drug Administration ("FDA") is an agency of the United States Government charged with the responsibility of protecting the American public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*.  Among other responsibilities, FDA enforces laws and regulations intended to ensure the safety of dietary supplements and drugs.

10.      Under the FDCA, the term "label" means a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).  The term "labeling" is broader, and is defined as all labels, as well as other printed or graphic matter upon any article or any of its containers or wrappers, or accompanying such article.  21 U.S.C. § 321(m).

Prohibited Acts and Penalties under the FDCA

11.      Causing the introduction or delivery for introduction into interstate commerce of a misbranded or adulterated food or drug is a prohibited act.  21 U.S.C. § 331(a).

12.      Causing the introduction or delivery for introduction into interstate commerce of a new drug that is not approved by the FDA is a prohibited act.  21 U.S.C. § 331(d).

13.      Causing the introduction or delivery for introduction into interstate commerce of a dietary supplement that is unsafe under 21 U.S.C. § 350b is a prohibited act.  21 U.S.C. § 331(v).

14.      Commission of a prohibited act is a misdemeanor punishable by a fine and up to a year in prison for each violation.  21 U.S.C. § 333(a).  If the prohibited act is done with "intent to defraud or mislead" consumers or an identifiable government agency, such as the FDA, it is a felony punishable by a fine and up to three years in prison for each violation.  21 U.S.C. § 333(a)(2).

Drugs under the FDCA

15.      Under the FDCA, "drug" is defined in relevant part as an article, other than food, intended to affect the structure or any function of the body of man.  21 U.S.C. § 321(g)(1)(C).

5

16.     A "new drug" is a drug that is not generally recognized among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under conditions prescribed, suggested, or recommended in the drug's labeling. 21 U.S.C. § 321(p).

17.     A "new drug" cannot be lawfully introduced into interstate commerce unless and until the FDA determines that the drug is safe and effective for its intended use and approves that drug.  21 U.S.C. § 355(a).

Foods and Dietary Supplements under the FDCA

18.     The FDCA defines "food" to include articles used for food or drink for man or other animals and articles used for components of such articles.  21 U.S.C. § 321(f).  Except for limited purposes, dietary supplements are deemed to be foods within the meaning of the FDCA.  21 U.S.C. § 321(ff).

19.     Under 21 U.S.C. § 321(ff), a "dietary supplement" is defined in relevant part as a product intended to supplement the diet that bears or contains one or more of the following dietary ingredients:

- vitamin;
- mineral;
- herb or botanical;
- amino acid;
- dietary substance for use by man to supplement the diet by increasing total dietary intake; or
- a concentrate, a metabolite, constituent, extract, or combination, of the preceding ingredients

and that is intended for ingestion, not represented for use as a conventional food or as a sole item of a meal or the diet, and is labeled as a dietary supplement.

20.    A product that includes an article that is approved as a "new drug" under 21 U.S.C. § 355 cannot be a dietary supplement unless the article was marketed as a dietary supplement or as a food prior to such approval.  21 U.S.C. § 321(ff)(3)(B)(i).

21.    A product that includes an article authorized for investigation as a "new drug" for which substantial clinical investigations have been instituted and made public cannot be a dietary supplement, unless the article was marketed as a dietary supplement or food before its authorization as an investigational new drug.  21 U.S.C. § 321(ff)(3)(B)(ii).

22.    A substance intended to become a component of a food, including a dietary supplement, is a food additive unless (1) it is generally recognized among experts qualified by scientific training and experience to evaluate its safety as having been adequately shown to be safe under the conditions of its intended use; (2) it is subject to prior sanction; or (3) it is an ingredient described in 21 U.S.C. § 321(ff) (a dietary ingredient).  21 U.S.C. § 321(s).  The other exceptions listed in 21 U.S.C. § 321(s) do not apply.

23.    A food additive is deemed unsafe unless it is used in conformity with a regulation prescribing conditions under which it may be safely used, it has been granted an exemption for investigational use under 21 U.S.C. § 348(j), or it is a food contact substance.  21 U.S.C. § 348(a).

24.    A food, including a dietary supplement, is adulterated if it contains a food additive that is unsafe within the meaning of 21 U.S.C. § 348.  21 U.S.C. § 342(a)(2)(C)(i).

25.    Under 21 U.S.C. § 350b, a dietary supplement that contains a new dietary ingredient (one not marketed in the United States before October 14, 1994) is deemed to be adulterated under 21 U.S.C. § 342(f) unless (1) the dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered, or (2) there is a history of use or other evidence of safety establishing that the

7

dietary ingredient will reasonably be expected to be safe and, at least 75 days before introducing the dietary supplement in interstate commerce, the manufacturer or distributor provides FDA with information which is the basis for its conclusion that the dietary supplement containing the new dietary ingredient will reasonably be expected to be safe ("premarket notification"). 21 U.S.C. § 350b.

26.     A dietary supplement also is deemed to be adulterated if: (1) it contains a dietary ingredient that presents a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in its labeling (21 U.S.C. § 342(f)(1)(A)(i)); or (2) it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury (21 U.S.C. § 342(f)(1)(B)).

27.     A food, including a dietary supplement, is misbranded if its labeling is false or misleading in any particular.  21 U.S.C. § 343(a)(1).

Relevant Title 18 Provisions

28.     18 U.S.C. § 1341 criminalizes mail fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, any such matter or thing, shall be fined or imprisoned not more than 20 years, or both.

29.     18 U.S.C. § 1343 criminalizes wire fraud, stating that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means

8

of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined or imprisoned not more than 20 years, or both.

30.     18 U.S.C. § 1349 criminalizes an attempt or conspiracy to commit mail fraud or wire fraud, stating that any person who attempts or conspires to commit such an offense shall be subject to the same penalties.

