AO 93  (Rev. 12/09) Search and Seizure Warrant

FILED by _____ D.C.

MAR - 2 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT
S.D. OF FLA. W.P.B.

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )   Case No.   17-8048-WM
  )
Premises located at VBS Laboratories, LLC,  )
1140 Holland Drive, Suite 12,  )
Boca Raton, FL 33487  )

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A.2

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the
property to be seized)*:
See Attachment B.2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before    February 17, 2017
*(not to exceed 14 days)*

☒ in the daytime  6:00 a.m. to 10 p.m.   ☐ at any time in the day or night as I find reasonable cause has been
established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
    Duty U.S. Magistrate Judge .
    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  February 3, 2017
    1:26 p.m.                                   *William M. Matthewman*
                                                        *Judge's signature*

City and state:   West Palm Beach, Florida         William Matthewman, United States Magistrate Judge
                                                        *Printed name and title*

9:19-CR-80030
GOVERNMENT
EXHIBIT
046

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>17-8048-WM | Date and time warrant executed:<br>2/16/17  10:17 am | Copy of warrant and inventory left with:<br>Anthony Ventrella |
| Inventory made in the presence of:  Jolisa Guadalupe + SA Mott HNA | | |
| Inventory of the property taken and name of any person(s) seized: | | |

See Attached

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 3/2/17

_____
Executing officer's signature

Mott W Heath, Special Agent
Printed name and title

Dave Lee Brannon, USMJ          3-2-2017

## ATTACHMENT A.2

### Property to Be Searched

The property to be searched is the offices of VBS Laboratories, LLC at 1140 Holland Drive, Suite 12, Boca Raton, FL 33487 ("VBS Search Premises").  The premise is located within a warehouse that is tan in color with the numbers "1140" affixed to the top of the building. Below the "1140" are two reddish-orange stripes.  See Exhibit 1 below.  Suite #12 is located on the NW corner of the warehouse and is marked with a "12" on the glass door.  See Exhibit 2 below.  The glass pane located next to the door states "VENTECH LABS."

Exhibit 1



Exhibit 2



**ATTACHMENT B.2**

Particular Things to Be Seized

1.  All records and information that constitute fruits, contraband, evidence and instrumentalities relating to violations of the Food, Drug, and Cosmetic Act, (21 U.S.C. §§ 331(a), 331(d), 331(v), and 333(a) (interstate distribution of misbranded or adulterated food, unapproved new drugs, or unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012 including, but not limited to:

    a.  any invoices, purchase orders, packing slips, receipts, notes, records, shipping records, ledgers, money orders, checks, bank records, pedigrees, storage records and other papers and documents relating to the purchase, shipment, sale, manufacturing, storage and/or holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs;

    b.  any information related to customers, suppliers or sources of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and related identifying information;

    c.  evidence of occupancy, residency, and/or ownership of the premises, including utility and telephone bills; mail, deeds, leases, rental agreements, loans, mortgages, photographs, personal telephone books, diaries, statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

    d.  any and all corporate records pertaining to the establishment, ownership, agreements, method of operation and purchase, shipment, sale, storage and holding of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

    e.  records of off-site locations to store records, banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients and/or currency, including safe deposit box keys, records and receipts, and rental agreements for storage facilities;

    f.  all bank records, checks, credit card bills, account information, and other financial records;

    g.  customer and employee records associated with the dispensing of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

1

h.  any and all records associated with the purchase or sale of labeling, printing or graphics which could be used to falsely alter, forge, or counterfeit the labeling or documentation of banned, adulterated, or misbranded dietary supplements and/or unapproved new drugs containing such ingredients;

i.  advertising, including promotional packets, promotional videos, disclosure statements; internet, television, and newspaper advertisements;

j.  correspondence with others, including vendors that performed services or provided products related to dietary supplements; and

k.  tangible things related to the above crimes, such as production materials, ingredients, production equipment, and dietary supplements themselves.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

c.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

d.  records of or information about Internet Protocol addresses used by the COMPUTER;

e.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

f.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

As used above, the term "correspondence" means both traditional, paper-based

2

correspondence and email, including all email records and metadata information.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution.



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017          **START TIME:** 10:17 am          **END TIME:** 2:11 pm

**SITE ADDRESS:** 1140 HOLLAND DRIVE, SUITE 12, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 1 | 1 | Chase Bank Records, Shipping Invoices, Business Records |
| 2 | 1 | Printed Emails, Handwritten notes |
| 3 | 1 | Envelope of Documents for COAs/Inventory |
| 4 | 1 | Business documents (taxes, order forms, product description) outliner nutrition business records, Chase Bank business checks |
| 5 | 1 | Box of Blackstone Labs Bank Documents; Ashley Ventrella Business Cards, Recipes for products, asset sheets; taxes invoices, Ventech records; outlier records, foreign shipping invoices, Fight Pharm Docs; Fight Pharm Timesheets. |
| 6 | 1 | Fight Pharm CPA Docs; VBS Summary of Documents, Fight Pharm business card for Ashley Ventrella; Ashley V business card for outlier nutrition; card for VBS. Blank Fight Pharm Chase Business Check; lables for Methyl DMZ |
| 7 | 1 | Fight Pharm Documents; business cards for Ventech and outside the norm for Ashley Ventrella |
| 8 | 1 | Roll of "Blackstone Labs Dust V2 labels" |
| 9 | 1 | Envelope containing production documents Dec 27-Feb 14, 2017 |
| 10 | 1 | Blackstone Labs Dust V2 labels (2) |
| 11 | 1 | Envelope containing one folder with product ingredient list and 1 yellow small notepad |
| 12 | 1 | black notebook ledger containing VBS laboratories business information |
| 13 | 1 | one roll of methyl DM2 label, 1 roll of unlimited fat destruction label, 1 roll of Hydra labels, 1 roll of M-drol labels, 1 roll of Iron eyes labeles, 1 roll of muscle metabolix SPR DM2 labels, 1 roll of Super DM2 2.0 Rx labels |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017       **START TIME:** 10:17 am       **END TIME:** 2:11pm

**SITE ADDRESS:** 1140 HOLLAND DRIVE, SUITE 12, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 1 | MacBook Air model # A 1465 bearing Serial # C02QLG3YGFWM |
| 2 | 1 | Mac All-in-One model # A 1419 bearing Serial # C02PD57GFY10 |
| 3 | 1 | Mac All-in-One model # A1418 bearing Serial # C02MCBDKF8J2 |
| 4 | 1 | HP Elite One 800 G1 Touch AiO Business PC bearing Serial # MXL6261V91 |
| 5 | 1 | Western Digital HD (S/N WCC3F7LZJYSR) containing (1) iphone 6 image belonging to Anthony Ventrella and (1) iphone 6 image belonging to Ashley Ventrella |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

**DATE OF SEARCH:** 02/16/2017   **START TIME:** 10:17 am   **END TIME:** 2:11 pm

**SITE ADDRESS:** 1140 HOLLAND DRIVE, SUITE 12, BOCA RATON, FL

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 1 | 80 | Sealed black bottles filled with unknown amount of capsules believed to be MK Inferno Growth Hormone activator, MK677 |
| 2 | 3 | Bags containing a white powder substance labeled 1,3 DMAA |
| 3 | 57 | Box containing bottles of Outlier Nutrition, Deviation Explo0sive Pre Workout. Labeled at 17.5 oz per bottle. |
| 4 | 5 | Evidence box containing 5 bottles Outlier Nutrition Deviation Explosive Pre workout. Labeled at 17.5 oz per bottle. |
| 5 | 20 | Bottles Deviation Explosive Pre workout at 17.5 oz per bottle |
| 6 | 20 | Bottles Deviation Explosive Pre Workout, listed weight 17.5 oz per bottle |
| 7 | 19 | Black bottles labeled as Heatwave Fat Burner with the listed ingredient of DMAA 60 capsules, Qty 19 small boxes with 12 bottles of heatwave |
| 8 | 1 | One box containing 16 boxes with 24 bottles each of 60 capsules labeled Blackstone Labs Cobra 6 Extreme Intense Stimulant |
| 9 | 32 | Bottles of clear sealed bottles of MK-47 physique enhancing containing 60 capsules |
| 10 | 1 | Box containing 10 bottles of Cobra 60 capsules, Intense Stimulant |
| 11 | 1 | Box of MK-2866 (Ostarine), 23 bottles - 60 count |
| 12 | 48 | Bottles - 60 capsules Outlier Nutrition MK Inferno |
| 13 | 78 | Bottles of 60 capsules - Outlier Nutrition Methyl DMZ-M-STEN & DMZ |
| 14 | 233 | Bottles/No labels containing red colored capsules |
| 15 | 1 | One box containing 13 boxes/each box containing 24 bottles of Blackstone Labs, Cobra 6 Extreme |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 16 | 1 | Box containing 13 boxes/each box contains 24 bottles of Blackstone Labs, Cobra 6 Extreme |
| 17 | 1 | Box containing 84 bottles labeled in part Blackstone Labs Androgenin Anabolic Activator, 60 capsules per bottle |
| 18 | 1 | Box containing 34 bottles labeled in part Androgenin Anabolic Activator |
| 19 | 1 | 384 bottles containing black in color capsules in four (4) boxes (8 bottles are labeled as Dragon Pharma, Typhon, and 375 are unlabeled) |
| 20 | 1 | Box containing 84 bottles of red capsules of unknown substance |
| 21 | 1 | Two boxes containing 168 bottles of red capsules with unknown substance |
| 22 | 68 | Bottles containing red capsules |
| 23 | 1 | Blackstone Labs - Eradicate - 13 bottles (sealed/unsealed) |
| 24 | 1 | Sample bottle of heatwave containing 60 capsules with 1 container of DMAA listed on ingredient label |
| 25 | 1 | Evidence bag containing two black bottles labeled in part Outlier Nutrition MK Inferno 60 capsules Growth Hormone Activator, MK677, Exp. 12/18, Lot 2D36 |
| 26 | 1 | Unmarked black bottle with post it note reading dust ext. base |
| 27 | 1 | One Bottle of Extreme Surge |
| 28 | 1 | Bottle of outlier nutrition deviation |
| 29 | 1 | Box containing 410 bottles, which contain unknown red capsules |
| 30 | 1 | Box containing 303 dark bottles containing unknown substance |
| 31 | 1 | Biohacker Lab-Golemn 1 sealed bottle |
| 32 | 1 | Blackstone Labs - Chosen 1 (unsealed) 60 tablets |



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 33 | 1 | Bottle of Blackstone Labs, Alpha-1 Max |
| 34 | 1 | Bottle Blackstone Labs, LGD Elite |
| 35 | 1 | Blackstone Labs-Brutal 4ce-Destined by Force (unsealed) |
| 36 | 1 | Ergogen Labs - Di-Stenaplex-1 sealed bottle |
| 37 | 1 | unknown white powder substance "Darkcycle Reign Extreme (DMZ+Alpha) 370 mg w/cap" written on clear bag |
| 38 | 1 | Black plastic container with label "osta" unit (unsealed) containing misc. red capsules |
| 39 | 1 | Blackstone Labs Alpha-1 May-1 sealed bottle |
| 40 | 1 | unknown white powder substance labeled as "outlier alpha profiller mix" in clear bag |
| 41 | 1 | unknown white powder substance labeled as "12/6/16 outlier MK 82g" in clear bag |
| 42 | 1 | unknown powder substance labeled as "Huperzine A 1%" in clear bag |
| 43 | 1 | unknown white powder substance labeled as "outlier preworkout base" in clear bag |
| 44 | 1 | unknown yellow powder substance labeled as "Andorine AD 800 G" in clear bag |
| 45 | 1 | unknown white powder substance labeled as "Batch: 215 DIL 3,5 Diiodthyronine " on clear bag |
| 46 | 477 | red capsules of unknown substance |
| 47 | 1 | unknown white powder substance labeled as "picamilon base" in clear white bag |
| 48 | 1 | unknown white powder substance labeled as "picamilon base" in clear bag |
| 49 | 1 | unknown white powder substance labeled as "10/21 outlier preworkout base" in clear bag |



U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 50 | 1 | unknown white powder labeled as "outlier MK 550 mg w/cap semi-auto" in clear bag |
| 51 | 1 | unknown white powder substance labeled as "muscle rage MK semi-auto mix 680 mg w/capsule" in clear bag |
| 52 | 1 | unknown white powder substance labeled as "LGD Extreme 12/14/16 26g 500 w/cap (profiller) " in clear bag |
| 53 | 1 | bottle outlier nutrition Methyl DMZ M-STEN and DMZ |
| 54 | 1 | unknown white powder substance labeled as "BSL DMZ 670 mg-weigh 120 g" in clear white bag |
| 55 | 1 | unknown powder substance labeled as "BSL Euphoria 760 mg w/capsule" in clear bag |
| 56 | 1 | unknown white powder substance labeled as "octopamine HCL" in clear bag |
| 57 | 1 | unknown white powder substance listed as "oxiracetam" in container |
| 58 | 1 | unknown powder substance labeled as "3,3 diiodothyronine" in clear bag |
| 59 | 1 | unknown white powder labeled as "noopet" in clear white bag |
| 60 | 1 | MMX SPR DM2 -1 bottle (Sealed) |
| 61 | 1 | Dark Cyde Reign Extreme (Sealed) |
| 62 | 1 | Dragon Pharma-Black Viper (sealed), 60 capsules (1) bottle |
| 63 | 1 | Bottle Ergogen labs, Androbolan Pro anabolic compound |
| 64 | 3 | Bottles Dragon Pharma Typhon category 3 anabolic |
| 65 | 3 | Bottles outlier nutrition Regen PCT |
| 66 | 4 | Bottles Blackstone Labs Super DMZ |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF **ITEMS SEIZED**

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|---|---|---|
| 67 | 3 | Bottles of Fight Pharm-MK Inferno(sealed/unsealed) |
| 68 | 3 | Bottles Dragon Pharma cycle reset (sealed/unsealed) |
| 69 | 9 | Bottles Hydra Anabolic Compound 9 bottles (open/unopen) |
| 70 | 6 | Bottles Andropharm-M1 Alpha (sealed/unsealed) |
| 71 | 1 | Bottle muscle rage-The Ultimate, sealed |
| 72 | 2 | Bottles muscle rage MK-47 sealed/unsealed |
| 73 | 1 | Bottle competitive edge labs M-DROL |
| 74 | 2 | sealed bottles Dynamik-war bringer |
| 75 | 11 | Blackstone Labs PCT Post cycle therapy |
| 76 | 6 | Bottles outlier nutrition Alpha Xtreme Methyl 1 Alpha |
| 77 | 1 | small box containing 16 bottles labeled in part was Euphoria Rx, mfg Blackstone Labs |
| 78 | 1 | unlabeled bottles appearing to be Euphoria RX-324 |
| 79 | 1 | Approximately 278 Blackstone Labs Euphoria Rx |
| 80 | 1 | Approximately 600 Blackstone Labs Euphoria Rx |
| 81 | 1 | Box containing about 600 bottles of red capsules labeled in part Euphoria Rx, Mft Blackstone Labs, 16 capsules each |
| 82 | 1 | Approximately 600 Blackstone Labs Euphoria RX |
| 83 | 540 | bottles of Blackstone Euphoria Rx |

OCI Form 4200



U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

# INVENTORY OF ITEMS SEIZED

| ITEM # | QTY | DESCRIPTION OF EVIDENCE |
|--------|-----|-------------------------|
| 84 | 1 | Box containing 493 bottles, which contain uknown red capsules |
| 85 | 1 | Box containing approx. 720 bottles of small bottles, red capsules, suspected to be Euphoria Rx |
| 86 | 1 | Box containing unmarked bottles w/red capsules suspected to be Euphoria Rx, Qty 554 bottles |

# FDA  U.S. Food and Drug Administration
## Protecting and Promoting Your Health

A to Z Index | Follow FDA | En Español

SEARCH

Home | Food | Drugs | Medical Devices | Radiation-Emitting Products | Vaccines, Blood & Biologics | Animal & Veterinary | Cosmetics | Tobacco Products

# Enforcement Report - Week of March 12, 2014

FDA Home  Enforcement Reports

## Product Detail

| | |
|---|---|
| Product Description | Super-DMZ Rx 2.0 Capsules, 60 count bottles, Dietary Supplement, Lean muscle mass, hardness and strength, Manufactured for Blackstone Labs Boca Raton, FL 33433. |
| Recall Number | D-1150-2014 |
| Classification | Class I |
| Code Info | lot numbers: 1) MS5Q (A) Exp 04/2016, 2) MS5Q (2) Exp 05/16, 3)E07Q Exp unknown |
| Product Distributed Qty | 11,200 bottles (60 capsules per bottle) (quantities for E07Q unknown) |
| Reason For Recall | Marketed without an Approved NDA/ANDA; product contains the steroid ingredient 2, 17a-dimethyl-17b hydroxy-5a-androst-1-en-3-one, making it an unapproved new drug |

## Event Detail

| | |
|---|---|
| Event Id | 65772 |
| Product Type | Drugs |
| Status | Ongoing |
| Recalling Firm | Mira Health Products Ltd. |
| City | Farmingdale |
| State | NY |
| Country | US |
| Voluntary / Mandated | Voluntary, Firm Initiated |
| Recall Initiation Date | 2013-07-22 |
| Initial Firm Notification of Consignee or Public | Two or more of the following: Email, Fax, Letter, Press Release, Telephone, Visit |
| Distribution Pattern | Nationwide |

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

9:19-CR-80030
GOVERNMENT
EXHIBIT
047

 

U.S. Food and Drug Administration
Protecting and Promoting *Your* Health

A to Z Index | Follow FDA | En Español

SEARCH

| Home | Food | Drugs | Medical Devices | Radiation-Emitting Products | Vaccines, Blood & Biologics | Animal & Veterinary | Cosmetics | Tobacco Products |

# Enforcement Report - Week of March 12, 2014
○ FDA Home ○ Enforcement Reports

  

## Product Detail

| | |
|---|---|
| Product Description | Super-DMZ Rx 2.0 Capsules, 60 count bottles, Dietary Supplement, Lean muscle mass, hardness and strength, Manufactured for Blackstone Labs Boca Raton, FL 33433. |
| Recall Number | D-1150-2014 |
| Classification | Class I |
| Code Info | lot numbers: 1) M55Q (A) Exp 04/2016, 2) M55Q (2) Exp 05/16, 3)E07Q Exp unknown |
| Product Distributed Qty | 11,200 bottles (60 capsules per bottle) (quantities for E07Q unknown) |
| Reason For Recall | Marketed without an Approved NDA/ANDA, product contains the steroid ingredient 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, making it an unapproved new drug |

## Event Detail

| | |
|---|---|
| Event Id | 65772 |
| Product Type | Drugs |
| Status | Ongoing |
| Recalling Firm | Mira Health Products Ltd. |
| City | Farmingdale |
| State | NY |
| Country | US |
| Voluntary / Mandated | Voluntary: Firm Initiated |
| Recall Initiation Date | 2013-07-22 |
| Initial Firm Notification of Consignee or Public | Two or more of the following: Email, Fax, Letter, Press Release, Telephone, Visit |
| Distribution Pattern | Nationwide |

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

9:19-CR-80030
GOVERNMENT
EXHIBIT
048



# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

*Item #5 1 of 2*

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Agent: SA Kelly McCoy

Site/Address: Site 2, VBS , 1140 Holland Drive, Suite 12, Boca Raton, FL

Case Number: 2016-MIF-735-0166

SCERS Agent: SA Schillinger (LEAD)

Room/Location: *Room A / Front Door*

[✓] Warrant    [ ] Consent    [ ] Subpoena    [ ] Other (See Comments)

## Device Information

System Name: *S2RAC4D1 S2RAC4D1*

Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | *Apple* | Model | *iPhone 6 Plus   IOS:10.2.1* |
|---|---|---|---|
| Serial / Service Tag | *SN# F9CR267765Q5* | Type | *Phone # 225-281-8838* |
| Owner | *Anthony Ventrella* | Passwords | *1598 = Provided by owner* |
| BIOS Date/Time | *2/16/17   10:31* | Actual Date/Time | *Same* |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| *Apple* | *F9CR267765Q5* | *64GB* | *S2RADTC1D1* |
| | | | *S2RAC4D1* |
| | | | |
| | | | |

## Comments

Imaged by: *SA Tim Griffin*

Imaging device S/N and version used: *Cellebrite UFED PA 6.0.0.126*

Destination Drive: *SCERS Laptop to WDHD WCC3F7LZJYSR transferred to Seagate 2TB S/N 04122 and then WD 500gb s/n WCC3F2J...*

Notes: *Phone was taken from Anthony Ventrella on the premise. Password was given voluntarily (1598). Phone was imaged via Cellebrite UFED Analyzer. Phone was restored to original user settings & returned to Anthony Ventrella.*

*phone # 225-281-8838*

*Destination Drive: Western Digital 500gb S/N WCC3F7LZJYSR*

9:19-CR-80030
GOVERNMENT
EXHIBIT
049



# U.S. FOOD AND DRUG ADMINISTRATION
## OFFICE OF CRIMINAL INVESTIGATIONS

*Item # 5*
*2 of 2*

### Digital Evidence Worksheet

Date: February 16, 2017

Case Name: Blackstone Labs LLC

Case Number: 2016-MIF-735-0166

Case Agent: SA Kelly McCoy

SCERS Agent: SA Schillinger (LEAD)

Site/Address: Site 2, VBS , 1140 Holland Drive, Suite 12, Boca Raton, FL

Room/Location: *Room A / Front Door*

[✓] Warrant      [ ] Consent      [ ] Subpoena      [ ] Other (See Comments)

## Device Information

System Name: *S2 RAC5D1* / ~~S2 RAC2D1 S2~~      Site Number, Room Letter, Device Number, (S_R_C_) Example: S1RAC1

| Manufacturer | *Apple* | Model | *NSGAU24/A* |
|---|---|---|---|
| Serial / Service Tag | *SN# F9CQW2YNG5QJ* | Type | *PH# 225-938-0526* |
| Owner | *Ashley Ventrella* | Passwords | *1598* |
| BIOS Date/Time | *2/16/17   12:46* | Actual Date/Time | *Same* |

## Media Information

| Manufacturer | Serial Number | Size | Image Name or Verifier |
|---|---|---|---|
| *Apple* | *F9CQW2YNG5QJ* | *64GB* | ~~*S2RAC2D1*~~ |
|  |  |  | ~~*S2RAC4D1*~~ |
|  |  |  | *S2RAC5D1* |
|  |  |  |  |
|  |  |  |  |

## Comments

Imaged by: *SA Tim Griffin*

Imaging device S/N and version used: *Cellebrite UFED PA 6.0.0.126*

Destination Drive: *Scers Laptop to WDHD SN# WCC3F7LZ5YSR transferred to ~~Seagate SFB S/N W4ZZW f00 2L~~*

Notes: *Phone was taken from Ashley Ventrella on the premise. Password was given voluntarily (1598) Phone was imaged via Cellebrite Phone was restored to original users settings & returned to Ashley Ventrella.*

*phone# 225-938-0526*

*Destination Drive: Western Digital 500 gb S/N WCC3F7LZ5YSiR*

9:19-CR-80030
GOVERNMENT
EXHIBIT
050

# Electronic Articles of Organization For Florida Limited Liability Company

L15000188742
FILED 8:00 AM
November 06, 2015
Sec. Of State
tjschroeder

## Article I

The name of the Limited Liability Company is:

VBS LABORATORIES, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL. US  33487

The mailing address of the Limited Liability Company is:

1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL. US  33487

## Article III

The name and Florida street address of the registered agent is:

ANTHONY  VENTRELLA
1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL.  33487

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:  ANHTONY VENTRELLA



9:19-CR-80030
GOVERNMENT
EXHIBIT
051

## Article IV

The name and address of person(s) authorized to manage LLC:

L15000188742
FILED 8:00 AM
November 06, 2015
Sec. Of State
tjschroeder

    Title: MGR
    ANTHONY  VENTRELLA
    1140 HOLLAND DRIVE, SUITE 2
    BOCA RATON, FL.  33487  US

## Article V

The effective date for this Limited Liability Company shall be:

    11/06/2015

Signature of member or an authorized representative

Electronic Signature: ANTHONY VENTRELLA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# 2016 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

**FILED**
**Apr 28, 2016**
**Secretary of State**
**CC2010575349**

DOCUMENT# L15000188742

**Entity Name:** VBS LABORATORIES, LLC

**Current Principal  Place of Business:**

1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL  33487

**Current Mailing Address:**

1140 HOLLAND DRIVE
SUITE 2
BOCA RATON,  FL  33487  US

**FEI Number: 47-5546256**                          **Certificate of Status Desired:** Yes

**Name and Address of Current Registered Agent:**

VENTRELLA, ANTHONY
1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL  33487  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

| | |
|---|---|
| Electronic Signature of Registered Agent | Date |

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | VENTRELLA, ANTHONY |
| Address | 1140 HOLLAND DRIVE, SUITE 2 |
| City-State-Zip: | BOCA RATON  FL  33487 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ANTHONY VENTRELLA                          MANAGING MANAGER          04/28/2016

| | |
|---|---|
| Electronic Signature of Signing Authorized Person(s) Detail | Date |



Case 9:19-cr-80030-WPD   Document 361-4   Entered on FLSD Docket 03/18/2020   Page 23 of 131

Florida Department of State                                                    DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

9:19-CR-80030
GOVERNMENT
EXHIBIT
053

# Detail by Entity Name

Florida Limited Liability Company
VBS LABORATORIES, LLC

## Filing Information

| | |
|---|---|
| **Document Number** | L15000188742 |
| **FEI/EIN Number** | 47-5546256 |
| **Date Filed** | 11/06/2015 |
| **Effective Date** | 11/06/2015 |
| **State** | FL |
| **Status** | INACTIVE |
| **Last Event** | VOLUNTARY DISSOLUTION |
| **Event Date Filed** | 08/17/2017 |
| **Event Effective Date** | 08/17/2017 |

## Principal Address

1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL 33487

## Mailing Address

1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL 33487

## Registered Agent Name & Address

VENTRELLA, ANTHONY
1140 HOLLAND DRIVE
SUITE 2
BOCA RATON, FL 33487

## Authorized Person(s) Detail

**Name & Address**

Title MGR

VENTRELLA, ANTHONY
1140 HOLLAND DRIVE, SUITE 2
BOCA RATON, FL 33487

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2016 | 04/28/2016 |

## Document Images

| | |
|---|---|
| 04/28/2016 -- ANNUAL REPORT | View image in PDF format |
| 11/06/2015 -- Florida Limited Liability | View image in PDF format |

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L16000114232
FILED 8:00 AM
June 13, 2016
Sec. Of State
cewilson

## Article I
The name of the Limited Liability Company is:

VENTECH LABS, LLC

## Article II
The street address of the principal office of the Limited Liability Company is:

1140 HOLLAND DRIVE
SUITE 12
BOCA RATON, FL, US  33487

The mailing address of the Limited Liability Company is:

1140 HOLLAND DRIVE
SUITE 12
BOCA RATON, FL, US  33487

## Article III
The name and Florida street address of the registered agent is:

ANTHONY J VENTRELLA

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   ANTHONY VENTRELLA



9:19-CR-80030
GOVERNMENT
EXHIBIT
054

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  MGRM
ANTHONY J VENTRELLA

████████████████████

L16000114232
FILED 8:00 AM
June 13, 2016
Sec. Of State
cewilson

## Article V

The effective date for this Limited Liability Company shall be:

06/13/2016

Signature of member or an authorized representative

Electronic Signature: ANTHONY VENTRELLA

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

**2017 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L16000114232

**Entity Name:** VENTECH LABS, LLC

**FILED**
**Jan 17, 2017**
**Secretary of State**
**CC0318906880**

**Current Principal Place of Business:**

1140 HOLLAND DRIVE
SUITE 12
BOCA RATON, FL 33487

**Current Mailing Address:**

1140 HOLLAND DRIVE
SUITE 12
BOCA RATON, FL 33487 US

**FEI Number:** 81-2940760

**Certificate of Status Desired:** Yes

**Name and Address of Current Registered Agent:**

VENTRELLA, ANTHONY J

███████████████████

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

| Electronic Signature of Registered Agent | Date |
| --- | --- |

**Authorized Person(s) Detail :**

| Title | MGRM |
| --- | --- |
| Name | VENTRELLA, ANTHONY J |
| Address | █████████████ |
| ████████ | ████████████ |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ANTHONY J VENTRELLA            MANAGING MEMBER            01/17/2017

| Electronic Signature of Signing Authorized Person(s) Detail | Date |
| --- | --- |



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:18-cv-81352-MARRA

**BLACKSTONE LABS, LLC,**

      **Petitioner,**

vs.

**UNITED STATES OF AMERICA, et al.,**

      **Respondents.**

_____/

### <u>UNITED STATES' STATEMENT</u>

The United States Department of Justice, Consumer Protection Branch (the "government") respectfully submits the following report following attempts to conference with Petitioner Blackstone Labs:

1.      Since the July 15, 2019 status conference, the government and counsel for Blackstone Labs conferred at length about the request for return of property.  The government provided more information about the items seized, and reasons why each of the items violate the law and are unlawful to return or distribute.  Blackstone Labs has not narrowed its original request for return of 21 products (listed in Petition, ECF No. 1 at p. 3; <u>accord</u> Petitioner's Response re Mootness, ECF No. 32, p. 2-3).  These items include products with ingredients deemed unlawful by a federal district court, products where testing revealed controlled substances, and products that are adulterated, misbranded, and unapproved new drugs under the Food, Drug, and Cosmetic Act.  <u>See</u> **<u>Exhibit A.</u>**



9:19-CR-80030
GOVERNMENT
EXHIBIT
056

2.    The government requested in conference that Blackstone Labs dismiss its petition for lack of jurisdiction.  This Court lacks jurisdiction for a petition in equity for return of property where there is a pending indictment.  The Indictment against Blackstone Labs was returned by a Grand Jury in this District on March 7, 2019.  United States v. Blackstone Labs, et al., ECF No. 1, Docket No. 19-CR-80030-WPD (hereinafter "the Indictment").  The pending criminal case provides a clear and adequate remedy at law.  For an overview of precedents requiring the Petition be dismissed, see the United States Motion to Decline Jurisdiction or for 90 Day Extension, ECF No. 24, p 8-17.  As argued in the government's motion, "the Court should not consider the Petitioner's motion where Petitioner has unclean hands, cannot articulate an irreparable injury, and will have an adequate remedy at law."  Id. at p. 2.

3.    Defendants in the criminal case are required to file motions by September 17, 2019, and Blackstone Labs recently moved for a continuance of the deadline.  ECF No. 180, Docket No. 19-CR-80030-WPD.  Petitioner has had more than four months to file a motion for return of property in the criminal case and has provided no reason why a motion for return of property under Fed. R. Crim. P. 41(g) cannot be decided by Judge Dimitrouleas, who is presiding over the criminal case and is the proper venue in which such a motion be brought and heard.

4.    A movant's decision not to pursue an adequate remedy at law does not vindicate his claim for equitable jurisdiction.  E.g., United States v. Foster, 635 Fed. App'x. 818, 822 (11th Cir. 2015) (concluding that it was improper to exercise equitable jurisdiction when the property owner elected to forego the procedures for seeking a remedy at law).

5.    The government maintains that the items listed in the Petition are relevant to the pending criminal case and that each item cannot be lawfully returned or sold.  See **Exhibit A** for a list of products in the Petition and alleged violations.

6.      There is no way that this Court can take evidence on the products without impacting the criminal proceeding.  All of the items were seized pursuant to a judicially-reviewed warrant authorizing seizure of fruits, contraband, evidence, and instrumentalities of violations of the Food, Drug, and Cosmetic Act,  (21 U.S.C. §§ 331(a), 331(d), 331(v) and 333(a) (interstate distribution of misbranded or adulterated food,  unapproved new drugs, and unsafe dietary supplements), 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and, 1349 (conspiracy to commit mail and wire fraud) occurring after January 1, 2012.  The warrant explicitly authorized the seizure of dietary supplements.  To examine whether the warrant was overbroad or facially deficient is an issue to be handled in the criminal case.

7.      The pending Indictment alleges a broad scheme to defraud the FDA and consumers by selling unlawful and unsafe products, and the seized items are examples thereof – and therefore relevant to the criminal charges.  The Indictment alleges Blackstone Labs illegally distributed multiple categories of unlawful ingredients, lists seven specific products as examples, and alleges distribution of "other products that violated the [Food, Drug, and Cosmetic Act]." Indictment at p. 10, ¶ 11.  Petitioner is requesting return of seized items that are evidence of the "other products" that violated the FDCA, and are relevant to the criminal case.

8.      The Indictment also alleges that the manner and means of the conspiracy to defraud included falsely claiming that all products were manufactured in "an FDA approved, registered and inspected facility that maintains [Good Manufacturing Practices] certifications and follows all FDA guidelines."  Indictment at p. 9, ¶ 8.  Evidence shows the majority of the items in **Exhibit A** were manufactured at facilities whose manufacturing processes did not conform with current Good Manufacturing Processes ("cGMP"), 21 C.F.R. Part 111, and thus could not be legally distributed to consumers.

9.      The government's reasons for declining to return each of the items is based on violations of the Food, Drug, and Cosmetic Act and/or violations of the Controlled Substances Act.  These items are not just evidence in a pending case but are contraband.  The Court should not permit Petitioner to retrieve contraband and sell it to consumers.

For the foregoing reasons, the Court must dismiss the Petition, and Petitioner must seek its requested relief in the criminal case.


Dated: August 5, 2019

                                        Respectfully submitted,

                                        ARIANA FAJARDO ORSHAN
                                        UNITED STATES ATTORNEY

                                        JOSEPH H. HUNT
                                        ASSISTANT ATTORNEY GENERAL
                                        CIVIL DIVISION
                                        U.S. DEPARTMENT OF JUSTICE

                                        _____/s/ Alistair Reader_____
                                        ALISTAIR F. A. READER
                                        Court ID A5502377
                                        Trial Attorney
                                        DAVID A. FRANK
                                        Court ID A5500486
                                        Senior Litigation Counsel
                                        Consumer Protection Branch
                                        U.S. Department of Justice
                                        P.O. Box 386
                                        Washington, D.C.  20044
                                        Alistair.F.Reader@usdoj.gov
                                        (202) 353-9930
                                        David.Frank@usdoj.gov
                                        (202) 307-0061

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by ECF on August 5, 2019 on all counsel or parties of record on the Service List below.

**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Attorneys for Petitioner
Blackstone Labs, LLC
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

_/s/ Alistair Reader_
Alistair Reader
U.S. Department of Justice

# EXHIBIT A

9:19-CR-80030
GOVERNMENT
EXHIBIT
057

## ALLEGED VIOLATIONS INVOLVING THE SEIZED ITEMS

Petitioner requested return of the following items.  Petition, ECF No. 1, at 3.

The summary does not list every possible violation of the Food, Drug, and Cosmetic Act, 21 U.S.C. §331 *et seq.* involving the seized items.

| Items Requested for Return in the Petition (Product Marketing Name) | Alleged Violations |
|---|---|
| Anesthetized | Misbranded food (21 U.S.C. §343(a)(1)) |
| Anogenin | Adulterated food (21 U.S.C. §342(f)(1)(B)) |
| Brutal 4ce | Controlled substances (21 U.S.C. §§ 841(a), (b)(1)(E)) |
| Chosen 1 | Controlled substances (21 U.S.C. §§ 841(a), (b)(1)(E)) |
| Cobra 6 Extreme<br>Cobra 6 Extreme Kiwi Strawberry<br>Cobra 6 Extreme Watermelon | Adulterated food (21 U.S.C. §342(f)(1)(B)) |
| Dust Black Lemonade<br>Dust Blue Sky<br>Dust Cotton Candy<br>Dust Red Ice<br>Dust Watermelon | Adulterated food (21 U.S.C. §342(f)(1)(B)) |
| Dust Extreme Pineapple<br>Dust Extreme Sour Gummy | Adulterated food (21 U.S.C. §342(f)(1)(B)) |
| Eradicate | Unapproved new drug (21 § U.S.C. 321(ff)(3)(B)); Misbranded food (21 USC 343(a)(1) |
| Gear Support<br>Gear Support Raspberry Lemonade | Unapproved new drug (21 § U.S.C. 321(ff)(3)(B)); Misbranded drug (21 U.S.C. § 352(a)(1)) |
| Growth<br>Growth Pineapple | Adulterated food (21 U.S.C. §342(f)(1)(B)) |
| PCT V | Unapproved new drug (21 § U.S.C. 321(ff)(3)(B)); Misbranded food (21 USC 343(a)(1)) |

Name

Address

Date of Birth

Phone Number

Email Address

Position / Title   What are your job responsibilities?

How long in position?

Who owns the company (Blackstone Labs)? Has anyone else been involved in ownership?

If ownership changed, why? And when?

Who manufactures for BSL? And which products?

Manufactures: Duracap, Hi-Tech, VBS/VenTech (Anthony Ventrella)

Who creates formulas?

Knowledge about the following ingredients in products:

> DMAA, DMBA, Picamillon, N-acetyl cysteine, Dimethazine, Methelstenbelone, Androstenedione,
>
> 1-Androsteron, SARMS, any steroids

Who manufactures Super DMZ?

Who manufactures Dust V2 and Dust Extreme? What's the difference?

Relationship with which Australian companies/distributors and what products are mailed to Australia?

Are any products specifically made for Australia or not mailed to Australia because of their laws and regulations?

Do any products omit ingredients off of the labels?

If so, which ones and what ingredient is omitted? (Dust V2-DMAA and Cobra 6p Extreme)

Have any complaints been filed with the company regarding any products?


9:19-80030
GOVERNMENT
EXHIBIT
058

Blackstone Products:

Super DMZ Rx 2.0

Brutal 4ce

Cobra 6p Extreme

Dust V2

Dust Extreme

Growth

Anesthetized

Euphoria

Gear Support

PCTV

Angel Dust

In reference to products:

Who manufactures each?

If different manufacturers for the same product, why?

Profits from products?

Blackstone Labs:

Phillip Braun – CEO/President

Celeste Braun -

James Boccuzzi – Director of Sales

Richard Newton

David Winsauer

Bryan Moskowitz – The Guerrilla Chemist

Amber Gingerich – bookkeeper

Christopher Herron – possible IT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  9:19-cr-80030-WPD

UNITED STATES OF AMERICA
                    Plaintiff,

v.

DAVID WINSAUER,
PHILLIP BRAUN,
AARON SINGERMAN,
JAMES BOCCUZZI,
BLACKSTONE LABS, LLC,
VENTECH LABS,
Defendants.

                    Defendants,

_____/

## AFFIDAVIT

I, DAVID WINSAUER, being duly sworn and deposed, states as follows:

1. I am the Defendant in the above-styled case.

2. I have read the redacted motion to suppress my statement and the incorporated exhibit which was filed on February 3, 2020.

3. I agree with the representation of facts contained within the motion as follows:

    A.  That on February 16, 2017 at approximately 10:00 a.m. the FDA executed the Search Warrant at the business offices where I was employed, Blackstone Labs, 1090 Holland Drive in Boca Raton, Florida.

    B.  When I arrived at I  still in my automobile, I was approached by an armed FDA agent who asked me if I was P.J. Braun, to which I responded, no.  I was then ordered to stay in his automobile.

1



Case 9:19-cr-80030-WPD   Document 361-4   Entered on FLSD Docket 03/18/2020   Page 39 of
131
Case 9:19-cr-80030-WPD   Document 285-1   Entered on FLSD Docket 02/21/2020   Page 2 of 3

C.  After approximately 15 minutes, an agent told me to get out of my automobile.  I was

then taken to the back of Blackstone Lab's building and told to sit on the curb with the rest of the

Blackstone employees.

D.  A short time later, I was approached by another armed agent, who asked for my I.D.

and what my position with the company.  At that time I told him I was the vice president.

E.  While still seated on the curb, Agent Houston E. Ramsey, Jr. and another agent

approached me and told me they wanted to talk to me and escorted me to the agent's automobile.

At this time, I asked Agent Ramsey that, "shouldn't I have a lawyer present for this interview?"

F.  The Agent did not respond to my inquiry, but ordered me into what I assumed was his

automobile while a second agent stood outside the passenger door.

G.  I was placed in the front of the agent's automobile and it was my understanding that I

was in custody and not free to leave.

H.  While seated in the automobile, Agent Ramsey told me he wanted to ask me some

questions and also told me that the agents wanted my cell phone.  At that time I asked Agent

Ramsey for a search warrant, which was provided.  While I was reading the search warrant, the

agent standing outside the automobile said he needed the phone immediately to which I replied,

"I need more time to read the search warrant and I want my lawyer to see it."

I.  Agent Ramsey told me that there was no time for that, they would have to go

downtown and I needed to produce the phone immediately.

J.  Pursuant to the agents' commands, I handed over my phone and at that time submitted

to an interview.  It was my understanding that at that time I was under arrest and not free to

leave.

2

Case 9:19-cr-80030-WPD   Document 361-4   Entered on FLSD Docket 03/18/2020   Page 40 of
Case 9:19-cr-80030-WPD   Document 285-1   Entered on FLSD Docket 02/21/2020   Page 3 of 3
131

K.  I knew that if I had continued to invoke my right to counsel, I would have been arrested.

I HEREBY AFFIRM under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

SWORN and SUBSCRIBED this 20th day of February, 2020.

DAVID WINSAUER

3

| Party | Time | Message |
|---|---|---|
| From: +15044951552 Ronnie<br><br>To: +17542466837 Trevor | 5/15/2015<br>11:34:03<br>PM(UTC-4) | I can't go early. I forgot. Mia has dance till noon and I have to watch Anthony. I can go sat evening or sunday |
| From: +17542466837 Trevor<br><br>To: +15044951552 Ronnie | 5/15/2015<br>10:11:21<br>PM(UTC-4) | Did you want to go fish tomorrow morning? Sorry I didn't text you earlier |
| From: +15044951552 Ronnie<br><br>To: +15615783517 Matt Mosier | 5/15/2015<br>9:06:02<br>PM(UTC-4) | K bud. Thanks. |
| From: +15615783517 Matt Mosier<br><br>To: +15044951552 Ronnie | 5/15/2015<br>8:09:36<br>PM(UTC-4) | So far we've brought over 732 bottles |
| From: +15044951552 Ronnie<br><br>To: +15615783517 Matt Mosier | 5/15/2015<br>8:08:44<br>PM(UTC-4) | how many ostarine did we turn in to Blackstone.  I didn't right it down when you told me. 700+ |
| From: +15044951552 Ronnie<br><br>To: +19498121857 Billy Hinzo-Nutristop Mission Viejo | 5/15/2015<br>8:07:32<br>PM(UTC-4) | Take care |
| From: +19498121857 Billy Hinzo-Nutristop Mission Viejo<br><br>To: +15044951552 Ronnie | 5/15/2015<br>7:58:43<br>PM(UTC-4) | No worries man |
| From: +15044951552 Ronnie<br><br>To: +19498121857 Billy Hinzo-Nutristop Mission Viejo | 5/15/2015<br>7:58:31<br>PM(UTC-4) | Sorry Billy. It's Joey with Fight Pharm. I called u on accident |
| From: +122622<br><br>To: +15044951552 Ronnie | 5/15/2015<br>7:33:21<br>PM(UTC-4) | $12.52 available after $2.12 purchase at REDBOX *DVD RENTAL OAKBROOK TER IL on 05/15 06:31PM CT with your PayPal Prepaid card ending in 6352. |
| From: +14048232328 Matt<br><br>To: +15044951552 Ronnie | 5/15/2015<br>7:28:50<br>PM(UTC-4) | You too |
| From: +15044951552 Ronnie<br><br>To: +14048232328 Matt | 5/15/2015<br>7:26:37<br>PM(UTC-4) | I know how you feel. the last two haven't been great for me. Oh well. Have a good weekend. |
| From: +14048232328 Matt<br><br>To: +15044951552 Ronnie | 5/15/2015<br>7:21:53<br>PM(UTC-4) | No sweat, thanks man. Day from hell |
| From: +122622<br><br>To: +15044951552 Ronnie | 5/15/2015<br>7:21:24<br>PM(UTC-4) | $14.64 available after $24.24 purchase at MCDONALD'S F6291 BOCA RATON FL on 05/15 06:20PM CT with your PayPal Prepaid card ending in 6352. |
| From: +15044951552 Ronnie<br><br>To: +14048232328 Matt | 5/15/2015<br>7:18:31<br>PM(UTC-4) | Sorry I missed  your texts earlier. I was getting that counter going. The  tracking on Jacksonville and Fayetteville say they have arrived. I'll email you the tracking on the epi |
| From: +15044951552 Ronnie<br><br>To: +14048232328 Matt | 5/15/2015<br>5:18:47<br>PM(UTC-4) | I'll check. I dropped off the one for Jacksonville and they will get that one tomorrow. Let me check on Fayetteville. |