## FACTS ESTABLISHING PROBABLE CAUSE

31.     FDA/OCI is currently conducting an investigation of Blackstone Labs, LLC, VBS Laboratories, LLC, and their associated companies.   Blackstone is an active corporation incorporated in the State of Florida on or about August 29, 2012.  Since March 2016, Blackstone's principal address and mailing address is listed as 1090 Holland Drive, Suite 1, Boca Raton, FL 33487.  Surveillance in November 2016 confirmed that Suite 1 is labeled with a sign "Blackstone Labs Suite 1 Headquarters."  Suite 2, the next door, is labeled with a sign "Blackstone Labs Suite 2 Shipping and Receiving."  Collectively, 1090 Holland Drive, Suites 1 and 2 are the Blackstone Search Premises.

32.     The company was owned and operated by Phillip Braun and Aaron Singerman until July 2016, when records from the Florida Department of State, Division of Corporations show that Singerman's name no longer appears as an officer or director.  However, in a November 2016 video available online, Singerman stated that he still retains partial ownership of Blackstone, reviews the books, and gets paid.  Braun is currently listed as a manager for the company, and states in numerous videos posted on Blackstone's website that he is the president and CEO.

33.    Blackstone sells products online through its own website, www.blackstonelabs.com, as well as wholesale and through other retail stores. Blackstone ships its products, including the products described herein, across the United States and internationally. Consumers using www.blackstonelabs.com are able to pay for their orders through PayPal, Inc. ("PayPal") an online payment system, Visa, MasterCard, American Express, and Discover. The website also offers the ability to chat directly with an employee at Blackstone, and has social networking profiles on Twitter, Facebook, Instagram, and YouTube, all of which promote Blackstone products.

34.    Financial records and public records from the Florida Secretary of State, Division of Corporations show that Singerman and Braun (either both or individually) have management, shareholder, or financial signatory roles with Blackstone and several other dietary supplement companies including: VBS Laboratories, LLC; Singerman & Braun, LLC, dba Prime Nutrition or Platinum Labs; Boca Nutrition, LLC; Run Everything LLC; Steel Supps; Dynamik Muscle, LLC; SizeSlim, LLC; Redcon 1; Fight Pharm; Dragon Nutraceuticals, and Hardcore Ventures.

35.    VBS Laboratories, LLC ("VBS Labs") is a Florida Limited Liability Company incorporated in November 2015. Although VBS Labs does not appear to have a website, evidence demonstrates probable cause that VBS Labs sells, manufactures and/or stores illegal products labeled as dietary supplements, including Blackstone's product Super DMZ Rx 2.0.

Super DMZ Rx 2.0

36.    Blackstone began with a product labeled as a dietary supplement containing two synthetic steroids. During an interview with an online entrepreneurship magazine "Secret Entourage," published prior to January 3, 2016, Singerman explained that Blackstone was created after a former business partner was worried that a product called Super DMZ "was going to become

10

illegal." While describing how he and his "best friend" Braun founded Blackstone, Singerman stated, "In our business, sometimes gray market ingredients will become illegal and you have to take them off the market. Basically anything that works too well will probably become illegal one day."

37.     During the same interview, Singerman also stated that Blackstone started when the former partner wanted to dispose of 7,000 units of Super DMZ, so Singerman took the legal risk himself and sold the products. He explained that he and Braun started a website called SuperDMZ.com and a new company, Blackstone Labs, LLC. According to Singerman, they sold all the units and also purchased more of the product, as the "ingredient had not become illegal yet."

38.     Notwithstanding Blackstone's claims, probable cause exists that their first product, Super DMZ Rx 2.0, was an unapproved new drug. Using an internet archive tool called the "Wayback Machine," I reviewed a copy of the SuperDMZ.com website, as it existed in September 2012. The website included a label for the product "Super DMZ Rx 2.0," and listed its only ingredients as 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, also known as methylstenbolone, and 17b-hydroxy 2a, 17b-demthyl 5a-androstan 3-one azine, also known as dimethazine or dymethazine.

39.     Methylstenbolone and dimethazine are synthetic steroids and are not dietary ingredients because they are not vitamins, minerals, herbs or other botanicals, amino acids, or concentrates, metabolites, constituents, or extracts of the same, nor are they dietary substances for use by man to supplement the diet by increasing total dietary intake. Because Super DMZ Rx 2.0 did not bear or contain a dietary ingredient, Super DMZ Rx 2.0 was not a dietary supplement as defined in 21 U.S.C. 321(ff).

40.     As of September 2012, the labeling of Super DMZ Rx 2.0 stated that the product was "engineered and designed to increase, sustain, and strengthen muscularity," would result in "increased vascularity," and "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol." Accordingly, Super DMZ Rx 2.0 was a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it was an article other than food intended to affect the structure or function of the human body. Super DMZ Rx 2.0 was also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it was not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Super DMZ Rx 2.0 was not approved as safe and effective by the FDA, it was, and still is, an unapproved new drug.

41.     Since 2012, Blackstone and its associated companies have used the online payment system PayPal to transact sales of products. Blackstone PayPal records show financial transactions starting on August 30, 2012. This first transaction and many others in September 2012 have a listed "subject" of "SDMZ 2.0." Based on context and my knowledge of the investigation, I believe this refers to the Super DMZ Rx 2.0 product, and that the records indicate that Blackstone was selling the Super DMZ Rx 2.0 product online in 2012.

42.     In July 2013, the Blackstone product "Super DMZ Rx 2.0" was part of a voluntary recall by its manufacturer, Mira Health Products, Ltd. ("Mira Health"). Mira Health's recall letter noted that the raw materials used to manufacture Super DMZ Rx 2.0 included dimethazine. The Super DMZ Rx 2.0 label listed dimethazine and methylstenbolone as the only dietary ingredients. As described above, Super DMZ Rx 2.0 is an unapproved new drug. Mira Health also recalled another Blackstone product "Metha-Drol Extreme" that contained dimethazine.