9:19-80030<br>GOVERNMENT EXHIBIT<br>060

| | | |
|---|---|---|
| **From:** +15044951552 Ronnie<br><br>**To:** +19549073275 Gill | 5/15/2015<br>5:17:40<br>PM(UTC-4) | K |
| **From:** +19549073275 Gill<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>4:50:32<br>PM(UTC-4) | Can go bye Mon and fix  thanks |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>4:46:46<br>PM(UTC-4) | May need to overnight some items to get them through |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>4:45:46<br>PM(UTC-4) | Can you get me the tracking number for TNS Fayetteville and Jacksonville they are freaking out needed the order before tomorrow |
| **From:** +193639452<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>2:48:05<br>PM(UTC-4) | AT&T Free Msg: Reminder, your bill is ready. To make a payment now for your balance of $202.37 using your credit card ending in 6218, reply 1 and press send. For more payment options, reply 2 and press send. There is no need to call. |
| **From:** +160680<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>11:00:07<br>AM(UTC-4) | MIA had an absence on 05/15/15. |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:56:13<br>AM(UTC-4) | I appreciate it |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:55:46<br>AM(UTC-4) | We'll do our best to finish it quickly. |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:54:27<br>AM(UTC-4) | I know |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:53:50<br>AM(UTC-4) | We are trying yo keep them up but these machines are making it difficult. |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:52:46<br>AM(UTC-4) | K. Start on that the we will finish the rest of the ostarine. We have to get our numbers up.. |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:49:54<br>AM(UTC-4) | Its about a quarter of the container left. We also have 335g of Ostarine |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:49:21<br>AM(UTC-4) | yea. That's not much though. Is it |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:48:34<br>AM(UTC-4) | Well we have the rest of the powder from yesterday that we couldn't finish because of lack of capsules. |
| **From:** +15044951552 Ronnie<br><br>**To:** +15616768390 | 5/15/2015<br>10:48:06<br>AM(UTC-4) | K. Thanks bud |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:47:38<br>AM(UTC-4) | How much ostarine do we have. 800grams or so |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:46:02<br>AM(UTC-4) | We got in more purple capsules, do you want us to just finish the Ostarine or just move on to Eradicate? |

| | | |
|---|---|---|
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:44:09<br>AM(UTC-4) | you have to unroll half of them. Try not to miss them up to bad. |
| **From:** +15616768390<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:35:47<br>AM(UTC-4) | Computer is ready |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:12:50<br>AM(UTC-4) | I have to unroll some of them off the 2000 count roll before I can label the rest. Also we only have 616g of Arimistane. |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:10:57<br>AM(UTC-4) | Are yall finished bottling and labeling all the ostarine |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:08:56<br>AM(UTC-4) | Got it |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 5/15/2015<br>10:08:12<br>AM(UTC-4) | Nah. Mix 1000g of arimistane (eradicate) and 21.8kilos of flour. It will make 635 bottles. Clear bottles and black caps. 90ct |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:05:22<br>AM(UTC-4) | It really requires several hundred off to make it worth it |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>10:04:45<br>AM(UTC-4) | Let's see what he says |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>10:04:26<br>AM(UTC-4) | Thats right. It's still 4600 |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:50:20<br>AM(UTC-4) | Hey Joey, do you want us to hold off on Eradicate until we have the capsuler has running? |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:41:58<br>AM(UTC-4) | I told him 4600 currently and to let me know |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:41:24<br>AM(UTC-4) | Checking |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:41:08<br>AM(UTC-4) | I think 4500. Can you get it cheaper |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:40:15<br>AM(UTC-4) | What's the cost on a kg of epi from spring? |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:28:56<br>AM(UTC-4) | My guy just texted me back. They will be sent today via FedEx. He will have the epi tuesday |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:28:45<br>AM(UTC-4) | My guy just texted me back. They will be sent today via FedEx. He will have the epi tuesday |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:27:00<br>AM(UTC-4) | K. If they didn't go out yesterday I'll send today. I wasn't around the office yesterday evening so I'm not sure if they were sent |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:24:48<br>AM(UTC-4) | Don't forget to send that 500 epi, and let me know. He waiting for that to pay the balance |

| | | |
|---|---|---|
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:22:38<br>AM(UTC-4) | I'll send them. I'll order some more Epi too bud |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:02:13<br>AM(UTC-4) | I have a couple 1k bottle runs lined up, will need epi to fill them |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>9:01:12<br>AM(UTC-4) | Do 2X to be safe, maybe just 2 T's and 1 polo, don't want to be greedy. |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:00:48<br>AM(UTC-4) | It slowing down for me too. I need to start hitting the phones hard again |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>9:00:15<br>AM(UTC-4) | They look good. Just the company logo on the front. The back says  where muscle meets science. The shirts are the same type that Blackstone uses. Not sure how they fit. I also have a Polo Shirt or two I can send. Up to you. |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:58:23<br>AM(UTC-4) | I don't like that shit, even though I know it's normal. |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:58:00<br>AM(UTC-4) | Seems to have started slowing mid-late April. Across the board for me. |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:57:24<br>AM(UTC-4) | Weeks I meant |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:57:16<br>AM(UTC-4) | Has it been slow for you the past couple of months? |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:56:59<br>AM(UTC-4) | You still gotta get these email addresses, and let's catch up on other stuff |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:56:22<br>AM(UTC-4) | Did we get our slogan on there? |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:56:09<br>AM(UTC-4) | How do they look? |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:55:59<br>AM(UTC-4) | Depends on the fit, usually XL, but a lot of cuts are 2X |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>8:55:12<br>AM(UTC-4) |  what size shirt do you wear. I'll send you some shirts if you want. |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>8:51:36<br>AM(UTC-4) | K bud. I will as soon as I get to my office |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 5/15/2015<br>8:50:53<br>AM(UTC-4) | Please do, and shoot me tracking when you can |
| **From:** +15044951552 Ronnie<br><br>**To:** +14048232328 Matt | 5/15/2015<br>8:50:25<br>AM(UTC-4) | I believe they went out yesterday evening. I'll check with my guys to make sure. |

| **From:** +14048232328 Matt | 5/15/2015 8:49:28 AM(UTC-4) | Did you get a chance to ship the 500 epi unlabeled? |
|---|---|---|
| **To:** +15044951552 Ronnie | | |

| Party | Time | Message |
|---|---|---|
| **From:** +18583820137 Brian Mohr<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>5:13:20<br>PM(UTC-4) | Hit me back when you can. Good news and bad but the good far out weighs the bad. Bad, I lost another big order because of timing but I'm sure I'll get them again in s few weeks. Good news, I have a great insurance broker and underwriter that we just conferences with that will write policies on even ephedra. So if you have any hang ups at all, I can pass you their info. |
| **From:** +12034159411 Chris- supplement City<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>4:02:19<br>PM(UTC-4) | Hey bud how did everything turn out? |
| **From:** +17039990938 Mike-Purchasing Group<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>3:22:52<br>PM(UTC-4) | Nice- thanks man!! |
| **From:** +15044951552 Ronnie<br><br>**To:** +17039990938 Mike-Purchasing Group | 8/4/2015<br>3:03:29<br>PM(UTC-4) | I have it buddy. I fedexed it a little earlier. You should get them tomorrow. |
| **From:** +17039990938 Mike-Purchasing Group<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>2:33:11<br>PM(UTC-4) | Do u need my address again? |
| **From:** +17039990938 Mike-Purchasing Group<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>2:33:06<br>PM(UTC-4) | Lol no worries sir |
| **From:** +1239663<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>12:40:20<br>PM(UTC-4) | BedBath&Beyond: Only 5 days left to use Ur mobile offer in-store OR online! Lost it? Text RESEND to 239663 to retrieve. Reply STOP to cancel |
| **From:** +15044951552 Ronnie<br><br>**To:** +17039990938 Mike-Purchasing Group | 8/4/2015<br>11:52:36<br>AM(UTC-4) | Mike. For some reason I can't seem to get the labels to you bud. I apologize Usps sent the package back to me. It's said something a bout insufficient address. I have no clue. It looks like a dog chewed the box. Fortunately the labels are good. I'm just going to FedEx them. You will get them tomorrow. I'm not trying to keep your labels:) |
| **From:** +15044951552 Ronnie<br><br>**To:** +18583820137 Brian Mohr | 8/4/2015<br>11:40:59<br>AM(UTC-4) | Hey bud. I'm back. They finished cutting a big as patch of skin off the back of my neck. I forgot to tell you about it. .the truth is I've been putting the fact that I had cancer out of my head cause I just didn't want to think about it. They got it all so I should be good. 36 and I have skin cancer. Go figure. I dropped by the office and they are good. The hot stamper is here. They are labeling right now. They will have the dmz and the alpha tomorrow finished and ready to ship tomorrow. |
| **From:** +12259789237 Pops | 8/4/2015 | Prayer works? |

| From / To | Date/Time | Message |
|---|---|---|
| **From:** +12259789237 Pops<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>10:45:43<br>AM(UTC-4) | Prayer works? |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>10:37:03<br>AM(UTC-4) | I asked about expediting, waiting to hear back. Never tell anyone on your end about our business, Ben mentioned the Tia to me yesterday, I def don't want it getting back. |
| **From:** +14048232328 Matt<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>10:35:55<br>AM(UTC-4) | My guy said it should be ready to ship in 2 days |
| **From:** +12259789237 Pops<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>9:31:23<br>AM(UTC-4) | I pray that your surgery will be short and effective and that God will bless you with a more gracious life! |
| **From:** +15044951552 Ronnie<br><br>**To:** +18583820137 Brian  Mohr | 8/4/2015<br>9:16:08<br>AM(UTC-4) | Well I have the guys working to get what you need out tomorrow. You are our priority one right now with business:)  so if you need anything don't hesitate to contact me. I am in constant contact with the boys at the warehouse |
| **From:** +18583820137 Brian  Mohr<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>9:14:20<br>AM(UTC-4) | Ouch. Ok, no worries. Thanks for hitting me back but I'll just chill and you guys handle that and he can give me a call later depending on how he's feeling. Business is business but there's a lotta things more important than it. Hope you enjoyed up north too. Talk soon. |
| **From:** +15044951552 Ronnie<br><br>**To:** +18583820137 Brian  Mohr | 8/4/2015<br>9:11:14<br>AM(UTC-4) | Hey Brian this is Ashley. I have Joey's phone I don't think he told you he is having a surgical procedure this morning. They found skin cancer and removing the area. Text him or me 225-938-0526 if you need anything we should be done by this afternoon. He has his phone periodically through this. They just called him back k again |
| **From:** +18583820137 Brian  Mohr<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>9:08:04<br>AM(UTC-4) | Awesome. I'm stoked. I know you're gonna be busy with production but if you get a chance, crunch the numbers on that formula I sent you and shoot me the numbers on your fat burner. I'll call you later to touch base but we have a bunch of products to grind out so I wanna press hard and get on it. |
| **From:** +15044951552 Ronnie<br><br>**To:** +18583820137 Brian  Mohr | 8/4/2015<br>8:55:03<br>AM(UTC-4) | Yep. We will have it before 1030. We will ship Wednesday. |
| **From:** +15044951552 Ronnie<br><br>**To:** +12034159411 Chris-supplement City | 8/4/2015<br>8:51:29<br>AM(UTC-4) | K bro. Thanks |
| **From:** +12034159411 Chris-supplement City<br><br>**To:** +15044951552 Ronnie | 8/4/2015<br>8:51:02<br>AM(UTC-4) | Ahh man good luck no worries! |

| | | |
|---|---|---|
| **From:** +15044951552 Ronnie<br><br>**To:** +12034159411 Chris-supplement City | 8/4/2015 8:50:04 AM(UTC-4) | I'll checking on it. I have a procedure this morning. I have a cyst that ended up being cancer. It's a form of skin cancer. They are removing it any minute now.. I might not be available for a few hrs but I'll get you the tracking. |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 8/4/2015 8:42:44 AM(UTC-4) | I thought he did. I'll call fedex |
| **From:** +12034159411 Chris-supplement City<br><br>**To:** +15044951552 Ronnie | 8/4/2015 8:41:17 AM(UTC-4) | Thanks buddy |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 8/4/2015 8:41:16 AM(UTC-4) | He said he dropped it off |
| **From:** +15615783517 Matt Mosier<br><br>**To:** +15044951552 Ronnie | 8/4/2015 8:20:15 AM(UTC-4) | I believe Matt took it |
| **From:** +15044951552 Ronnie<br><br>**To:** +15615783517 Matt Mosier | 8/4/2015 8:19:24 AM(UTC-4) | Didn't y'all drop something off to FedEx Friday. I can't find a record of it being shipped |
| **From:** +15044951552 Ronnie<br><br>**To:** +12034159411 Chris-supplement City | 8/4/2015 8:00:51 AM(UTC-4) | K. Give me a min to find it |
| **From:** +12034159411 Chris-supplement City<br><br>**To:** +15044951552 Ronnie | 8/4/2015 7:53:27 AM(UTC-4) | Hey Joey last time  I bother you promise but can I get tracking on the order please |
| **From:** +15044951552 Ronnie<br><br>**To:** +17548028072 J R - Blackstone | 8/4/2015 7:52:06 AM(UTC-4) | I will bud. Thanks for texting me |
| **From:** +17548028072 J R - Blackstone<br><br>**To:** +15044951552 Ronnie | 8/4/2015 7:49:43 AM(UTC-4) | Call me when you get out buddy |

| Party | Time | Message |
|---|---|---|
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 9:38:49 PM(UTC-5) | He's still wants to sell his place doesn't he. I would try to buy it if he gave me a year. I'd let him still keep his cabin. I won't pay want he wants. He said he wants like 2.1 million. That's a lot bro. |
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 9:33:36 PM(UTC-5) | He sounds like it. Like I mentioned to him. I dont doubt the disciples thought Jesus was the son of God. I know they believed that. It's just don't feel the New Testament convinces me. When I tell him that he just quotes more scripture. |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 9:29:39 PM(UTC-5) | Hahaha dude he's been reading alot of scripture |
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 9:28:42 PM(UTC-5) | Ha. He just tries to convict me with scripture. I told him that by itself just isn't enough for me at this point. I probably shouldn't say that cause he just tries to preach more |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 9:27:16 PM(UTC-5) | That's his thing....What'd he say? |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 9:26:58 PM(UTC-5) | Yea man, that's what he talks about all the time |
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 9:26:07 PM(UTC-5) | It was good seeing them. It had been a while. Pops comes on a little strong with his religious views. Does he try convert you all the time? |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 9:24:42 PM(UTC-5) | All good for now How are things how was the trip with Dad? |
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 9:23:54 PM(UTC-5) | Sure. Just let me know when and where and I'll be there. How is everything else |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 9:23:13 PM(UTC-5) | Idk yet I'll let you know, you'll have to be in my wedding |
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 9:21:50 PM(UTC-5) | When is the date? |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 9:07:31 PM(UTC-5) | Thanks bro |
| **To:** +12252789780 Ryan Ventrella | 12/21/2016 8:46:43 PM(UTC-5) | Congratulations. I think that's great. I'm happy for you. |
| **From:** +12252789780 Ryan Ventrella | 12/21/2016 7:58:33 PM(UTC-5) | I'm getting married! |
| **From:** +12253978671 | 12/21/2016 6:52:39 PM(UTC-5) | Send me that pick of rolley you were tslkin about joe |
| **From:** +19543030595 Juan | 12/21/2016 5:16:18 | I think he did most of it. The auger is half full and i dont se anymore powder anywhere. I can |

9:19-80030
GOVERNMENT
EXHIBIT
062

| | | |
|---|---|---|
| **From:** +19543030595 Juan | 12/21/2016 5:16:18 PM(UTC-5) | I think he did most of it. The auger is half full and i dont se anymore powder anywhere. I can mix another 100 in the morning. |
| **To:** +19543030595 Juan | 12/21/2016 5:14:16 PM(UTC-5) | Matt Rossi wants 300 alpha instead on 200. Might have to mix some more up. Did Mosier finish capping it today by the way. |
| **From:** 242733 | 12/21/2016 4:14:04 PM(UTC-5) | Fr:Chase Online. If you did not request this code, call us immediately at 1-866-355-3744. This code is for online use only for the next 10 minutes. We will neve |
| **From:** 242733 | 12/21/2016 4:14:03 PM(UTC-5) | Fr:Chase Online Identification Code:83334082 Enter online at prompt or in password field at logon w/in 10 minutes |
| **From:** 72524 | 12/21/2016 7:12:02 AM(UTC-5) | DHL EXPRESS 1094599984 from CATHERINE HUANG is scheduled for delivery Dec 27 2016. Signature is required. Manage delivery at https://delivery.dhl.com/US/OlZBGa Reply END to stop msgs. |

| # | Title | Body | Summary |
|---|-------|------|---------|
| 1 | Cobra 6- green opaque caps. Size 00 | Cobra 6- green opaque caps. Size 00 Ingredients 466 mg total caffeine anhydrous Achyrantes aspera Theobromine<br><br>[thumbnail_1BE38A98-3404-4C25-9160-6355B312A4D2-1-512x384.png] [thumbnail_84A87AA1-E963-475C-BC8D-4B9B0F0720C1-1-2048x1536.png] | Ingredients 466 mg total |
| 2 | April | April 1-800-804-9389 Ext 5509 | |
| 3 | Tammy@stfpd.comu | Tammy@stfpd.comu | |
| 4 | -Dan hong in china for $320 | -Dan hong in china for $320 | |
| 5 | Curtis PMC | Curtis PMC P/N 25864Go5 S/N - P089656 3.5 HP motor at 36v | |
| 6 | Kawasaki Vulcan | Kawasaki VulcanFront- Bridgestone 130/90-M/C 67H Back- Bridgestone 170/70B16M/C  75h  Exedra G722 | |
| 7 | 920024649 | 920024649 | |
| 8 | Up top | Up top 1)25" pc 1 flat cap 1 -6" pc 1 pc metal and 1 cap 1-23 5/8" blanket 5" width Bottom | |



9:19-80036
GOVERNMENT
EXHIBIT
063

| 8 | Up top | Up top<br>1)25" pc 1 flat cap<br>1 -6" pc<br>1 pc metal and 1 cap<br>1-23 5/8" blanket 5" width<br>Bottom<br>1-26 3/4<br>1-8"  pc<br>1-11" pc<br>1-37 1/4" pc<br>2-blAnkets 23 5/8" x 5"<br>4 caps<br>1- flat cap | |
| 9 | 94"x 15 1/2 | 94"x 15 1/2<br>78"x26" | |
| 10 | Battery 12volt 14ah yuasa | Battery 12volt 14ah yuasa<br>Ytx16-bs | |
| 11 | Betty's # | Betty's # | |
| 12 | Bass harvest rates-2012 | Bass harvest rates-<br>20124/28- 6 fish=10pounds<br>5/4-9 fish=10ponds<br>5/5-1 fish= 2 pounds | |
| 13 | Policy # | Policy #F2097730<br>866-472-3326 | |
| 14 | Anthony | AnthonyDNA wa geuarray of<br>DDS  on 6/11/2010<br>Resultsyojgoollm<br>- loss of copy number on the<br>2p16.3 chromosome  which<br>partially overlaps  the<br>NRXN1 gene(neurexin 1)<br>Disruption of this gene has<br>been associated with autism<br>spectrum dis order. | |
| 15 | Safeco | Safeco866-472-3326<br>Policy # f2097730 | |

| | | | |
|---|---|---|---|
| 16 | Paws | Paws- aventrella159878 | |
| 17 | Bills | Bills1. GE money- $96<br>2. AT&T - $160<br>3. Lafayette- $120<br>4. Jack-130<br>5. Spectrum- $78<br>6. Ebr credit union- $435<br>7. Safeco-$196<br>8.demco-$160 | |
| 18 | Doug@PAFdistrubution.com | Doug@PAFdistrubution.com | |
| 19 | Make sure to check and see if Tim has been charged a second time of… | Make sure to check and see if Tim has been charged a second time of $2500. Check on order for seth to make sure it was shipped. | $2500. Check on order for seth to make sure it was shipped. |
| 20 | Sarms-Price as follows | Sarms-Price as follows<br><br>Ostarine -at usd2000/kg<br>Gw-at usd3500/kg<br>Mk677-at usd12000/kg<br>Sr9009-at usd13000/Kg<br>Rad140-at usd14000/kg<br>S4-at usd2200/kg<br>Yk11-at usd20000/kg<br>Lgd4033-at usd7000/kg | Ostarine -at usd2000/kg |
| 21 | 11/23 | 11/23<br>1.Call Renato<br>2.1Finish quote for Seth on pre<br>Order powders for condemned labz<br>Order raws for muscle Rage<br>NDA for Luke<br>Check on CB products<br>Salt armour label- send to qt label<br>Call Karan-cb product and conquer labs<br>Call Jeremy | 1.Call Renato |
| 22 | Amino | Amino<br>Ph- 250mg and Methionine - 500mgq- 250mg and Methionine - 500mg? ? | Ph- 250mg and Methionine - 500mgq- 250mg and Methionine - 500mg? ? |
| 23 | Things to do: | Things to do:<br>Estimate for Landon.<br>Send Chris product descriptions and pics<br>Collect money Monday.<br>Brian- natural body estimate | Estimate for Landon. |
| 24 | New Note | | |

| 25 | Digital marketing- Facebook | Digital marketing- Facebook<br>Dynamic marketing<br>Retargeting campaign<br> 3.CTA - shop now or learn more | Dynamic marketing |
| 26 | 5htp - $150/ kg | 5htp - $150/ kg | |
| 27 | Adapter for air compressor. | Adapter for air compressor. | |
| 28 | Matt. | Matt.<br>Here is a list of products to work on tomorrow.<br>1. PctV-400units (mix this first)<br>Arimistane -720 grams of arimistane<br>NAC-3 kilos<br>Saw palmetto-3.84 kilos<br>Tribulus terrestris - 6 kilos<br>Let me know what we don't have in stock. Add rice flour to replace whatever. We need these done today<br>2. finish bsl alpha max<br>3. A. Need to finish 250 Lgd. They are upstairs. Amber 150cc bottle red tops. (Make the capsules match the capsules of the bottles that are finished.  I think we need less than 20 Lgd<br>Math for 20 Lgd<br>9 grams Lgd<br>711 grams of rice flour  This is the math for one of the profillers.<br>   3B. Need to finish 250 ostarine. Most are finished upstairs. Need 20 or so to finish. -amber 150 cc bottles red tops<br>Math for ostarine<br>Profillers<br>18 grams of ostarine<br>702grams of rice flour -<br>   3C. 350 arimistane- ( miix this right after pct v)amber 150cc bottle Amber / red tops /capsule can be whatever color. size zero<br>We have in stock. Here is the math for 365 units in profillers<br>723 grams of arimistane<br>8.04 kilos of rice flour | Here is a list of products to work on tomorrow. |

| | | 4. Eradicate- once you finish job numbers 1-3 go to number 4<br>Here is the math<br>Semi.<br>750 grams of arimistane<br>21.8 kilos of rice flour<br>500 units of bsl eradicate/ black capsules<br>Profillers-<br>750 grams of arimistane<br>17. 3 kilos of rice flour<br>500 units of bsl eradicate<br>Clear bottle 150cc/ black tops , black capsules | |
|---|---|---|---|
| 29 | $5.70 double tap- recon | $5.70 double tap- recon<br>$4.90 pct<br>$4.20 pct | $4.90 pct |
| 30 | Outlier fatburner | Outlier fatburner<br>Acetyl l carnitine-1.5 grams<br>DMAA -75mg<br>Garcinia Canbogia -500mg<br>L tyrosine<br>Green tea extract | Acetyl l carnitine-1.5 grams |

| 31 | 12-31-15 | 12-31-15<br>Supplement city - Chris invoice<br>Dhillon - send 100 dmz at $20 each<br>Pay rent<br>Pay truck note<br>Get with John on labels for Outlier Nutrition<br>Send Brian a new invoice<br>Get with Prinova on flavors and dyes.<br>Order raws for powders<br>Rice flour<br>Get containers , lids and labels for new Blackstone product<br>Email Landon about Quote<br>Get with John on private label products<br>Get with Ashley on black bottles, clear bottles and tops. | Supplement city - Chris invoice |
|----|----------|-----------------------------------|---------------------------------|
| 32 | Sarm order xtreme suppz | Sarm order xtreme suppz<br>450 g ostarine<br>135g of lgd<br>150g of mk-677 | 450 g ostarine |
| 33 | BSL dust | BSL dust<br>Beta alanine-3 | Beta alanine-3 |
| 34 | Gold Coast flavors  in California. | Gold Coast flavors  in California. | |
| 35 | Cobra 6 extreme | Cobra 6 extreme<br>Ingredients-675mg<br>caffeine anhydrous<br>Achyranthes Aspera<br>3<br>4. Theobromine<br>5. Dendrobium<br>6. Advantages Z TM<br>7. Bioperine<br>8. Yohimbine | Ingredients-675mg |
| 36 | Royal Palm med spa | Royal Palm med spa | |

| 37 | Run everything labs | Run everything labs DTE fatburner( 90 ct Size OO Serving size3 capsule (30 servings per bottle -Acetyl l carnitine-1g /30g per bottle Naringin-625mg/18.75g per bottle Coleus Forskolin-250mg/7.5g per bottle Caffeine Anhydrous-250mg/7.5g per bottle Arcolean(Arcoline Hydrobromide-125mg/3.75g per bottle (Cymbidium Georingii Extract) Hesperidin-100mg/3G per bottle/ 3 Synephrine HCl -50mg/1.5 g per bottle/1.5kg Rawolscine-3mg/90mg per bottle-90g per 1000units | DTE fatburner( 90 ct Size OO |

# EXHIBIT 1



4:19-80030
GOVERNMENT
EXHIBIT
064

**Rule 16 Summary of Expert Opinion and Bases**

**Report date:** March 07, 2019

**Prepared by:** Daniel Willenbring, Ph.D.

**Substance at issue:** 17β-hydroxy-2,17α-dimethyl-5α-androst-1-en-3-one

**Alternate names:** methylstenbolone; M-Sten; Methyl-Sten; Ultradrol

**Opinion:** Based on a review of current scientific literature and chemistry information, methylstenbolone has a chemical structure substantially similar to the structure of stenbolone (17β-hydroxy-2-methyl-5α-androst-1-en-3-one), a listed anabolic steroid under the Controlled Substances Act (CSA).

**Bases and Reasons:**

1. The figure below depicts the chemical structure of 5α-androstane. The figure uses a common representation for chemical structures, with scientifically acceptable shorthand to depict carbon (C) and hydrogen (H) atoms. Letters (A-D) indicate the four fused rings in the structure and the numbers indicate the positions of substitution discussed here.



5α-androstane

2. Methylstenbolone and stenbolone both contain this 5α-androstane structure. The 5α-androstane structure is modified at the same positions in both substances (1-, 2-, 3-, and 17-positions).