12

43.     As part of the recall process, the FDA determined that the two Blackstone products posed a serious health hazard.  The recall included 11,200 bottles of Super DMZ Rx 2.0 with lot numbers M55Q (expiration date 04/2016), M55Q, (expiration date 05/2016), and E07Q (expiration date unknown), and 5,555 bottles of Metha-Drol Extreme.

44.     Despite the recall, Blackstone continued to sell Super DMZ Rx 2.0.  Using the "Wayback Machine," I reviewed a copy of Blackstone's website, www.blackstonelabs.com, as it existed in May 2015, which shows the company was still selling bottles of Super DMZ Rx 2.0 with methylstenbolone and dimethazine as the only dietary ingredients on the label.  The product was still described as being "engineered and designed to increase, sustain, and strengthen muscularity," and that the product "will increase lean muscle mass and strength at a level that is comparable to popular anabolic steroids such as Dianabol and Anadrol, the only difference is it's 100% legal!"

45.     The Blackstone website no longer offers "Super DMZ Rx 2.0" for sale, but includes a picture of the product covered by the word "Discontinued."  A Google search, however, revealed Blackstone's product "Super DMZ Rx 2.0" is currently for sale from multiple online dietary supplement vendors despite the prior recall and FDA's warning of health risks.

46.     On or about September 7, 2016, FDA/OCI agents made an undercover purchase of the Blackstone-branded product "Super DMZ Rx 2.0" from an online bodybuilding supplement retailer, Legendary Supplements, via the website www.legendarysupplements.com.  As discussed in paragraph 113, documents show that Legendary Supplements purchases products directly from Blackstone.

47.     On or about September 14, 2016, FDA/OCI agents received the Super DMZ Rx 2.0 product via mail.  Upon review, the label appeared to be identical to the label found in the dumpster

13

at the VBS Search Premises (see paragraph 115), other than the stamped expiration date and lot number. The expiration date for the purchased product was 05/18 and the lot number was 345, both of which were stamped in white rather than red. The label listed as the only dietary ingredients 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one (methylstenbolone) and dimethazine, which are the same ingredients as in the Blackstone Super DMZ Rx 2.0 product previously recalled. After inventorying the product into evidence, it was sent to the FDA Forensic Chemistry Center ("FDA FCC") for testing. FDA FCC test results confirmed that the product did contain dimethazine ("DMZ") but did not detect the presence of methylstenbolone.

48.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Super DMZ Rx 2.0, an unapproved new drug, in violation of 21 U.S.C. § 331(d).

Formal Warnings from FDA

49.     Super DMZ Rx 2.0 was the first product in a pattern of selling illegal products labeled as dietary supplements. On April 24, 2015, the FDA issued a Warning Letter to Aaron Singerman at Blackstone Labs, LLC in reference to another Blackstone product "Angel Dust," which was also sold as a dietary supplement. The product label declared that it contained as a dietary ingredient a substance called AMP Citrate (2-Amino-4-Methylpentane or 4-amino-2-methylpentane citrate), also known as DMBA. The FDA issued a second Warning Letter on the same day to Singerman as CEO of Prime Nutrition, for another product labeled as a dietary supplement and containing DMBA as a dietary ingredient.

50.     The Warning Letters informed Blackstone and Singerman that DMBA is a new dietary ingredient because there is no information demonstrating that DMBA was lawfully marketed as a dietary ingredient in the United States before October 15, 1994. The Blackstone

Warning Letter stated that Angel Dust was adulterated because DMBA, as a new dietary ingredient, is subject to the premarket notification requirement and Blackstone had not submitted premarket notification to the FDA.

51.    The Blackstone Warning Letter also advised Blackstone that, even if the premarket notification had been submitted, Angel Dust would still be adulterated because it contained a new dietary ingredient (DMBA) for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury. The Blackstone Warning Letter further advised Blackstone that introduction of Angel Dust into interstate commerce is prohibited under 21 U.S.C. § 331(a) (adulterated dietary supplement) and 21 U.S.C. § 331(v) (unsafe dietary supplement).

52.    The Blackstone Warning Letter requested that Blackstone take prompt action to correct the violations, as well as any other violations associated with the product Angel Dust or other dietary supplement products marketed by the firm, including any containing DMBA. The letter also warned that "Failure to immediately cease distribution of your product Angel Dust and any other products you market that contain DMBA could result in enforcement action by FDA without further notice."

53.    In a May 19, 2015 response from counsel to the Blackstone Warning Letter, Blackstone stated that it "takes the allegations in the [Blackstone Warning Letter] very seriously," and acknowledged that FDA had sent Warning Letters to at least 16 companies using DMBA, and that the FDA posted a public Q&A addressing DMBA on the internet. Blackstone agreed to immediately discontinue distributing and selling the Angel Dust product. Blackstone also stated that "[i]n deference to FDA's concerns as expressed in the warning letter and the Q&A on DMBA,

15

if Blackstone ever elects to market and sell Angel Dust again, it will reformulate the product without Amp Citrate aka DMBA."

Cobra 6P Extreme

54.     Notwithstanding the Warning Letter and Blackstone's response, Blackstone continued to sell products labeled as dietary supplements that contained DMBA as a dietary ingredient. For example, FDA twice purchased the product Cobra 6P Extreme from Blackstone, and there is probable cause to believe that both purchased products violated the law. The first Cobra 6P Extreme purchase contained DMBA and the DMBA was listed on the label, while the second Cobra 6P Extreme purchase also contained DMBA, but omitted the DMBA from the label. These purchases are described below.

55.     In August 2015, FDA made an undercover purchase from Blackstone of the product Cobra 6P Extreme via www.blackstonelabs.com.

56.     A review of the label affixed to the Cobra 6P Extreme revealed that the product ingredient list included 2-Amino-4-Methylpentane (DMBA) as a dietary ingredient, and FDA testing subsequently confirmed that the product contained DMBA.