Expert Report of Daniel Willenbring, Ph.D.
Drug Science Specialist
Drug and Chemical Evaluation Section
Drug Enforcement Administration

1

3. The chemical structure for each substance is shown below.

methylstenbolone stenbolone

4. Both methylstenbolone and stenbolone include a double bond (–C=C–) between carbon atoms, commonly known as an alkene group, at the 1- and 2-positions on the A-ring.
5. Both methylstenbolone and stenbolone are substituted with a methyl group ($-CH_3$) at the 2-position on the A-ring.
6. Both methylstenbolone and stenbolone are substituted with a ketone group (=O) at the 3-position on the A-ring.
7. Both methylstenbolone and stenbolone are substituted with a hydroxyl group (–OH) at the 17-position on the D-ring.
8. Methylstenbolone is substituted with an additional methyl group ($-CH_3$) at the 17-position on the D-ring.
9. The structural difference between methylstenbolone and stenbolone is the addition of a single methyl group at the 17-position. The remainder of the chemical structures are identical.
10. In comparing the chemical structures for methylstenbolone and stenbolone, as depicted in #3, the difference in the chemical structure is minor given that it consists of the addition of a single methyl group. Therefore, methylstenbolone is substantially similar in chemical structure to stenbolone, a listed anabolic steroid under the CSA.

# EXHIBIT 2

**Rule 16 Summary of Expert Opinion and Bases**

**Report date:** March 07, 2019

**Prepared by:** Daniel Willenbring, Ph.D.

**Substance at issue:** 2α,17α-dimethyl-5α-androstan-17β-ol-3-one azine

**Alternate names:** dymethazine; dimethazine; mebolazine

**Opinion:** Based on a review of current scientific literature and chemistry information, dymethazine is derived from and has a chemical structure substantially similar the structure of methasterone (2α,17α-dimethyl-5α-androstan-17β-ol-3-one), a listed anabolic steroid under the Controlled Substances Act (CSA).

**Bases and Reasons:**

1. The figure below depicts the chemical structure of 5α-androstane. The figure uses a common representation for chemical structures, with scientifically acceptable shorthand to depict carbon (C) and hydrogen (H) atoms. Letters (A-D) indicate the four fused rings in the structure and the numbers indicate the positions of substitution discussed here.



5α-androstane

2. Dymethazine and methasterone both contain this 5α-androstane structure. The 5α-androstane structure is modified at the same positions in both substances (2-, 3-, and 17-positions). Dymethazine is a dimer and consists of two identical molecules linked together at their 3-positions.

3. The chemical structure for each substance is shown below.



dymethazine

methasterone

4. Both dymethazine and methasterone are substituted with methyl groups ($-CH_3$) at the 2- and 17-positions on the A- and D-rings, respectively.

5. Both dymethazine and methasterone are substituted with a hydroxyl group ($-OH$) at the 17-position on the D-ring.

6. Both dymethazine and methasterone are substituted at the 3-position of the A-ring.

    a. As described in #2, dymethazine contains two identical molecules linked together at this position. The group linking these molecules is known as an azine (=N–N=).

    b. Methasterone is substituted with a ketone group (=O) at this position.

7. It is possible to derive dymethazine in a reversible way from two molecules of methasterone.

8. The structural difference between dymethazine and methasterone is that two molecules of methasterone are linked together with a hydrazine molecule ($NH_2-NH_2$) at the 3-poitions to create dymethazine. The remainder of the chemical structures are identical.

9. In comparing the chemical structures for dymethazine and methasterone, as depicted in #3, the difference in the chemical structure is minor given that it consists of linking two identical molecules of methasterone together. Therefore, dymethazine is substantially similar in chemical structure to methasterone, a listed anabolic steroid under the CSA.

Expert Report of Daniel Willenbring, Ph.D.
Drug Science Specialist
Drug and Chemical Evaluation Section
Drug Enforcement Administration

2

# EXHIBIT 3

**Rule 16 Summary of Expert Opinion and Bases**

**Report date:** March 07, 2019

**Prepared by:** Daniel Willenbring, Ph.D.

**Substance at issue:** 17α-methyl-3β,17β-dihydroxy-5α-androst-1-ene

**Alternate names:** methyl-1-etiocholenolol; methyl-1-alpha; m1a; methyl 1-AD; alpha one

**Opinion:** Based on a review of current scientific literature and chemistry information, methyl-1-etiocholenolol has a chemical structure substantially similar to the structure of 1-androstendiol (3β,17β-dihydroxy-5α-androst-1-ene), a listed anabolic steroid under the Controlled Substances Act (CSA).

**Bases and Reasons:**

1. The figure below depicts the chemical structure of 5α-androstane. The figure uses a common representation for chemical structures, with scientifically acceptable shorthand to depict carbon (C) and hydrogen (H) atoms. Letters (A-D) indicate the four fused rings in the structure and the numbers indicate the positions of substitution discussed here.



5α-androstane

2. Methyl-1-etiocholenolol and 1-androstendiol both contain this 5α-androstane structure. The 5α-androstane structure is modified at the same positions in both substances (1-, 2-, 3-, and 17-positions).

Expert Report of Daniel Willenbring, Ph.D.
Drug Science Specialist
Drug and Chemical Evaluation Section
Drug Enforcement Administration

1

3. The chemical structure for each substance is shown below.



"methyl-1-etiocholenolol"          1-androstendiol

4. Both methyl-1-etiocholenolol and 1-androstendiol include a double bond (−C=C−) between carbon atoms, commonly known as an alkene group, at the 1- and 2-positions on the A-ring.

5. Both methyl-1-etiocholenolol and 1-androstendiol are substituted with hydroxyl groups (−OH) at the 3- and 17-positions on the A- and D-rings, respectively.

6. Methyl-1-etiocholenolol is substituted with an additional methyl group (−CH$_3$) at the 17-position on the D-ring.

7. The structural difference between methyl-1-etiocholenolol and 1-androstendiol is the addition of a single methyl group at the 17-position. The remainder of the chemical structures are identical.

8. In comparing the chemical structures for methyl-1-etiocholenolol and 1-androstendiol, as depicted in #3, the difference in the chemical structure is minor given that it consists of the addition of a single methyl group. Therefore, methyl-1-etiocholenolol is substantially similar in chemical structure to 1-androstendiol, a listed anabolic steroid under the CSA.

# EXHIBIT 4

Home (http://store.blackstonelabs.co)    Super DMZ RX 2.0™

# SUPER DMZ RX 2.0™
Availability: In stock

## $59.99

Qty:

1

Add to Wishlist (https://store.blackstonelabs.com/wishlist/index/add/product/3/)

Email to a Friend (http://store.blackstonelabs.co/sendfriend/product/send/id/3/)

1 Review(s) (http://store.blackstonelabs.com/review/product/list/id/3/) | Add Your Review (http://store.blackstonelabs.com/review/product/list/id/3/#review-form)

24

# Buy 2 Get $10 Off!

# Supplement Facts
Serving Size: 1 Capsule    Servings Per Container: 60

| Amount Per Capsule | | % Daily Value |
|---|---|---|
| 2,17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one | 10 mg | * |
| 17b-hydroxy-2a,17b-dimethyl-5a-androstan-3-one azine | 10 mg | * |

* Percent Daily Value (%DV) not established

(http://store.blackstonelabs.com/media/catalog/product/cache/1/image/9df78eab33525d08d6e5fb8d27136e95/s/u/super-dmz-20-render.png)





(http://store.blackstonelabs.com/media/catalog/product/cache/1/image/9df78eab33525d08d6e5fb8d27136e95/s/u/super-dmz-20-render.png)

Product Description    Reviews

**Super-DMZ Rx 2.0™** is a newly formulated supplement "Hardening Stack" engineered and designed to increase, sustain, and strengthen muscularity via multiple pathways. Super-DMZ Rx™ incorporates a combination of two synergistic compounds (Dymethazine & Methylsten) that target multiple receptor sites resulting in dry gains, harder/leaner muscle, and increased vascularity from one workout to the next. Super-DMZ Rx™ will increase lean muscle mass and strength at a level that is comparable to popular supplements such as Dianabol and Anadrol, the only difference is it's 100% legal!.

# Dimethazine

Featuring unheard of muscle building effects, Dimethazine was compared to Methyltestosterone, Oxymethalone, Androstanazole and Testosterone Propionate in their protein activity. Dimethazine was shown to have the HIGHEST myotropic (muscle building) effects out of any of the previously named supplements (Methyl-Test, Anadrol, Winstrol, and Testosterone Propionate)! In addition to this, it also displayed an ability to induce a higher rate of Nitrogen retention than Methyl-Test.(1)

In another study performed on Dymethazine, patients were administered Dymethazine for 45+ days. Liver values did not change for 50% of patients, while the other 50% noticed only modest to moderate increases in liver values(2). So, Dymethazine can increase liver values, however nowhere near the current methyl monsters on the market today. This means Dimethazine can be run for 4-6 weeks without the need of expensive liver support supplements.

Supplemental products that give huge strength/weight gains are usually associated with watery or wet gains due to large amounts of aromatization resulting in high levels of estrogen in the body. Too much estrogen can cause severe bloating, fat gain, and even potential growth problems. Dymethazine features 0% ability to aromatize and expresses an extremely weak androgenic activity (3). This means Dimethazine will produce intense gain, has very little to no liver impact, and will cause absolutely no estrogen related side effects.

Move beyond the supplements of yesterday, and step into the future of supplements with Dimethazine. Consume 1-3 capsules, evenly spaced throughout the day. Do not use Dimethazine for longer than 6 weeks. Immediately begin PCT dosing protocol upon finishing Dymethazine. Wait at least 90 days before running Dimethazine again.

References:

1. Biological activity of dimethazine in the protein field. Matscher, R.; Lupo, C.; De, P. Ruggieri. Lab. Ric. Ormonoter. Richter, Milan, Bollettino - Societa Italiana di Biologia Sperimentale (1962), 38 988-90. CODEN: BSIBAC ISSN: 0037-8771. Journal language unavailable. CAN 58:34623 AN 1963:34623 CAPLUS

2. Protracted action of protein anabolism in gynecological oncology and its effect on hepatic function. Dambrosio, F.; Donatelli, G. Fontana. Univ. Milan, Cancro, II (1963), 16(5), 553-604. Journal language unavailable. CAN 62:11656 AN 1965:11656 CAPLUS

3. A new supplement with protein activity: dimethazine. De Ruggieri, P.; Matscher, R.; Gandolfi, C.; Chiaramonti, D.; Lupo, C.; Pietra, E.; Cavalli, R. Ormonoterap. Richter, Milan, Archivio di Scienze Biologiche (Bologna) (1963), 47(1), 1-19. CODEN: ASBIAL ISSN: 0004-0169. Journal language unavailable. CAN 60:46973 AN 1964:46973 CAPLUS

# Methylstenbolone

In 1966 Methylstenbolone was researched by Searle Laboratories, along with several other compounds; several of which have become well known in the supplements today. Some of the supplements included in this research were Desoxymethyltestosterone (Pheraplex), Methyl-1-Testosterone (M1T), and 17a-methyl-1-androstendiol (M1-Alpha). At the conclusion of this research, the results were compared against several other well known compounds, all of which are still regularly used today.

The results of this comparison were shocking, with the researchers commenting that even the least active compound in Table 6 (see below) possessed a higher relative myotropic (muscle-building) potency than previously has been obtained with several clinically interesting compounds, which have been studied under identical conditions, i.e. Oxymetholone (Anadrol), Oxandrolone (Anavar), Stanozolol (Winstrol), and Methandrostenolone (Dianabol).

Even a novice in the world of supplements understands that Anadrol and Dianabol are considered strong supplements. In fact, Anadrol was long believed by many to be the most potent oral supplements in the world when it came to adding overall muscle mass. For every single supplements studied in Table 6 to be considered more myotropic than Anadrol, we are indeed looking at a powerful class of compounds. See below.



(USAO GAN 6/10) Search Warrant

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

In the Matter of the Search of

6015 Unity Drive, Suites A, B, D and F Norcross, GA 30071.

**SEARCH WARRANT**
Case number: 1:17-MC-1106
**UNDER SEAL**

TO: Special Agent with Food and Drug Administration-Office of Criminal Investigations, ("FDA-OCI") Brian Kriplean, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Brian Kriplean who has reason to believe that on the property described as:

### See Attachment A-1,

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

### See Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 331(a), 333(a)(2), 331(k) and 841(a)(1). I find that the affidavit(s) establishes probable cause to search for and seize the certain property, certain information, and certain data from the property described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before _Oct. 12 2017_ (not to exceed 14 days) IN THE DAYTIME (6 a.m. – 10 p.m.). You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a copy of the warrant and receipt at the place where the property was taken. The officer executing the warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Russell G. Vineyard.

September 28, 2017 at _5:48 pm_
Date and Time Issued

at Atlanta, Georgia
City and States

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer
AUSA Steven D. Grimberg, 6367

Signature of Judicial Officer

9:19-80030
GOVERNMENT
EXHIBIT
070

## ATTACHMENT A-1

SUBJECT LOCATION 1, a business property located at 6015 Unity Drive, Suites

A, B, D and F Norcross, GA 30071.  A picture of the location is incorporated herein.

Front View





Suite A is located within the business complex of 6015 Unity Drive.  The front door to Suite A is located on the northwest side of the building (on the back side of Suite B) and has glass doors with no descriptive markings. Suite F is located within the business complex of 6015 Unity Drive.  The front door to Suite F is located on the northeast side of the building (on the backside of Suite D) and contains a green in color sign on the door marked as 6015-F.

## ATTACHMENT B

Evidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 and 21 U.S.C. § 841(a)(1). This evidence, fruits, and instrumentalities include:

1. Any misbranded and/or adulterated foods and/or drugs, including but not limited to products purportedly labeled as dietary supplements.

2. Any Schedule III controlled substances in whatever form present.

3. Raw materials and bulk powders used to distribute controlled substances and/or manufacture misbranded and/or adulterated foods and/or drugs.

4. All labels, labeling, and advertisements pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

5. Paraphernalia for manufacturing, packaging, weighing, or distributing controlled substances or misbranded and/or adulterated foods and/or drugs.

6. All electronic devices, including but not limited to, computers, routers, modems, hard drives, flash drives, cell phones, printers and label making

devices utilized in any capacity involving the manufacturing or distribution of controlled substances and/or adulterated foods and/or drugs.

7. All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of controlled substances and introduction into interstate commerce any misbranded and/or adulterated foods and/or drugs. The documents to be seized include those relating to the brokering, ordering, producing, purchasing, shipping, selling and distributing of misbranded and/or adulterated foods and/or drugs, including but not limited to: business journals and ledgers; purchase orders; invoices; contracts; receipts; delivery receipts; work orders; production records, batch records, recipes, product formulations, laboratory test results, certificates of content, certificates of analysis, certificates of free sale, GMP certifications, GMP audit reports, telephone, telefax, and computer Internet records; written and electronic correspondence; bank records, including bank statements; records of investment accounts; financial statements and summaries; letters of credit; canceled checks, check registers, and other records reflecting payments; airway bills; bills of lading; handwritten notes; memoranda; address books; sales orders; purchase orders; rolodexes, business cards, and other documents identifying suppliers and customers; shippers' letters of instructions; business inquiries;

confirmations; commodity business brochures; supplier and customer lists; records of purchase from suppliers; application forms, documents, and literature regarding the FDA and/or State agency; and any unopened mail addressed to or from the individuals/businesses mentioned herein.

8. All tax records, including summaries and schedules.

9. All records relating to property, both real and personal, that may have been acquired with the proceeds of the illegal purchase, possession, and unauthorized distribution of controlled substances or introduction into interstate commerce of any misbranded and/or adulterated foods and/or drugs.

10. Indicia of occupancy, residency, and/or ownership of the premises to be searched.

11. Relating to computer-generated records, such records include:

A. Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment. This media includes floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser discs, video cassettes and other media that is capable of storing

magnetic coding, as well as punch cards, and/or paper tapes, and all printouts of stored data.

B. Any and all electronic devices that are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word-processing equipment, modems, monitors, cables, printers, plotters, encryption circuit boards, optical scanners, external hard drives, external tape backup drives and other computer-related electronic devices.

C. Any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

D. Any and all written or printed material that provides instruction or examples concerning the operation of computer systems or software, and/or any related device, and sign-on passwords, encryption codes or other information needed to access the computer system and/or software programs.

The terms "items," "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means such items, records, or documents, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonographic records, printing, or typing); and electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, backup tapes, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel may need to seize and search the following items:

    a.    Any computer equipment and storage device capable of being used to commit, further or store evidence of crimes, including but not limited to the introduction into interstate commerce of misbranded and/or

adulterated foods and/or drugs in violation to Title 21 USC § 331, and manufacturing and distributing controlled substances in violation of 21 USC § 841(a)(1).

b.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices

or data; and

g.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

In addition, agents conducting this search are authorized to utilize the service(s) of outside computer expert(s), who may not be Federal Law Enforcement Officer(s), in order to use and operate the computer system(s) at the above specified location(s), for purposes of retrieving the above specified computer information during the course of the authorized search, provided that such expert(s) operate under the direction, supervision, and control of Special Agent(s) of the United States Food and Drug Administration Office of Criminal Investigations.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).



**DUPLICATE**

(USAO GAN 6/10) Search Warrant

**FILED IN CHAMBERS**
U.S.D.C. Atlanta

JAN 24 2014

## United States District Court

NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

**a business/warehouse suite located at 4301 Pleasantdale
Road, Suite I, Atlanta, GA 30340 (SUBJECT LOCATION
A)**

JAMES N. HATTEN, Clerk

By: _Deputy_ _____
Deputy Clerk

**SEARCH WARRANT**
Case number: 1:14-MC-0034

**UNDER SEAL**

TO: Special Agent Brian C. Kriplean, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Brian C. Kriplean who has reason to believe that on the
property described as:

a business/warehouse suite operated by Active Sports Supplements, LLC, and Adrenaline Nutrition
Supplements, LLC, a/k/a ANS, located at 4301 Pleasantdale Road, Suite I, Atlanta, GA 30340, described
more fully in Attachment A-1, which is attached hereto and incorporated by reference

in the Northern District of Georgia there is now concealed certain property, certain information, and
certain data, namely,

See Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and
property designed for use, intended for use, or used in committing a crime, concerning violations of Title
21, United States Code, Section(s) 331, 841(a)(1) and Title 18, United States Code, Section(s) 1341, 1343. I
find that the affidavit(s) establishes probable cause to search for and seize the certain property, certain
information, and certain data from the property described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before 2/7/14 (not to
exceed 14 days) IN THE DAYTIME (6 a.m. – 10 p.m.). You must give a copy of the warrant and a receipt
for the property taken to the person from whom, or from whose premises, the property was taken, or
leave a copy of the warrant and receipt at the place where the property was taken. The officer executing
the warrant, or an officer present during the execution of the warrant, must prepare an inventory as
required by law and promptly return this warrant and inventory to United States Magistrate Judge
Gerrilyn G. Brill.

January 24, 2014 at    4:05PM          at   Atlanta , Georgia
Date and Time Issued                        City and States

GERRILYN G. BRILL                           _signature_
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer          Signature of Judicial Officer
AUSA Ryan Scott Ferber

9:19-80030
GOVERNMENT
EXHIBIT
071

(USAO GAN 6/10)  Search and Seizure Warrant (Page 2)

## RETURN

| Case No: 1:14-MC-0034 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of

A list of property/information/data/person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date _____

Executing officer's signature _____

Printed name and title _____

## ATTACHMENT A-1

SUBJECT LOCATION A, located at 4301 Pleasantdale Road, Suite I, Atlanta, GA 30340, is located in an industrial business complex which has multiple business suites. The building is one story tan in color. The location is clearly marked by a sign above the front entrance which states "Active Sports 4301-I". Furthermore, the front entrance has the letter "I" identified next to the front door. The rear side of the location has a door marked "I" and a loading dock. Photographs of SUBJECT LOCATION A are depicted below.

Front Entrance



Rear Entrance



## ATTACHMENT B

Evidence, fruits, and instrumentalities of violations of federal law, including but not limited to 21 U.S.C. § 331, 21 USC § 841(a)(1), 18 USC § 1341 and 1343, related to purported dietary supplements. This evidence, fruits, and instrumentalities include:

1. Any misbranded and/or adulterated foods and/or drugs.

2. Raw materials used to manufacture misbranded and/or adulterated food and/or drugs including, but not limited to, chemical compounds, active pharmaceutical ingredients, drugs, drug components, food additives, capsules and tablets.

3. All labels, labeling, and advertisements pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

4. Paraphernalia for packaging, weighing, or distributing to misbranded and/or adulterated foods and/or drugs.

5. Equipment used to manufacture misbranded and/or adulterated foods and/or drugs.

6. U.S. currency, financial instruments, and other items of value and/or proceeds of manufacture, distribution, and/or possession of misbranded and/or adulterated foods and/or drugs.

7. Any records or keys related to the use of any safe or safe deposit boxes.

8. All electronic devices, including but not limited to, computers (desktop, laptop, and/or tablet), routers, modems, hard drives, flash drives, cell phones, printers and label making devices which may contain evidence stored in an electronic format.

9. All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs. The documents

to be seized include those relating to the brokering, ordering,
producing, purchasing, shipping, selling and distributing of
misbranded and/or adulterated foods and/or drugs, including but
not limited to: business journals and ledgers; purchase orders;
invoices; contracts; receipts; delivery receipts; work orders; telephone,
telefax, and computer Internet records; written and electronic
correspondence; bank records, including bank statements; records of
investment accounts; financial statements and summaries; letters of
credit; canceled checks, check registers, and other records reflecting
payments; airway bills; bills of lading; handwritten notes;
memoranda; address books; sales orders; purchase orders; rolodexes,
business cards, and other documents identifying suppliers and
customers; shippers' letters of instructions; business inquiries;
confirmations; commodity business brochures; supplier and customer
lists; records of purchase from suppliers; application forms,
documents, and literature regarding the FDA and/or State agency;
and any unopened mail addressed to or from the
individuals/businesses mentioned herein.

10.     All tax records, including summaries and schedules.

11.     All records relating to property, both real and personal, that may have
        been acquired with the proceeds of the illegal purchase, possession,
        and unauthorized distribution of misbranded and/or adulterated
        foods and/or drugs.

12.     Indicia of occupancy, residency, and/or ownership of the premises to
        be searched.

Relating to computer-generated records, such records include:

A.      Any and all information and/or data stored in the form of magnetic or
        electronic coding on computer media or on media capable of being
        read by a computer or with the aid of computer-related equipment.
        This media includes floppy diskettes, fixed hard disks, removable
        hard disk cartridges, tapes, laser discs, video cassettes and other
        media that is capable of storing magnetic coding, as well as punch
        cards, and/or paper tapes, and all printouts of stored data.

-2-

B.  Any and all electronic devices that are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word-processing equipment, modems, monitors, cables, printers, plotters, encryption circuit boards, optical scanners, external hard drives, external tape backup drives and other computer-related electronic devices.

C.  Any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

D.  Any and all written or printed material that provides instruction or examples concerning the operation of computer systems or software, and/or any related device, and sign-on passwords, encryption codes or other information needed to access the computer system and/or software programs.

The terms "items," "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means such items, records, or documents, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonographic records, printing, or typing); and electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, backup tapes, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

-3-

In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel may need to seize and search the following items:

a.      Any computer equipment and storage device capable of being used to commit, further or store evidence of crimes, including but not limited to the introduction into interstate commerce of misbranded and/or adulterated foods and/or drugs in violation to 21 USC § 331, and the conspiracy to do so in violation of 18 USC § 371.

b.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.      Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

In addition, agents conducting this search are authorized to utilize the service(s) of outside computer expert(s), who may not be Federal Law Enforcement Officer(s), in order to use and operate the computer system(s) at the above specified location(s), for purposes of retrieving the above specified computer information during the course of the authorized search, provided that such expert(s) operate under the direction, supervision, and control of Special Agent(s) of the United States Food and Drug Administration Office of Criminal Investigations.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

DUPLICATE

(USAO GAN 6/10) Search Warrant

FILED IN CHAMBERS
U.S.D.C. Atlanta

JAN 2 4 2014

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

In the Matter of the Search of

a business/warehouse suite located at 6080 McDonough Drive, Suite D, Norcross, GA 30093 (SUBJECT LOCATION B)

**SEARCH WARRANT**
Case number: 1:14-MC-0035

**UNDER SEAL**

TO: Special Agent Brian C. Kriplean, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Brian C. Kriplean who has reason to believe that on the property described as:

a business/warehouse suite occupied by employees/contractors associated with Active Sports Supplements, LLC, and Adrenaline Nutrition Supplements, LLC, a/k/a ANS, located at 6080 McDonough Drive, Suite D, Norcross, GA 30093 described more fully in Attachment A-2, which is attached hereto and incorporated by reference

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

See Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 331, 841(a)(1) and Title 18, United States Code, Section(s) 1341, 1343. I find that the affidavit(s) establishes probable cause to search for and seize the certain property, certain information, and certain data from the property described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before _2/7/14_ (not to exceed 14 days) IN THE DAYTIME (6 a.m. – 10 p.m.). You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a copy of the warrant and receipt at the place where the property was taken. The officer executing the warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Gerrilyn G. Brill.