57.     The ingredient DMBA caused the Cobra 6P Extreme to be adulterated because it contained a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury and because DMBA is subject to the premarket notification requirement and, as of January 26, 2017, no firm had submitted to the FDA premarket notification for DMBA.

58.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list Cobra 6P Extreme. Based

on context, I believe these entries refer to sales of the Cobra 6P Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

59.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, an adulterated food and an unsafe dietary supplement, in violation of 21 U.S.C. § 331(a) and 331(v).

60.     On or about February 3, 2016, FDA/OCI agents made another undercover purchase, this time for products labeled Dust V2, Brutal 4ce (pronounced "Brutal Force"), and Cobra 6P Extreme via Blackstone's website. Blackstone included a free product labeled "Euphoria RX" in the order at no charge. Shortly after FDA/OCI agents placed their order online, an email was received from the email address "cs@blackstonelabs.com," confirming the purchase and listing information about the sale. Blackstone's website stated with respect to the Cobra 6P Extreme, "It's so strong we weren't sure if it was a good idea to bring it to the market."

61.     On or about February 23, 2016, FDA/OCI agents received the undercover purchase of the aforementioned products. After inventorying the products into evidence, FDA/OCI sent the products to the FDA FCC for testing.

62.     On or about October 21, 2016, a chemist from the FDA FCC sent results of the analysis of the Cobra 6P Extreme. The testing revealed that the Cobra 6P Extreme purchased on February 3, 2016, also contained DMBA. However, unlike the Cobra 6P Extreme product purchased in 2015, the label affixed to the 2016 Cobra 6P Extreme omitted DMBA from the product ingredient list. Accordingly, the Cobra 6P Extreme purchased in February 2016 was misbranded under 21 U.S.C. § 343(a)(1) because its labeling was false and misleading.

63.     There is probable cause that Blackstone caused the introduction or delivery for introduction into interstate commerce of Cobra 6P Extreme, a misbranded food, in violation of 21 U.S.C. § 331(a).

64.     Blackstone intended to defraud consumers and the FDA by promoting Cobra 6P Extreme, accepting orders online, and mailing misbranded Cobra 6P Extreme products to consumers while intentionally not listing the potentially unsafe ingredient DMBA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

## Dust V2

65.     Testing of the Dust V2 purchased in February 2016 revealed that the product contained DMAA, also known as 1,3-dimethylamylamine.

66.     The FDA advises consumers not to buy or use dietary supplements that contain DMAA due to the health risks they present.  FDA FCC's analysis also revealed that Dust V2 contains caffeine.  FDA has publicly warned that "DMAA, especially in combination with other ingredients such as caffeine, can be a health risk to consumers."  DMAA narrows blood vessels and arteries, which can elevate blood pressure, and may lead to cardiovascular problems such as shortness of breath, arrhythmias, tightening in the chest, and heart attack, as well as seizures and other neurological and psychological conditions.

67.     A review of the label affixed to the Dust V2 purchased in 2016 revealed that the product ingredient list omitted DMAA from the label.  Failure to include DMAA on the label as an ingredient causes the labeling to be false or misleading, and causes Dust V2 to be misbranded under 21 U.S.C. § 343(a)(1).

68.     DMAA is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same,

nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake. DMAA is a food additive within the meaning of 21 U.S.C. § 321(s) because it is not a dietary ingredient, it is not generally recognized as safe under the conditions of use of Dust V2, and it is not the subject of a sanction or approval under the FDCA or other applicable statutes.

69.     DMAA is an unsafe food additive under 21 U.S.C. § 348 because it is not a food contact substance, there is no regulation prescribing the conditions under which it may be safely used, and no exemption for investigational use has been granted under 21 U.S.C. § 348(j). Therefore, the presence of DMAA in Dust V2 causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

70.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Dust V2." Based on context, I believe these entries refer to sales of the Dust V2 product, with shipping addresses that show the product was shipped to customers in multiple states.

71.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust V2, a misbranded and adulterated food, in violation of 21 U.S.C. § 331(a).

72.     Blackstone intended to defraud consumers and the FDA by promoting Dust V2, accepting orders online, and mailing Dust V2 products to consumers while intentionally not listing the potentially dangerous ingredient DMAA on the product's label, in violation of 18 U.S.C. §§ 1341, 1343, 1349.

Brutal 4ce

73.     FDA FCC analysis of the Brutal 4ce product concluded that it contained 1-androsterone and 4-androstene-3, 17-dione, also known as androstenedione.  Both 1-androsterone

19

and androstenedione are anabolic steroid precursors, meaning they are substances that are
converted in the human body to testosterone, an anabolic steroid.

74.     As early as 2004, FDA publicly stated that products containing androstenedione are
not lawful dietary supplements and may increase the risk of serious health problems.  See
"Questions and Answers: Androstenedione" available at:

http://www.fda.gov/Food/ComplianceEnforcement/ucm081788.htm

75.     The Brutal 4ce label does not list 1-androsterone or androstenedione as an
ingredient in the product.  Failure to include 1-androsterone  or androstenedione on the label as an
ingredient causes the labeling to be false and misleading and causes Brutal 4ce to be misbranded
under 21 U.S.C. § 343(a)(1).