January 24, 2014 at _4:05pm_
Date and Time Issued

at _Atlanta_, Georgia
City and States

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer
AUSA Ryan Scott Ferber

_____
Signature of Judicial Officer

(USAO GAN 6/10)  Search and Seizure Warrant (Page 2)

## RETURN

| Case No: 1:14-MC-0035 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of

A list of property/information/data/person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date

Executing officer's signature

Printed name and title

## ATTACHMENT A-2

SUBJECT LOCATION B, located at 6080 McDonough Drive, Suite D, Norcross, GA 30093, is located in an industrial business complex which has multiple business suites. The building is one story white and gray in color. The numbers "6080" are displayed on the front side of the building and each suite is identified by letter (A thru G) on the front entrance. Suite D is not identified by any business name on the front door. The front windows contain a material which does not allow a person on the outside of the business to see into the suite. However, the front door does allow sight into the suite.


Front Entrance




Rear Entrance

## ATTACHMENT B

Evidence, fruits, and instrumentalities of violations of federal law, including but not limited to 21 U.S.C. § 331, 21 USC § 841(a)(1), 18 USC § 1341 and 1343, related to purported dietary supplements. This evidence, fruits, and instrumentalities include:

1. Any misbranded and/or adulterated foods and/or drugs.

2. Raw materials used to manufacture misbranded and/or adulterated food and/or drugs including, but not limited to, chemical compounds, active pharmaceutical ingredients, drugs, drug components, food additives, capsules and tablets.

3. All labels, labeling, and advertisements pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

4. Paraphernalia for packaging, weighing, or distributing to misbranded and/or adulterated foods and/or drugs.

5. Equipment used to manufacture misbranded and/or adulterated foods and/or drugs.

6. U.S. currency, financial instruments, and other items of value and/or proceeds of manufacture, distribution, and/or possession of misbranded and/or adulterated foods and/or drugs.

7. Any records or keys related to the use of any safe or safe deposit boxes.

8. All electronic devices, including but not limited to, computers (desktop, laptop, and/or tablet), routers, modems, hard drives, flash drives, cell phones, printers and label making devices which may contain evidence stored in an electronic format.

9. All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs. The documents

to be seized include those relating to the brokering, ordering,
producing, purchasing, shipping, selling and distributing of
misbranded and/or adulterated foods and/or drugs, including but
not limited to: business journals and ledgers; purchase orders;
invoices; contracts; receipts; delivery receipts; work orders; telephone,
telefax, and computer Internet records; written and electronic
correspondence; bank records, including bank statements; records of
investment accounts; financial statements and summaries; letters of
credit; canceled checks, check registers, and other records reflecting
payments; airway bills; bills of lading; handwritten notes;
memoranda; address books; sales orders; purchase orders; rolodexes,
business cards, and other documents identifying suppliers and
customers; shippers' letters of instructions; business inquiries;
confirmations; commodity business brochures; supplier and customer
lists; records of purchase from suppliers; application forms,
documents, and literature regarding the FDA and/or State agency;
and any unopened mail addressed to or from the
individuals/businesses mentioned herein.

10. All tax records, including summaries and schedules.

11. All records relating to property, both real and personal, that may have
been acquired with the proceeds of the illegal purchase, possession,
and unauthorized distribution of misbranded and/or adulterated
foods and/or drugs.

12. Indicia of occupancy, residency, and/or ownership of the premises to
be searched.

Relating to computer-generated records, such records include:

A. Any and all information and/or data stored in the form of magnetic or
electronic coding on computer media or on media capable of being
read by a computer or with the aid of computer-related equipment.
This media includes floppy diskettes, fixed hard disks, removable
hard disk cartridges, tapes, laser discs, video cassettes and other
media that is capable of storing magnetic coding, as well as punch
cards, and/or paper tapes, and all printouts of stored data.

-2-

B.  Any and all electronic devices that are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data.  These devices include computers, computer components, computer peripherals, word-processing equipment, modems, monitors, cables, printers, plotters, encryption circuit boards, optical scanners, external hard drives, external tape backup drives and other computer-related electronic devices.

C.  Any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components.  The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

D.  Any and all written or printed material that provides instruction or examples concerning the operation of computer systems or software, and/or any related device, and sign-on passwords, encryption codes or other information needed to access the computer system and/or software programs.

The terms "items," "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means such items, records, or documents, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonographic records, printing, or typing); and electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, backup tapes, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

-3-

In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel may need to seize and search the following items:

a. Any computer equipment and storage device capable of being used to commit, further or store evidence of crimes, including but not limited to the introduction into interstate commerce of misbranded and/or adulterated foods and/or drugs in violation to 21 USC § 331, and the conspiracy to do so in violation of 18 USC § 371.

b. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

In addition, agents conducting this search are authorized to utilize the service(s) of outside computer expert(s), who may not be Federal Law Enforcement Officer(s), in order to use and operate the computer system(s) at the above specified location(s), for purposes of retrieving the above specified computer information during the course of the authorized search, provided that such expert(s) operate under the direction, supervision, and control of Special Agent(s) of the United States Food and Drug Administration Office of Criminal Investigations.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

DUPLICATE

(USAO GAN 6/10) Search Warrant

FILED IN CHAMBERS
U.S.D.C. Atlanta

JAN 2 4 2014

JAMES N. HATTEN, Clerk
By: _Fint Andele_
Deputy Clerk

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

a business/warehouse suite located at 1755 Wilwat Drive,
Suite E, Norcross, GA 30093 (SUBJECT LOCATION C)

**SEARCH WARRANT**
Case number: 1:14-MC-0036

**UNDER SEAL**

TO: Special Agent Brian C. Kriplean, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Brian C. Kriplean who has reason to believe that on the property described as:

a business/warehouse suite occupied by employees/contractors associated with Active Sports Supplements, LLC, and Adrenaline Nutrition Supplements, LLC, a/k/a ANS, located at 1755 Wilwat Drive, Suite E, Norcross, GA 30093 described more fully in Attachment A-3, which is attached hereto and incorporated by reference

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

See Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 331, 841(a)(1) and Title 18, United States Code, Section(s) 1341, 1343. I find that the affidavit(s) establishes probable cause to search for and seize the certain property, certain information, and certain data from the property described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before 2/7/14 (not to exceed 14 days) IN THE DAYTIME (6 a.m. – 10 p.m.). You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a copy of the warrant and receipt at the place where the property was taken. The officer executing the warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Gerrilyn G. Brill.

January 24, 2014 at ___4:10PM___                    at ___Atlanta___, Georgia
Date and Time Issued                                              City and States

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE                    _Signature_
Name and Title of Judicial Officer                        Signature of Judicial Officer
AUSA Ryan Scott Ferber

(USAO GAN 6/10) Search and Seizure Warrant (Page 2)

| RETURN | | |
|---|---|---|
| Case No: 1:14-MC-0036 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of | | |
| A list of property/information/data/person(s) seized: | | |

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

_____
Date

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A-3

SUBJECT LOCATION C, located at 1755 Wilwat Drive, Suite E, Norcross, GA 30093. This address is located in an industrial business complex which has multiple business suites. The building is one story red in color. The numbers "1755" is displayed on the front side of the building and most suites are identified by suite letter on the front entrance. Suite E is not identified by any business name on the front door nor does it bear the suite number. The front entrance door contains a material which does not allow a person on the outside of the business to see into the suite. The rear entrance does have a sign above the door as "Georgia Pack & Load Moving & Storage, Inc 1755-E Shipping/Receiving".

Front Entrance



Rear Entrance



## ATTACHMENT B

Evidence, fruits, and instrumentalities of violations of federal law, including but not limited to 21 U.S.C. § 331, 21 USC § 841(a)(1), 18 USC § 1341 and 1343, related to purported dietary supplements. This evidence, fruits, and instrumentalities include:

1. Any misbranded and/or adulterated foods and/or drugs.

2. Raw materials used to manufacture misbranded and/or adulterated food and/or drugs including, but not limited to, chemical compounds, active pharmaceutical ingredients, drugs, drug components, food additives, capsules and tablets.

3. All labels, labeling, and advertisements pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

4. Paraphernalia for packaging, weighing, or distributing to misbranded and/or adulterated foods and/or drugs.

5. Equipment used to manufacture misbranded and/or adulterated foods and/or drugs.

6. U.S. currency, financial instruments, and other items of value and/or proceeds of manufacture, distribution, and/or possession of misbranded and/or adulterated foods and/or drugs.

7. Any records or keys related to the use of any safe or safe deposit boxes.

8. All electronic devices, including but not limited to, computers (desktop, laptop, and/or tablet), routers, modems, hard drives, flash drives, cell phones, printers and label making devices which may contain evidence stored in an electronic format.

9. All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs. The documents

to be seized include those relating to the brokering, ordering, producing, purchasing, shipping, selling and distributing of misbranded and/or adulterated foods and/or drugs, including but not limited to: business journals and ledgers; purchase orders; invoices; contracts; receipts; delivery receipts; work orders; telephone, telefax, and computer Internet records; written and electronic correspondence; bank records, including bank statements; records of investment accounts; financial statements and summaries; letters of credit; canceled checks, check registers, and other records reflecting payments; airway bills; bills of lading; handwritten notes; memoranda; address books; sales orders; purchase orders; rolodexes, business cards, and other documents identifying suppliers and customers; shippers' letters of instructions; business inquiries; confirmations; commodity business brochures; supplier and customer lists; records of purchase from suppliers; application forms, documents, and literature regarding the FDA and/or State agency; and any unopened mail addressed to or from the individuals/businesses mentioned herein.

10. All tax records, including summaries and schedules.

11. All records relating to property, both real and personal, that may have been acquired with the proceeds of the illegal purchase, possession, and unauthorized distribution of misbranded and/or adulterated foods and/or drugs.

12. Indicia of occupancy, residency, and/or ownership of the premises to be searched.

Relating to computer-generated records, such records include:

A. Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment. This media includes floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser discs, video cassettes and other media that is capable of storing magnetic coding, as well as punch cards, and/or paper tapes, and all printouts of stored data.

-2-

B.      Any and all electronic devices that are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word-processing equipment, modems, monitors, cables, printers, plotters, encryption circuit boards, optical scanners, external hard drives, external tape backup drives and other computer-related electronic devices.

C.      Any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

D.      Any and all written or printed material that provides instruction or examples concerning the operation of computer systems or software, and/or any related device, and sign-on passwords, encryption codes or other information needed to access the computer system and/or software programs.

The terms "items," "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means such items, records, or documents, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonographic records, printing, or typing); and electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, backup tapes, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

-3-

In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel may need to seize and search the following items:

a.      Any computer equipment and storage device capable of being used to commit, further or store evidence of crimes, including but not limited to the introduction into interstate commerce of misbranded and/or adulterated foods and/or drugs in violation to 21 USC § 331, and the conspiracy to do so in violation of 18 USC § 371.

b.      Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.      Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.      Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

-4-

In addition, agents conducting this search are authorized to utilize the service(s) of outside computer expert(s), who may not be Federal Law Enforcement Officer(s), in order to use and operate the computer system(s) at the above specified location(s), for purposes of retrieving the above specified computer information during the course of the authorized search, provided that such expert(s) operate under the direction, supervision, and control of Special Agent(s) of the United States Food and Drug Administration Office of Criminal Investigations.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

-5-

FILED IN CHAMBERS
U.S.D.C. Atlanta

JAN 2 4 2014

JAMES N. HATTEN, Clerk
By: _Frank Andell_
Deputy Clerk

(USAO GAN 6/10)  Search Warrant

# United States District Court
## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

a business/warehouse suite located at 6250-A
McDonough Drive, Norcross, GA 30093 (SUBJECT
LOCATION D)

**SEARCH WARRANT**
Case number: 1:14-MC-0037

**UNDER SEAL**

TO: Special Agent Brian C. Kriplean, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Brian C. Kriplean who has reason to believe that on the property described as:

a business/warehouse suite occupied by employees/contractors associated with Active Sports Supplements, LLC, and Adrenaline Nutrition Supplements, LLC, a/k/a ANS, located at 6250-A McDonough Drive, Norcross, GA 30093, described more fully in Attachment A-4, which is attached hereto and incorporated by reference

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

See Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 21, United States Code, Section(s) 331, 841(a)(1) and Title 18, United States Code, Section(s) 1341, 1343. I find that the affidavit(s) establishes probable cause to search for and seize the certain property, certain information, and certain data from the property described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before _2/7/14_ (not to exceed 14 days) IN THE DAYTIME (6 a.m. – 10 p.m.). You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a copy of the warrant and receipt at the place where the property was taken. The officer executing the warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Gerrilyn G. Brill.

January 24, 2014 at    _4:10 PM_                at   _Atlanta_ , Georgia
Date and Time Issued                                      City and States

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                   Signature of Judicial Officer
AUSA Ryan Scott Ferber

(USAO GAN 6/10)  Search and Seizure Warrant (Page 2)

## RETURN

| Case No: 1:14-MC-0037 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of

A list of property/information/data/person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

_____
Date

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A-4

SUBJECT LOCATION D, located at 6250-A McDonough Drive, Norcross, GA 30093. This address is located in an industrial business complex which has multiple business suites. The building is one story red in color. The numbers "6250" is displayed on the front side of the building and Suite 6250-A is clearly marked on the front entrance. The rear entrance to 6250-A bears a sign which states "MA LABS Will Call 6250-A Shipping/Receiving".

Front Entrance

Rear Entrance



## ATTACHMENT B

Evidence, fruits, and instrumentalities of violations of federal law, including but not limited to 21 U.S.C. § 331, 21 USC § 841(a)(1), 18 USC § 1341 and 1343, related to purported dietary supplements. This evidence, fruits, and instrumentalities include:

1.    Any misbranded and/or adulterated foods and/or drugs.

2.    Raw materials used to manufacture misbranded and/or adulterated food and/or drugs including, but not limited to, chemical compounds, active pharmaceutical ingredients, drugs, drug components, food additives, capsules and tablets.

3.    All labels, labeling, and advertisements pertaining to misbranded and/or adulterated foods and/or drugs, including magazines, videotapes, handouts, inserts, flyers, and other promotional material.

4.    Paraphernalia for packaging, weighing, or distributing to misbranded and/or adulterated foods and/or drugs.

5.    Equipment used to manufacture misbranded and/or adulterated foods and/or drugs.

6.    U.S. currency, financial instruments, and other items of value and/or proceeds of manufacture, distribution, and/or possession of misbranded and/or adulterated foods and/or drugs.

7.    Any records or keys related to the use of any safe or safe deposit boxes.

8.    All electronic devices, including but not limited to, computers (desktop, laptop, and/or tablet), routers, modems, hard drives, flash drives, cell phones, printers and label making devices which may contain evidence stored in an electronic format.

9.    All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs. The documents

to be seized include those relating to the brokering, ordering, producing, purchasing, shipping, selling and distributing of misbranded and/or adulterated foods and/or drugs, including but not limited to: business journals and ledgers; purchase orders; invoices; contracts; receipts; delivery receipts; work orders; telephone, telefax, and computer Internet records; written and electronic correspondence; bank records, including bank statements; records of investment accounts; financial statements and summaries; letters of credit; canceled checks, check registers, and other records reflecting payments; airway bills; bills of lading; handwritten notes; memoranda; address books; sales orders; purchase orders; rolodexes, business cards, and other documents identifying suppliers and customers; shippers' letters of instructions; business inquiries; confirmations; commodity business brochures; supplier and customer lists; records of purchase from suppliers; application forms, documents, and literature regarding the FDA and/or State agency; and any unopened mail addressed to or from the individuals/businesses mentioned herein.

10. All tax records, including summaries and schedules.

11. All records relating to property, both real and personal, that may have been acquired with the proceeds of the illegal purchase, possession, and unauthorized distribution of misbranded and/or adulterated foods and/or drugs.

12. Indicia of occupancy, residency, and/or ownership of the premises to be searched.

Relating to computer-generated records, such records include:

A. Any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment. This media includes floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser discs, video cassettes and other media that is capable of storing magnetic coding, as well as punch cards, and/or paper tapes, and all printouts of stored data.

-2-

B.     Any and all electronic devices that are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word-processing equipment, modems, monitors, cables, printers, plotters, encryption circuit boards, optical scanners, external hard drives, external tape backup drives and other computer-related electronic devices.

C.     Any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio or other means of transmission.

D.     Any and all written or printed material that provides instruction or examples concerning the operation of computer systems or software, and/or any related device, and sign-on passwords, encryption codes or other information needed to access the computer system and/or software programs.

The terms "items," "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means such items, records, or documents, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonographic records, printing, or typing); and electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, backup tapes, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel may need to seize and search the following items:

a.  Any computer equipment and storage device capable of being used to commit, further or store evidence of crimes, including but not limited to the introduction into interstate commerce of misbranded and/or adulterated foods and/or drugs in violation to 21 USC § 331, and the conspiracy to do so in violation of 18 USC § 371.

b.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

In addition, agents conducting this search are authorized to utilize the service(s) of outside computer expert(s), who may not be Federal Law Enforcement Officer(s), in order to use and operate the computer system(s) at the above specified location(s), for purposes of retrieving the above specified computer information during the course of the authorized search, provided that such expert(s) operate under the direction, supervision, and control of Special Agent(s) of the United States Food and Drug Administration Office of Criminal Investigations.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

2019 WL 7906186
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

UNITED STATES of America
v.
Choat SOVIRAVONG, Defendant.

CRIMINAL ACTION NO. 1:19-cr-146-AT-CMS
|
Signed 12/02/2019

**Attorneys and Law Firms**

Cassandra Juliet Schansman, Nathan Parker Kitchens, Office of the United States Attorney, Atlanta, GA, for United States of America.

**REPORT AND RECOMMENDATION**

CATHERINE M. SALINAS, UNITED STATES MAGISTRATE JUDGE

 *1 This matter is before the Court on two motions filed by the defendant in this case: Motion for Joinder [Doc. 14] and Motion to Suppress Seized Electronic Equipment and Emails (the "Motion to Suppress") [Doc. 23]. For the reasons that follow, I recommend that both motions be denied.

On April 16, 2019, a federal grand jury in the Northern District of Georgia returned a four-count indictment against Defendant Choat Soviravong ("Defendant") alleging that on June 24, 2014, he made four false statements during an interview with agents from the Food and Drug Administration ("FDA") and the Internal Revenue Service ("IRS"), in violation of 18 U.S.C. § 1001(a)(2). [Doc. 1]. According to the indictment, the statements allegedly concerned the design and preparation of certain documents related to the regulation of dietary supplements, "GMP certificates" and "Certificates of Free Sale." [Id.].

The instant case is related to another case pending in this district against Jared Wheat, John Brandon Schopp, and Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech"), United States v. Wheat, et al., No. 17-cr-229-AT-CMS (the "Wheat case"). The eighteen-count indictment in the Wheat case alleges four distinct conspiracies over a six-year time span. The indictment in the Wheat case also alleges substantive counts for wire fraud, money laundering, introduction of misbranded drugs into interstate commerce, and the manufacture and distribution of controlled substances. Defendant, a long-time graphic designer at Hi-Tech, is not charged in the Wheat case, but apparently is an unindicted co-conspirator in connection with the wire fraud offenses alleged in that case.

**I. MOTION FOR JOINDER**

In his single-page motion for joinder, Defendant asks to have his case tried jointly with the Wheat case, pursuant to Federal Rule of Criminal Procedure 8. [Doc. 14 at 1]. He argues, with no citation to caselaw and only a passing reference to the rule, that there should be a single trial because the two cases involve many of the same facts, issues, witnesses, and exhibits. [Id.]. The Government responds that because Defendant has not argued or shown that he is charged with participating in the same series of acts or transactions as the defendants in the Wheat case, joinder would not be proper. [Doc. 21]. Defendant did not file a reply brief.

This is an unusual motion. Typically, the issue of Rule 8 joinder is raised by a defendant seeking to sever his case from that of his co-defendants. In those circumstances, the Court is tasked with determining whether the Government has properly joined the cases together. Here, on the other hand, the Government has elected to charge Defendant separately from those charged in the Wheat case, and Defendant seeks to compel the Government to try the two cases at the same time. The absence of legal authority for this **particular** request is telling.

As noted above, Defendant cites only generally to Rule 8 of the Federal Rules of Criminal Procedure, which is titled "Joinder of Offenses or Defendants." Subsection (b) addresses joinder of defendants in the same indictment.[1] That subsection provides:

> *2 **(b) Joinder of Defendants.** The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be ch

9:19-80030
GOVERNMENT
EXHIBIT
072

or more counts together or separately. All defendants need not be charged in each count.

FED. R. CRIM. P. 8(b). Nothing in this rule requires the Government to charge individuals in a single indictment, even if the crimes overlap in some ways. On the contrary, the rule provides that the Government may charge defendants separately.

The Government argues that joinder (which did not occur) would have been improper because the connection between the various defendants is limited to a few individuals who are alleged to have committed separate acts that involve them in separate offenses with no common aim. See United States v. Weaver, 905 F.2d 1466, 1477 (11th Cir. 1990). Under such circumstances, the requisite substantial identity of facts or participants required by the rule is not present. See id. Similarly, joinder is not proper "if different facts and circumstances must be established to support the alleged violations." Id.

I agree with the Government that Defendant has not shown a substantial identity of facts or participants necessary to satisfy Rule 8(b). The acts that the Government alleges Defendant committed involve wholly separate acts from those charged against the three defendants in the Wheat case. See United States v. Yearty, No. 1:08CR40-SPM, 2009 WL 1343904, at *1–2 (N.D. Fla. May 8, 2009) (finding misjoinder and ordering separate trials for a defendant charged with false statements and other defendants charged with bribery-related crimes). Moreover, there is no allegation that the defendants in the Wheat case were aware of Defendant's allegedly false statements to investigators in 2014 or that there was a plan between Defendant and the defendants in the Wheat case for Defendant to lie. Although it is true that Defendant worked for Hi-Tech and that there may be some overlap in witnesses, Defendant has not shown that he is alleged to have participated in the same acts or transactions as the defendants in the Wheat case. I will not compel the Government to try these cases together in the absence of any legal authority requiring it. I therefore recommend that Defendant's motion for joinder be denied.

## II. MOTION TO SUPPRESS

In his three-page motion to suppress, Defendant moves to suppress all evidence obtained from the following search warrants, arguing that they were unsupported by probable cause and were overbroad:

- A warrant dated October 23, 2014 authorizing the search of Defendant's yahoo email account (csdesign22@yahoo.com), signed by Alan J. Baverman, a United States Magistrate Judge for the Northern District of Georgia (the "Yahoo Warrant") [Doc. 23-3].

- Six warrants dated September 28, 2017 authorizing the search of six Hi-Tech business locations, signed by Russell G. Vineyard, a United States Magistrate Judge for the Northern District of Georgia (the "Premises Warrants") [Docs. 23-1, 25-1]. [2]

*3 [Doc. 23]. [3] In his brief, Defendant does not refer to a single fact in any of the affidavits, and he makes only generalized assertions without any citation to the record or any analysis. He fails to identify what he believes is lacking in terms of probable cause and does not explain why the warrants might be considered overbroad. Nevertheless, I have reviewed the affidavits supporting the various warrants with an eye toward the supposed problems that Defendant has identified.