76.     Additional evidence suggests that Blackstone, Singerman, and Braun know that
Brutal 4ce includes anabolic steroid precursors.  A video posted on Blackstone's website shows
Braun personally describing the product Brutal 4ce as the "strong stuff," the "bad daddies of
Blackstone Labs," and states it is "the stuff people look for now that all the old prohormones are
gone. This is your answer." He further explained that individuals who use this product "absolutely
have to take PCTV" afterwards.  The product PCTV[1] is displayed on Blackstone's website and is
described as "The Next Evolution of Post Cycle Therapy."  A "Post Cycle Therapy" generally
refers to a course of drugs or dietary supplements used to restore the body's natural testosterone
production after using anabolic steroids for a time period or "cycle."   The Blackstone website
states "PCTV defends and protects your body in five distinct ways; so now even more then [sic]
ever you can be confident that you will not only bounce back after a cycle, but actually improve
and be even better then [sic] ever.  In fact, PCTV can even be used by natural competitors looking

---

[1] There is probable cause that PCTV is an unapproved new drug, as discussed in paragraph 109.

for an anabolic edge!"   Based on my training and experience, this reference to "natural
competitors" refers to athletes who do not use anabolic steroids, and demonstrates Braun's
knowledge that he is recommending PCTV for use with products, such as Brutal 4ce, that contain
anabolic steroids or anabolic precursors.

77.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132
show that many transactions of "Payments Received" specifically list "Brutal 4ce."  Based on
context, I believe these entries refer to sales of the Brutal 4ce product, with shipping addresses
that show the product was shipped to customers in multiple states.

78.    There is probable cause to believe that Blackstone caused the introduction or
delivery for introduction into interstate commerce of Brutal 4ce, a misbranded food, in violation
of 21 U.S.C. § 331(a).

79.    Blackstone intended to defraud consumers and the FDA by promoting Brutal 4ce,
accepting orders online, and mailing Brutal 4ce products to consumers while intentionally not
listing 1-androsterone and/or androstenedione on the product's label, in violation of 18 U.S.C. §§
1341, 1343, and 1349.

Evidence from the Blackstone Premises

80.    On or about June 24, 2016, FDA/OCI agents procured items and documents from
a large dumpster outside the Blackstone Search Premises.

81.    Several items retrieved from the dumpster at the Blackstone Search Premises
contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and
conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises.  These
items include:

(A) An article of mail addressed to Blackstone Labs at the Blackstone Search Premises;

(B) Numerous UPS shipping invoices stating they were from Blackstone and addressed to customers who purchased products, including the Dust V2 and Dust Extreme products;

(C) A sample packet of the Dust V2 product; and

(D) A copy of a spreadsheet labeled "Blackstone Labs A/P Aging Detail." Upon information and belief, this document refers to Blackstone's Accounts Payable, and lists money owed to suppliers. The document includes two (2) transactions from a vendor by the name of "VBS Labs" in the amounts of $43,250.00 and $18,435.25 dated 05/06/16 and 05/19/16, showing that Blackstone pays VBS Labs for goods or services.

<u>Evidence from the VBS Search Premises</u>

82.     Additional evidence confirms that there is probable cause that some of the Blackstone illegal products are manufactured, assembled, and/or stored at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487, the VBS Search Premises.

83.     Surveillance in June 2016 revealed an individual outside the VBS Search Premises wearing a Blackstone Labs t-shirt and a surgical mask. This individual was outside Suite 12, and the garage door at Suite 12 was partially open. Based on my training and experience, I know that individuals who manufacture or package pharmaceuticals or dietary supplements often wear personal protective equipment such as surgical masks while working in close proximity to pharmaceuticals or dietary supplements to protect their health and ensure sanitary requirements.

84.     On or about June 24, 2016, FDA/OCI agents also procured items and documents from a dumpster outside the VBS Search Premises at 1140 Holland Drive, Boca Raton, FL 33487. Although the Florida Department of State Division of Corporations website listed the principal place of business and mailing address for VBS Laboratories LLC as 1140 Holland Drive, *Suite 2*, Boca Raton, Florida, several sources of evidence, including bank records and mail, list the address for VBS Labs as *Suite 12* (twelve). Surveillance in November 2016 revealed that the door to Suite 12 is labeled "VenTech." VenTech Labs, LLC is the name of a company registered to Anthony Ventrella, who is also the registered agent for VBS Labs.

85.     Several items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, and that the VBS Search Premises will contain evidence of criminal violations including violations of the FDCA, mail and wire fraud, and conspiracy to commit mail and wire fraud. These items include:

> (A) Loose labels for the Blackstone product "Super DMZ Rx 2.0," some of which had a stamped expiration date of 06/18 and a lot number of 370 in red coloring; however, the majority had no expiration date or lot number listed;
>
> (B) Loose labels for a "Fight Pharm" product named "Ostapro";
>
> (C) A color photocopy of a Florida Driver's License for Anthony Joseph Ventrella, the registered agent of VBS Laboratories, LLC;
>
> (D) A printed email from anthonyventrella@gmail.com dated June 22, 2016 asking for current prices on SARMs;[2]

---

[2] SARMs, or "Selective Androgen Receptor Modulators" are compounds that have similar properties to anabolic agents (e.g. steroids). As a general matter, SARMs are not appropriate for inclusion in a dietary supplement.

(E) Printed spreadsheets listing raw materials and pricing for ingredients from different companies.  Items on the list included: Picamilon Base, N-Acetyl-Cysteine, methylstenbolone, dimethazine, Ostarine, and Amp Citrate (DMBA);[3]

(F)  A handwritten note which included the words "BSL DMZ" and numbers;

(G) A handwritten list titled "To Do Pills" and "To Do Powders."  Under "To Do Powders" was listed several items, including "DUST."  Based on context and my training and experience, I believe these handwritten documents are evidence contributing to probable cause that VBS Labs is manufacturing or storing products for Blackstone at the VBS Search Premises, including Super DMZ and one or more of the "Dust" products discussed herein.

(H) A UPS shipping label from shipper: 2252818838, VBS Laboratories, LLC, 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 (the VBS Search Premises);

(I) A Chase business/debit card (cut in half) in the name "Anthony J. Ventrella/Fight Pharm LLC."