### A. The Yahoo Warrant

The Yahoo Warrant was supported by an application and affidavit executed on October 23, 2014 by Jacqueline Reynolds, a Special Agent with the criminal investigations section of the IRS. [Doc. 23-3 ("Reynolds Aff.") ]. According to the affidavit, Hi-Tech is a Georgia-based company that manufactures dietary supplements under the Hi-Tech brand name as well as under private label names. [Id. ¶ 5]. As a manufacturer of dietary supplements, Hi-Tech is required by federal law to comply with Good Manufacturing Practices ("GMPs"), and some customers of Hi-Tech require proof of Hi-Tech's compliance with GMPs in order to conduct business. [Id. ¶ 6]. Evidence of a firm's compliance with GMPs can be accomplished by providing a document called a GMP Certification, which must be issued by an independent and qualified firm. [Id.].

The affidavit states that in May 2013, federal agents obtained a search warrant for an email account associated with Jared Wheat, the sole officer of Hi-Tech. [Reynolds Aff. ¶ 7]. According to Special Agent Reynolds, the email communications obtained from that search warrant included

those sent and/or received by Defendant, through the email address csdesign22@yahoo.com (the "Target Account"), that show that Mr. Wheat may have been directing Defendant to prepare false and fraudulent documents related to Hi-Tech's compliance with GMP regulations. [Id.].

The **affidavit** provided several specific examples of such communications, including emails tending to show that Defendant, a graphic designer, was preparing false documents regarding Hi-Tech's compliance with GMP regulations by creating false GMP Certification forms [id. ¶ 8] and by fraudulently modifying documents relating to GMP audits [id. ¶¶ 9–12]. According to Special Agent Reynolds, Defendant designed product labels, product boxes, and marketing materials as part of his job at Hi-Tech, and investigators believed that this experience gave him both the background and expertise to create the false forms and to fraudulently modify documents. [Id. ¶ 13]. Additionally, Defendant apparently admitted to agents that he used the Target Account to conduct business activities for Hi-Tech and to communicate with Jared Wheat for work-related correspondence. [Id. ¶ 14]. Special Agent Reynolds stated that in her opinion, there was probable cause to believe that the Target Account would contain evidence of mail fraud, wire fraud, false statements, and conspiracy. [Id. ¶ 4].

**\*4** The Yahoo **Warrant** described the **particular** things to be seized in two parts. The first part, Section I, is titled "Information to be disclosed by YAHOO." That information included the content of all emails sent from the Target Account and stored in that account, information regarding the identification of the account, other information stored by any individual using the account, and all records pertaining to communications between Yahoo and any person regarding the account. [Doc. 23-3 at 14]. Then, in the second part, the Yahoo **Warrant** narrowed the information that the Government was authorized to seize, as follows:

**II. Information to be seized by the Government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of mail fraud, wire fraud, false statements, and conspiracy to commit any of the foregoing, including but not limited to the following matters:

a. Audit reports, certificates (including GMP certificates), and any other communications, representations or documents concerning Hi-Tech's compliance with FDA rules and regulations.

b. Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

[Id. at 15].

Probable cause to support a search **warrant** exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a **particular** location. See United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). The search **warrant affidavit** must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the **warrant**." United States v. Bushay, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing Massachusetts v. Upton, 466 U.S. 727, 728 (1984)). Finally, courts are not to "interpret supporting **affidavits** in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the **warrant** process and to promote the high level of deference traditionally given to 9 magistrates in their probable cause determinations." Id. (citing United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994)); see also United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewer to afford "great deference" to a judicial determination of probable cause).

The only specific argument that Defendant makes regarding probable cause is that the Yahoo **Warrant** was based on stale information, i.e., "emails that appear to be three years old." [Doc. 23 at 2]. The staleness doctrine "requires that the information supporting the government's application for a **warrant** must show that probable cause exists at the time the **warrant** issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000). Whether information is stale is determined "on the peculiar facts of each case." Id. at 1265. However, "there is no mathematical measure for when freshness fades away and staleness sets in." United States v. Lopez, 649 F.3d 1222, 1246 (11th Cir. 2011). When the **warrant** authorizes the seizure of electronically-stored information, time becomes less significant, because the

evidence sought to be seized is not a tangible object easily destroyed or removed. *See id.* (citing United States v. Hyde, 574 F.2d 856, 865 (5th Cir. 1978)).

**\*5** Here, the Yahoo **Warrant** sought emails and other digital information. Courts have recognized that staleness concerns regarding "[d]igital files, **particularly** those stored with an email service provider, are qualitatively different" from those concerns associated with the search of real property, where the "supporting information must be timely in order to believe that a fair probability exists for finding **particular** evidence at a **particular** place." *See* United States v. Khateeb, No. 8:14-cr-185-T-23MAP, 2015 WL 6438755, at \*4 (M.D. Fla. Oct. 21, 2015) (citing United States v. Bervaldi, 226 F.3d 1256, 1264–65 (11th Cir. 2000)). Accordingly, when seeking authorization to search digital information, the passage of months or even years will not automatically render supporting information in a **warrant** application "stale" because such evidence can reasonably be stored by email service providers on their servers for an indefinite period of time. *See id.*

The suspicious emails and attachments from Mr. Wheat's email account that led investigators to Defendant's email account were sent in 2011 and 2012, long before Special Agent Reynolds presented her **affidavit** to the judge in October 2014. The information was not stale, however, because there existed more than a fair probability that evidence of illegal conduct still remained on the Yahoo servers in 2014 when the Yahoo **Warrant** was signed. *See* Khateeb, 2015 WL 6438755, at \*4 (rejecting staleness argument for an email search **warrant** based on conduct that occurred more than two years before the **warrant** was issued, stating that "two years is hardly relevant in the digital age" given that such information is normally stored on servers indefinitely). Indeed, Special Agent Reynolds stated that in her experience, unless the email sender or receiver specifically deleted the email from the server, the email messages typically remain on the systems indefinitely. [Reynolds Aff. ¶ 18]. In cases involving digital media, courts have found that much longer periods of time than the **affidavits** at issue in this case did not render information stale. *See, e.g.,* United States v. McBurnette, 382 F. App'x 813, 815 (11th Cir. 2010) (in pornography context, finding a period of almost two years did not render information stale); United States v. Wang, No. 5:12-cr-00581EJD, 2014 WL 794203, at \*6 (N.D. Cal. Feb. 26, 2014) (stating that where the evidence sought is the kind that is preserved for long periods of time, such as email accounts maintained by Google indefinitely on

its servers, "staleness is not a problem"). For these reasons, I conclude that the **affidavit** in support of the Yahoo **Warrant** provided at least a "fair probability" that evidence of mail fraud, wire fraud, false statements, and conspiracy would be found in the Target Account.

Defendant also states, in a purely conclusory fashion, that the Yahoo **Warrant** is overbroad. Although he does not mention the United States Constitution, I assume that he is raising a Fourth Amendment challenge. The Fourth Amendment provides that "no **Warrants** shall issue, but upon probable cause, supported by Oath or affirmation, and **particularly** describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. Thus, the Fourth Amendment requires that a **warrant particularly** describe both (1) the place to be searched and (2) the persons or things to be seized. *Id.*; United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000) ("A **warrant** which fails to sufficiently **particularize** the place to be searched or the things to be seized is unconstitutionally over broad."); *see also* FED. R. CRIM. P. 41(e)(2)(A) (explaining that "the **warrant** must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned").

**\*6** The Yahoo **Warrant's** description of the place to be searched—the email account and information associated with it stored at Yahoo's premises—was sufficiently **particularized**. With regard to the items or information to be seized, the Yahoo **Warrant** provided for the seizure of information that "constitute[d] fruits, evidence and instrumentalities" of violations of the mail and wire fraud statutes, and conspiracy, including information that related to (a) audit reports, certificates, and any other communications, representations, or documents concerning Hi-Tech's compliance with FDA rules and regulations; and (b) records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts. [Doc. 23-3 at 15]. By explicitly limiting the scope of what may be searched and seized to evidence of the crimes under investigation, the Yahoo **Warrant** was sufficiently **particular** to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized. *See* United States v. Lee, No. 1:14-cr-227-TCB-2, 2015 WL 5667102, at \*3 (N.D. Ga. Sept. 25, 2015) (concluding that a search **warrant** similar to the one in this case was sufficiently **particular** and stating, "a **warrant** that requires disclosure of the entire contents of an email account and then describes a subset of that information

that will be subject to seizure is reasonable"); United States v. Harvey, No. 1:15-cr-53-TWTRGV, 2015 WL 9685908, at *13 (N.D. Ga. Nov. 30, 2015), *report and recommendation adopted by*, 2016 WL 109984, at *1 (N.D. Ga. Jan. 8, 2016) (concluding that a search **warrant** for a cell phone was sufficiently **particularized** where the property to be seized was limited to evidence of the crimes being investigated). The Yahoo **Warrant**, therefore, was not a general **warrant** because it described with sufficient **particularity** not only the information to be disclosed from the Target Account, but also the specific evidence that the Government was allowed to seize from within that body of information. *See* Lee, 2015 WL 5667102, at *10. For the reasons stated, I conclude that the Yahoo **Warrant** satisfied the Fourth Amendment's **particularity** requirement.

**B. The Premises Warrants**

The entirety of Defendant's argument in support of his motion to suppress the evidence seized pursuant to the Premises **Warrants**, is as follows:

> Defendant also objects to the **warrant**(s) executed at Hi-Tech on October 4, 2017 for many of the same reasons enumerated above. Again the **warrants** were non specific, overbroad, and lacking in probable cause. The materials seized (essentially every hard drive and computer in the business) was seized [sic]."

[Doc. 23 at 2]. I will begin my analysis by reviewing the facts that the agents provided in support of the Premises **Warrants** to determine whether the **warrants** were supported by probable cause. Then I will turn to the question of whether the **warrants** are overbroad.

The six Premises **Warrants** were all supported by a single application and **affidavit** executed by Brian Kriplean, a Special Agent with the FDA's Office of Criminal Investigations. In his **affidavit**, Special Agent Kriplean averred that there was probable cause to believe that Hi-Tech was manufacturing, marketing, and distributing misbranded foods and/or drugs, some of which contain anabolic steroids, which is a Schedule III controlled substance. [Doc. 25-1

("Kriplean Aff.") ¶ 3]. Special Agent Kriplean explained in his **affidavit** that the FDA is the federal agency responsible for protecting the health and safety of the American public by enforcing the federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-399f ("**FDCA**"). [Id. ¶ 9]. One of the FDA's roles is to ensure that drugs are safe and effective for their intended uses and that drugs and foods bear labeling containing true and accurate information. [Id.]. The FDA's responsibilities under the **FDCA** include regulating the manufacturing, labeling, and distribution of all drugs and foods shipped or received in interstate commerce. [Id.].

In his **affidavit**, Special Agent Kriplean stated that in September 2016, federal law enforcement agents conducted undercover purchases from Hi-Tech of certain products that were marketed for sale as testosterone and prohormone supplements. [Kriplean Aff. ¶¶ 20–21]. He stated that based on his training and experience, he believed that such supplements "often contain non-dietary ingredients or Schedule III controlled substances, namely anabolic steroids." [Id. ¶ 20]. Upon receipt of the products, the law enforcement officers submitted them for chemical analysis to the FDA's Forensic Chemistry Center. [Id. ¶ 22]. According to Special Agent Kriplean, the testing revealed that five of the products—1-AD, 1-Testosterone, Androdiol, Equibolin, and Superdrol—contained Schedule III anabolic steroids, but the labeling did not reflect that the products contained these Schedule III anabolic steroids. [Id. ¶¶ 22–23]. According to Special Agent Kriplean, this false or misleading labeling rendered those products misbranded under the **FDCA**. [Id.].

**\*7** Special Agent Kriplean then stated that in early August 2017, he reviewed Hi-Tech's website and confirmed that Hi-Tech offered for sale numerous testosterone and prohormone supplements, including the five products that had previously tested positive for anabolic steroids. [Kriplean Aff. ¶ 20]. At the agent's direction, a cooperating source emailed a regional sales manager for Hi-Tech, inquiring about Hi-Tech's prohormones. [Id. ¶ 24]. The Hi-Tech employee responded the next day, stating that "all [of Hi-Tech's prohormones] are compliant and DHEA compounds that bypass the liver so they are not toxic." [Id.]. Thereafter, on August 15, 2017, the cooperating source placed an order with the Hi-Tech regional sales manager for five bottles each of the prohormone products that had previously tested positive for anabolic steroids. [Id.].

On August 21, 2017, the cooperating source received the products from Hi-Tech. [Kriplean Aff. ¶ 25]. Special Agent

Kriplean thereafter took custody of the still-sealed package, and he reviewed the respective labels of the products received, confirming that they were consistent with the respective label information as the products purchased and received in September 2016, with the only difference being the lot numbers. [Id.]. After the products were delivered, Special Agent Kriplean submitted samples of the products for chemical analysis. [Id. ¶ 26]. The testing revealed that with respect to four of the products—1-AD, Androdiol, Equibolin, and Superdrol—each contained Schedule III anabolic steroids. [Id.]. And, like the earlier-purchased products, the labeling did not list the Schedule III anabolic steroids as ingredients. [Id. ¶ 27].

The six Premises **Warrants** were all based on the same **affidavit**, which described the Hi-Tech business locations to be searched, and provided specific facts tying each location to the investigation. [Kriplean Aff. ¶¶ 29–40]. The **warrants** authorized law enforcement to search the six locations for "[e]vidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 [relating to prohibited acts with respect to adulterated or misbranded food or drugs] and 21 U.S.C. § 841(a)(1) [making it a crime to manufacture, distribute, dispense, and possess controlled substances]." [Doc. 23-1 at 4]. The **warrant** then went on to describe eleven categories of what such "evidence, fruits, and instrumentalities" might be, including business records and computers. [Id. at 4–10].

With respect to any challenge to probable cause, it is evident from the face of the application that Special Agent Kriplean's **affidavit** presented probable cause to believe that evidence of the specified crimes would be found at the various Hi-Tech locations. The evidence presented in the **affidavit** established probable cause to believe that Defendants manufactured, labeled, marked, and distributed at least four different supplements that contained non-dietary and/or controlled ingredients that were not properly declared on the label, and that this practice occurred over a significant period of time. While it was not a certainty that such evidence would be discovered, it was probable that it would, and that is all that the law requires. The facts presented regarding the test results from the two purchases of the various products supported the magistrate judge's decision to issue the **warrants** because the totality of the circumstances allow a conclusion that there is a fair probability of finding other adulterated and/or misbranded products and/or contraband or evidence of the crimes noted in the **affidavit**. See United States v. Brundidge,

170 F.3d 1350, 1352 (11th Cir. 1999). It is evident that in deciding whether to sign the Premises **Warrants**, Judge Vineyard followed the law, used a commonsense, practical approach, and correctly found that there was probable cause to believe that the requested searches would yield evidence of violations of law.

**\*8** Defendant's assertion that the Premises **Warrants** were overbroad is without factual or legal support. The scope of the things to be seized is explicitly limited in multiple ways. First, the opening phrase of Attachment B to the **warrants** operates as a limitation, authorizing the seizure of "[e]vidence, fruits, and instrumentalities" of violations of federal law including violations of Title 21, United States Code, Sections 331 (**FDCA** violations) and 841(a) (controlled substance violations). Second, many of the categories contain additional limiting provisions. For example, Category 7, which authorizes the seizure of business records, includes two additional limitations. It provides for the seizure only of those business records "pertaining to the illegal purchase, possession, and/or unauthorized distribution of controlled substances and introduction into interstate commerce any misbranded and/or adulterated foods and/or drugs." [Doc. 23-1 at 5–6]. In addition to that phrase, the business records category also provides: "The documents to be seized include those relating to the brokering, ordering, producing, purchasing, shipping, selling and distributing of misbranded and/or adulterated foods and/or drugs, including but not limited to...." [Id.].

While it is true that the Premises **Warrants** are broadly worded and encompass many items and documents, **warrants** of such breadth have been upheld, especially in white-collar crime cases where a "paper puzzle" must be assembled "from a large number of seemingly innocuous pieces of individual evidence." United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982). The investigation here had revealed that Hi-Tech was actively marketing and selling to the public at least four misbranded products containing a Schedule III substance for at least a year, and many items and documents could be relevant to (and evidence of) such conduct. It is reasonable for the Government to be interested in determining or verifying how pervasive the misconduct was and the level of danger to the public.

By explicitly limiting the scope of what could be seized to evidence of the crimes under investigation, the Premises **Warrants** were sufficiently **particular** to enable the

searchers to reasonably ascertain and identify the documents and information authorized to be seized. See *United States v. Wilson*, No. 4:12-cr-0023-RLV-WEJ, 2012 WL 7992597, at *15 (N.D. Ga. Nov. 28, 2012) (concluding that a search **warrant** was written with sufficient **particularity** because the items listed on the **warrants** were qualified by phrases that emphasized that the items sought were those related to the crime under investigation. Due to the limitation on the things to be seized to only those things connected with the crimes under investigation, there is a sufficient nexus that satisfies the practical realities "that enable the searcher to ascertain and identify things authorized to be seized."

*United States v. Smith*, 918 F.2d 1501, 1507–08 (11th Cir. 1990) (approving similar language for documents pertaining to narcotics trafficking).

Under these circumstances, and giving the appropriate "great deference" to Judge Vineyard's decision to issue the Premises **Warrants**, I cannot say that the **warrants** were overbroad or that any of the categories of things to be seized were not supported by probable cause. I conclude that the Premises **Warrants** provided sufficient **particularity** to guide the officers and satisfy the **particularity** requirements of the Fourth Amendment. See *Signature Pharmacy, Inc. v.*

*Wright*, 438 F. App'x 741, 745–46 (11th Cir. 2011) (per curiam) (unpublished) (holding that the items to be seized were described with sufficient **particularity** where the items were limited by the specific crimes under investigation and stating "[b]ecause the descriptions in the **warrants** refer to items that are evidence of a violation of certain statutes relating to the sale of controlled substances, the items were described with sufficient **particularity** to allow Wright, a seasoned law enforcement officer, to identify the things to be seized").

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND** that Defendant's Motion for Joinder [Doc. 14] and Motion to Suppress Seized Electronic Equipment and Emails [Doc. 23] be **DENIED**.

**\*9  SO REPORTED AND RECOMMENDED**, this 2nd day of December, 2019.

**All Citations**

Slip Copy, 2019 WL 7906186

---

### Footnotes

1   Defendant does not indicate which portion of Rule 8 he is relying upon, but I have assumed that he is relying upon subsection (b). Subsection (a) of Rule 8 is titled "Joinder of Offenses" and addresses the circumstance when different crimes against a **particular** defendant may be joined in a single indictment. See FED. R. CRIM. P. 8(a). Defendant has not argued that there is any problem with the four counts in his case being tried together.

2   The six **warrants** were all supported by the same, single **affidavit**. Defendant attached only one of the six **warrants** to his motion, and he failed to attach the **affidavit**. The Government filed the **affidavit** in connection with its response brief. [Doc. 25-1].

3   In his motion to suppress, Defendant also complained about a **warrant** dated May 17, 2013 authorizing the search of Jared Wheat's AOL email account (the "AOL **Warrant**"). [Doc. 23-2]. At the pretrial conference, however, Defendant conceded that he lacks standing to challenge the AOL **Warrant**. The Government states in its response brief that it has assumed—for purposes of this motion only and without conceding the point —that Defendant has standing to challenge the Premises **Warrants**. [Doc. 25 at 4, n.2]. The Government does not dispute that Defendant has standing to challenge the Yahoo **Warrant**, which authorized the search of Defendant's own email account.

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2124899
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

UNITED STATES of America,
v.
Beny MESIKA and Elizabeth Kuecher, Defendants.

CRIMINAL ACTION NO. 1:16-cr-224-MHC-CMS
|
Signed 03/30/2018

**Attorneys and Law Firms**

Cassandra Juliet Schansman, Kelly Kathleen Connors, Steven D. Grimberg, Office of United States Attorney, Atlanta, GA, for United States of America.

Bruce S. Harvey, Law Office of Bruce Harvey, Kimberly Hargrave Cornwell, Law Office of Kimberly Cornwell, Atlanta, GA, Arthur W. Leach, Law Office of Arthur W. Leach, Alpharetta, GA, for Defendants.

John Wesley Houser, IV, Atlanta, GA, pro se.

**REPORT AND RECOMMENDATION**

CATHERINE M. SALINAS, United States Magistrate Judge

*1 On June 21, 2016, a grand jury returned a twelve-count indictment charging Beny Mesika and John Wesley Houser, IV with being part of a conspiracy to "manufacture, distribute and dispense products labeled and marketed as 'dietary supplements' designed to increase muscle mass and strength, which in fact contained anabolic steroids." [Doc. 1, ¶¶ 1-2]. In addition to conspiracy, the indictment also charged Mesika and Houser with two counts of distribution of controlled substances, two counts of introducing misbranded drugs into interstate commerce, and seven counts of money laundering. [Id. ¶¶ 6-16].

On April 19, 2017, Houser pleaded guilty to being part of a conspiracy to distribute anabolic steroids via a one-count information in Case No. 1:17-cr-134-MHC.

On December 19, 2017, a grand jury returned a twenty-five-count superseding indictment in this case. [Doc. 85 ("Superseding Indictment") ]. Houser was removed as a

defendant, and Elizabeth Kuecher was added as a defendant. [Id.]. The Superseding Indictment charges Mesika and Kuecher with being part of three separate conspiracies—one involving the manufacture, distribution, and possession of anabolic steroids (Count One), the second involving the unlawful importation of synthetic steroid compounds from China and Hong Kong (Count Eight), and the third involving the operation of facilities that should have been, but were not, registered with the United States Food and Drug Administration ("FDA") (Count Twelve). Both Mesika and Kuecher are also charged with three counts of smuggling (Counts Nine through Eleven) and four counts of failure to register a food facility (Counts Thirteen through Sixteen). Additionally, Mesika is charged with three counts of distribution of controlled substances (Counts Two through Four), three counts of introducing misbranded drugs into interstate commerce (Counts Five through Seven), and nine counts of money laundering (Counts Seventeen through Twenty-Five).

This matter is before the Court on two motions filed by Mesika: (1) a Motion and Amended Motion to Suppress Statements ("Statements Motion") [Docs. 47, 61]; and (2) a Motion to Suppress Evidence Relating to Search Warrants ("Warrants Motion") [Doc. 46]. After Kuecher was added as a defendant, she adopted the Warrants Motion. [Doc. 110].

**STATEMENTS MOTION**

**I. BACKGROUND**

In Mesika's original Statements Motion [Doc. 47], he argues that on October 4, 2013, he was illegally questioned by special agents from the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI"). He contends that the questioning occurred while he was in custody, and therefore, the agents should have given him his Miranda warnings before questioning him. [Id. at 2]. Acknowledging that he was not in "formal custody" at the time of the interview, Mesika contends that because he was under criminal investigation at the time, he was being served with a criminal grand jury subpoena, and he was questioned by the lead agents in the investigation, "[Mesika] believed he could not simply walk out the door at any time." [Id. at 5-6]. Mesika also appears to argue that if he had answered some of the agents' questions, he would have incriminated himself, and therefore, he was entitled to Miranda warnings. [Id. at 7]. He complains further that the agents engaged in improper "psychological conditioning" techniques designed

9:19-80030
GOVERNMENT
EXHIBIT
073

Case 9:19-cr-80030-WPB   Document 361-4   Entered on FLSD Docket 03/18/2020   Page 119 of 131

United States v. Mesika, Not Reported in Fed. Supp. (2019)

statements. [Id. at 8]. In his motion, Mesika asserts that at some point he requested an attorney, but that the agents continued to question him. [Id. at 8-10]. Mesika also argues that his October 4, 2013 statement was not voluntary. [Id. at 10-11].