Ostapro

86.    The label for the Fight Pharm product "Ostapro" recovered from the dumpster at the VBS Search Premises revealed a listed ingredient of [(2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide, which is a "selective androgen

---

[3] These substances are discussed herein at the following paragraphs: Picamilon, ¶¶ 100-103, N-Acetyl-Cysteine, ¶¶ 106-107, Ostarine, ¶¶ 86-88; and DMBA, ¶¶ 49-62.

receptor modulator" ("SARM"), also known as ostarine. The product label describes Ostapro as a dietary supplement.

87.     Products that contain ostarine are not dietary supplements because ostarine is the subject of substantial clinical investigations which have been made public. To the best of FDA's knowledge, ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigations. Accordingly, Ostapro cannot be a dietary supplement.

88.     The Ostapro label states the product was manufactured and distributed by "Fight Pharm" and states the product will "increase lean mass," "decrease body fat," "maximize strength," and is "physique enhancing." Accordingly, Ostapro is a drug within the meaning of 21 U.S.C. § 321(g)(1)(C) because it is intended to affect the structure or function of the human body. Ostapro is also a "new drug" within the meaning of 21 U.S.C. § 321(p) because it is not generally recognized among qualified experts as safe and effective for the use suggested, recommended, or prescribed in its labeling. Because Ostapro is not approved as safe and effective by the FDA, it is an unapproved new drug.

89.     The introduction or delivery for introduction into interstate commerce of Ostapro, an unapproved new drug, is illegal under 21 U.S.C. 331(d).

90.     According to the Florida Department of State, Division of Corporations website, the registered agent for Fight Pharm is Anthony Ventrella, and the principal and mailing address is listed as the VBS Search Premises.

91.     Bank records confirm a financial connection between Blackstone and Fight Pharm. Former Blackstone CEO Singerman was listed on a Fight Pharm LLC bank account as a "Signer" in April 2014. Braun was added to the signature card of the same bank account in August 2015.

92. VBS Labs and Blackstone are also linked in financial records, including the Blackstone Accounts Payable described in paragraph 81. Bank documents show that Singerman and Braun were authorized as "Signers" to VBS Labs' JP Morgan Chase business bank account in March 2016.

## Dust Extreme

93. Based on evidence from the June 2016 trash pull at the Blackstone Search Premises, FDA/OCI agents made another undercover purchase via www.blackstonelabs.com on or about June 27, 2016. During this undercover transaction, the FDA/OCI purchased the product "Dust Extreme." According to Blackstone's website, the Dust Extreme product label lists DMAA as a dietary ingredient. Under the image of the product on the website, the website text stated "DMAA strikes back." Shortly after the purchase, an email was received from the email address: "cs@blackstonelabs.com," confirming the above referenced purchase, and listing information about the sale.

94. On or about June 30, 2016, FDA/OCI agents received the package that contained the aforementioned product. The return address listed on the United States Postal Service ("USPS") Priority Mail package was "Blackstone Labs, LLC, 1090 Holland Drive, Suite 2, Boca Raton, Florida 33487." After inventorying the product into evidence, it was sent to the FDA FCC for testing.

95. As described in paragraphs 68-69, DMAA is not a dietary ingredient and is an unsafe food additive. Accordingly, the presence of DMAA in Dust Extreme causes the product to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i).

96. Even if DMAA were a dietary ingredient, it would be a new dietary ingredient subject to premarket notification. As of January 26, 2017, Blackstone has not submitted a

premarket notification for DMAA. Therefore, even if DMAA were a dietary ingredient, Dust Extreme would be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a).

97.     Even if Blackstone had submitted the required premarket notification, Dust Extreme would still be adulterated under 21 U.S.C. §§ 342(f)(1)(B) and 350b(a) because there is no adequate information to provide reasonable assurance that DMAA does not present a significant or unreasonable risk of illness or injury.

98.     Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that transactions of "Payments Received" specifically list "Dust Extreme." Based on context, I believe these entries refer to sales of the Dust Extreme product, with shipping addresses that show the product was shipped to customers in multiple states.

99.     There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of Dust Extreme, an adulterated food and unsafe dietary supplement in violation of 21 U.S.C. §§ 331(a) and 331(v).

### Growth, Anesthetized, and Euphoria RX

100.     The Blackstone website also lists for sale other products that violate the FDCA, including products named "Growth," "Anesthetized," and "Euphoria RX." The website includes images of each product and their labels. According to the labels for the products, all three products contain 4-(pyridine-3-cabonylamino), also known as Pikatropin or Picamilon, and list it as one of the dietary ingredients.

101.     Picamilon is used as a prescription drug in Russia for a variety of neurological conditions. It is not approved as a drug in the United States. FDA has issued Warning Letters to five companies whose products marketed as dietary supplements claim to contain Picamilon and

listed it as a dietary ingredient. These products were misbranded because Picamilon does not meet the statutory definition of a dietary ingredient.

102.    FDA has publicly stated that Picamilon is not a dietary ingredient because it is not a vitamin, a mineral, an herb or other botanical, an amino acid, or a concentrate, metabolite, constituent, or extract of the same, nor is it a dietary substance for use by man to supplement the diet by increasing total dietary intake.

103.    The inclusion of Picamilon as a dietary ingredient on the product label causes the Growth, Anesthetized, and Euphoria RX products to be misbranded in that the labeling is false and misleading within the meaning of 21 U.S.C. § 343(a)(1).

104.    Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Growth," "Anesthetized," and "Euphoria." Based on context, I believe these entries refer to sales of the three products, with shipping addresses that show the products were shipped to multiple states.

105.    There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of misbranded foods Growth, Anesthetized, and Euphoria RX, in violation of 21 U.S.C. § 331(a).

Gear Support and PCTV

106.    The Blackstone website also lists for sale other products that violate the FDCA, including products named "Gear Support" and "PCTV." The website includes images of each product and their labels. According to the products' labels, Gear Support and PCTV contain N-Acetyl-Cysteine ("NAC") and are described as dietary supplements.