**\*2** Two months later, Mesika supplemented his Statements Motion, asserting that statements he gave during an interview on May 16, 2013 should also be suppressed. [Doc. 61 at 1-2]. Again, Mesika argues that he was in custody and was not given <u>Miranda</u> warnings. [Id.]. In support of his contention that he was in custody, Mesika states, "during the May 16, 2013 interview, the agents confronted [him] and expressly told him that his conduct violated [federal law] and that the products are classified as misbranded." [Id. at 4]. He also argues that his May 16, 2013 statement was not voluntary.

On April 28, 2017, I held an evidentiary hearing on the Statements Motion. [Doc. 67, Transcript ("Tr.") at 53-54]. At that hearing, the Government presented the testimony of Scott Tolman and Brian Kriplean, both special agents with the FDA-OCI.

### A. The May 16, 2013 Statement

Scott Tolman testified that on May 16, 2013, he conducted a non-custodial interview of Beny Mesika at Mesika's business office at 4301 Pleasantdale Road, in Atlanta, Georgia as part of an investigation concerning unlisted ingredients in a nutritional supplement that had been shipped from Mesika's address with his name on it. [Tr. at 52-53, 69]. According to Special Agent Tolman, Mesika and his company were targets of the investigation. [Id. at 53]. Special Agent Tolman testified that he arranged the interview in advance by speaking with Mesika by phone. [Id. at 54]. At the designated time and place, Special Agent Tolman arrived at Mesika's business in an unmarked car, along with Special Agent Gerald Dunham, also of the FDA. [Id. at 55]. Both were wearing casual clothes. [Id.]. The agents were armed, but their weapons were not visible. [Id.]. Upon their arrival, Mesika met the agents, who showed Mesika their credentials. [Id.].

Special Agent Tolman testified that he and Special Agent Dunham entered Mesika's business into an open room similar in size to my courtroom, and they sat down at a conference table. [Tr. at 56]. The conversation began with a discussion about Mesika's love for fine art, and then it moved on to Mesika's business. [Id. at 57]. According to Special Agent Tolman, Mesika appeared relaxed during the conversation, and was not nervous. [Id. at 57-59]. At one point, Mesika

did not fully answer a question about where he was obtaining his product, but the agents did not press the issue. [Id. at 58-59]. The interview lasted about thirty minutes, and ended with Mesika making a joke about the agents' car (a Hyundai Sonata). [Id. at 60].

### B. The October 4, 2013 Statement

Special Agent Kriplean testified that he was part of a team that began investigating Mesika and Houser in August 2012. [Tr. at 7-8]. According to Special Agent Kriplean, he conducted an interview with Mesika on October 4, 2013 at 4301 Pleasantdale Road, which was one of the locations where Mesika operated his dietary supplement businesses. [1] [Id. at 8-9]. Special Agent Kriplean testified that the previous month, law enforcement had executed a search warrant in Texas on a supplement distribution company, and that search revealed evidence that one of Mesika's businesses may have manufactured some of the products that were discovered. [Id. at 9]. Following the search, the agents obtained a federal grand jury subpoena for one of Mesika's businesses. [2] [Id.].

**\*3** On October 4, 2013, Special Agent Kriplean and another agent went to Mesika's business on Pleasantdale Road in Atlanta with two purposes in mind—to serve the subpoena and to interview anyone they could at the location. [Tr. at 9, 23]. The agents arrived at the location in an unmarked car wearing business casual clothing but with their badges and firearms exposed. [Id. at 10]. Upon arrival, the agents identified themselves as agents with the FDA and showed their credentials to a woman named Elizabeth Kuecher. [Id. at 11]. Special Agent Kriplean testified that he told Ms. Kuecher that "we had some documents to provide to the owners, and we would like to speak to one of them." [Id.]. In response, Ms. Kuecher stated that neither was present but that she could call one of them on the phone, which she did. [Id. at 11-12]. She then made a phone call that lasted about thirty seconds and advised the agents that Mesika would be coming to meet them in about fifteen minutes. [Id. at 12].

The agents waited for Mesika in the foyer area, standing near a conference table. [Tr. at 13]. Approximately fifteen minutes later, Mesika arrived. [Id. at 14]. The agents identified themselves to him as agents, and they displayed their credentials. [Id.]. Then they all sat down at the conference table and spoke for approximately twenty minutes. [Id. at 16]. Special Agent Kriplean described the room as follows: "[I]t's a business about the size of this courtroom, and there aren't any partitioned walls per se that you can see. The conference

Case 9:19-cr-80030-WPD  Document 361-4  Entered on FLSD Docket 03/18/2020  Page 120 of
131
United States v. Mesika, Not Reported in Fed. Supp. (2015)

table is visible from the front door, as is all the desks and the computers and such ... one large room." [Id. at 32]. Special Agent Kriplean sat at the head of the table; Mesika was seated to his left, and the other agent was seated to his right. [Id. at 16]. According to Special Agent Kriplean, Mesika was not restrained in any way, and there was nothing that might have caused Mesika to believe that he was not free to leave. [Id.].

Special Agent Kriplean testified that he did not tell Mesika that he was under arrest or that he was required to answer any questions. [Tr. at 16-17]. He described the interview as a "casual conversation" that was not confrontational, and he described Mesika's demeanor as "calm." [Id. at 17]. When Special Agent Kriplean asked Mesika who manufactured the products that his company was distributing, Mesika declined to answer and said that he would not like to answer any more questions without talking to his attorney. [Id. at 17-18]. Special Agent Kriplean testified that after that point, they did not ask any more questions, and they served the grand jury subpoena on Mesika. [Id. at 18]. He explained to Mesika in general terms what the subpoena was, what records it was seeking, and how Mesika could produce the records. [Id.]. Special Agent Kriplean testified that after Mesika was served with the subpoena and while Kriplean was going over the subpoena, Mesika "made a comment to the effect that he had previously had an encounter with FDA agents regarding a purchase of products that had a banned substance in it that was not banned at the time that the product was purchased." [Id.]. At that point, the agents left. [Id. at 19].

### C. Mesika's Statements Motion
As noted above, Mesika originally moved to suppress only the October 4, 2013 statement but later supplemented his motion to include the May 16, 2013 statement. [Docs. 47, 61]. Following the evidentiary hearing and the preparation of the transcript, Mesika filed a post-hearing brief omitting some of the arguments that he had previously made. [3] [Doc. 80]. The Government filed a response. [Doc. 84]. Mesika did not file a reply. In his post-hearing brief, Mesika argues that he was entitled to Miranda warnings during both interviews for several reasons that are discussed more fully below.

## II. DISCUSSION
**\*4** Mesika's arguments fall into two categories. First, he argues that he was effectively in custody during the interview, such that the agents' failure to advise him of his Miranda rights renders his statements inadmissible. Second, he argues that his statements were not voluntary. [Doc. 80 at 4-6]. As

explained below, I find both these arguments to be meritless, and I recommend that the Statements Motion be DENIED.

### 1. Whether Mesika Was in Custody
Once in custody, a suspect may not be interrogated unless he is advised of his Miranda rights, he demonstrates that he understands them, and he voluntarily waives them, either explicitly or implicitly. See Yarborough v. Alvarado, 541 U.S. 652, 661-63 (2004). Custody is established if, in light of the circumstances of an interrogation, a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave. See id. at 663. The test is objective: whether a reasonable person in the defendant's position would feel a restraint on his freedom equivalent to that normally associated with formal arrest. See Berkemer v. McCarty, 468 U.S. 420, 441 (1984); United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir. 1989). The Eleventh Circuit considers several factors in applying this objective test, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled. See United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006). No particular fact in the "custody" analysis is outcome determinative; rather, the court simply weighs the totality of the circumstances. See United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010). Defendant carries the burden of showing that he was in custody, and therefore, that Miranda warnings were necessary. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977); United States v. Peck, 17 F. Supp. 3d 1345, 1353-55 (N.D. Ga. 2014) (discussing the applicability of de la Fuente).

In support of his contention that he was effectively in custody, Mesika points to the following facts:

- at the time of the interviews, Mesika was under federal investigation, the outcome of which could affect Mesika's freedom;

- the agents used a "ruse" and various "tactics" to get Mesika to talk, specifically during the second interview when they did not tell him up front that they were there to serve a subpoena on him;

- the interviews were conducted in a hostile, freedom-inhibiting environment; and

Case 9:19-cr-80030-WPD Document 361-4 Entered on FLSD Docket 03/18/2020 Page 121 of 131

*United States v. Mesika, Not Reported in Fed. Supp. (2015)*

- the questions posed were designed to elicit inculpatory statements.

[Doc. 80 at 4-6]. According to Mesika, these facts would make a reasonable, innocent person believe that he was not free to leave, meaning that Mesika should have been given <u>Miranda</u> warnings.

Analysis of the circumstances presented in this case leads to a conclusion that Mesika has not carried his burden of establishing that he was in custody, for <u>Miranda</u> purposes, during his interviews. The undisputed evidence is that he agreed to be interviewed, and he arrived at both the interviews without the assistance or involvement of law enforcement, knowing that federal agents wanted to speak with him. Although he was not told that he was free to leave, he also was not told that he could not leave. The tone of the interviews was calm, and there is no evidence that either interview became confrontational. There is no evidence that the agents touched Mesika, brandished their weapons, or prevented him from leaving. When, during the second interview, Mesika indicated that he wanted to speak with a lawyer, the questioning ceased. Mesika has presented no evidence of any threats, coercion, or deception on the part of law enforcement. To the extent Mesika implies that there was something improper about the fact that the agents conducted an interview with him that was designed to bolster their case against him, he has presented no law to support that argument. Nor has Mesika shown that the agents were somehow required to serve the subpoena before attempting to interview him. There is simply nothing in the record to show that anything improper occurred or that there was any attempt to intimidate or trick Mesika. In sum, there is no evidence to support Mesika's argument that a reasonable person in his position would have felt that he was subject to a restraint on his freedom of movement akin to a formal arrest. Because Mesika was not in custody when he made the statements to the agents, <u>Miranda</u> warnings were not required. Accordingly, this basis for his Statements Motion is without merit.

### 2. Whether Mesika's Statements Were Voluntary

**\*5** "[A] confession, in order to be admissible, must be free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." Bram v. United States, 168 U.S. 532, 542-43 (1897) (citations omitted). The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement.

See Colorado v. Connelly, 479 U.S. 157, 170 (1986) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986) ("The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.") ). The issue of voluntariness is determined by examining the totality of the circumstances, and the burden is on the Government to establish, by a preponderance of the evidence, that a challenged confession was voluntary. See Lall, 607 F.3d at 1285.

In his post-hearing brief, Mesika makes only a single passing reference to the voluntariness of his statement: "The fact that Mesika was not informed of his <u>Miranda</u> rights or told that he was free to stop the interview at any time also indicates his statement was not voluntarily made with knowledge of the situation facing him." [Doc. 80 at 4]. This argument fails both factually and legally. There is no evidence of any threats, violence, or promises. There is no evidence to indicate that Mesika was held in the conference room, that he was in an intimidating custodial condition, or that he was deprived of his liberty at any point during either interview. Mesika was not handcuffed or restrained during the interviews, and the undisputed evidence is that everyone spoke in calm, non-confrontational tones. There is simply nothing in the record to suggest that Mesika was coerced, threatened, or intimidated into speaking with the agents, or that the agents made any promises to induce him to talk. Moreover, the fact that Mesika requested an attorney during the second interview shows that he had the ability to refuse to answer questions and that he was aware of that right. Based on the totality of the circumstances and the evidence presented at the hearing, I conclude that the Government has carried its burden of showing that both of Mesika's statements to the agents were voluntary. Therefore, this second basis for the Statements Motion also is without merit.

For these reasons, I recommend that the Statements Motion be DENIED in its entirety.

### WARRANTS MOTION

### I. BACKGROUND

#### A. The Business Location Warrants
On January 24, 2014, federal law enforcement officers presented Gerrilyn Brill, a United States Magistrate Judge

*United States v. Mesika, Not Reported in Fed. Supp. (2019)*

for the Northern District of Georgia, with an affidavit and application for a series of search warrants authorizing the search of four business properties associated with Mesika (the "Business Locations"). [4] [Doc. 84-5 ("Kriplean Aff.")] ¶ 2].

The affiant was Brian Kriplean, the Special Agent who had conducted the October 4, 2013 interview with Mesika. In his affidavit, Special Agent Kriplean averred that there was probable cause to believe that Active Sports Supplements, LLC ("Active Sports"), one of the occupants of the four Business Locations, was "engaged in the wholesale distribution and manufacturing of purported dietary supplement products that are misbranded and adulterated foods and/or drugs, some of which contain anabolic steroids." [Kriplean Aff. ¶ 3]. Special Agent Kriplean explained in his affidavit that the FDA is the federal agency responsible for protecting the health and safety of the American public by enforcing the federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-395 ("**FDCA**"). [Id. ¶ 9]. He also explained that pursuant to the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. ("CSA"), certain substance classified as anabolic steroids are Schedule III controlled substances. [Id. ¶¶ 26-27].

**\*6** According to Special Agent Kriplean, in June 2012, the FDA-OCI began an investigation into the distribution of misbranded and adulterated dietary supplements suspected to contain anabolic steroids and other drugs not considered to be dietary ingredients. [Kriplean Aff. ¶ 29]. The investigation identified a network of individuals and businesses involved in nationwide manufacturing and distribution of certain dietary supplements marketed by the dietary supplement industry as "pro-hormone supplements" intended to increase muscle mass and strength. [Id. ¶ 30]. Two of the businesses identified were Active Sports and Adrenaline Nutrition Supplements, LLC ("ANS") (collectively "the Subject Businesses"); the Subject Businesses were incorporated by Mesika and Houser. [Id. ¶¶ 31-33]. In the affidavit, Special Agent Kriplean stated that the Subject Businesses, Mesika, and Houser, were "believed to be using [the four Business Locations] to illegally manufacture, warehouse, distribute, and sell" dietary supplements that contained non-dietary ingredients and/or controlled substances. [Id. ¶ 33-34].

Special Agent Kriplean averred that during the investigation, law enforcement also identified two companies owned by a man named Joe De Melo—Rezultz Distribution, LLC ("Rezultz") and NutriPac Manufacturing, LLC ("NutriPac")—that were distributing some dietary supplements, including

pro-hormone supplements, that ANS had manufactured. [Kriplean Aff. ¶¶ 42-46]. From July 2012 to May 2013, law enforcement made three undercover purchases from Rezultz and sent the products to the FDA's Forensic Chemistry Center for analysis. The testing revealed that "[m]any of the products were found to contain non dietary ingredients including anabolic steroids" that were illegal for Rezultz to distribute and were illegal for ANS to manufacture. [Id. ¶ 47]. In September 2013, several products were seized from Rezultz during the execution of a federal search warrant, including products bearing the same name as products that NutriPac had purchased from ANS. [Id. ¶ 48]. Several of those products also tested positive for anabolic steroids. [Id. ¶ 49]. During the course of the investigation, financial records revealed that NutriPac had issued checks to the Subject Businesses in amounts in excess of $200,000 during a five-month period between November 2012 and April 2013. [Id. ¶ 54].

In his affidavit, Special Agent Kriplean referred to his October 2013 interview with Mesika during which Mesika allegedly advised that his company "did not manufacture dietary supplements but was in the process of acquiring a FDA registered and GMP certified facility to commence manufacturing." [Kriplean Aff. ¶ 57]. He then proceeded to provide additional facts related to the connection between the Subject Businesses and each of the four Business Locations that he was requesting be searched, facts showing the relationship between the Subject Businesses and De Melo's businesses, and evidence that the Subject Businesses were actively engaged in improperly manufacturing dietary supplements. [Id. ¶¶ 58-88]. This evidence included: checks issued by Active Sports for rent, utilities, and insurance payments at the four Business Locations; checks issued by Active Sports for large pieces of manufacturing equipment; a purchase order purportedly showing a link between a North Carolina man diagnosed with liver toxicity and a product purchased from ANS; items recovered from the dumpster behind one of the Business Locations that were consistent with the manufacture of dietary supplements; and the results of surveillance connecting the Subject Businesses, Mesika, and Houser to the four Business Locations and showing that they were engaged in the manufacture of dietary supplements. [Id. ¶¶ 61-88].

Judge Brill witnessed the applications and signed the warrants (the "Business Location Warrants"), authorizing law enforcement to search the four Business Locations for "evidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331 [relating to

Case 9:19-cr-80030-WPD Document 361-4 Entered on FLSD Docket 03/18/2020 Page 123 of 131

*United States v. Mesika, Not Reported in Fed. Supp. (2019)*

prohibited acts with respect to adulterated or misbranded food or drugs], 21 U.S.C. § 841(a)(1) [making it a crime to manufacture, distribute, dispense, and possess controlled substances], and 18 U.S.C. § 1341 and 1343 [prohibiting mail and wire fraud], related to purported dietary supplements." [Attachment B to Docs. 84-1 (Subject Location A), 84-2 (Subject Location B), 84-3 (Subject Location C), 84-4 (Subject Location D) ]. Those items included, among other things: misbranded and/or adulterated foods or drugs; raw materials used to manufacture misbranded and/or adulterated food or drugs; labels and advertisements pertaining to misbranded and/or adulterated food or drugs; paraphernalia for packaging, weighing, or distributing misbranded and/or adulterated food or drugs; and equipment used to manufacture misbranded and/or adulterated food or drugs. [Id.]. The Business Location Warrants also authorized the seizure of other, more general, information related to the operation of the Subject Businesses, such as computers and business records "pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs." [Id.].

### B. The Residence Warrant

**\*7** Two years later, on June 21, 2016, Mesika and Houser were indicted, as described above. [Doc. 1]. Thereafter, Mesika was arrested, and he had his initial appearance in this Court on July 1, 2016 before United States Magistrate Judge Janet King. [Doc. 11]. That same day, Special Agent Kriplean returned to federal court and presented Judge King with an affidavit and application for a warrant authorizing the search of Mesika's residence located at 8241 Nesbit Ferry Road, in Sandy Springs, Georgia. [Doc. 63-1 ("Second Kriplean Aff.") ¶ 2].

In his affidavit, Special Agent Kriplean averred that he was part of the group sent to execute the arrest warrant on June 30, 2016 at Mesika's residence. [Second Kriplean Aff. ¶ 11]. When they arrived, the agents received consent from an occupant of the home to search for Mesika. [Id.]. According to the affidavit in support of the application for the warrant, while searching for Mesika, Special Agent Kriplean observed several items "in plain view inside a closet within the attached garage." [Id.]. Those items included "several international parcels which purported to contain quantities of chemical compounds ... labels for dietary supplement products; and a box which appeared to contain the dietary supplement product called 'Steel Woody.' " [Id.]. According

to Special Agent Kriplean, these items were consistent with other items he had encountered during his investigation. [Id. ¶ 12]. He stated that he was aware from his investigation that: (1) Mesika and Houser had purchased chemical compounds from international suppliers to manufacture misbranded drugs containing anabolic steroids; and (2) "Steel Woody" is a product that had been found to contain an undeclared prescription drug. [Id.]. Special Agent Kriplean stated that based on these facts, he believed that there was probable cause to believe that execution of a warrant at Mesika's home would reveal evidence of violations of federal law, including the introduction into interstate commerce of misbranded and adulterated foods or drugs and distribution of (and conspiracy to distribute) anabolic steroids, a controlled substance. [Id. ¶ 3].

Judge King witnessed the application and signed the warrant, which is hereinafter referred to as the "Residence Warrant." [Doc. 63-2]. The Residence Warrant authorized law enforcement to search Mesika's residence for "evidence, fruits, and instrumentalities of violations of federal law, including 21 U.S.C. § 331(a) [relating to prohibited acts with respect to adulterated or misbranded food or drugs], 21 U.S.C. § 841(a)(1) and (b)(1)(E) [making it a crime to manufacture, distribute, dispense, and possess controlled substances], and 21 U.S.C. § 846 [conspiracy], related to purported dietary supplements." [Attachment B to Doc. 63-2]. Those items included, among other things: any potentially misbranded and/or adulterated foods or drugs; raw materials used to manufacture misbranded and/or adulterated food or drugs; labels and advertisements pertaining to misbranded and/or adulterated food or drugs; equipment used to manufacture misbranded and/or adulterated food or drugs; and paraphernalia for packaging, weighing, or distributing misbranded and/or adulterated food or drugs. [Id.]. The Residence Warrant also authorized the seizure of all business records "pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs." [Id.].

### C. The Computer Warrant

Twelve days after obtaining the Residence Warrant, on July 13, 2016, Special Agent Wesley Cooper of the Internal Revenue Service Criminal Investigations ("IRS-CI") presented United States Magistrate Judge John K. Larkins, III with an application and affidavit seeking a warrant to search and copy the data and contents of three computers that had been seized from Mesika's residence during the execution

United States v. Mesika, Not Reported in Fed. Supp. (2019)

Case 9:19-cr-80030-WPD Document 361-4 Entered on FLSD Docket 03/18/2020 Page 124 of 131

of the Residence Warrant. [Doc. 84-7 ("Cooper Aff.") ]. In the affidavit in support of the request, Special Agent Cooper stated that there was probable cause to believe that the requested search of the computers would reveal evidence of violations of federal law, including the introduction into interstate commerce of misbranded and adulterated foods or drugs as well as distribution of (and conspiracy to distribute) anabolic steroids, a controlled substance. [Id. ¶ 3]. Attached to Special Agent Cooper's affidavit as Exhibit 1 was the affidavit that had been submitted to Judge King in connection with the Residence Warrant. According to Special Agent Cooper, he believed that the computers could have been used by Mesika and Houser (in the course of the business to manufacture and distribute misbranded drugs and drugs containing anabolic steroids) to create, maintain, and transmit business records such as email correspondence, purchase orders, invoices, work orders, and wire transfers. [Id. ¶ 12]. He further averred that businesses and individuals engaged in illegal enterprises and the laundering of illicit proceeds often produce and maintain records of such criminal activity on their computers. [Id. ¶ 13].

**8** Judge Larkins witnessed the application and signed the warrant, hereinafter referred to as the "Computer Warrant." [Doc. 84-6]. The Computer Warrant authorized the search of three specified computers [see Attachment A to Doc. 84-6] for "evidence, fruits, and instrumentalities of violations of federal law, including but not limited to 21 U.S.C. § 331(a) [relating to prohibited acts with respect to adulterated or misbranded food or drugs], 21 U.S.C. § 841(a)(1) and (b)(1)(E) [making it a crime to manufacture, distribute, dispense, and possession controlled substances], and 21 U.S.C. § 846 [conspiracy], related to purported dietary supplements" [Attachment B to Doc. 84-6]. The Computer Warrant stated that those items included "All business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs...." [Id.]. The Computer Warrant then provided additional examples of what types of information could be seized. [Id.].

## II. DISCUSSION

### A. The Business Location Warrants

Defendants argue that the Business Location Warrants were not supported by probable cause [Doc. 46 at 2, 9-13] and were

unconstitutionally overbroad and not particularized [id. at 3, 13-19]. [5] I address these arguments in turn.

### 1. Probable Cause

Defendants contend that the Business Location Warrants were not supported by probable cause because (1) there is no direct link to show that the products seized from Rezultz originated from ANS; (2) although the affidavit states that the products seized from Rezultz tested positive for certain drugs, the affidavit "fails to state whether any amount/quantity of the drugs could be identified, or whether the product just tested positive for the presence of certain drug components"; and (3) there was insufficient information in the affidavit to establish probable cause with respect to each of the four Business Locations. [Doc. 46 at 2, 9-13].

"[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." United States v. Bushay, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing Massachusetts v. Upton, 466 U.S. 727, 728 (1984) ). Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location. See United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). "[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id. (citation omitted).

Issuing judges are to employ a practical, commonsense approach to the probable cause analysis and should avoid hypertechnical review of the legitimacy of search warrants:

> In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the

Case 9:19-cr-80030-WPD Document 361-4 Entered on FLSD Docket 03/18/2020 Page 125 of
131

United States v. Mesika, Not Reported in Fed. Supp. (2015)

issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.

\*9 United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (internal citations and quotations omitted). Reviewing courts accord "great deference" to judicial determinations of probable cause to issue a search warrant. See United States v. Leon, 468 U.S. 897, 926 (1984); United States v. Joseph, 709 F.3d 1082, 1093 (11th Cir. 2013). Applying these standards, it is evident that Judge Brill followed the law, used a commonsense, practical approach, and correctly found that there was probable cause to believe that the requested searches would yield evidence of violations of law.