107.    Products that contain NAC are excluded from the definition of dietary supplement under 21 U.S.C. § 321(ff)(3)(B)(i) because FDA approved NAC as a "new drug" in 1985 and FDA

28

does not have any information that indicates that NAC was marketed as a dietary supplement or as a food prior to its approval as a "new drug."

108.   A video advertising the product Gear Support located on Blackstone's website displayed Braun describing the product and stating "It'll decrease your blood pressure." A video advertising the product PCTV located on Blackstone's website displayed Braun describing the product and stating it "replenishes natural glutathione stores" and it "keeps the liver super healthy."

109.   Accordingly, Gear Support and PCTV are drugs within the meaning of 21 U.S.C. § 321(g)(1)(C) because they are intended to affect the structure or function of the human body. They are also "new drugs" within the meaning of 21 U.S.C. § 321(p) because the products Gear Support and PCTV are not generally recognized among qualified experts as safe and effective for use suggested, recommended, or prescribed in its labeling.  Gear Support and PCTV have not been approved by FDA as safe and effective for their intended uses, and therefore are unapproved "new drugs." *See* paragraphs 16-17 and 20-21 for explanation of "new drugs."

110.   Records of "Transaction Logs" for the Blackstone PayPal account ending in 3132 show that many transactions of "Payments Received" specifically list "Gear Support" and "PCTV."  Based on context, I believe these entries refer to sales of the products, with shipping addresses that show the products were shipped to customers in multiple states.

111.   There is probable cause to believe that Blackstone caused the introduction or delivery for introduction into interstate commerce of the unapproved "new drugs" Gear Support and PCTV, in violation of 21 U.S.C. § 331(d).

<u>Recent Evidence from the Premises</u>

112.   On or about October 14, 2016, FDA/OCI agents procured items and documents from a large dumpster outside the Blackstone Search Premises.

29

113.    Several items retrieved from the dumpster at the Blackstone Search Premises contribute to probable cause that evidence of FDCA violations, mail and wire fraud, and conspiracy to commit mail and wire fraud, will be found at the Blackstone Search Premises. These items include:

(A) Multiple printed emails from various employees of Blackstone including the director of sales, vice president, and inventory manager;

(B) Several order forms detailing who ordered the products, where the products were shipped to (including locations outside the state of Florida), and which products were ordered; one in particular stated a shipment was sent to Legendary Supplements[4] for a total of $12,500.00; however, it did not list the products ordered;

(C) A copy of Blackstone Labs Accounts Payable including multiple transactions from a vendor by the name of "Duracap Labs" ranging in amounts from $25,851.00 to $128,161.00 during July 2016. According to the Georgia Secretary of State Corporations Division, Duracap Labs is also the name of a Georgia corporation founded by "Wesley Houser," and three other individuals in January 2014. Upon information and belief, "Wesley Houser" is John Wesley Houser, IV, an individual under indictment for manufacturing and sale of controlled substances and illegal dietary supplements;

(D) Handwritten notes including one stating "Found emails of Aaron telling Wes: 1. underdose, but keep label same 2. mask ingredients + flavors". Upon

---

[4] As discussed in paragraph 46, Legendary Supplements continues to sell Super DMZ Rx 2.0, notwithstanding the recall and FDA's determination that the product is an unapproved new drug and poses a serious health hazard.

information and belief, "Aaron" refers to Aaron Singerman, founder of Blackstone, and "Wes" refers to John Wesley Houser, IV. Based on my knowledge and context, I believe this document is evidence of Blackstone's intent to misrepresent information on product labels, and defraud consumers.

114. On or about October 14, 2016, FDA/OCI agents procured items from a large dumpster outside the VBS Search Premises.

115. Items retrieved from the dumpster at the VBS Search Premises confirmed that there is probable cause to believe the activities at the address are connected to Blackstone, the manufacturing of products labeled as dietary supplements, and will contain evidence of criminal violations, including violations of the FDCA, mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. These items included:

(A) Loose labels for the Blackstone product "Super DMZ Rx 2.0"; no expiration date or lot number was visible on the front of the label; however, an imprint of an expiration date of 07/18 and a lot number of 512 was located on the inside;

(B) Seven (7) loose pill capsules of assorted colors;

(C) Two (2) empty bags of rice flour with a listed weight of 22.68 kg (50 pounds) each (rice flour is often used as a filler ingredient in supplements);

(D) A large clear bag containing seven (7) empty red pill capsules; and

(E) A large silver bag containing twelve (12) empty white pill capsules.

116. Upon information and belief, Blackstone continues to promote and sell products which violate the FDCA on their website, through other online retailers, and through wholesale distribution, including the products discussed herein: Brutal 4ce, Dust V2, Dust Extreme, Growth,

31

Anesthetized, Euphoria RX, Gear Support, and PCTV. (Note: this is not a complete list of all products labeled as dietary supplements currently marketed for sale by the company.)

EXECUTION OF THE WARRANT

117. As described above and in Attachment B.1 and B.2, this application seeks permission to search for records that might be found on the Blackstone Search Premises and VBS Search Premises in whatever form they may be found, including data stored on a computer's hard drive or other storage media. One form in which records may exist is as paper documents, including financial records, invoices, and correspondence. For example, FDA/OCI has reviewed mail in the trash at the Blackstone Search Premises addressed to Blackstone or Blackstone employees, and shipping labels, invoices, ingredient sheets, and printed correspondence from the trash at the VBS Search Premises.

118. Another form in which records may exist is as data stored on computer hard drives or other storage media. A storage medium is any physical object upon which computer data can be recorded, which includes hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media. Based on my review of other evidence related to this investigation, I believe that there is a computer system or systems currently located at the Blackstone and VBS Search Premises. For example, I believe that emails from various employees of Blackstone including the director of sales, vice president, and inventory manager, as previously mentioned, will be found on a computer or computers at the Blackstone Search Premises. Documents found in the trash at the VBS Search Premises include documents printed from computers, such as spreadsheets and email from Anthony Ventrella and I believe that similar electronic documents will be found on a computer or computers at the VBS Search Premises. Thus, the warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

119.    I submit that if a computer or storage medium is found at either of the search premises, there is probable cause to believe the records described above will be stored on that computer or storage medium, for at least the following reasons:

(A) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(B) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(C) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging

files.  Computer users typically do not erase or delete this evidence, because
special software is typically required for that task.  However, it is technically
possible to delete this information.