The Kriplean Affidavit demonstrated that on more than one occasion, law enforcement agents had purchased dietary supplement products that appeared to have been manufactured by ANS and that tested positive for both controlled and non-controlled anabolic steroids. [Doc. 84-5, Kriplean Aff. ¶¶ 42-53]. The affidavit also included facts related to a report of liver toxicity in a patient who had taken a dietary supplement that appeared to have been manufactured by ANS and that tested positive for non-dietary ingredients including dimethazine, testosterone, and methasterone. [Id. ¶¶ 49, 63-64]. And the affidavit contained sufficient facts tying the suspected unlawful activity to all four locations, including facts derived from surveillance, "trash pulls,"

government documents, UPS documents, bank records, and witness interviews. [Id. ¶¶ 46, 52-53, 55-56, 59, 61, 67-72, 74-88].

Taken together, the evidence presented in the Kriplean Affidavit established a "fair probability that contraband or evidence of a crime [would be] found" at all four Business Locations. See United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011). While it was not a certainty that such evidence would be discovered, it was certainly probable that it would, and that is all that the law requires. See Miller, 24 F.3d at 1361.

### 2. Overbroad and Not Particularized

Defendants also argue that the Business Location Warrants were unconstitutionally overbroad and not particularized because: the warrants allowed for the seizure of "all records" and a "whole-sale search and seizure of all the data contained on computers," and they contained no pre-approved search protocol to prevent the seizure and retention of documents not covered by the warrant and to protect that information. [Doc. 46 at 3, 13-19].

The Fourth Amendment provides that "no **Warrants** shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. [6] The **particularity** requirement protects against "the use of general **warrants** as instruments of oppression." Stanford v. Texas, 379 U.S. 476, 482 (1965). "The requirement that **warrants** particularly describe the place to be searched and the things to be seized makes general searches under them impossible." United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000) (citing Stanford, 379 U.S. at 485). A search based on a **warrant** that fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutional. To deter such **warrants** and searches, any evidence so seized must be excluded from the trial of the defendant. See Stone v. Powell, 428 U.S. 465, 492 (1976) ("Evidence obtained by police officers in violation of the Fourth Amendment is excluded at trial in the hope that the frequency of future violations will decrease."). The Eleventh Circuit instructs that the **particularity** requirement "be applied with a practical margin of flexibility, depending on the type of property to be

seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux,* 683 F.2d 1343, 1349 (11th Cir. 1982) (citations omitted).

**\*10** I note initially that in making their overbreadth argument, Defendants ignore the fact that the scope of the things to be seized in the Business Location Warrants is explicitly limited in multiple ways. First, the opening phrase of Attachment B operates as a limitation, authorizing the seizure of "[e]vidence, fruits, and instrumentalities" of violations of the **FDCA** and the CSA as well as mail and wire fraud. [Docs. 84-1 through 84-4 at 4]. Second, the "business records" category about which Defendants primarily complain contains an additional limiting provision:

> 9. All business records and related correspondence, in whatever form, including handwritten and computer-generated, ***pertaining to the illegal purchase, possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs....***

Id. (emphasis added). In making their arguments, Defendants simply do not acknowledge these limitations.

By explicitly limiting the scope of what could be seized to evidence of the crimes under investigation, the Business Location **Warrants** were sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized. See *United States v. Wilson,* No. 4:12-cr-23-RLV-WEJ, 2012 WL 7992597, at \*15 (N.D. Ga. Nov. 28, 2012) (concluding that a search **warrant** was written with sufficient **particularity** because the items listed on the **warrants** were qualified by phrases that emphasized that the items sought were those related to the crime under investigation). Because the things to be seized were limited to only those things connected with the crimes under investigation, there is a sufficient "nexus" that satisfies the practical realities "that enable the searcher to ascertain and identify things authorized to be seized." *United States v. Smith,* 918 F.2d 1501, 1507-08 (11th Cir. 1990) (approving similar language for documents pertaining to narcotics trafficking).

Defendants complain that seventeen computers were seized, but "[s]o long as the computer search is limited to a search for evidence explicitly authorized in the warrant, it is reasonable for the executing officers to open the various types of files located in the computer's hard drive in order to determine whether they contain such evidence." *United States v. Richards,* 659 F.3d 527, 540 (6th Cir. 2011) (citations and internal quotations omitted); see also *United States v. Triplett,* 684 F.3d 500, 505-06 (5th Cir. 2012) ("Although officers should limit exposure to innocent files, for a computer search, in the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders") (citation and internal quotations omitted). Here, having established a nexus between the crimes alleged and the computers, a thorough search of these items was the only practical way to determine whether they contained evidence of the crimes under investigation or any other information responsive to the specific categories of information set forth in the Business Location Warrants.

Defendants' argument that evidence should be suppressed because there was no pre-approved protocol for the computer searches also is without merit. In *United States v. Bradley,* the Eleventh Circuit explicitly rejected this argument, stating, "we reject outright the [defendants'] claim that the searches were unconstitutional because the agents failed to obtain pre-approval from the district court of a search protocol before conducting the searches." 644 F.3d 1213, 1258 n.95 (11th Cir. 2011); see also *United States v. Khanani,* 502 F.3d 1281, 1290-91 (11th Cir. 2007) (rejecting the argument that the lack of a written search protocol required the district court to suppress all evidence agents seized as a result of the search of the defendants' computers); *United States v. Intakanok,* No. CR 114-060, 2014 WL 4825368, at \*8 (S.D. Ga. Sept. 25, 2014) ("It is well-established in the Eleventh Circuit that warrants of this nature need not specify search protocols or methodologies in order to pass constitutional muster."). Here, Defendants have failed to cite any binding case law that would lead me to conclude that the procedures used in this case infringed on Defendants' Fourth Amendment rights.

**\*11** Other courts presented with similar arguments have recognized the practical difficulties inherent in searching computers and have permitted law enforcement to seize computers under similar circumstances. See *United States*

v. Burgess, 576 F.3d 1078, 1094 (10th Cir. 2009) ("it is folly
for a [computer] search warrant to attempt to structure the
mechanics of the search, and a warrant imposing such limits
would unduly restrict legitimate search objectives"); see also
Richards, 659 F.3d at 538 nn.8-9 (collecting cases).

Moreover, the Kriplean Affidavit provided detailed
information concerning the anticipated search and seizure of
computers at the Business Locations. [Doc. 84-5, Kriplean
Aff. ¶¶ 89-93]. Special Agent Kriplean stated facts to show
that there was probable cause to believe that records could
be stored on computer hard drives or other electronic storage
media. [Id. ¶ 90]. He also set forth the need to locate,
and the process for reviewing, forensic computer evidence
establishing how the computers were used, the purpose for
their use, who used them, and when. [Id. ¶ 91]. Special Agent
Kriplean detailed the constraints of thoroughly searching
computers on-site, thus requiring the seizure and/or imaging
of entire computers and/or storage media for later, off-site
review. [Id. ¶ 92]. And he stated that the search techniques
used to locate the evidence described in the Business Location
Warrants could include computer-assisted scans of the entire
medium and might expose many parts of the computer hard
drive to human inspection. [Id. ¶¶ 89-93]. This was sufficient
for Judge Brill to authorize the seizure of the computers.
Defendants have provided no case law holding that the
information in the Kriplean Affidavit was insufficient or that
the Business Location Warrants are somehow improper on the
issue of computers, and therefore I conclude that Judge Brill's
decision to sign the Business Location Warrants was proper.
See generally Wilson, 2012 WL 7992597, at *15 (denying
motion to suppress evidence seized from computers).

**B. The Residence Warrant**

Defendants make several arguments as to why the fruits of the
Residence Warrant should be suppressed. First, they contend
that the Residence Warrant was based on information illegally
obtained via an illegal warrantless search that occurred when
the agents were trying to arrest Mesika. [Doc. 46 at 19-20].
Second, they contend that the Residence Warrant was not
supported by probable cause. [Id. at 4, 20]. Third, they argue
that the Second Kriplean Affidavit failed to describe a nexus
between the places to be searched and the items sought. [Id.
at 4, 21]. Fourth, they contend that the Residence Warrant
was unconstitutionally overbroad and not particularized. [Id.
at 4, 22]. Finally, they argue that law enforcement seized
computers that were outside the scope of the Residence
Warrant. [7] [Id. at 5, 21].

*1. Fruit of the Poisonous Tree—the Look in the Closet*

**\*12** Defendants' lead argument challenging the Residence
Warrant is that it was based on information illegally obtained
because the agent "searched a closet" which amounts to an
illegal warrantless search. According to Defendants, "[o]nce
an agent opens a closet and does not see a human being, he
has no right to remain and rummage through the contents of
the closet." [Doc. 46 at 19-20]. I have previously addressed
this argument when I denied Mesika's request for a Franks
hearing, concluding:

> It is evident that Mesika has failed to make a sufficient
> preliminary showing to warrant a Franks hearing. Mesika
> does not contest that on June 30, 2016, law enforcement
> agents went to his residence to execute an arrest warrant;
> that those agents obtained consent to search the home
> for Mesika; that the items identified in the affidavit were
> actually located in the closet inside the garage; or that the
> agents looked in the closet as part of their lawful efforts to
> execute the arrest warrant. Rather, Mesika contends only
> that the closet door in question was closed. I note that
> Special Agent Kriplean does not state whether the door was
> closed or open, only that in an attempt to execute the arrest
> warrant, he "observed several items in plain view inside
> a closet within the attached garage." (Doc. 63-1 at 6-7).
> Mesika provides no legal authority for the proposition that
> agents conducting a search for a person may not open a
> closet door and look inside or that the plain view doctrine
> does not apply to areas properly searched in connection
> with a consent search for a person in order to execute an
> arrest warrant. I also note that Mesika makes no offer of
> proof, instead relying solely on argument of counsel.

> Mesika has failed to make a "substantial preliminary
> showing" that Special Agent Kriplean made a false
> statement or omission, either intentionally or with reckless
> disregard for the truth. Franks, 438 U.S. at 171-72, 98 S.
> Ct. at 2684-85; United States v. Cross, 928 F.2d 1030,
> 1040 (11th Cir. 1991). Nor has he shown that even if his
> version of the facts is true—i.e., that the closet door was
> closed—that the probable cause determination would be
> affected. Id.

[Doc. 65 at 5-6]. For these same reasons, I find Defendants'
first argument without merit.

Case 9:19-cr-80030-WPD   Document 361-4   Entered on FLSD Docket 03/18/2020   Page 128 of
131
United States v. Mesika, Not Reported in Fed. Supp. (2015)

### 2. Probable Cause

Defendants next argue that the Residence Warrant was not supported by probable cause because Special Agent Kriplean did not state that possession of the prescription drug in Steel Woody is per se illegal. [Doc. 46 at 4, 20]. As with Defendants' arguments regarding probable cause in the Business Location Warrants, Defendants again propose a hypertechnical review of the warrants, which is contrary to the Eleventh Circuit case law.

In his affidavit in support of the Residence Warrant, Special Agent Kriplean stated that during a consent search of Mesika's residence, he observed several items in plain view in an attached garage, including: (1) international parcels addressed to Mesika and/or his business partner, which appeared to contain chemical compounds; (2) labels for dietary supplements; and (3) a box containing the purported dietary supplement "Steel Woody." [Doc. 63-1, Second Kriplean Aff. ¶ 11]. He described these items as consistent with other items obtained during the investigation of Mesika, and noted that agents had previously acquired samples of "Steel Woody" during their investigation, which had been analyzed and found to contain the undeclared active pharmaceutical ingredient sildenafil. [Id. ¶ 12]. Special Agent Kriplean also stated that based on his experience and training, it is common for businesses and individuals engaged in the illegal manufacturing and distribution of adulterated and/or misbranded foods and/or drugs (i.e., the same criminal activity for which Mesika had just been indicted) to hide and maintain computers and records of such crimes in their homes. [Id. ¶ 13]. Taken together, these facts easily satisfy the legal requirements for probable cause.

### 3. Lack of a Nexus

**\*13**  Defendants next argue that the Second Kriplean Affidavit failed to describe a nexus between the places to be searched and the items sought because at the time the warrant was issued, Mesika had not been charged with—and was not suspected of—manufacturing or distributing "Steel Woody." [Doc. 46 at 4, 21]. This argument simply ignores Special Agent Kriplean's statement that his investigation had revealed that certain samples of "Steel Woody" contained an undeclared active pharmaceutical ingredient and that Mesika's possession of "Steel Woody" is consistent with

the type of unlawful conduct under investigation. [Second Kriplean Aff. ¶¶ 12, 13].

### 4. Overbroad and Not Particularized

Defendants next argue that the Residence Warrant was unconstitutionally overbroad and not particularized because it was not limited to the alleged contraband, but rather authorized law enforcement to seize "all business records and related correspondence, in whatever form, including handwritten and computer generated." [Doc. 46 at 4, 22]. Defendants have provided no case law to support their position that law enforcement could not search for documents and other evidence, but somehow should have been limited to "contraband," and I am aware of no such law.

Moreover, the Residence Warrant was not open ended. Rather, it limited the items to be seized to "[e]vidence, fruits, and instrumentalities of violations of federal law, including but not limited to Title 21 U.S.C. § 331(a), 21 U.S.C. § 841(a)(1) and (b)(1)(E), and 21 U.S.C. § 846, related to purported dietary supplements." [Doc. 63-2 at 4]. By explicitly limiting the scope of what could be seized to evidence of the crimes under investigation, the Residence Warrant was sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized. See Wilson, 2012 WL 7992597, at *15; Smith, 918 F.2d 1501, 1507-08.

### 5. Seizure of Evidence Outside the Scope of the Residence Warrant

Finally, Defendants argue that law enforcement seized computers that were outside the scope of the Residence Warrant. According to Defendants, the Residence Warrant authorized the seizure only of records generated by a computer, not the computers themselves. [Doc. 46 at 5, 21]. In making this argument, Defendants again ignore both the wording of the warrant and the law governing search warrants.

The Residence Warrant identified the following category of things that could amount to evidence of violations of the specified federal laws: "[a]ll business records and related correspondence, in whatever form, including handwritten and computer-generated, pertaining to the illegal purchase,

possession, and/or unauthorized distribution of misbranded and/or adulterated foods and/or drugs." [Doc. 63-2 at 4]. The Residence Warrant specifically defined the term 39 "documents" that could be seized as including, among other things, "computer Internet records" and "electronic correspondence." [Id.]. Therefore, the agents' seizure of repositories for such items, including computers, from Mesika's residence during execution of the Residence Warrant was reasonable. See United States v. Patel, 429 Fed.Appx. 885, 888 (11th Cir. 2011) (per curiam) ("[t]he crucial inquiry is always whether the search and seizures were reasonable under all the circumstances") (citation and internal quotations omitted).

**C. The Computer Warrant**

With respect to the Computer Warrant, Defendants argue that: (1) the Computer Warrant was not supported by probable cause; (2) the Cooper Affidavit failed to describe a nexus between the computers and the items sought; (3) the Computer Warrant was unconstitutionally overbroad and not particularized; and (4) the Computer Warrant should have contained, but did not contain, a time-frame limitation.[8] [Doc. 46 at 5, 6, 23-25]. These arguments, like their predecessors, are unavailing.

**\*14** Twelve days after lawfully seizing the three computers from Mesika's residence, agents sought a separate warrant before searching those computers for evidence of criminal activities. In his affidavit, Special Agent Cooper stated that on June 21, 2016, Mesika was indicted for conspiring to distribute controlled substances, distributing controlled substances, introducing misbranded drugs into interstate commerce, and money laundering. [Doc. 84-7, Cooper Aff. ¶ 10]. He stated that based on the investigation to date, he was familiar with the records produced by Mesika in the course of manufacturing and distributing misbranded drugs and anabolic steroids, which included email correspondence, purchase orders, and invoices. [Id. ¶ 12]. Special Agent Cooper averred that based on his training and experience, he was aware that computers are typically used to create, maintain, and transmit those types of records and that people involved in illegal enterprises and the laundering of illicit proceeds commonly produce and maintain records of such criminal activity on their computers. [Id. ¶ 13].

Like the earlier affidavit submitted to Judge Brill in support of the Business Location Warrants, the Cooper Affidavit included an entire section detailing the probable cause to, and

the intended way in which agents would, search for, identify, and ultimately seize electronic evidence. [Cooper Aff. ¶¶ 15-19]. Defendants' characterization of the Cooper Affidavit as overbroad and non-particularized simply is not supported by the facts or the law. It is evident that the initial seizure of the computers from Mesika's residence was within the scope of the Residential Search Warrant, and the separate Computer Warrant properly authorized agents to search the computers for evidence of specific, enumerated crimes.

Defendants also argue that the Computer Warrant was unconstitutionally overbroad and not particularized because it authorized the seizure of all information and records "with no probable cause limitation on which electronic data, computers or files therein could be seized"; no procedures were set to govern the search of the computers; and no reason was given for why an inspection could not be performed on site. [Doc. 46 at 6, 24-25]. I find these arguments unpersuasive for the same reasons stated earlier in this Report and Recommendation. The Computer Warrant did, in fact, contain limitations on the information that could be seized. [Doc. 84-6 at 4]. The U.S. Constitution does not require that warrants of this nature specify search protocols. See supra at 31-32. Finally, the Cooper Affidavit explained why an on-site inspection would not be sufficient. [Cooper Aff. ¶¶ 18-19].

**D. *Leon* Good Faith Exception to the Exclusionary Rule**

Moreover, the Government correctly argues that even if the various warrants at issue in the Warrants Motion were not supported by probable cause (which they were), the good faith exception to the exclusionary rule under United States v. Leon, 468 U.S. 897, 926 (1984), saves the fruit of the warrants from suppression. [Doc. 84 at 32]. Defendants did not file a reply or otherwise respond to this argument.

In Leon, the Supreme Court held that even if a search warrant is ultimately found to be unsupported by probable cause, the Fourth Amendment will not bar admission of evidence obtained by law enforcement officers if the officers were acting in reasonable reliance upon the search warrant. See United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing Leon, 468 U.S. at 922). Because the purpose of the exclusionary rule is to deter unlawful police misconduct, the Leon good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an

Case 9:19-cr-80030-WPD   Document 361-4   Entered on FLSD Docket 03/18/2020   Page 130 of
131
United States v. Mesika, Not Reported in Fed. Supp. (2018)

objectively reasonable belief in the existence of probable cause." Leon, 468 U.S. at 926. The Eleventh Circuit interpreted Leon as follows:

> The Leon good faith exception applies in all but four limited sets of circumstances [citation omitted]. The four sets of circumstances are as follows: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S. Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

**\*15** Martin, 297 F.3d at 1313 (internal quotation marks omitted). Here, Defendants did not file a reply or otherwise argue any of the exceptions apply. Having reviewed the entire record, all the arguments presented, and the relevant case law, I can see no basis for finding that any of the four circumstances articulated about are applicable here. Thus, if the warrants lacked the requisite probable cause, Leon would apply and prevent application of the exclusionary rule.

For all the reasons discussed herein, I recommend that the Warrants Motion be DENIED in its entirety.

## CONCLUSION

I **RECOMMEND** that Mesika's Statements Motion, as amended, [Docs. 47, 61], be **DENIED,** and that the Warrants Motion [Docs. 46, 110] also be **DENIED** as to both Kuecher [9] and Mesika.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, the case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 30th day of March, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2124899

## Footnotes

1    Mesika is part owner of at least two supplement-related businesses that share a common physical address of 4301 Pleasantdale Road in Atlanta, Georgia—Active Sports Supplements, LLC and Adrenaline Nutrition Supplements, LLC. [Tr. at 8; Doc. 84-5 ¶¶ 31-32]. Throughout the evidentiary hearing on the Statements Motion, the lawyers and witnesses also referred to those business entities as "Active Sports Nutrition" [Tr. at 8, 21, 23, 61, 64], "Nutritional Adrenaline Supplements" [id. at 63], "Applied Nutrition Supplements" [id. at 47], "Adrenaline Sports Nutrition" [id. at 9, 21, 39, 52, 63], and "ANS" [id. at 21, 47]. It is not clear from the record whether these are different entities or other names for Mesika's two businesses. It appears to me, however, that the distinction between and among the businesses is not important for purposes of the Statements Motion. For that reason, I have not distinguished among the businesses in the Statements Motion

portion of this Report and Recommendation. If there is an important distinction that I have missed, the parties
may raise that issue in any objections they may file.

2    The subpoena was not introduced into evidence. It is unclear from the record which of Mesika's businesses
     it was directed to; the testimony is contradictory on this point. [Compare Tr. at 9 (Q: "And so what was the
     purpose of your visit to Adrenaline Sports Nutrition on October 4, 2013?" A: "We had a subpoena issued
     from the Western District of Tennessee for records for the company.") with Tr. at 23 ("It was for Active Sports
     Supplements.") ]. Again, it does not appear that there is an issue with respect to which particular company
     the Government was seeking to serve with the subpoena; neither party disputed that the subpoena was
     addressed to one of Mesika's companies. [Id. at 24].

3    For example, Mesika originally complained that he was questioned after he asked for a lawyer [Doc. 47 at
     8-10], but in his post-hearing brief, he appears to have abandoned that argument [Doc. 80].

4    Three of the Business Locations are in Norcross, Georgia and one is in Atlanta, Georgia: 4301 Pleasantdale
     Road, Suite I, Atlanta, Georgia (Subject Location A); 6080 McDonough Drive, Suite D, Norcross, Georgia
     (Subject Location B); 1755 Wilwat Drive, Suite E, Norcross, Georgia (Subject Location C); and 6250-A
     McDonough Drive, Norcross, Georgia (Subject Location D). [Kriplean Aff. ¶ 2].

5    Defendants also contend that the Kriplean Affidavit contained stale information, but they make no specific
     argument with respect to staleness. [Doc. 46 at 3, 13]. In the absence of any argument directing the Court to
     any particular evidence or legal authority, I find this argument lacking in merit.

6    Thus, the Fourth Amendment requires that a warrant particularly describe both (1) the place to be searched
     and (2) the persons or things to be seized. See United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000).
     Here, Defendants argue that the Business Location Warrants were not sufficiently particular with respect to
     the **_things to be seized_**; they do not make that argument with respect to the **_place to be searched_**.

7    Defendants also argue that the Second Kriplean Affidavit and the subsequent Cooper Affidavit contained
     stale information because Mesika had already been indicted at the time those affidavits were signed. [Doc.
     46 at 4, 6, 21, 23]. Defendants provide no legal authority for the proposition that after a defendant is indicted,
     law enforcement cannot continue to investigate suspected criminal activity or obtain search warrants in
     furtherance of such investigations. In the absence of any such legal authority, I find this argument meritless.

8    Defendants also argue that the evidence used to obtain the Computer Warrant was the fruit of the poisonous
     tree because the Residence Warrant—through which law enforcement seized the computers—was obtained
     through evidence obtained illegally, i.e., the officers looking in the closet without a warrant; and the computers
     were outside the scope of the Residence Warrant. [Doc. 46 at 22-23]. For the reasons stated previously in
     this Report and Recommendation, I conclude that there was nothing improper about the officers looking in
     the closet during the consent search of Mesika's house, and the computers were not outside the scope of
     the Residence Warrant.

9    Additionally, Kuecher has failed to show that she had a reasonable expectation of privacy in any the locations
     identified in the Business Location Warrants, in Mesika's residence, or in the computers. I allowed Kuecher
     to adopt Mesika's Warrants Motion. [Doc. 109]. Thereafter, I gave her the opportunity to establish standing.
     [Doc. 120 ("If Kuecher contends that she has standing to challenge one or more of the warrants at issue in
     the Warrants Motion, Kuecher must make a showing, in writing, that she has standing to do so, no later than
     the close of business on March 26, 2018.") ]. Kuecher failed to accept my invitation to make such a showing.
     She has failed to demonstrate that she had a legitimate expectation of privacy in any of places searched.
     Accordingly, the Warrants Motion should be denied as to her for this additional reason.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.