(D) Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."

(E) Based on my review of evidence related to this investigation, including various
financial records and other documents, I am aware that computer equipment
was used to generate, store, and print documents used in the FDCA violations,
mail and wire fraud, and conspiracy schemes.  There is reason to believe that
there are computer systems currently located at both the Blackstone and VBS
Search Premises.

120.    *Forensic evidence*.  As further described in Attachment B.1 and B.2, this
application seeks permission to locate not only computer files that might serve as direct
evidence, instrumentalities or fruits of the crimes described in the warrants, but also for forensic
electronic evidence that establishes how computers were used, the purpose of their use, who used
them, and when.  There is probable cause to believe that this forensic electronic evidence will be
on any storage medium in both the Blackstone and VBS Search Premises because:

(A) Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of
a file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave traces of information on the storage
medium that show what tasks and processes were recently active.   Web
browsers, email programs, and chat programs store configuration information

34

on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

(B) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein,

computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). This geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

(C) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

(D) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(E) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

121. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either

37

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

(A) *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(B) *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(C) *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

122. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), I seek permission to seize, image, or otherwise copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

123. Blackstone and VBS Labs are functioning companies that may conduct legitimate business in addition to its participation in the distribution of illegal dietary supplements and drugs, mail fraud, and wire fraud. The seizure of Blackstone's or VBS's computers may limit their ability to conduct legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.

## REQUEST FOR SEALING

124. Due to the ongoing nature of this investigation, I respectfully request that this Affidavit, Application, Search Warrant, and all attachments be sealed by the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents until further order of the Court because their premature disclosure may give

targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify co-conspirators, or otherwise seriously jeopardize the investigation.

## CONCLUSION

125.    I submit that this affidavit supports probable cause for a warrant to search the Blackstone Search Premises described in Attachment A.1 and seize the items described in Attachment B.1.

126.    I submit that this affidavit supports probable cause for a warrant to search the VBS Search Premises described in Attachment A.2 and seize the items described in Attachment B.2.

FURTHER AFFIANT SAYETH NAUGHT

Kelly McCoy
Special Agent
Food and Drug Administration,
Office of Criminal Investigations

Subscribed and sworn to before me
On this 3 Rd day of February, 2017.

The Honorable William Matthewman
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By
Deputy Clerk
Date 2/3/2017

**ATTACHMENT A.1**

Property to Be Searched

The property to be searched is the offices of Blackstone Labs, LLC at 1090 Holland Drive, Boca Raton, FL 33487, including Suite 1 and Suite 2 ("Blackstone Search Premises"). The premise is located within a warehouse that is two-toned tan in color with the numbers "1090" and the wording "Lake Pointe Centre" affixed to the top of the building. See Exhibit 1 below. There is a green stripe painted around the building immediately below "1090 Lake Pointe Centre." The two entrance doors for the premise are tinted glass and positioned on the South side of the building. They are marked as "Blackstone Labs, Suite 1, Headquarters," see Exhibit 2 below, and "Blackstone Labs, Suite 2, Shipping & Receiving," see Exhibit 3 below.

Exhibit 1



1

Exhibit 2



Exhibit 3



**ATTACHMENT A.2**

Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises"). The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes. See Exhibit 1 below. Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door. See Exhibit 2 below. The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



<u>Exhibit 2</u>



**ATTACHMENT B.1**

Particular Things to Be Seized

1.    All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012, including, but not limited to:

   a.   any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

   b.   any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

   c.   evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

   d.   any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

   e.   records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

   f.   all bank records, checks, credit card bills, account information, and other financial records;

   g.   customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

h.  any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.  advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.  correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.  tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.  records of or information about Internet Protocol addresses used by the COMPUTER;

e.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based correspondence and email, including all email records and metadata information.

2

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

**ATTACHMENT B.2**

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012 including, but not limited to:

    a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

    b.  any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

    c.  evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

    d.  any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

    e.  records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

    f.  all bank records, checks, credit card bills, account information, and other financial records;

    g.  customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

h.     any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.     advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.     correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.     tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.     records of or information about Internet Protocol addresses used by the COMPUTER;

e.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.     contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )  Case No.   17-8048-WM |
| | ) |
| Premises located at VBS Laboratories, LLC, | ) |
| 1140 Holland Drive, Suite 12, | ) |
| Boca Raton, FL 33487 | ) |

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____ Deputy Clerk
Date _____2/3/2017_____ Florida

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:
                                        See Attachment A.2

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
                                        See Attachment B.2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      *February 17, 2017*
                                                                                 *(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_____Duty U.S. Magistrate Judge_____.
            *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                        ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   *February 3, 2017*               _____William Matthewman_____
                               *1:26 p.m.*                                    *Judge's signature*

City and state:   West Palm Beach, Florida _____   William Matthewman, United States Magistrate Judge
                                                                      *Printed name and title*

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

    *I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A.2

### Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises"). The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes. See Exhibit 1 below. Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door. See Exhibit 2 below. The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



Exhibit 2



**ATTACHMENT B.2**

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012 including, but not limited to:

    a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

    b.  any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

    c.  evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

    d.  any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

    e.  records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

    f.  all bank records, checks, credit card bills, account information, and other financial records;

    g.  customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

1

h.     any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.     advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.     correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.     tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.     records of or information about Internet Protocol addresses used by the COMPUTER;

e.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.     contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.